# EXHIBIT C

Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
2           FORT LAUDERDALE DIVISION
3           Judge RAAG SINGHAL
            CASE NO: 22-cv-61477-AHS
4

5

6   DEVIN GRANDIS, and ADVANCED POWER TECHNOLOGIES, LLC,

7

8               Plaintiffs,
    VS.

9

10  BGIS GLOBAL INTEGRATED SOLUTIONS US LLC, and BIFM
    JERSEY TOPCO LIMITED,

11

12              Defendants.
    _____/

13

14

15

                    Regus
16                  501 East Las Olas Boulevard
                    Suite 300
17                  Fort Lauderdale, FL 33301
                    September 1, 2023
18                  9:01 A.M. - 1:29 P.M.

19

20        VIDEOTAPED DEPOSITION OF DEVIN GRANDIS

21

22      Taken before MARIA FERNANDEZ, RPR, FPR-C
23      and Notary Public for the State of Florida at
24      Large, pursuant to Notice of Deposition filed
25      in the above cause.

Page 2

```
 1   APPEARANCES:
 2   On behalf of Plaintiffs:
 3   BENNETT AIELLO KREINES
     3471 Main Highway, Suite 206
 4   Coconut Grove, FL 33133
     BY:   PAUL AIELLO, ESQ.
 5         paiello@bennettaiello.com
 6
 7   On behalf of Defendants:
 8   HAHN LOESER & PARKS, LLP
     200 Public Square, Suite 2800
 9   Cleveland, OH 44114
     BY:   MICHAEL B. PASCOE, ESQ.
10         mpascoe@hanlaw.com
11
12
13   Also Present:
14   Paul Smith, Videographer
     Veritext Legal Solutions
15
16         REPORTED BY:
17         Maria Fernandez, RPR, FPR-C
           Veritext Legal Solutions
18         2 South Biscayne Boulevard, Suite 2250
           Miami, FL 33131
19
20
21
22
23
24
25
```

1                    I N D E X

2

3   Devin Grandis                    Page

4   Direct  By Mr. Pascoe              5

    Cross   By Mr. Aiello            152

5

6

7           EXHIBITS MARKED FOR IDENTIFICATION

8

9   Exhibit 1  12/21/21 Letter       45

10  Exhibit 2  Stock Option          54

               Agreement

11

    Exhibit 3  APT Handbook          73

12

    Exhibit 4  Answers to First set  89

13             of Interrogatories

14  Exhibit 5  3/7/22 Letter         98

15  Exhibit 6  Workplace            109

               Investigation

16

    Exhibit 7  Various Documents    135

17

18

19

20

21

22

23

24

25

                                              Page 4

1           THE VIDEOGRAPHER:  Good morning.  We're

2     going on record at 9:01 a.m. on September 1,

3     2023.

4           Please note the microphones are sensitive

5     and may pick up whispering and private

6     conversations.  Please mute your phones at this

7     time.

8           Audio and video recording will continue to

9     take place unless all parties agree to go off the

10    record.

11          This is Media Unit 1 of the video-recorded

12    deposition of Devin Grandis taken in the matter

13    of Devin Grandis, et al., versus BGIS Global

14    Integrated Solutions US LLC, et al.

15          The location of the deposition is 501 East

16    Las Olas Boulevard, Fort Lauderdale, Florida.

17          My name is Paul Smith, representing the firm

18    of Veritext.  I'm the videographer.  And the

19    court reporter is Maria Fernandez, from the firm

20    of Veritext.

21          Counsel and all present will now state their

22    appearance and affiliations for the record,

23    beginning with the noticing attorney.

24          MR. PASCOE:  Mike Pascoe of Hahn Loeser

25    Parks for the defendant, BGIS.

1          MR. AIELLO:  Paul Aiello, Bennett Aiello &

2      Kreines for the plaintiff, Devin Grandis.

3          THE VIDEOGRAPHER:  Would the court reporter

4      please swear in the witness.

5  Thereupon:

6                    DEVIN GRANDIS,

7      A witness named in the notice heretofore filed,

8  being of lawful age and having been first duly

9  sworn, testified on his oath as follows:

10         THE WITNESS:  I do.

11                 DIRECT EXAMINATION

12  BY MR. PASCOE:

13     Q    Mr. Grandis, before we began I promised your

14  counsel that we would all note for the record that

15  it's quite warm in here.

16     A    Okay.

17     Q    My name is Mike Pascoe.  I'm counsel for

18  BGIS.  We met briefly off the record.  We're here

19  today for your deposition pursuant to notice.

20         Let me ask you, sir, have you ever been

21  deposed before?

22     A    I have.

23     Q    How many times?

24     A    A few.

25     Q    Okay.  How many is a few?

```
                                                    Page 6

  1        A     Three-ish.

  2        Q     Okay.  What were the three-ish previous

  3   times you were deposed?

  4        A     I don't recall specifically but various --

  5   various times I was asked to depose for lawsuits.

  6        Q     Is your testimony today that you don't --

  7   you don't remember what the deposition in the lawsuits

  8   were?

  9        A     That's correct.

 10        Q     Okay.  Is it -- is it a common occurrence

 11   for you to appear to testify under oath?

 12        A     No.

 13        Q     Okay.  But not sufficiently uncommon to make

 14   an impression on you?

 15              MR. AIELLO:  Objection to the form of the

 16        question.

 17   BY MR. PASCOE:

 18        Q     Is that right?

 19        A     Repeat the question, please.

 20        Q     It's surprising to me, Mr. Grandis.  I've

 21   been doing this for 17 years and I've never in my

 22   career have seen nor heard a witness being unable to

 23   recall depositions and what they were about.  And so

 24   I'm probing as to why the depositions didn't make an

 25   impact on your memory.
```

1         And so I guess the follow-up question to you

2    don't remember was:  Is it a sufficiently common

3    occurrence that appearing to testify under oath would

4    not make an impression on you?

5              MR. AIELLO:  Objection -- excuse me.

6         Objection to the statement that preceded the

7         question.  Objection, once again, to the form of

8         the question.

9    BY MR. PASCOE:

10        Q    Go ahead.

11        A    No.

12        Q    Okay.  So can you tell me anything about the

13   previous three times you were deposed?

14        A    Not that I can recall.

15             (Interruption)

16             MR. AIELLO:  We're getting a knock on the

17        door.

18             MR. PASCOE:  I know.  She has some exhibits,

19        some copies.

20             Let's just go off the record, not the video,

21        just the record for a second.

22             (Brief recess taken.)

23             MR. PASCOE:  All right.  Let's go back on

24        the record.

25

Page 8

1   BY MR. PASCOE:

2       Q    Well, Mr. Grandis, since you don't remember

3   them I'll go over some ground rules for the

4   deposition.  It's an oral process.  I'll ask

5   questions, you'll answer.  The court reporter will

6   record your answers.

7            It's important that when I ask a question

8   you let me finish so we can get a clear record.  And

9   if I ever interrupt you or speak over your answer,

10  please let me know.  That's not my intention.  I'd

11  like to hear the whole answer.

12           If at any point I ask you a question that

13  you don't understand, please ask me to rephrase it,

14  okay?

15      A    Yes.

16      Q    And if you answer a question, I'm going to

17  presume that you understood it.  Is that fair?

18      A    Yes.

19      Q    Is there any reason today that you can't

20  testify truthfully and competently?

21      A    No.

22      Q    Are you under the influence of any drugs or

23  alcohol, or suffering from any mental defect that

24  would impair your ability to understand my questions

25  and answer them truthfully and competently today?

```
                                          Page 9

 1        A     No.

 2        Q     Okay.  What did you do today, sir, to

 3   prepare for your deposition?

 4        A     Nothing particularly.

 5        Q     From the time your deposition was noticed

 6   for today, other than your counsel, did you have

 7   conversations with anyone regarding your deposition?

 8        A     Just that I was getting one, other than my

 9   wife.

10        Q     What do you mean, other than your wife?

11        A     Other than my wife who I discuss everything

12   in life with, there are people who I just told that I

13   was going to be deposed.

14        Q     Okay.  So do I understand correctly that

15   your testimony is that other than telling your wife

16   that you were being deposed, you had no other

17   conversation with anyone, outside of your counsel,

18   regarding your deposition; is that right?

19        A     Correct.

20        Q     My understanding is that you and Mr. Neiser

21   work out together; is that right?

22        A     Not in the last -- almost a year.

23        Q     Have you spoken with Mr. Neiser in the past

24   year?

25        A     Yes.
```

Page 10

```
 1        Q    At any time when you spoke to Mr. Neiser in
 2   the past year did you discuss this case?
 3        A    Only that there was a lawsuit.
 4        Q    So what do you mean when you say only that
 5   there was a lawsuit?
 6        A    He understood that I had a suit against
 7   BGIS.
 8        Q    Okay.  So recount the conversation for me.
 9        A    "I'm suing BGIS."
10        Q    And what did Mr. Neiser say?
11        A    I can't give you verbatim of what he said
12   when I talked about it.
13        Q    I'm not asking you for verbatim,
14   Mr. Grandis.  Just the sum and substance of what the
15   conversation was about.
16        A    The substance is, he understood.
17        Q    What do you mean "he understood"?
18        A    He understood why I was suing BGIS.
19        Q    What did he say about what he understood?
20        A    I don't recall the words that he said.  He
21   just understood that because BGIS didn't want to pay
22   me my severance, that I had every right to sue BGIS.
23        Q    Mr. Neiser said that to you?
24        A    He understood why I was doing it, yes.
25        Q    Well, I guess what I'm trying to delineate,
```

Page 11

1    Mr. Grandis, is:  Was that Mr. Neiser's sentiment or

2    is that your sentiment?

3        A     My impression was he understood why I was

4    doing it.

5        Q     What gave you that impression?

6        A     That he, I believe, thought it was unfair as

7    well.

8        Q     And what led you to believe that he thought

9    it was unfair?

10       A     The reason for my termination.

11       Q     No, no.  I'm sorry if the question wasn't

12   clear.

13             The question is:  What led you to believe

14   that Mr. Neiser thought it was unfair?

15       A     My relationship with Paul for the last 12

16   years.

17       Q     Anything else?

18       A     The reason I was terminated was because of a

19   joke, or a couple of jokes, that I had mentioned which

20   was quite the norm for our culture and Paul thought

21   that it was not a good reason to terminate me.

22       Q     Did Mr. Neiser say that to you?

23       A     In similar words.

24       Q     And your testimony today, if I understood

25   what you just said, is that you believe you were

Page 12

1   terminated for a joke or a couple of jokes; is that

2   right?

3        A    Yes.

4        Q    Have you had any discussions with Annie --

5   is it Lasagna?

6        A    Lasaga.

7        Q    Lasaga.

8             Have you had any discussions with Annie

9   Lasaga regarding the lawsuit?

10        A    Yes.

11        Q    And approximately how many?

12        A    Just a couple.

13        Q    Tell me the sum and substance of those

14   conversations, generally.

15        A    Generally that I was suing BGIS because of

16   them trying to get away with not paying me my

17   severance based on my termination.

18        Q    And what did Ms. Lasaga say?

19        A    She thought it was incorrect that they would

20   not pay me my severance.

21        Q    Did you and Ms. Lasaga have any other

22   discussions regarding this lawsuit other than her

23   general statement that she thought it was incorrect

24   that they wouldn't pay you -- that BGIS would not pay

25   you your severance?

Page 13

1       A    I had some inventory questions, which is

2    unrelated to this lawsuit.

3       Q    Anything else?

4       A    Not that I recall.

5       Q    Have you had any discussions with Nikki

6    Sakoff regarding this lawsuit?

7       A    No.

8       Q    What about Hal Sakoff?

9       A    No.

10      Q    Chris Palmieri, have you had any

11   conversations with him regarding the lawsuit?

12      A    Yes.

13      Q    Tell me about your conversations with Chris

14   Palmieri regarding the lawsuit.

15      A    That, again, I was terminated and that

16   they -- BGIS refused to give me my severance package.

17      Q    What did Mr. Palmieri say?

18      A    He agreed with me.

19      Q    Your testimony today is that Mr. Palmieri

20   agreed that it was improper to terminate you, and you

21   should have been -- you should have received your

22   severance package; is that right?

23      A    Mr. Palmieri had indicated to me that he

24   thought that I should not have been -- well, specific

25   words, no.  But did he understand that I was

Page 14

1    terminated not for the correct reasons, yes.

2        Q    And what led you to form the impression that

3    Mr. Palmieri believed that you were terminated not for

4    the correct reasons?

5        A    Well, as he is a partner in one of the

6    other -- in an unrelated company, he was let go as

7    well because he wouldn't sign documents that would put

8    him against me.

9             MR. AIELLO:  Please answer his question.

10            THE WITNESS:  Your question, please.

11   BY MR. PASCOE:

12       Q    No, you answered it.  That's perfectly fine.

13   Thank you, sir.

14            So your testimony today is that Mr. Palmieri

15   told you that he was terminated from BGIS because he

16   wouldn't sign documents against you.  Is that -- did I

17   understand that correctly?

18       A    Somewhat, yeah.

19       Q    What do you mean "somewhat"?

20       A    Well, you're using very specific words and I

21   don't recall the specific words he used.  Just that he

22   was let go from the company.

23       Q    Yes, sir.  So when I -- when I use specific

24   words I'm attempting to repeat the words that you said

25   to me that I wrote down to make sure that I wrote them

Page 15

```
 1   down correctly and I understand them correctly.
 2            And so your words were:  That he was a
 3   partner in an unrelated company and he was terminated
 4   because he wouldn't sign documents against you.
 5            Those are your words.  And so in response to
 6   that, when I asked if that was your position, you said
 7   somewhat.
 8            And so, I guess, is it or is it not your
 9   position that Mr. Palmieri informed you -- not
10   specific words, but the substance -- that he was
11   terminated from BGIS because he wouldn't sign
12   documents against you?
13            MR. AIELLO:  Excuse me.
14            Objection to form.  Asked and answered.
15   BY MR. PASCOE:
16       Q    You can answer, Mr. Grandis.
17       A    He had to sign documents.  Those documents
18   would have put him against me.  He did not sign
19   documents specifically that said, you're putting me --
20   you're putting yourself against Devin.  The result
21   would have been that.
22       Q    Okay.  Any other conversations with
23   Mr. Palmieri regarding the lawsuit?
24       A    Just ongoing, that it's progressing.
25       Q    I don't know what you mean by "just ongoing,
```

Page 16

1    that it's progressing."

2         A    Well, this case is now gone past a year, as

3    he is a partner of mine, and his life is affected as

4    well.  I keep him abreast of where we are in the

5    lawsuit.

6         Q    And in your most recent discussion with

7    Mr. Palmieri, where did you tell him you were in the

8    lawsuit?

9         A    That I was going to be deposed.

10        Q    Wait a minute.  Mr. Grandis, I thought you

11   had previously testified that the only person you

12   talked to about your deposition was your wife, who you

13   share everything with.  And the only thing that you

14   had said to her was that you were being deposed.  Are

15   you amending your previous testimony?

16        A    I think you misunderstood my testimony.  I

17   had said I spoke to several people about the fact that

18   I was getting deposed.  And I tell my wife about

19   everything, inclusive of the fact that she knows I'm

20   getting deposed.

21        Q    Okay.  So then, because I misunderstood you,

22   other than your wife and Mr. Palmieri and counsel, who

23   else have you discussed your deposition with?

24             MR. AIELLO:  I'm going to object to the form

25        of the question.

1           THE WITNESS:  I had told you that I'd spoken

2       to Paul Neiser and I had spoken to Annie Lasaga.

3   BY MR. PASCOE:

4       Q    Anyone else?

5       A    Oh, I've probably told many people I'm

6   getting deposed.

7       Q    Anyone else that you can recall today?

8       A    My friends, family.

9       Q    Okay.  So tell me their names.

10      A    Jay Lazar.  Tom Siegel.  Bruce Siegel.

11  Peter Hill.  Daniel Stone.  I'm sure there's quite a

12  few others.

13      Q    What were your conversations with Mr. Lazar

14  about your deposition?

15      A    That I was pursuing my lawsuit and I was

16  going to be getting deposed today.

17      Q    Anything else?

18      A    Not specifically.

19      Q    What were your conversations with Mr. Siegel

20  regarding your deposition?

21      A    All of them would be similar.

22      Q    What were your conversations with Mr. Siegel

23  regarding your deposition?

24           MR. AIELLO:  Asked and answered.

25           THE WITNESS:  That I was going to be getting

Page 18

```
 1      deposed.

 2   BY MR. PASCOE:

 3      Q    Did you have any substantive conversations

 4   other than saying you're getting deposed with Bruce

 5   Hill, Peter Hill or Daniel Stone regarding your

 6   deposition?

 7      A    Yes.

 8      Q    Okay.  Tell me about the substantive

 9   conversations with Bruce Hill regarding your

10   deposition?

11      A    Well, when my friends were asking me what

12   brought the lawsuit, I told them that BGIS refused to

13   pay me my severance and basically took the company

14   from me.

15      Q    What do you mean "took the company from

16   you"?

17      A    Well, they were able to purchase the company

18   for next to nothing, and I think from the very

19   beginning planned on letting me go.

20      Q    What was the value paid to you by BGIS for

21   substantially all the assets of APT?

22      A    I didn't get anything.

23      Q    The question was:  What was the value that

24   was paid for the transaction for substantially all of

25   the assets of APT?
```

Page 19

1      A      They paid 4.7, $4.8 million.

2      Q      And your testimony today is that that's

3    substantially nothing?

4      A      Well, the receivables that they bought

5    covered it, plus.

6      Q      So your testimony today is that the -- and

7    when you say the receivables they bought, I'm sorry,

8    let me back up and ask a foundational question.

9             When you say the receivables that they

10   bought, were they all good receivables?

11     A      Yes.

12     Q      And were they all current, meaning less than

13   30 days?

14     A      Not all customers had 30-day terms.

15     Q      That's a fair point.

16            Were they all current within whatever the

17   payment terms were for each of the customers?

18     A      Some probably not.

19     Q      Okay.  What percentage of the receivables

20   were current versus not?

21     A      Do you have an accounts receivable schedule

22   that I could look at?

23     Q      Mr. Grandis, if the answer is "I don't

24   know," just tell me you don't know.

25     A      I don't know.

Page 20

1       Q    Okay.  Is it correct that APT had been

2  through bankruptcy proceedings prior to the

3  acquisition?

4       A    A reorganization, yes.

5       Q    Okay.  And is it also correct that APT's

6  EBITDA for the four years leading up to the

7  transaction was essentially zero?

8       A    No.

9       Q    Did you and Mr. Marquis -- Mark Marquis of

10  BGIS -- exchange e-mails to the extent that the EBITDA

11  of APT for the four years leading up to the

12  transaction was essentially zero?

13      A    No.

14      Q    And let me make sure that I'm clear when you

15  give me the answer to that question.

16           The question is not do you agree with it.

17  The question is simply whether you and Mr. Marquis

18  exchanged e-mails where Mr. Marquis made a reference

19  to the fact that the EBITDA for APT was essentially

20  zero for the four years leading up to the transaction.

21           MR. AIELLO:  Objection to the form.

22           THE WITNESS:  I don't recall seeing an

23       e-mail like that.

24  BY MR. PASCOE:

25      Q    So then in follow-up to that, Mr. Grandis, I

Page 21

1    received on -- let's see.  I flew down here

2    Wednesday -- on Wednesday afternoon a set of documents

3    that had a number of e-mails, including with

4    Mr. Marquis.  Where did those documents come from?

5         A    Which documents?

6         Q    The ones that were produced two days ago.

7         A    Some of them came from Acorn.

8         Q    What's Acorn?

9         A    They're a company that went into my computer

10   and my phone to find e-mails and text messages that

11   pertain to this case.

12        Q    Okay.  And where did the rest of them come

13   from?

14        A    I think they had almost all of them.  I

15   don't recall which ones they did or didn't have.

16        Q    Okay, but they all would have come from

17   either your phone or your e-mail?

18        A    Correct.

19        Q    Okay.  Going back to the substantive

20   conversations with Bruce Siegel, Peter Hill and Daniel

21   Stone, other than discussing the lawsuit, stating that

22   BGIS took the company from you, any other substantive

23   conversations with those individuals regarding your

24   deposition today?

25        A    They understand that the issues that I have

Page 22

1   with BGIS by my telling them that.  These are very

2   close friends of mine.

3        Q     Okay.  But the question is:  Was there any

4   substantive conversations with them other than what

5   we've already talked about thus far, which is, your

6   statement that BGIS took the company from you and the

7   fact that you're being deposed?

8        A     They understand that I have a working

9   capital issue as well.

10       Q     Okay.  Anything else?

11       A     They understand that after a year and a half

12  BGIS still hasn't transferred all of the vendors and

13  the trucks and trailers into their name as they were

14  supposed to have.

15       Q     Okay.  Anything else?

16       A     That I'm still getting tickets and

17  receivables -- and payables that are being paid late

18  that I have to deal with.

19       Q     Anything else?

20       A     That it took them -- that it took BGIS many

21  months to release the lien on my building after I had

22  already paid BGIS back all of their PPP funds that

23  they had secured with an escrow.

24       Q     Anything else?

25       A     That I thought -- that I thought I was set

Page 23

1    up from the beginning, that BGIS wanted me out.

2         Q    Is that the same or different than the fact

3    that BGIS took the company from you for next to

4    nothing?

5         A    Repeat the question.

6         Q    Sure.  You said you thought that you were

7    set up.  I'm trying to get the sum and substance, the

8    total universe of --

9         A    Right.

10        Q    -- substantive discussions you had with the

11   individuals you mentioned.  And you just said that you

12   thought you were set up.  And I'm asking if that's --

13   substantively that's the same or different than the

14   previous statement that BGIS took the company from you

15   for next to nothing.

16        A    No, that would have been part of a

17   conversation.

18        Q    Okay.

19        A    But not necessary the only part that I had

20   previously answered.

21        Q    Okay.  Anything else?

22        A    Not that I recall that would be substantive.

23        Q    Okay.  Have you had any discussions with

24   Mike Gainsley regarding your deposition?

25        A    Just that I was getting deposed.

Page 24

1      Q     And when was that conversation?

2      A     The beginning part of this week.

3      Q     And how did that conversation come about?

4      A     We were on a phone call together before we

5  were speaking to a customer that he brought to my

6  company.

7      Q     Tell me the sum and substance of the

8  conversation?

9      A     He asked how I was doing.  I said I was

10  doing well.  And he had asked me -- I believe he might

11  be someone I neglected to remember telling you that I

12  had spoken to him in the past that I was suing BGIS,

13  so he asked me how it was going and I told him that I

14  was going to be deposed today.

15     Q     Anything else you can recall about that --

16  sum and substance of that conversation with

17  Mr. Gainsley?

18     A     No, I don't think anything else that would

19  be substantive.

20     Q     Have we now discussed, to the best of your

21  recollection sitting here today, all of the

22  individuals, other than your counsel, who you've had

23  substantive conversations with regarding your

24  deposition today?

25     A     I'm sure there would be some other people

```
                                                   Page 25
 1   that I just don't remember talking about right now.
 2        Q    Yes, sir, but to the best of your
 3   recollection, have we discussed everyone that you had
 4   material conversations with regarding your deposition
 5   today, other than your counsel?
 6             MR. AIELLO:  Objection to the form of the
 7        question.
 8             THE WITNESS:  Oh, former counsel.
 9   BY MR. PASCOE:
10        Q    Okay.  Other than counsel and former
11   counsel, have we now discussed everyone that you had a
12   substantive conversation with regarding your
13   deposition today?
14        A    That I can recall at this moment.
15        Q    Okay.  Sir, I don't want to belabor it too
16   much sir, but I do want to go a little bit through
17   your background.
18             Tell me about your educational history,
19   starting with high school.
20        A    I went to Kew Forest High School and
21   graduated.  And then I went to --
22        Q    What year, sir?
23        A    '77.  '76, 77.
24        Q    Okay.
25        A    Then I went to Pace University for a short
```

Page 26

1   period of time.  I then went to Queens College for a

2   period of time.  I then went to the University of

3   Miami for a semester.

4        Q    Did you obtain any degrees from any of those

5   institutions?

6        A    I did not.

7        Q    Any other formal education that you received

8   other than those three institutions after high school?

9        A    No.

10        Q    Let's briefly go through your job history.

11   Well, I guess let's just start right after high

12   school.

13             When was your first full-time employment

14   after high school?

15        A    With my father.

16        Q    And where was that?

17        A    SG D'Or.

18        Q    SG D'Or?

19        A    D'Or.

20        Q    And what does or what did SG D'Or do?

21        A    We manufactured ladies' fashion accessories.

22        Q    How long did you work at SG D'Or?

23        A    From the time I finished high school until

24   1994.

25        Q    And where did you work next after that?

Page 27

1        A     Advanced Power Technologies.

2        Q     And how did you come to work for Advanced

3    Power Technologies?

4        A     I started the company.

5        Q     And when the company was started in 1994,

6    what did it do?

7        A     It did lighting retrofits.

8        Q     What's a lighting retrofit?

9        A     We convert inefficient T12 lamps to the more

10   efficient, at the time, T8 lamps that used less

11   engine -- that used less energy as well as consumed

12   less -- were more efficient, lumens per watt.

13       Q     And how did you make the transition from

14   ladies' fashion accessories to lighting retrofits?

15       A     Can you be more specific?

16       Q     Yeah.  I know it's a widely broad question.

17   It just strikes me as, obviously, a very different

18   industry.  And I just don't know enough about either

19   of the industries to ask you an intelligent question,

20   and so the general question is:  How was the

21   transition -- or why did you go from fashion to

22   lighting?

23       A     Well, there were certain aspects of fashion

24   that I loved and certain aspects that I didn't.  And

25   there was an opportunity for us to do a retrofit in

Page 28

```
 1   our factory in Boynton Beach and it made a lot of
 2   sense to do that.  Unfortunately with NAFTA kicking in
 3   it forced us to close down the operations.
 4            And when deciding to go into a different
 5   career, we had an opportunity to retrofit, as I said,
 6   my entire facility.  I liked many aspects of that so
 7   my father and I, who had always been partners
 8   together, he wanted to go into a telephone type of
 9   business and asked me if I wanted to do that with him,
10   and I told him maybe we'd be better off to have two
11   different opportunities in case one didn't work out
12   and I said, I think I'm going to try those lights.
13       Q    NAFTA was the piece I was missing.  Thank
14   you.
15            And so you got into this lighting retrofit
16   business as a new venture.  How about APT, I guess,
17   expand from there?
18       A    With my sales.
19       Q    Again, another very poor question on my
20   part.
21            At some point after 1994 did APT expand
22   beyond lighting retrofit services?
23       A    Oh, for sure.
24       Q    Okay.  And what areas did APT expand into?
25       A    We went into service.  We went into
```

Page 29

1    electrical service.  We went into automation,

2    controls.  We went into EV.  We went into --

3         Q    EV, just for the record is -- just for the

4    court reporter -- is electrical vehicles?

5         A    Yes.  Not that we built the vehicles, but we

6    did the infrastructure or started to do the

7    infrastructure for supporting the vehicles.

8         Q    Okay.  I interrupted you just to clarify.  I

9    apologize.  Please continue.

10        A    We ended up going into tenant improvements

11   on the electrical nature.  We did surge suppression.

12   We did sine wave line tracking to clean up power for a

13   bit.  We went into lightning protection for a bit.  We

14   went into converting chlorine pools into -- converting

15   them to sodium bromide or sodium chloride.

16             We went into ATM conformance where we would

17   measure light levels for banks to ensure that the ATM

18   codes and statutes would be upheld by the associated

19   bank.  I think that covers most of it.

20        Q    Okay.  And that was your full-time

21   employment up through the purchase at the end of 2021;

22   is that right?

23        A    That's correct.

24        Q    Did you hold any other full-time employment

25   in that time period between 1994 and 2021 that we

```
                                                    Page 30
 1    haven't discussed?
 2         A    I wouldn't say it was full time.
 3         Q    Okay.
 4         A    So, no.
 5         Q    So I guess then maybe let me broaden it.
 6              Did you hold any other employment between
 7    1994 and 2021 that we haven't discussed?
 8         A    Yes, two companies.
 9         Q    Okay.  And what are the names of the
10    companies?
11         A    Team E-Motion, LLC and Energy &
12    Environmental Design Services.
13         Q    Is that also referred to as EEDS, correct?
14         A    EEDS, yes.
15         Q    Okay.  And what did you do for Team
16    E-Motion?
17         A    I was one of the founders.
18         Q    Who were the other founders?
19         A    Jack Pyros, and Chris Palmieri and EEDS.
20         Q    And who were the founders of EEDS?
21         A    Kathy Grandis.
22         Q    Just Kathy Grandis?
23         A    She was the founder.
24         Q    Okay.  What does Team E-Motion do?
25         A    Team E-Motion was set up to do everything
```

Page 31

1    from fleet electrification, EV installation, anything

2    to do with energy reduction for a company and provide

3    those services on multiple financial models.

4        Q    What does that mean, "multiple financial

5    models"?

6        A    Well, one of the unique areas was to be able

7    to offer a customer a model where they could buy a

8    fleet of vehicles, have the infrastructure installed,

9    maintained, eliminate the need for fleet maintenance,

10   was one of the divisions.  And it could be done as a

11   subscription model, it could be done as a lease model,

12   it could be done as a purchase model.

13       Q    Got it.  Anything else that Team E-Motion

14   does that we haven't discussed?

15       A    It's fairly similar to the areas that --

16            (Interruption)

17            MR. PASCOE:  Let's go off the record for a

18       second, please.

19            THE VIDEOGRAPHER:  Going off record at

20       9:37 a.m.

21            (Recess was taken.)

22            THE VIDEOGRAPHER:  Back on record at

23       9:39 a.m.

24   BY MR. PASCOE:

25       Q    Mr. Grandis, before we went off the record

Page 32

```
 1   we were talking about Team E-Motion and EEDS, and I
 2   believe I asked but didn't get an answer to the
 3   question.
 4            What does EEDS do?
 5       A    Similar things to what Team E-Motion and APT
 6   did.
 7       Q    Anything materially different that EEDS
 8   does?
 9       A    It is a minority company.  So we had, for
10   instance, an opportunity to do work in Miami.
11       Q    Okay.  So it's essentially an MBE or DBE
12   company?
13       A    What is an MBE?  What were the --
14       Q    Minority Business Enterprise or --
15       A    Yes.
16       Q    -- Disadvantaged Business Enterprise?
17       A    Minority.
18       Q    Any other employment other than APT, Team
19   E-Motion, and EEDS between 2000- -- or I'm sorry,
20   between 1994 and 2021?
21       A    For a short period of time, no.  Actually,
22   no.  I'm sorry.  The answer is no.
23       Q    Between 1994 and 2021, did you hold -- go
24   ahead.
25       A    I'm confusing my affiliated companies.  So
```

Page 33

1    Creative Lighting and Sustainable Management Solutions

2    would be two other companies that I had founded.

3        Q    Okay.  What does Creative Lighting do?

4        A    Creative Lighting is a wholesale distributor

5    of lighting and electrical products that was created

6    in order to buy from manufacturers directly.

7        Q    Does it do anything else?

8        A    It buys and sells products.

9        Q    But other than buying and selling products,

10   does it do anything else?

11       A    No, sir.

12       Q    And what does Sustainable Management do?

13       A    Presently it holds an unknown number of

14   trucks under lease that once transferred over to BGIS

15   will close.

16       Q    And have we now discussed all your

17   employment between 1994 and 2021?

18       A    Yes.

19       Q    So let's talk about the transaction with

20   BGIS.  How did that start?

21       A    Well, first time I had met Mark Marquis was

22   at a trade show.

23       Q    Okay.  So you met Mark Marquis at a trade

24   show and then what happened?

25       A    We had coffee, he asked me what I did.  I

Page 34

1   told him.  He said that's very interesting.  Love to

2   talk more.  Next time in Fort Lauderdale is it okay if

3   I call you?  I said, sure.

4        Q    And did that next visit occur?

5        A    It did.

6        Q    What happened then?

7        A    I met him at Shooters and we just talked

8   about my business and he asked me if I would ever

9   consider selling the business.

10       Q    What did you say?

11       A    The only thing not for sale is my wife and

12   my son.

13       Q    Okay.  And what happened after that?

14       A    We had a few -- we had a meeting at my

15   office, an introductory meeting.  I introduced him to

16   my executive team and it progressed from there.

17       Q    And what was the approximate time or maybe

18   just even season and year that that occurred?

19       A    So it would have been somewhere -- I believe

20   I met him the end of August/September, which is when

21   the RFMA, or whichever trade show it was.  So it would

22   be in October, end of September, October that we would

23   have had these discussions.

24       Q    Of 2021?

25       A    That's correct.

Page 35

1        Q     And then what happened next?

2              MR. AIELLO:  I am going to object to the

3        form of the question.

4              THE WITNESS:  Could you be more specific?

5   BY MR. PASCOE:

6        Q     Sure.  So you had a meeting at your office,

7   you introduced him to your executive team, and we know

8   the transaction closed December 23, 2021.

9              So between October 2021 and December of 2021

10  I'm trying to track through in your mind, just a very

11  high level, the timeline of events that led up to the

12  sale of substantially all the assets of APT, so I

13  don't want to ask too narrow of a question but I'm

14  just looking for the timeline of the significant

15  events in your mind.

16       A     All right.

17             MR. AIELLO:  Excuse me.  I object to the

18       question.  You misstated the closing date.

19  BY MR. PASCOE:

20       Q     Okay.  Go ahead, Mr. Grandis.

21       A     End of -- so throughout October we had a few

22  conversations.  At some point in time we agreed to a

23  purchase and they started due diligence, I think

24  middle of November.

25       Q     As part of the discussions, did you have

Page 36

1   conversations with anyone at BGIS regarding your

2   future with the entity after acquisition?

3        A     Predominately with Mark Marquis.

4        Q     Okay.  And tell me about the conversations

5   with Mark Marquis about what you would be doing for

6   the entity after acquisition?

7        A     Well, initially it was going to be to

8   continue to run the company and focus on expanding the

9   business, introducing BGIS to my customers to be able

10  to incorporate additional business as they were

11  desperately looking for self performing opportunities

12  to serve their clients.

13       Q     Did you have discussions with Mr. Marquis

14  about an employment agreement with BGIS?

15       A     Yes.

16       Q     Tell me about those discussions.

17       A     Well, the initial discussion was that I was

18  going to be paid a salary and then get a percentage

19  of -- a percentage commission for all my sales.  And

20  as I thought about that, I actually went back to him

21  and said, You know, I don't think that's going to be a

22  good understanding for BGIS because I may make out

23  like a bandit making a lot of money even if the

24  company is losing money, and I don't ever want

25  somebody at BGIS to think that I was doing this

Page 37

```
 1    strictly for myself, and I certainly don't want to

 2    have the wrong perception from BGIS management.

 3            So I thought that it might be better not to

 4    get a commission and just have a better bonus plan

 5    based on performance and a higher salary.

 6            And Mr. Marquis came back to me and said,

 7    after having discussion with Gord, that number one he

 8    appreciated my unselfishness but also that Gord agreed

 9    100 percent that it would be a better model.

10       Q    Anything else about your discussions

11    regarding your employment agreement with BGIS?

12       A    Yes.  Besides -- the final end result was

13    that he was going to give me, at no charge, 500

14    shares.  That I was going to have a bonus plan that

15    could earn up to 100 percent of my salary.  That I

16    would be given a future bonus plan.  And that I was

17    not going to be reimbursed for my medical insurance or

18    my -- nor would I have a company paid automobile.

19       Q    Any other discussions regarding your

20    employment agreement with BGIS that you can recall?

21       A    Other than what was listed in the final term

22    sheet that I signed off on, and he showed me the

23    projection of what I could be walking into right off

24    the bat with additional equity as a result of those

25    shares.
```

Page 38

1          And as I had told him that I was not getting

2    as much for the company I was hoping for, he had told

3    me that he would put it on the EBITDA side of life, as

4    well as gave me a projection that if we -- being

5    BGIS -- hit the numbers over the next few years, that

6    the shares that he was -- the options that he was

7    giving me at no charge would have a value of

8    substantially more, potentially in excess of a million

9    dollars.

10        Q    Anything else you can recall about your

11   discussions regarding negotiating your employment

12   agreement with BGIS?

13        A    Not that I recall.

14        Q    Did you discuss a length of term for the

15   agreement?

16        A    Three years.

17        Q    Did you discuss termination for cause and

18   not cause?

19        A    We didn't discuss it as part of my

20   employment agreement.  It was in the APA.

21        Q    I'm sorry, I just didn't hear you.  Did you

22   say that you did or did not discuss it?

23        A    I didn't specifically discuss it with Mark

24   Marquis.  It was part of the documents that were

25   finalized as part of the attachments to the term

Page 39

1   sheet.

2       Q    What was your understanding of the things

3   that could lead to your for-cause termination?

4       A    Fraud, embezzlement.  If you have a copy of

5   the term sheet, it was listed there.  I don't recall

6   off the top of my head the specific language.

7       Q    Okay.

8       A    Basically doing dishonest things.

9       Q    Did you understanding that if you engaged in

10  criminal activity you could be terminated for cause?

11      A    Yes.

12      Q    Did you understand that if you engaged in

13  workplace harassment you could be terminated for

14  cause?

15      A    I don't think that was part of the -- for

16  cause.

17      Q    So did you have a belief prior to signing

18  the employment agreement that you could engage in

19  workplace harassment and not be fired for cause?

20          MR. AIELLO:  If I may.  I object to the form

21      of the question.

22          THE WITNESS:  Repeat the question, please.

23  BY MR. PASCOE:

24      Q    Sure.  So was your understanding prior to

25  signing the employment agreement that you could engage

Page 40

1    in workplace harassment and that would not be

2    justification for termination of your employment

3    agreement with cause?

4        A    Well, I wouldn't even have contemplated that

5    because I don't harass.

6        Q    That's not my question, sir.

7             My question is about your understanding of

8    the employment agreement and whether or not you had an

9    understanding that you could engage in harassing

10   conduct in violation of whatever provisions in the

11   state that are under the governance of harassment, and

12   BGIS wouldn't be able to terminate you for cause?

13            MR. AIELLO:  Objection to the form.

14            THE WITNESS:  Again, I didn't have an

15        understanding specific to that for cause.  I know

16        it's an understanding by law that you're not

17        allowed to harass, which being in business for 40

18        years, I didn't do.  So it's something I didn't

19        even think about.

20   BY MR. PASCOE:

21       Q    Okay.  Is your position in this lawsuit that

22   BGIS was not permitted to fire you for cause for

23   harassment?

24       A    That's correct.

25            MR. AIELLO:  Objection to form.

Page 41

```
 1   BY MR. PASCOE:
 2       Q    Okay.  And you understand that harassment is
 3   unlawful; is that right?  Workplace harassment is
 4   unlawful?
 5            MR. AIELLO:  Objection to form.
 6            THE WITNESS:  Yes.
 7   BY MR. PASCOE:
 8       Q    Okay.  And so your testimony today is that
 9   you could engage in unlawful activity and BGIS was not
10   permitted to terminate you for cause?
11            MR. AIELLO:  Objection to form.
12            THE WITNESS:  I'm not understanding your
13       question.
14   BY MR. PASCOE:
15       Q    Sure.  So you just testified that you could
16   engage in harassment and that would not be sufficient
17   jurisdiction for BGIS to terminate you for cause.
18   You've also said that you acknowledge that harassment
19   is unlawful.
20            So my question is:  Is it your position in
21   this litigation that you could engage in unlawful
22   conduct and that would not justify BGIS terminating
23   you for cause?
24            MR. AIELLO:  Objection to form.
25            THE WITNESS:  Harassment was not one of the
```

Page 42

```
1          terms specifically used for termination with

2          cause.  If that's what you're asking, that would

3          be my answer.

4     BY MR. PASCOE:

5          Q    That's not what I'm asking.  It's whether or

6     not you contend in this litigation that you could

7     engage in unlawful harassment and BGIS would not have

8     grounds to terminate you for cause?

9          A    It's --

10              MR. AIELLO:  Excuse me.  Asked and answered.

11    BY MR. PASCOE:

12         Q    Okay, you can answer, Mr. Grandis.

13         A    The same answer as I've given you already.

14         Q    But you haven't answered the question.

15              MR. AIELLO:  He has.  Asked and answered.

16              MR. PASCOE:  Okay.  So, Paul, object to the

17         form.

18    BY MR. PASCOE:

19         Q    So, Mr. Grandis, you said in response -- and

20    we can have the court reporter read it back -- that it

21    wasn't listed.  And there are lots of things that

22    aren't listed, but my question is about your position

23    in this lawsuit.

24              And it seems to be that you could engage in

25    harassment, and while you could certainly be
```

Page 43

1   terminated, it wouldn't serve as termination for cause

2   under your employment agreement.  Do I understand that

3   correctly?

4        A    I think that's correct.

5        Q    Okay.  And certainly we can agree that

6   murder isn't listed in the employment agreement as

7   a -- grounds for cause for termination; is that right?

8             MR. AIELLO:  Unnecessary.  Form.  Asked and

9        answered.

10            THE WITNESS:  I would say that I'd be in a

11       lot more trouble if I committed murder than

12       worrying about my employment agreement.

13  BY MR. PASCOE:

14       Q    The question is whether murder is listed as

15  one of the grounds for cause for termination in your

16  employment agreement?

17            MR. AIELLO:  Objection to form.  Repetitive

18       and harassing at this point.

19            THE WITNESS:  I'm not a lawyer, so I would

20       not be able to look at those -- at murder and say

21       that that, by definition and those three things,

22       would be cause.

23            Now do I think that I'd be in trouble for

24       that?  Do I think that would be cause?  Yeah.

25

Page 44

1    BY MR. PASCOE:

2         Q    Okay.

3         A    But I don't have that memorized to tell you

4    whether or not everything that might be done is for

5    cause or not cause.

6              They certainly had the right to terminate me

7    because they didn't like the color of my hair.  That

8    doesn't mean that they don't have to pay me for it.

9         Q    Right, I understand, Mr. Grandis.  And what

10   we're doing right now is we're drawing lines outside

11   of what your position is, which is the entire purpose

12   of discovery.

13             And so I appreciate you acknowledging that

14   if you engaged in murder, you murdered a colleague,

15   BGIS would have cause to terminate you under the

16   agreement.  Do you agree with that?

17             MR. AIELLO:  Asked and answered.

18             THE WITNESS:  Yes.

19   BY MR. PASCOE:

20        Q    Okay.  And so were you permitted, from your

21   position, to engage in multiple acts of sexual

22   harassment and BGIS would not have the right to

23   terminate you for cause under the employment

24   agreement?

25             MR. AIELLO:  Asked and answered.

Page 45

```
 1            THE WITNESS:  Yes, they would not have the
 2       right to do that.
 3  BY MR. PASCOE:
 4       Q    Was one of the grounds for termination in
 5  your employment agreement failure to cooperate in an
 6  investigation?
 7       A    No.
 8       Q    Okay.
 9            Let's mark this as Grandis 1.
10            (Defendant's Exhibit 1 marked.)
11  BY MR. PASCOE:
12       Q    Mr. Grandis, the court reporter has handed
13  you what's been marked Exhibit 1 for the deposition.
14  Take a look at it, take as long as you need, and tell
15  me if you recognize that document.
16            MR. AIELLO:  I'm objecting to this Exhibit 1
17       for the record.  It is incomplete.
18            It's two-sided.
19            MR. PASCOE:  We've been going an hour.
20       Let's take a quick break and go off the record
21       and let the witness review the document.
22            THE VIDEOGRAPHER:  Going off record at
23       10 a.m.
24            (Recess was taken.)
25            THE VIDEOGRAPHER:  Back on record at
```

Page 46

1        10:08 a.m.

2    BY MR. PASCOE:

3        Q    Mr. Grandis, before we took the break the

4    court reporter has handed you what's been marked as

5    Exhibit 1, and the question was:  Do you recognize

6    Exhibit 1?

7        A    I do.

8        Q    What is it?

9        A    It was my employment agreement, my term

10   sheet.

11       Q    Okay.  So if you take a look at page 2 of 4

12   under "Cause," Romanette 1, which is the little i, I

13   had asked you, before showing this to you, if failure

14   to cooperate with an investigation was cause for

15   termination, you said no.

16            Take a look at Romanette i and see if that

17   refreshes your recollection as to whether or not

18   failure to cooperate in an investigation is in fact

19   cause for termination of your employment agreement.

20       A    One of us may have misunderstood the answer.

21   Failure to cooperate in an investigation would be

22   termination for cause.

23       Q    Okay.  And what does that mean to you,

24   failure to cooperate in an investigation?

25       A    It means trying to obstruct an investigation

Page 47

1    or it means if they ask me questions, I wouldn't

2    answer them.   Although I did ask if I could

3    participate in the investigation and they told me they

4    didn't need me to.

5              So, does that answer your question?

6        Q    Yeah, partially.

7              Would giving misleading answers be failure

8    to cooperate in an investigation?

9        A    You'd have to be more specific as to what

10   misleading answers would encompass.

11       Q    Well, so you listed trying to obstruct.

12   Maybe a better question, since you used the word

13   obstruct, what's encompassed in that statement, trying

14   to obstruct an investigation?

15       A    Hiding information, doing things that are

16   illegal.

17             Not having obstructed, I can't tell you what

18   it would have been.

19       Q    So that was what led to my question about

20   misleading.   So if -- if you gave inaccurate

21   representations of what happened, would that be

22   failure to cooperate in an investigation?

23       A    What happened --

24             MR. AIELLO:   Excuse me.   I object to the

25         form.

Page 48

1           THE WITNESS:  What happened where?

2    BY MR. PASCOE:

3        Q    Well, this is just generally about the

4    concepts of investigation.  We'll get into the actual

5    investigation at issue here.

6           But as with the previous questions, and as I

7    told you one of the purposes of discovery is to

8    understand your understanding of the contract.

9           I'm trying to get a full understanding of

10   what failure to cooperate means to you, and so would

11   offering misleading explanations for things be a

12   failure to cooperate in the investigation?

13          MR. AIELLO:  Objection to the form.

14          THE WITNESS:  Depending on the severity and

15      how it impacted it, it could, but not necessarily

16      in every case.  Again, it depends on what

17      misleading would be.

18   BY MR. PASCOE:

19       Q    So sticking with that Romanette i, and we'll

20   read the defined term in Romanette 1 for the record.

21          "Cause means BGIS's good faith and

22   reasonable determination that you have engaged in any

23   of the following."

24          In Romanette 1, "your material failure to

25   perform your duties and responsibilities to BGIS,

Page 49

```
 1   including but not limited to, a failure to cooperate

 2   with BGIS in any investigation or formal proceeding;

 3   provided, however, you shall have the right to cure

 4   such material failure to satisfaction of BGIS (if

 5   capable of being cured) within 30 days after delivery

 6   by BGIS to you of written notice requiring curative

 7   action."

 8            Did I read that correctly?

 9       A    Yes.

10       Q    Is workplace harassment capable of being

11   cured?

12            MR. AIELLO:  Object to the -- excuse me.

13            Object to the form of the question.

14            THE WITNESS:  I'm not a lawyer so I can't

15       tell you what cured or wouldn't be cured would

16       encompass.

17   BY MR. PASCOE:

18       Q    I'm not asking for a legal definition.  I'm

19   asking for your understanding of the term.

20            MR. AIELLO:  So I object -- excuse me.

21            THE WITNESS:  I'm sorry.

22            MR. AIELLO:  I object to the form of that as

23       intended to be a question.

24            THE WITNESS:  What is the question?

25
```

Page 50

1    BY MR. PASCOE:

2         Q    What does -- is harassment, is workplace

3    harassment capable of being cured?

4              MR. AIELLO:  Asked and answered.

5              MR. PASCOE:  So, Paul --

6              MR. AIELLO:  Excuse me.

7              MR. PASCOE:  No.  It hasn't been answered.

8         His response was "I'm not a lawyer."  I'm not

9         asking for a legal definition.  I'm asking for

10        his understanding.

11             MR. AIELLO:  And you haven't qualified or

12        specified any qualifications on that question.

13        So his answer has been given.  You're just asking

14        the same question again.  The same answer.

15             MR. PASCOE:  So it isn't.

16   BY MR. PASCOE:

17        Q    I'm not asking for the legal interpretation,

18   Mr. Grandis.  I'm asking -- you know, you're a party

19   of the lawsuit.  This contract is at issue in the

20   lawsuit.  You signed it.

21             What was your understanding -- not the legal

22   definition -- but what was your understanding.  Can

23   workplace harassment, can that be cured?

24             MR. AIELLO:  Objection to the form of the

25        question.  Asked and answered.

Page 51

```
 1            THE WITNESS:  Not having done any workplace
 2       harassment, depending on what it is, I would have
 3       to then let you know if it could be cured or not.
 4  BY MR. PASCOE:
 5       Q    So is your testimony today that you've never
 6  done any workplace harassment?
 7       A    Can you define your definition of what
 8  workplace harassment would be?  It's not in this
 9  document.
10       Q    Whatever it is you meant when you just said,
11  "having never done workplace harassment."  Whatever
12  you meant by that.
13            MR. AIELLO:  Objection to the boundless form
14       of your question, and he's asked and answered it.
15            THE WITNESS:  I'd have to have specifics as
16       to what the harassment is for me to tell you
17       whether it could be cured or not.
18  BY MR. PASCOE:
19       Q    Well -- so you agreed that you just said,
20  "having never done workplace harassment."  Do you
21  agree you just said those words?
22       A    Yes.
23       Q    What did you mean when you said those words,
24  "having never done workplace harassment"?
25       A    Something that would be deemed illegal.
```

Page 52

1      Q     And by illegal, do you also mean unlawful?

2      A     Yes.

3      Q     And so is it your testimony today that

4    you've never engaged in workplace harassment?

5      A     Yes.

6      Q     Let's switch topics.

7            What are the -- and I'm not asking for

8    specific amounts, but what are the categories of

9    damages that you're seeking in this lawsuit?

10     A     This lawsuit is encompassing my compensation

11   for the balance of my employment term.  I'm seeking

12   the value of the shares that were promised -- or the

13   options that I was not to pay for, for the value.

14           I'm looking at -- the shares, the

15   compensation -- predominately, from a monetary

16   standpoint predominantly those two things and -- yeah,

17   that would be it.

18           Basically having them honor the term of my

19   employment agreement to pay that out.

20     Q     So when we're talking about monetary

21   damages, you're saying compensation for the remainder

22   of the term of your employment and stock options; is

23   that right?

24     A     As well as legal fees.

25     Q     And legal fees.

Page 53

1           So other than compensation for the term of

2     your employment, stock options, and legal fees,

3     there's no other monetary damages you're seeking in

4     this lawsuit; is that right?

5           A     That's fair.

6           Q     Okay.

7           A     At this point, yeah.

8           Q     Are there nonmonetary damages that you're

9     seeking in the lawsuit?

10          A     I would like to have BGIS complete the

11    transfer of vendors and vehicles that are still in my

12    name that I've personally guaranteed that exposes me

13    to financial liability.

14          Q     Anything else?

15          A     Not off the top of my head.

16          Q     So we've discussed now all of the monetary

17    and nonmonetary damages you're seeking in this

18    lawsuit; is that right?

19          A     At this point.  As I'm not a lawyer, I don't

20    know if I'm entitled to other types of damages for

21    things that have been said.

22          Q     Okay.  But you don't have -- to the best of

23    your knowledge, you don't have a claim for defamation

24    in this case?

25          A     Well, I'd love to make a claim but I'm not a

Page 54

```
1    lawyer so I'll have to discuss that with counsel.

2        Q    Okay.  Let's mark this as Grandis 2.

3        A    Do you want this back or do you want me to

4    hold on to it?

5        Q    So the procedure, Mr. Grandis, is you have

6    the official copy with a sticker on it, and she, the

7    court reporter, will take those at the end of the day.

8             If you put them in a stack next to you, just

9    facedown, it will be easy to access them if we need to

10   get back to them.

11            MR. AIELLO:  Thank you.  No worries, Devin.

12        I have a copy.

13            THE WITNESS:  Okay.

14            MR. AIELLO:  Counsel has been kind enough to

15        give me a copy, so we're fine.

16            (Defendant's Exhibit 2 marked.)

17   BY MR. PASCOE:

18        Q    Mr. Grandis, the court reporter has handed

19   you Exhibit 2.  Is this the Exhibit A to your

20   employment agreement, the Stock Option Agreement that

21   was part of this transaction?

22        A    No.

23        Q    It's not?

24        A    No.

25        Q    Okay.
```

Page 55

1      A      I never saw this agreement.

2      Q      Is your testimony today that your previous

3  counsel never shared the stock option agreement with

4  you?

5           MR. AIELLO:   I'm going to object to the form

6       of the question, and it calls for speculation.

7           THE WITNESS:   I don't know what they did.   I

8       can tell you in my closing binder this isn't

9       there.   And this particular copy you're showing

10       me, it shows that I did not execute it.   So,

11       again, I don't recall ever seeing this document.

12  BY MR. PASCOE:

13      Q      Okay.   Well, I'll represent to you for the

14  record that in that Exhibit 2 is a copy of the Stock

15  Option Agreement prepared for you.   I acknowledge that

16  it was never signed or executed.

17           Seeing as you've never seen it, I guess

18  let's walk through it.   So it talks about, at the very

19  top, it has your name and it lists 500 shares, and the

20  exercise price in Canadian dollars.

21           Do you see that?

22      A      I do.

23      Q      And it's consistent, at least, with your

24  understanding that you were going to receive 500

25  shares; is that right?

Page 56

1      A    Correct.

2      Q    Okay.  And in the vesting portion, in

3    Section 2(a), it talks about stock options, vesting in

4    accordance with Schedule A.

5           Do see that?

6      A    Yes.

7      Q    Okay.  And if we look at Schedule A, and

8    let's start with the time vesting options.

9      A    What page -- what page is Schedule A,

10   please.

11     Q    It's A-1.  It's page 7, Schedule A.

12     A    Got it.

13     Q    Okay.  And so in number 1, Time-Vesting

14   Options, little a, it says:  "Fifty percent of the

15   shares subject to the Stock Option will be eligible to

16   vest based on the satisfaction of time-based vesting

17   criteria (such portion, the 'Time-Vesting Option').

18   Unless earlier terminated, forfeited, or expired, the

19   Time-Vesting Option will vest as one-fifth of the

20   Shares subject to the Time-Vesting Option on each of

21   the first five anniversaries of the Vesting

22   Commencement Date."

23           Do you see that?

24     A    I hear that, yeah.  I'm not looking at the

25   words as you're reading them.  I'm listening to you.

Page 57

1      Q    Okay.  And so in Exhibit 2 it clarifies that

2  you have to be employed for the -- for at least

3  50 percent of the stock options.  You have to be

4  employed at BGIS for a total of five years for all of

5  the "Time-Vesting Option" to vest.

6           Do you see that?

7      A    I do.

8      Q    And you agree that you were not employed by

9  BGIS for a year; is that right?

10     A    I agree I wasn't for a year, but I don't

11  know what that has to do with this document that I

12  didn't see, nor do you have a copy that I executed so

13  I was unaware of the terms that you're reading to me.

14     Q    Okay.  And then if we look at 2,

15  Performance-Vesting Option, it says, "Fifty percent of

16  the Shares subject to the Stock Option will be

17  eligible to vest based on the satisfaction of

18  performance-based vesting criteria (such portion, the

19  'Performance-Vesting Option')."

20           And then it says, "Unless earlier

21  terminated, forfeited, or expired, the

22  Performance-Vesting Option will vest (i) in the event

23  of a Change of Control, if the CCMP Shareholders

24  achieve a Return on Capital of at least 2.0x or (ii)

25  in the event of IPO, if the closing price of the

Page 58

1    securities of the Company or its applicable Affiliate

2    that were registered in such IPO equals or exceeds the

3    Liquidity Threshold Price for any ten consecutive day

4    trading period, in each case, prior to the Final

5    Measurement Date and subject, in each case, to the

6    Participant remaining in continuous Employment from

7    the Date of Grant through such date."

8            Did I read that accurate?

9    A    I hear what you're saying, yes.

10   Q    And then it goes on to say:  "To the extent

11   not then vested, the Performance-Vesting Option shall

12   be forfeited for no consideration due to the

13   Participant immediately upon the earlier to occur of

14   (A) a termination of the Participant's Employment; or

15   (B) the Final Measurement Date."

16           Do you see that?

17   A    Okay.

18   Q    You understood, based on your employment

19   agreement which is Exhibit 1, that the stock options

20   were subject to Exhibit A to the employment agreement.

21   A    Which again --

22           MR. AIELLO:  Excuse me.

23           THE WITNESS:  I'm sorry.

24           MR. AIELLO:  I object to the form of the

25       question.

Page 59

1    BY MR. PASCOE:

2        Q    Well, if you -- okay.  So if you turn to

3    Exhibit 1, which is your employment agreement, it's in

4    front of you sir, and you look at the bottom of the

5    first page it says, next to equity:  "Subject to Board

6    approval, you will be granted an option to purchase

7    500 shares of BIFM Jersey TopCo Limited, the ultimate

8    parent entity of BGIS, which will be evidenced by, and

9    subject to the terms and conditions included in, an

10   award agreement in the form attached as Exhibit A."

11            Do you see that?

12       A    Yes.

13       Q    Okay.  And so you agree that your employment

14   agreement, Exhibit 1, which you did sign, explicitly

15   stated that any stock options would be subject to the

16   attached Exhibit A?

17       A    The attachment wasn't there, so I

18   interpreted the graph that Mark Marquis sent me

19   showing me the value of that and the projected value

20   that it was going to be as my Exhibit A.

21       Q    Was the graph attached to your employment

22   agreement and labeled Exhibit A?

23       A    It was not labeled but it was attached.

24       Q    So your testimony today is that your

25   employment agreement has a graph attached to it?

Page 60

1        A    It was a graph that Mark had sent me that

2   was showing me, after I had asked him some questions,

3   as to what the value was, how it works, and all of

4   that.  And that I had -- and when I had asked about

5   the board approval, he had represented to me that the

6   board had already approved, because it was part of the

7   whole deal, including my term sheet.

8        Q    But my question is whether or not you have a

9   copy of the employment agreement signed by BGIS and

10  you that has that graph attached as Exhibit A.

11       A    I believe it is.

12       Q    Okay.  So it hasn't been produced in this

13  litigation.  If you could give it to your counsel, and

14  have your counsel produce it, I would appreciate it.

15            MR. AIELLO:  Objection to the form.  You

16       misstate what you received from me prior to this

17       deposition.  You have an Asset Purchase Agreement

18       with the employment agreement followed by the

19       graph.

20            MR. PASCOE:  I don't.

21            MR. AIELLO:  Well, you should.  I have it

22       here what I produced to you.

23            MR. PASCOE:  So -- okay.

24  BY MR. PASCOE:

25       Q    And so your testimony today is that the

Page 61

1    graph -- well, I don't -- I mean --
2           MR. AIELLO:  I understand what you're
3        saying.
4           MR. PASCOE:  But I don't -- I don't -- I
5        don't have it, Paul, so I don't know what you're
6        talking about.  So let's go off the record for
7        just a second.
8           MR. AIELLO:  I rather stay on the record.
9           MR. PASCOE:  Well, if you want to stay --
10          MR. AIELLO:  I think it will make it easier
11       for you.  I mean, we don't have to argue with
12       each other.
13          Let me show you something.  There's a
14       closing binder that we produced.  This is exactly
15       the Asset Purchase Agreement.  The closing binder
16       was hundreds of pages -- and inside the closing
17       binder, which I don't have.  I just have the
18       Asset Purchase Agreement with me -- the graph was
19       attached to the employment agreement.  This is --
20          MR. PASCOE:  Well, so if the representation,
21       and if you want to stay on the record, was that
22       you were going to show it to me, you haven't.
23          MR. AIELLO:  I hear you.  I can't because I
24       don't have all the documents produced.
25          MR. PASCOE:  I have the entire --

Page 62

1          MR. AIELLO:  Do you?

2          MR. PASCOE:  -- closing binder in electronic

3     format.  I have all 600 pages.  And I will

4     represent that there is no graph attached after

5     the employment agreement.

6          So my request, for the record, is if such a

7     document exists, that it be produced.  And if the

8     response is, it's been already produced, just

9     after the deposition at some point identify the

10    Bates numbers for me.

11         MR. AIELLO:  Okay.  I might be able to do it

12    right now.

13         MR. PASCOE:  Well, I don't want to --

14         MR. AIELLO:  When we take our next break I

15    will call the office.

16         MR. PASCOE:  I don't want to spend any more

17    time on that.

18  BY MR. PASCOE:

19    Q    And so turning back to Exhibit 2 that's

20  still in front of you, your testimony today is, and

21  maybe it looked slightly different, maybe it didn't

22  have your name on it, maybe there were some

23  ministerial differences, but you've never seen

24  anything that looks anything even close to Exhibit 2?

25    A    I have never seen anything remotely close to

Page 63

```
 1    this.
 2         Q    Okay.  You understood, right, because it
 3    says it explicitly in the employment agreement, that
 4    you were getting an option to purchase shares from a
 5    different company than BGIS.  The company was BIFM
 6    Jersey TopCo; is that right?
 7              MR. AIELLO:  I'll object to the form of that
 8         question.
 9              THE WITNESS:  My understanding from Mark
10         Marquis was he was giving me 500 shares at no
11         charge.  It was an option.  And I said, "Why does
12         it say I have to purchase the option?"  You told
13         me it's part of my comp that you're giving me.
14         He said, "Devin, they just have to write it that
15         way, but these shares and options are being given
16         to you."  I said, "Oh, okay."
17              As a matter of fact I have a couple of
18         e-mails that had stated that in my asking, "Can
19         you please clarify it?"  I said, "Very nice of
20         you to have given me this.  What is it worth?"
21         And that's where he had explained to me that the
22         shares could be worth a lot of money in the
23         future.
24    BY MR. PASCOE:
25         Q    Have you ever received a stock option of any
```

Page 64

1    kind previously in your life?

2         A    No.

3         Q    Okay.  Do you have any understanding of what

4    a stock option is or how it works?

5         A    I'm not an expert in that field, no.

6         Q    Okay.  If I represented to you that

7    generally speaking the way a stock option works is

8    that at the time it's granted to you it's valued, and

9    then you can exercise it at a later date by paying, at

10   the time the value was granted, but receiving in

11   exchange the increased value.  Would you have any

12   bases to disagree with me?

13             MR. AIELLO:  Object to the form.

14             THE WITNESS:  I hear what you're saying but

15        that's not what was represented to me.

16   BY MR. PASCOE:

17        Q    Okay.  You were advised by Lewis Brisbois in

18   this transaction; is that right?

19        A    Yes.

20        Q    At any point did you have discussions with

21   them about your stock option plan?

22             MR. AIELLO:  I'll object.  Attorney-client

23        privilege.

24             MR. PASCOE:  Well, I agree.  I don't --

25        that's a -- well, so I don't agree with that

Page 65

1          quite yet.  I agree the substance of discussions
2          would be privileged.  Whether or not a topic was
3          discussed, like preparation for deposition is not
4          privileged.
5     BY MR. PASCOE:
6          Q    So -- and I'm going to ask you this question
7     for the record and I'm going to tell you to wait
8     because your counsel might instruct you not to answer.
9          A    Very good.
10         Q    So the question for the record is:  Did you
11    ever have any discussions with Lewis Brisbois
12    regarding your stock options with BIFM Jersey TopCo?
13              MR. AIELLO:  Is there a time frame that
14         you're asking him about?
15              MR. PASCOE:  No.  I mean ever.  Well, okay,
16         let me divide it.
17    BY MR. PASCOE:
18         Q    At any time prior to the end of December
19    2021, did you have any discussions with Lewis Brisbois
20    regarding your stock options with BIFM Jersey TopCo?
21              MR. AIELLO:  Devin, that's a yes or no
22         question, and you may answer it, but don't give
23         anything else out.
24              THE WITNESS:  Yes.
25

Page 66

1    BY MR. PASCOE:

2        Q    Okay.  Let's go back to Exhibit 1.  And if

3    you look at page 2 of 4, we already went over

4    Romanette 1 of bases for cause of termination.

5    Romanette 2 is, "your commission of any act of fraud,

6    embezzlement, dishonesty, or any other intentional

7    misconduct that results from material injury to BGIS."

8            Do you see that?

9        A    I do.

10       Q    Would workplace harassment be an instance of

11   intentional misconduct that results in injury to BGIS?

12           MR. AIELLO:  Object to the form.

13           THE WITNESS:  Not being a lawyer, I don't

14       know what would fall or not fall into fraud,

15       embezzlement, or dishonesty.  It doesn't sound

16       like it to me.

17   BY MR. PASCOE:

18       Q    I'm not asking about any of those.  My

19   question is whether, and I'm entitled to know your

20   understanding, whether or not workplace harassment is

21   intentional misconduct that results in material injury

22   to BGIS?

23           MR. AIELLO:  Same objection.

24           THE WITNESS:  It could.

25

Page 67

1   BY MR. PASCOE:

2       Q    Okay.  Is sexual harassment intentional

3   conduct -- misconduct that results in material injury

4   to BGIS?

5               MR. AIELLO:  Object to the form.

6               THE WITNESS:  Repeat the question, please.

7   BY MR. PASCOE:

8       Q    Is sexual harassment intentional misconduct

9   that results in material injury to BGIS?

10      A    Not necessarily.

11      Q    What do you mean "not necessarily"?

12      A    It depends on the severity.  If it's -- I

13  guess there's a lot of things to it but, again, I'm

14  not a lawyer.  The way I read that, Roman Numeral 2,

15  sexual harassment would not be part of it, even if it

16  did occur, and I'm not saying it occurred.  But you're

17  asking me a question and I'm trying to answer your

18  question.

19      Q    Sure.

20              MR. AIELLO:  And it's been asked and

21          answered several times.

22  BY MR. PASCOE:

23      Q    And then Romanette 3 is -- or, I'm sorry, I

24  have another question of Romanette 2.

25              Would misconduct that damages an extremely

Page 68

1   valuable business relationship, in your mind

2   constitute intentional misconduct that results in

3   material injury to BGIS?

4           MR. AIELLO:  Objection to form.

5           THE WITNESS:  Can you be more specific,

6      please.

7   BY MR. PASCOE:

8      Q    I can't.

9      A    Okay.  Then repeat the question.

10     Q    Sure.

11          Would actions that damage a business

12   relationship with a significant customer constitute

13   intentional misconduct that results in material injury

14   to BGIS?

15          MR. AIELLO:  Objection to form.

16          THE WITNESS:  Not necessarily.

17   BY MR. PASCOE:

18     Q    What do you mean by "not necessarily"?

19     A    There's vague words there.  You haven't told

20   me what material damage is and you haven't told me the

21   extent of what something like that would be so I could

22   say based on that example, I could then give you a

23   better answer, but it's a very vague question, in my

24   opinion.

25     Q    If you engaged in sexual assault,

Page 69

1   specifically groping a female employee's breast or

2   buttocks, would that constitute intentional misconduct

3   that results in material injury to BGIS?

4        A    Not necessarily.

5        Q    I'm sorry, did you say "no"?

6        A    I said "not necessarily."

7        Q    So your testimony today is that you could,

8   without consent, grope a female employee's breast or

9   buttocks and that would not be intentional misconduct

10  that results in material injury to BGIS?

11            MR. AIELLO:  Object to the form because

12       you've added an element and you're making it

13       sound like it's the same question, so...

14            THE WITNESS:  I didn't say that.  I didn't

15       say I could.

16            MR. AIELLO:  You added the "unwelcomed,"

17       Michael.

18  BY MR. PASCOE:

19       Q    Well, okay.  I guess let me ask the first

20  question again.

21            Could you engage in the unwelcomed groping

22  of a female employee's breast or buttocks -- would the

23  unwelcomed groping of a female employee's breast or

24  buttocks constitute intentional misconduct that

25  results in material injury to BGIS?

1          MR. AIELLO:  I am going to object to the

2      form but go ahead.

3          THE WITNESS:  Anything is possible, but not

4      having done that, I'm not following the question

5      for me.

6  BY MR. PASCOE:

7      Q    Well, it's a yes or no question.

8          Does it, in your interpretation of the

9  agreement, constitute intentional misconduct that

10 results in material injury to BGIS?

11     A    And I'm saying it depends on what it was

12 that -- what happened.  Was it welcomed?  Was it not

13 welcomed?  Not that I would have done that.  So I --

14 is it possible that it could create material injury?

15 It could.  It does not mean it definitely always has

16 to.

17          Again, I'm not a lawyer to say whether it's

18 a slam dunk or whether it isn't, so that's the best

19 answer I can give you, Counselor.

20     Q    So give me a scenario where you could engage

21 in the unwelcoming grope -- unwelcoming groping of a

22 female employee's breast or buttocks and it would not

23 constitute intentional misconduct that results in

24 material injury to BGIS?

25          MR. AIELLO:  Objection to form.  This a

```
 1        hypothetical.
 2              THE WITNESS:  It would be hard for me to do
 3        that because I've never done it, so I would --
 4        I'm not going to, you know, to hypothesize as to
 5        what would or wouldn't happen if I did something
 6        that I would never do.
 7   BY MR. PASCOE:
 8        Q    So sitting here today, you can't come up
 9   with a scenario of where you could intentionally --
10   that you could engage in the unwelcoming groping of a
11   female employee's breast or buttocks and it would not
12   be intentional misconduct that resulted in material
13   injury to BGIS?
14              MR. AIELLO:  Objection to form.
15              THE WITNESS:  It may not result in a
16        material -- into material damage.  That doesn't
17        mean it's right.  But you keep reading the
18        sentence that says it results in material injury.
19        And I'm saying it doesn't unnecessarily, even if
20        it was unwelcomed, it doesn't mean that it
21        automatically results in material damage, so it's
22        the best I can answer to you.
23              MR. PASCOE:  Would you please read my
24        question back.
25              (Requested portion was read.)
```

Page 72

```
1            THE WITNESS:  Yeah, I understood the
2        question and I still say it doesn't necessarily
3        result in a material injury.
4    BY MR. PASCOE:
5        Q    You didn't understand the question,
6    Mr. Grandis.
7        A    Okay.
8        Q    The question is -- is:  You cannot identify
9    a hypothetical scenario today where you could engage
10   in the unwelcomed groping of a female employee's
11   breast or buttocks and it would not constitute
12   intentional misconduct that results in material injury
13   to BGIS?
14           MR. AIELLO:  Objection to the form.  Asked
15       and answered.
16           If you take out the "material injury,"
17       you'll have the answer, if you want to do that.
18       But he's said, what if it doesn't involve
19       material injury.
20           MR. PASCOE:  But that's not the question,
21       Mr. Aiello.
22   BY MR. PASCOE:
23       Q    The question is -- is:  Do you agree that
24   you can't give me a hypothetical scenario where you
25   could engage in unwelcoming groping of a female
```

Page 73

1   employee's breast or buttocks and not have it

2   constitute intentional misconduct that results in

3   material injury to BGIS?

4       A    It's a --

5            MR. AIELLO:  Excuse me.

6            Objection to form.  Asked and answered.

7            Go ahead.

8            THE WITNESS:  Hypothetically, if what you're

9       saying is come up with something, I would say if

10      one were to do that and that employee didn't make

11      a lawsuit that cost the company millions of

12      dollars, then I would say it's not material.

13  BY MR. PASCOE:

14      Q    Okay.  All right.  Let's talk about APT's

15  Employee Handbook.  Let's mark this as Exhibit 34,

16  please.

17           (Defendant's Exhibit 3 marked.)

18  BY MR. PASCOE:

19      Q    Mr. Grandis, the court reporter has handed

20  you what's been marked as Exhibit 3.  You'll see it

21  bears numbers in the lower right hand corner, P, and

22  then six digits.  I'll represent to you that that

23  means it was produced by your counsel.

24           Do I understand correctly that the APT

25  Employee Handbook was in place prior to the purchase

Page 74

1    of APT by BGIS?

2        A    Yes.

3        Q    And it remained in place at least initially

4    immediately after the purchase of APT by BGIS; is that

5    right?

6        A    Well, there was some confusion to that.

7        Q    Did -- what do you mean?

8        A    There was confusion as to which document was

9    being used, the APT or the BGIS.

10        Q    Well, so I'm talking about January 1, 2022,

11    was the APT Employee Handbook in place or not?

12        A    The APT employment agreement -- the employee

13    handbook was in place as was, supposedly, the BGIS

14    handbook.

15        Q    Okay.

16        A    And that was cause for many areas of

17    confusion.

18        Q    Okay.  So you agree that Exhibit 3 was in

19    place after the acquisition of substantially all the

20    assets of APT by BGIS?

21            MR. AIELLO:  I am going to ask the witness

22        not to speculate, but go ahead.

23            THE WITNESS:  I don't know, that's why I'm

24        saying to you there was confusion.

25

Page 75

1    BY MR. PASCOE:

2        Q    So on January 25, 2022 -- I guess you recall

3    on January 25, 2022, receiving an e-mail from Sherry

4    Pelletier to you, Mr. Fellows, Ron Shory and Peter

5    Papagiannis noting two bullet points.

6             "We will be using the APT handbook that was

7    updated last year."

8             It's produced by your counsel as P590.  Do

9    you recall that?

10       A    I don't specifically recall it, but your

11   question was as of January 1, so you're just telling

12   me that it wasn't January 1.

13       Q    Well, so as of January 25th, was the APT

14   handbook still in place?

15       A    It was.

16       Q    Okay, great.

17            Let's walk through the APT handbook.  I have

18   some questions for you.  On page 6, which is Bates

19   number P649, it talks about the mission, vision and

20   values.  Let me know when you're on that page.

21       A    I'm on the page.

22       Q    Okay.  And in the value section it talks

23   about fairness.  It says, "Be fair to myself, be fair

24   to the company, be fair to the client."

25            Do you see that?

Page 76

1         A     Yes.

2         Q     And then on P650 in respect it says, "Openly

3    communicate and treat our internal and external

4    customers with dignity and courtesy."

5               Do you see that?

6         A     I do.

7         Q     Were those values of APT prior to the

8    acquisition?

9         A     They were.

10        Q     Did they continue after the acquisition?

11        A     It was.

12        Q     Okay.  And when you say "internal

13   customers," does that mean coworkers?

14        A     Yes.

15        Q     And then under customer relations and

16   service, in the second paragraph -- third sentence, it

17   says, "Nothing is more important than being courteous,

18   friendly, helpful and prompt in your attention to

19   customers."

20               Do you see that?

21        A     Yes.

22        Q     Does that "customers" include internal and

23   external customers?

24        A     Yes.

25        Q     Okay.  And so it was APT's policy, both

Page 77

1    before and after the acquisition, that nothing was

2    more important than being courteous, friendly, helpful

3    and prompt in your attention to, essentially, your

4    coworkers; is that right?

5        A    Yes.  Yes.

6        Q    So if we talk -- if we move now to page 9,

7    P652, this is APT's non-harassment policy.

8             Do you see that?

9        A    Yes.

10       Q    It says, "It is Advanced Power Technologies'

11   policy to prohibit intentional and unintentional

12   harassment," and it lists a number of categories and

13   individuals.

14            Do you see that?

15       A    I do.

16       Q    And it says, "such conduct will not be

17   tolerated by APT."

18            Do you see that?

19       A    Yes.

20       Q    If prior to the acquisition somebody engaged

21   in intentional harassment, would you have terminated

22   them?

23       A    That's hypothesizing.  It depends on the

24   severity and what the result was of a discussion and

25   an interview.

Page 78

1      Q    Okay.  So -- and I want to make sure you

2   understand.  I'm not talking about unintentional.  I'm

3   not talking about an accident, I'm not talking about

4   taking something too far.

5           I'm asking:  Prior to the acquisition, if

6   one of your employees was intentionally harassing

7   another employee, would you have terminated them?

8           MR. AIELLO:  Objection to the question.

9       Asked and answered.

10          THE WITNESS:  Again, it depends on the

11      situation.  And what the result of an

12      investigation by my HR department would result

13      in.

14   BY MR. PASCOE:

15      Q    Okay.  The policy goes on to note, it

16   concludes that paragraph by saying, "such conduct will

17   not be tolerated by APT."

18           Do you see that?

19      A    I do.

20      Q    Was that the policy of APT prior to the

21   acquisition?

22      A    Yes.  Tolerated doesn't mean termination.

23      Q    And does -- did that remain the policy of

24   APT after the acquisition, at least up through your

25   termination?

Page 79

1          MR. AIELLO:  Object to the form of the

2      question.

3          THE WITNESS:  Repeat it, please.

4   BY MR. PASCOE:

5      Q    Sure.

6          So the non-harassment policy says, "such

7   conduct will not be tolerated by APT."

8          And my question was whether that remained

9   the policy of APT up through your termination?

10     A    Yes.  Certainly harassment would not be

11  tolerated without discussion, for sure.

12     Q    Then it goes on to say, "The purpose of this

13  policy is not to regulate our employee's personal

14  morality, but to ensure that no one harasses another

15  individual in the workplace, including while on APT

16  premises, while on APT business (whether or not on APT

17  premises) or while representing APT.  In addition to

18  being a violation of this policy, harassment or

19  retaliation based on any protected characteristic as

20  defined by applicable federal, state and local laws is

21  also unlawful."

22          Do you see that?

23     A    Okay.

24     Q    And then it goes on to define harassment,

25  and in the second paragraph notes that harassment can

Page 80

1    be verbal and include slurs, jokes, insults, epithets,

2    gestures or teasing.  Do you see that?

3         A    Yes.

4         Q    And if we go on to the next page, it talks

5    about sexual harassment and then it gives some

6    examples of conduct that would violate the policy.

7              Example number four is, sexual jokes or

8    comments about a person's body, sexual prowess or

9    sexual deficiencies.

10             Do you see that?

11        A    No, where is that?

12        Q    On P563.

13        A    Yes, I'm on the page.

14        Q    Number four, example of conduct that

15   violates your sexual harassment policy.

16        A    Yes, I see it.

17        Q    Okay.  And that was the policy in place

18   prior to the acquisition of APT -- substantially all

19   of APT's assets by BGIS?

20        A    Specifically if it was unwelcomed, yes.

21        Q    And it remained the policy after the

22   acquisition of all APT's -- substantially all of APT's

23   assets by BGIS; is that right?

24             MR. AIELLO:  Objection to the form.  Asked

25        and answered.

Page 81

```
 1              THE WITNESS:  As I said, certainly if it was
 2       unwelcomed.
 3  BY MR. PASCOE:
 4       Q    Okay.  But it doesn't say "unwelcomed"
 5  anywhere in Number 4, right?
 6              MR. AIELLO:  Misstates what it states.  I
 7       object.
 8              THE WITNESS:  Above that where it defines
 9       sexual harassment it says "as well as other
10       unwelcomed conduct."
11              So if it was unwelcomed or unsolicited then
12       I think the examples fall under those categories.
13  BY MR. PASCOE:
14       Q    My question specifically, sir, is, if
15  anywhere in APT's employment handbook, Number 4, as an
16  example of conduct, the word "unwelcomed" appears?
17              MR. AIELLO:  Object to the form of your
18       question then.
19              THE WITNESS:  The intention of this, since I
20       owned the company and helped write these, was if
21       it was unwelcomed.
22  BY MR. PASCOE:
23       Q    I understand that you want to amend the
24  handbook now.
25       A    I'm not amending it.
```

Page 82

1        Q     You agree that the word "unwelcomed" does
2   not appear in Number 4?
3              MR. AIELLO:  Objection to the form.  Asked
4         and answered.  He said it did and it appears in
5         the same section, though.
6              THE WITNESS:  In the line item 4 all it says
7         is, "sexual jokes or comments about a person's
8         body, sexual prowess or sexual deficiencies" are
9         the only words used in number 4.
10   BY MR. PASCOE:
11        Q     Okay.  And then Number 9 separately calls
12   out "unwelcomed sexually related comments."
13              Do you see that?
14        A     I do.
15        Q     Okay.  And then Number 12 is "teasing or
16   other comments directed toward a person because of the
17   person's gender."
18              Do you see that?
19        A     I do.
20        Q     And then on the next page, page 11, P654,
21   the policy concludes by noting, "Violation of this
22   policy, including any improper retaliatory conduct
23   will result in disciplinary action, up to and
24   including termination."
25              Do you see that?

Page 83

1      A    I do.

2      Q    And if we turn to page 55, which is P698.

3      A    Sorry, 6 what?

4      Q    698.

5      A    698.  Okay.

6      Q    So P698 is a general acknowledgment of

7   receipt of the handbook; is that right?

8      A    It is.

9      Q    And then separately, if you turn to the next

10  page, the next three pages which is P699 through P701,

11  has acknowledged receipt of the non-harassment policy.

12  Do you see that?

13     A    I do.

14     Q    Did you receive the non-harassment policy,

15  Mr. Grandis, during your time working for APT?

16     A    I had a copy of the handbook.

17     Q    Okay.  And you were aware of all of the

18  requirements of the non-harassment policy; is that

19  right?

20     A    Yes, sir.

21          MR. PASCOE:  Okay, we're coming up on an

22      hour and I'm going to change topics, so let's

23      give the court reporter a quick break here.

24          THE VIDEOGRAPHER:  Going off record at

25      10:54 a.m.

Page 84

```
 1              (Recess was taken.)

 2              THE VIDEOGRAPHER:  Back on record at

 3       11:03 a.m.

 4    BY MR. PASCOE:

 5       Q    So, Mr. Grandis, I'd like to switch topics

 6    now and start our discussions about a trade show that

 7    you attended February 16th to 17th of 2022.

 8              Do you recall that?

 9       A    Yes.

10       Q    Okay.  At that trade show did you discuss

11    voting with individuals from -- well, I guess let me

12    ask the background.  Who was the trade show for?

13       A    Are you sure you're talking about a trade

14    show or you're talking about the trip to Los Angeles?

15       Q    Well -- so, again, whatever it was that was

16    February 16th to 17th, 2022, it was a two-day meeting

17    with a client.

18       A    Okay, that was not a trade show.

19       Q    Okay.

20       A    That's why I was confused.

21       Q    What was it?

22       A    That was an introduction to Shell and

23    Greenlots at the time, converted to a Shell Recharge,

24    where I was asked to go out and talk about Shell's

25    project for installing of an EV infrastructure.
```

Page 85

1       Q    Okay.  And what happened when you got there?

2            MR. AIELLO:  I am going to object to the

3       form of the question.

4   BY MR. PASCOE:

5       Q    Well, so, again, I'm just trying to get an

6   overview.  You said you were there to talk about

7   Shell's project.

8            You show up to the meeting, you're

9   introduced to the Shell people and then did you have a

10  presentation or what was the next step?

11      A    They were making the presentations.

12      Q    Okay.  Did anything improper happen during

13  the two days that you were with Shell?

14      A    Not in my opinion.

15      Q    Did you ever say to anyone affiliated with

16  Shell that they should come on your boat and go

17  fishing for mermaids?

18      A    No.

19      Q    Or words to that extent?

20      A    It was completely different and out of

21  context.

22      Q    Well, what did you -- did you make any

23  statements about mermaids?

24      A    Yes.

25      Q    Okay.  What were the statements that you

Page 86

1    made about mermaids?

2         A    After Shasun, who was heading the group, put

3    his arm around me and said I was his new best friend

4    because I was able to install 250 chargers during the

5    year if everyone was able to coordinate their -- the

6    process to do that.  I said, "You know, we're talking

7    generalities here today.  And what would really make a

8    lot of sense is for a team of you to come down and

9    visit my team so we can go into the details to ensure

10   that this project can be done."

11            And I said, "Given that the weather is so

12   nice in Canada, it would be my pleasure to take you

13   guys out on the Intracoastal and we can go to dinner.

14   It's a beautiful evening."

15            Well, one of the Shell people said, "Oh, do

16   you go fishing on your boat?  And I said -- I laughed

17   and I said, "The only type of fish my boat can catch

18   are mermaids because it's not a fishing boat."

19        Q    And we agree, right, Mr. Grandis, mermaids

20   are not real?

21            MR. AIELLO:  Objection.

22            THE WITNESS:  As far as I'm concerned,

23       they're not real.

24   BY MR. PASCOE:

25        Q    Okay.  So what did you mean then when you

Page 87

1    said you were going to catch mermaids?

2              MR. AIELLO:  Objection to form.

3              THE WITNESS:  What did I mean?  I meant I

4         don't go fishing on my boat.

5    BY MR. PASCOE:

6         Q    Okay.

7         A    There was actually no other innuendo

8    intended.

9         Q    So if the individuals from Shell testified

10   that you invited them to go fishing for mermaids, that

11   would be a misunderstanding?

12             MR. AIELLO:  Excuse me.  Objection to the

13        form.  You're mischaracterizing what he just told

14        you.

15             THE WITNESS:  I never invited them to go

16        catch mermaids.  I invited them to go out to

17        dinner on my boat.

18   BY MR. PASCOE:

19        Q    I understand.  And so my understanding is:

20   If the individuals from Shell said that you had said

21   to them repeatedly, "come fishing for mermaids," they

22   would be mistaken?

23        A    They would be --

24             MR. AIELLO:  Objection.  Excuse me.

25        Objection to form.

Page 88

1          THE WITNESS:  They would be completely

2     mistaken.

3  BY MR. PASCOE:

4     Q    Okay.  What did you mean then when you

5  said -- what does it mean then to catch a mermaid?

6          MR. AIELLO:  Objection to form.  Asked and

7     answered.

8          THE WITNESS:  It means somebody would have

9     to be pretty ignorant not to know that I was

10    joking and implying that my boat is not a fishing

11    boat after I had explained that it's a bowrider

12    and we just go cruising.  So that's all that was

13    intended.

14         As a matter of fact, I've used that line

15    before and everyone seemed to have understood it

16    and quite often giggles because we know mermaids

17    don't exist.

18  BY MR. PASCOE:

19    Q    Is there a euphemism in the Fort Lauderdale

20  area where individuals who have boats use the phrase

21  catching mermaids or fishing for mermaids to mean

22  picking up attractive young women?

23    A    I've never heard that in 60 years.

24    Q    Okay.

25    A    Certainly not what I meant, and hardly

Page 89

1    grounds for termination.

2        Q    Are you aware of the slang definition of the

3    term mermaid?

4        A    No.

5        Q    Okay.  Have you ever used -- heard someone

6    in the boating community use the term mermaid to refer

7    to a female who will perform oral sex but won't have

8    intercourse with you?

9        A    No, I've never heard that.

10       Q    The previous times you've used the joke

11   about mermaids, did you say the same thing, "catch

12   mermaids" or did you use the phrase "fishing for

13   mermaids"?

14       A    When I'm asked if I go fishing on my boat,

15   the standard line is "the only kind of fish my boat

16   can catch is mermaids," which don't exist, especially

17   because I'm happily married for 34 years.

18       Q    Okay.  Turning away from the discussion

19   about mermaids, any other statements that you've made

20   that you could contemplate would be offensive or

21   improper?

22       A    Not that I would contemplate.

23            (Defendant's Exhibit 4 marked.)

24   BY MR. PASCOE:

25       Q    Mr. Grandis, the court reporter has handed

Page 90

1    you what has been marked as Exhibit 4.  These are your

2    responses to BGIS's interrogatories.

3            If you look at page 3, the second full

4    paragraph, it talks about a Los Angeles workshop.

5            Is that the -- is that the two-day meeting

6    we've been discussing?

7        A    Yes, sir.

8        Q    Okay.  And it lists three comments that you

9    believe were deemed inappropriate.  Do you see that?

10       A    You're saying I deemed them to be

11   inappropriate?

12       Q    Well, I'm trying to paraphrase the first

13   sentence:  "The three comments at the Los Angeles

14   workshop for Shell that were deemed inappropriate were

15   as follows:"

16           Do you see that?

17       A    Yes, that's what they deemed inappropriate.

18   You asked if I deemed it inappropriate.

19       Q    So I just asked you about the -- any other

20   comments and you couldn't come up with any others

21   other than the mermaids?

22       A    I couldn't come up with anything that you

23   asked me if I deemed inappropriate, and that's my

24   answer.

25       Q    Okay.  So we talked about Romanette 1, which

Page 91

1    is the discussion about mermaids.  In Romanette 2 --

2         MR. AIELLO:  Are you saying -- I'm sorry,

3       Michael, are you saying "Romanette"?

4         MR. PASCOE:  Little i, that's what it's

5       called.  I don't know.

6         MR. AIELLO:  I just never heard the word --

7       Roman Numeral I or Roman Numeral II.  You're

8       saying "Romanette" and I'm, like, am I focusing

9       on the wrong thing?

10        MR. PASCOE:  Well, yeah, the Romanette is

11      the upper -- Roman, numerals, is the upper case.

12      Romanette is the lower case.

13        MR. AIELLO:  Got it.  Thank you.

14   BY MR. PASCOE:

15      Q    So Romanette 2, which is the two little i in

16   parenthesis, "In another conversation, when the Shell

17   representatives complained about engineers who were

18   taking six months or more to produce drawings for

19   charging stations, I said something to the effect that

20   'we should grow some balls' in our dealings with the

21   engineers and force them to produce the turnaround

22   time on the drawings or give the work to other

23   engineering firms, especially if Shell wanted 250

24   charging stations before the end of 2022."

25        Do you see that?

Page 92

1          A     I do.

2          Q     Did you make that comment?

3          A     I did.

4          Q     And then Romanette 3, "While riding in the

5     third seat of an Uber van, during a phone call with a

6     BGIS colleague, I was told that two Shell Mobility US

7     representatives overheard me using profanity in

8     response to a proposal that BGIS needs to reduce

9     pricing for another customer whose AR to BGIS was

10    overdue to the tune of one million dollars."

11              Do you see that?

12         A     I do.

13         Q     Okay.  And so other than those three items,

14    we talked about the mermaids, the conversation about

15    the engineers needing to "grow some balls," and

16    profanity, any other conduct at the Los Angeles

17    meetings that comes to mind that could be offensive?

18         A     Not that I'm aware of.

19         Q     Okay.

20         A     Nor do I think those are offensive,

21    considering the rep from BGIS were dropping F -- from

22    Shell were dropping F bombs throughout dinner, so I

23    didn't think using the same language that they were

24    would be deemed offensive.

25         Q     Your contention is that after these comments

Page 93

1   were made there was a dinner where individuals from

2   shell were using profanity?

3        A    I didn't --

4             MR. AIELLO:   Object to the form.   Go ahead.

5             THE WITNESS:   I didn't say it was after.

6        The evening that I was in the back of the van was

7        right after having dinner wherein a

8        representative from BGIS, Alain, as well as the

9        two Shell representatives were dropping F bombs

10       repeatedly.

11            So I thought there was nothing wrong with

12       using the similar language when I was speaking to

13       a colleague.

14  BY MR. PASCOE:

15       Q    And prior to that Los Angeles workshop you

16  agree that, in Brian Fellows' presence, you referred

17  to women as chicks; is that right?

18       A    I did make that major mistake one time on

19  the phone, yeah.

20       Q    And --

21            MR. AIELLO:   Did you say that was before?

22       I'm sorry, I don't want to interrupt, but I just

23       want to make sure I heard the testimony -- she

24       can read it -- but did you say before the LA

25       workshop?

Page 94

1              MR. PASCOE:  That was my question.

2              MR. AIELLO:  Okay.

3              MR. PASCOE:  Did it occur before the LA

4         workshop.

5              THE WITNESS:  I thought you had said it

6         occurred -- you said before the LA workshop, is

7         it correct that you said the word chicks.

8              I think that's what you said.  Would you

9         like to read it back to make sure --

10             MR. AIELLO:  No, that is what he said.

11        That's what he just said.

12             THE WITNESS:  It was beforehand, uh-huh,

13        correct.

14   BY MR. PASCOE:

15        Q    You talk about an off-color joke.

16   Specifically you were engaging in discussion with

17   Brian Fellows and you were asked to describe what

18   services Rebecca Nicholas provided for BGIS, and you

19   responded that she swallows; is that right?

20        A    I don't agree with you saying it was an

21   off-color joke.

22        Q    My question is just whether or not you

23   replied that she swallows?

24        A    I did say that.

25        Q    Okay.  What did she swallow, Mr. Grandis?

Page 95

1      A     I have no idea.

2      Q     Well, you used the words.

3      A     Yeah, I was joking.

4      Q     What would she have swallowed?

5      A     Whatever you'd like her to swallow.

6      Q     Well, okay.

7      A     I didn't say anything that she swallows.  I

8  just used the word, "I heard she swallows."

9      Q     Did you mean semen, Mr. Grandis?

10     A     I -- you can interpret it any way you like.

11     Q     Okay.  Is it your testimony under oath today

12  that when you said she swallows you did not mean

13  semen?

14     A     I meant exactly what I said, which is "I

15  heard she swallows."

16     Q     That's not the question.  The question is

17  whether your testimony under oath today is when you

18  said the word "she swallows," you were not referring

19  to her swallowing semen after performing oral sex?

20     A     Well, that certainly could have been an

21  interpretation.

22     Q     I'm asking you what an interpretation is,

23  Mr. Grandis.  I'm asking you to give me your

24  permission -- your position under oath, and the

25  question is:  Is your position under oath that when

Page 96

1   you said, "she swallows," referring to Rebecca

2   Nicholas, you did not mean she swallows semen after

3   performing oral sex?

4       A    I definitely did not say she swallowed

5   semen.

6       Q    I know you didn't say she swallowed semen.

7   My question is:  Under oath, can you say you didn't

8   mean to imply that she swallows semen after performing

9   oral sex?

10      A    It could have been interpreted that way.

11      Q    I'm not asking about the interpretation,

12  Mr. Grandis.  I'm asking about what you intended to

13  comply -- imply and whether or not you are saying

14  under oath that you meant something other than Rebecca

15  Nicholas swallowed semen after performing oral sex.

16          MR. AIELLO:  Asked and answered.

17          THE WITNESS:  Again, I'm not going to

18      remember what I meant at the time and what --

19      what context it was.  It certainly could have

20      been interpreted that way.

21  BY MR. PASCOE:

22      Q    You would agree with me that it is a

23  violation of a sexual harassment policy to joke that

24  the services a female employee provide are swallowing

25  after performing oral sex?

Page 97

1           MR. AIELLO:  Objection to form.

2           THE WITNESS:  Repeat the question.

3    BY MR. PASCOE:

4       Q    Yeah.  You would agree that it would violate

5    APT's sexual harassment policy by joking that the

6    services that a female employee provides is swallowing

7    semen after performing oral sex?

8           MR. AIELLO:  Objection to form.

9           THE WITNESS:  If I said it to that female it

10          certainly would be.

11   BY MR. PASCOE:

12      Q    Okay.  But it's an okay joke that doesn't

13   violate the sexual harassment policy as long as that

14   particular female is not around?

15          MR. AIELLO:  Objection to the form.

16          THE WITNESS:  It would not -- the policy was

17          for unwelcomed and the policy was for harassing

18          and the policy was for putting people

19          uncomfortable, and I don't think what I had said

20          to Mr. Fellows would fall under any of those

21          definitions.

22   BY MR. PASCOE:

23      Q    Okay.

24      A    So I would say that I did not violate the

25   policy.

Page 98

1      Q    Okay.  After you returned from the trip to

2  Los Angeles, did you receive a letter hand delivered

3  to you from BGIS?

4      A    Are you referring to March 7th?

5      Q    Yes, sir.

6      A    Yes.

7           Are we finished with this prior exhibit that

8  I can put away?

9      Q    Yes.  If you can flip it and face it down.

10          (Defendant's Exhibit 5 marked.)

11  BY MR. PASCOE:

12     Q    Mr. Grandis, the court reporter has handed

13  you what's been marked as Exhibit 5.  Have you seen

14  this before?

15     A    Yes.

16     Q    What is it?

17     A    Yes, what was your question?  I'm sorry.

18     Q    What is Exhibit 5.

19     A    This is a final warning.

20     Q    What was the final warning for?

21     A    According to this letter, it was for some

22  comments that I had made which were discussed at

23  Shell, the cab ride, and Brian Fellows.

24     Q    Okay, so Exhibit 5 was handed to you by Mark

25  Marquis on March 7th; is that right?

Page 99

1      A     It was actually handed to me Ron Shory.

2            COURT REPORTER:  I'm sorry, what was his

3      last name?

4            THE WITNESS:  I think it's Shory.  I don't

5      know how to spell that, though.

6            MR. PASCOE:  S-h-o-r-y.

7   BY MR. PASCOE:

8      Q     So Exhibit 5 was handed to you by Ron Shory

9   on March 7, 2022?

10     A     Correct.

11     Q     What happened after Mr. Shory -- I guess,

12  was it -- was it in a -- what were the circumstances

13  surrounding?  Was it a meeting, or how was it handed

14  to you?

15     A     Yes, he showed up at 4:30 in the afternoon,

16  presented this to me, had me read it.  I told him that

17  I never received the BGIS handbook because it referred

18  to that.  And I also told him that it says it's

19  inconsistent with BGIS core values, and I had never

20  received anything that showed what their core values

21  are.

22            And it was somewhat of a friendly meeting.

23  I told them that I had no idea what I had done was to

24  this level.  And he said, "Well, I'm going to send you

25  that handbook and I'm going to ask you to do some

Page 100

1   training, some online training."

2           I certainly said it was never my intention

3   to offend anyone and I welcome both of those at his

4   earliest convenience, at which point I actually had to

5   follow up a couple of times.

6       Q    Did you at that point dispute with Mr. Shory

7   that your conduct in February 16th and 17th, did you

8   dispute the characterization of it as inappropriate?

9       A    I didn't think it was inappropriate.  I

10  understood that they did.

11      Q    I understand what you thought.  My question

12  is what you said to Mr. Shory at the March 7th

13  meeting?

14      A    I acknowledged saying those things.  I

15  didn't say they were inappropriate.

16      Q    Well, it doesn't -- so I guess let's walk

17  through it.  And in the second paragraph it talks

18  about that workshop, the February 16th and 17th

19  workshop.

20      A    Correct.

21      Q    And it talks about who was there, Greenlots

22  and Shell.  And it says, "There were senior leaders

23  present from both of our client organizations.  It was

24  brought to the attention of BGIS from our client, and

25  witnessed by Alain Chaput, Vice President Client

Page 101

1    Service Delivery (BGIS), that some of your actions and

2    statements were inappropriate and clearly not aligned

3    with either the values of BGIS and/or our client

4    organizations."

5            Do you see that?

6        A    I do.

7        Q    And then he talks about the Uber cab ride.

8        A    Yeah.

9        Q    Making inappropriate comments that were

10   derogatory in nature about your dissatisfaction with

11   other clients in the presence of Shell leaders.

12           Do you see that?

13       A    I do.

14       Q    Okay.  And so did you read this letter when

15   it was handed to you in the March 7th meeting?

16       A    I did.

17       Q    And did you tell Mr. Shory that you

18   disagreed with those characterizations?

19       A    I disagreed that they were inappropriate.  I

20   acknowledged that I had said them.

21       Q    Okay.  And when you say you acknowledged

22   that you had said them, what specifically did you

23   acknowledge in the March 7th meeting that you had

24   said?

25       A    What the letter states and what you asked me

Page 102

1    before.

2       Q    Okay.  And then the paragraph concludes by

3    saying, "As a direct result of this series of events,

4    the clients at Shell specifically requested that they

5    do not wish to interact with you in the future."

6            Do you see that?

7       A    I do.

8       Q    Is it your testimony that saying you should

9    grow some balls, talking about mermaids, and using the

10   F word, were the only conduct that occurred that could

11   have resulted in Shell specifically requesting not to

12   interact with you?

13           MR. AIELLO:  Objection to form.  Compound.

14       Asked and answered.

15           THE WITNESS:  As far as this letter stated,

16       that's all they told me that happened.

17   BY MR. PASCOE:

18       Q    I'm not asking what they told you.  I'm

19   asking -- right.  Does it seem inconsistent to you,

20   sir?

21       A    What?  Does what seem inconsistent?

22       Q    Well, Shell specifically requested not to

23   interact with you.  And your characterization of your

24   interaction with them was that you used a swear word,

25   you talked about mermaids and you said "grow some

Page 103

1    balls."  Is that the sum and substance of it?

2         A    That's what I'm understanding.

3         Q    And it didn't strike you as odd that that

4    was the only thing that happened and Shell was

5    specifically saying they don't want to interact with

6    you anymore?

7              MR. AIELLO:  Objection.

8              THE WITNESS:  That's all -- I didn't even

9         think those were reasons for it, but that's what

10        they stated bothered them.  So I don't know what

11        else they thought would have bothered them, but

12        obviously nothing to the extent that they put it

13        in this letter, which I'm sure they would have

14        written everything they could have to say what I

15        did wrong, and I don't see anything else.

16             MR. AIELLO:  Objection to form, and move to

17        strike what which is nonresponsive.  Go ahead.

18             MR. PASCOE:  That's not a thing.

19             MR. AIELLO:  Pardon me?

20             MR. PASCOE:  There's no moving to strike in

21        a deposition.

22             MR. AIELLO:  If something is nonresponsive,

23        I need to protect myself.  Go ahead.  And need to

24        protect my client.

25             MR. PASCOE:  The only objection in federal

Page 104

1          court is to the form of the question.  Anything
2          else is inappropriate witness coaching.
3     BY MR. PASCOE:
4          Q    Okay.  So I think that you're interpreting
5     my question to mean BGIS.  And I want to make sure
6     that's not how you're interpreting my question, so I
7     won't not use the pronoun "them."
8               So the only thing you can think of that you
9     did in front of Shell are the three comments we've
10    discussed.
11              And so my question is:  When you received
12    Exhibit 5 on March 7th, didn't it strike you as odd
13    that Shell was now saying that they did not want to
14    interact with you any more?
15         A    I thought it was odd.
16         Q    Okay.  Did you raise that with anyone at
17    BGIS?
18         A    Yes.
19         Q    Okay.  Who did you raise it with?
20         A    Alain.
21         Q    Who else?
22         A    When Gord called me and coached me.
23         Q    Who else?
24         A    That's it.
25         Q    Okay.  When you spoke with Alain, what did

Page 105

1    you say to him?

2         A    I said, "Alain, I'm so sorry that it seems

3    that I had offended Shell," which would be my last

4    intention to do.  And I spoke to Alain after Gord had

5    called me and coached me and said that Shell is their

6    most sensitive customer they have because 50 percent

7    of the employees -- or of the executives are women.

8    And that I have to be extra, extra careful.

9              And my comment back was, "Well, it certainly

10   would have been helpful if somebody told me that prior

11   to the meeting."

12             And when I spoke to Alain subsequent to

13   that, I apologized to Alain.  And Alain said, "You

14   know, Devin, I also have to apologize to you.  I could

15   have warned."

16             I said, "Well, it certainly would have saved

17   some embarrassment because it wasn't my intention to

18   cause any of this."

19        Q    So when did you talk to Gord?

20        A    After the trip, obviously.

21        Q    Well, and then after March 7th, right?

22        A    No.  No.  You can see here that Gord had

23   contacted me prior.  He contacted me sometime the

24   following week after I had returned from the trip.

25        Q    And when did you talk to Alain?

Page 106

1      A     Within the next day or so, or after that

2   call, in close proximity.  I don't remember exactly

3   when.

4      Q     And then after the paragraph regarding the

5   two-day workshop, the letter recites that other two

6   inappropriate comments we discussed referring to women

7   as chicks and stating that Rebecca Nicholas swallows;

8   is that right?

9      A     I'm sorry, your question was what?

10     Q     Well, the next paragraph references two

11  instances.  Do you see that?

12     A     Yes.

13     Q     The one instance is referring to women as

14  chicks in front of Brian Fellows; is that right?

15     A     Yes, as you had pointed out, that was prior

16  to the trip.

17     Q     And then the flippant and highly

18  unacceptable remark that the letter talks about is the

19  discussion that we had about the Rebecca Nicholas and

20  when you were asked what she does, you said "she

21  swallows."  Is that right?

22     A     Yes.

23     Q     And then the last paragraph says, "I would

24  like you to be successful and I am here to assist you

25  so you can be successful.  Please let me know if

Page 107

1    there's anything I or the human resources team can do

2    to help you through the process.  Needless to say

3    immediate and sustained improvement is expected.  Our

4    workplace investigation continues, although any

5    violation of BGIS's guidelines or any other serious

6    deficiency in your performance may result in further

7    disciplinary actions, up to and including termination

8    of your employment."

9           Do you see that?

10    A    I do.

11    Q    Was this portion a demand to you that you

12    improve your performance immediately?

13           MR. AIELLO:  Objection to form.

14           THE WITNESS:  Along with them assisting me

15       to know what it is that I did wrong so I would

16       not make the same mistakes, in their mind, in the

17       future.

18    BY MR. PASCOE:

19    Q    But that's a yes, it was a demand for you to

20    immediately improve your performance; is that right?

21    A    That's what it says.

22    Q    So I'll just represent to you, for the

23    record, that March 7, 2022 was a Monday.  The next

24    Monday, the 14th, did you attend a trade show?

25    A    I did.

Page 108

1      Q     What was the trade show for?

2      A     A restaurant facility managers' association.

3      Q     What were you doing at the trade show?

4      A     I was helping to set it up and I

5   participated in the first day of the trade show,

6   selling or presenting the products and services that

7   we were delivering.

8      Q     When you say "help set it up," what were you

9   setting up?

10     A     The booth.

11     Q     And what were you selling specifically?

12     A     The services of Team E-Motion and BGIS.

13     Q     What kind of services would people at the

14   restaurant facilities management, is that right,

15   restaurant facilities --

16     A     Good enough.  You could refer to it as RFMA.

17     Q     RFMA okay.  At RFMA --

18     A     Yeah.

19     Q     -- be purchasing for BGIS or Team E-Motion?

20     A     Any and all.

21     Q     Okay.  At some point during that trade show,

22   did you make a statement to Nikki Sakoff that if she

23   keep bending over like that she was going to be

24   attacked or raped?

25     A     No.

Page 109

```
 1              MR. PASCOE:  Let's mark this as 6.

 2              (Defendant's Exhibit 6 marked.)

 3    BY MR. PASCOE:

 4       Q    Mr. Grandis, the court reporter has handed

 5    you what's been marked as Exhibit 6.  This is a

 6    written statement from Michael Gainsley obtained as

 7    part of BGIS's investigation by its HR department,

 8    specifically Sherry Pelletier and --

 9              MR. AIELLO:  I object to your

10         characterization of this as a written statement

11         of Mr. Gainsley.

12    BY MR. PASCOE:

13       Q    Okay.  On page 2 of 2, Mr. Gainsley was

14    asked -- I'll read the paragraph for you.

15              "When asked if Mr. Gainsley remembers any

16    unprofessional statements or behaviors being made by

17    his coworkers, he shared there was an incident at the

18    trade show booth."

19              And it says, "He further stated he knew it

20    was extremely unprofessional at the time, but did not

21    say anything at the time.  Mr. Gainsley claims that it

22    was on Monday, September 14, 2022, in the afternoon.

23    The four of them were working in the booth with

24    Mr. Grandis behind the table, Ms. Sakoff on the other

25    side of the table by the aisleway leaning on the table
```

Page 110

 1    with her elbows and Mr. Palmieri and Mr. Gainsley were

 2    on each side of the table.  Mr. Gainsley stated

 3    hearing something inappropriate said by Mr. Grandis

 4    towards Ms. Sakoff, 'If you keep bending over the

 5    table like that with your ass out, you're bound to get

 6    attacked or raped."

 7           Do you see that?

 8      A    I see it.

 9      Q    And your statement today is you did not make

10    that comment?

11      A    That's correct.

12      Q    So if Mr. Gainsley were to testify to that

13    under oath, would he be lying or could you perhaps

14    have forgotten?

15           MR. AIELLO:  I will object to the form of

16        the question.  It is totally inappropriate to ask

17        one witness a question such as that.

18           Go ahead, Devin.

19           THE WITNESS:  Sure.  If I read this, even

20        Mr. Gainsley says he said something like, not

21        those exact words.  I don't know what he heard.

22        I don't know what he interpreted he heard, but

23        obviously as he says, he didn't say anything.

24           So I don't know it could have been that bad

25        if he didn't say anything, Chris didn't say

Page 111

1      anything, and Nikki didn't say anything, so

2      that's why I'm saying to you I didn't say that.

3  BY MR. PASCOE:

4      Q    Well, right, that was -- I guess the sum and

5  substance of my question is:  Sometimes when we say we

6  didn't say something, we mean we don't remember saying

7  it.  And sometimes when we say we didn't say something

8  we mean we are absolutely certain we didn't say it.

9      A    I'm sure that I did not tell her that if she

10  bent over she would get raped or attacked.

11      Q    Or words to that effect?

12      A    I -- not that I would recall ever saying

13  that.

14      Q    Later on at some point during the trade show

15  did you tell Ms. Sakoff an off-color joke?

16      A    Could you define "off-color"?

17      Q    Did you say to Ms. Sakoff, words to the

18  effect of, "If you went camping and woke up with a

19  condom in your ass, would you say anything?"

20      A    That is out of context.  She had asked me to

21  tell her a joke after we were walking her back from

22  the trade show, and Chris saw a billboard.

23      Q    What do you mean she asked you to tell her a

24  joke?

25      A    When we were walking back there was a

Page 112

1   billboard about camping.  Chris started laughing and

2   said does Nikki know the camping joke?  Nikki said,

3   "Oh, what joke was that?"  So I said something to the

4   effect of, "Do you want to hear the joke?"  And her

5   response was the affirmative, in which case I said,

6   "The joke goes like this:  "If somebody goes up to you

7   and says if you went camping and woke up in the

8   morning with a condom sticking out of your rear-end,

9   would you tell anybody?"

10          She replied, "I think I would know who I

11  went to -- camping or went to bed with."  And I said,

12  "Yeah, but that's not how the joke goes.  The normal

13  response is somebody says:  No, I wouldn't.  And the

14  response to that is:  Oh, do you want to go camping?

15          That's the joke.  Seeing that she really

16  didn't understand it, I dropped it and moved on.

17      Q    Where were you when you saw the billboard?

18      A    We were walking her back to her hotel room

19  after the -- after dinner.

20      Q    After dinner where?

21      A    At the trade show.  We had gone to a

22  restaurant, eaten.  And I don't remember the name of

23  the restaurant, if that's what you're asking.

24      Q    So did you hesitate at all before relaying

25  that to Ms. Sakoff?

Page 113

1          A     I don't recall.

2          Q     Well, so just a week earlier you had been

3    placed on a final written warning letter that said

4    that sustained improvement was needed from you.

5                Did you hesitate at all to make a sexual

6    joke or even reference a sexual joke?

7          A     Again, I don't believe I hesitated other

8    than answering her question based on the relationship

9    that she and I had.  I think that my interpretation

10   from BGIS would be a highly situational one and it

11   depends on who you're speaking to.  In Nikki's case, I

12   didn't think it was a problem.

13         Q     So you saw nothing wrong with making a joke

14   essentially about anal rape to a colleague?

15               MR. AIELLO:  Object to the form of the

16         question.

17               MR. PASCOE:  What's wrong with the form?

18               MR. AIELLO:  You're talking about anal rape?

19               MR. PASCOE:  Well, if someone is sleeping

20         and they wake up with a condom in their ass, yes,

21         that would be rape.  That's un-consensual sexual

22         intercourse.

23               THE WITNESS:  Not unless they knew about it

24         beforehand and fell asleep and woke with it,

25         right?  I mean, you're talking about a joke and

Page 114

1       you're trying to infer something that I said or
2       meant --
3   BY MR. PASCOE:
4       Q    Wait.  Is your testimony, Mr. Grandis, that
5   there is a situation where it would be okay to perform
6   anal intercourse on someone while they're sleeping?
7       A    I was telling a joke.
8       Q    Okay.  So we agree that there is no
9   circumstance where it would be acceptable to perform
10  anal intercourse on someone while they're sleeping.
11  We agree with that.
12      A    Well, I don't think they'd stay asleep, do
13  you?
14      Q    No, but we agree it's inappropriate, right,
15  Mr. Grandis.  There's no situation where it would be
16  okay.
17      A    If it was unwelcomed, it would be
18  inappropriate for sure.
19      Q    Okay.  And it would constitute rape; is that
20  right?
21      A    I'm not a lawyer to judge that.
22      Q    You think that there's a situation where you
23  could approach someone who's sleeping and begin anal
24  intercourse and it wouldn't be rape?
25      A    Again, that's not what the joke is, and if

Page 115

1    it was consensual it would be different than somebody

2    purposely preventing somebody from moving or hearing

3    of the word no or anything like that.

4              If it was rape, would it be wrong?  The

5    answer there is very easily yes.

6        Q    So is your testimony today that unless the

7    person woke up and said "stop" or indicated some kind

8    of incident of nonconsent that it would be okay?

9        A    I'm not going to hypothesize on any of this.

10   The answer is, if it was rape, it is rape and it's

11   wrong.  That's completely out of context of explaining

12   a joke.

13       Q    Well, I'm curious what you understand the

14   concept of concept to mean --

15       A    Meaning --

16       Q    -- which is especially relevant to this

17   litigation.  Is it your understanding that it would

18   have -- it would be okay to, without prior concept,

19   engage in anal intercourse with someone who's

20   sleeping?

21       A    No --

22            MR. AIELLO:  Excuse me.

23            THE WITNESS:  Sorry.

24            MR. AIELLO:  Objection to form.  Asked and

25        answered.  Now how many more times are we going

Page 116

1          to ask this question?

2      BY MR. PASCOE:

3          Q    You can answer, Mr. Grandis.

4          A    Yeah, it would be wrong.

5          Q    Okay.  Good.

6               Was there a time in February of 2022 where

7      you were on a videoconference call with executives

8      from Rexel?

9          A    I don't recall but it's possible.

10         Q    Do you recall repeatedly stating on that

11     video call that one of the female executives from

12     Rexel was extremely pretty and beautiful, and

13     repeating that several times?

14         A    I said that on the call to Rexel is what

15     you're suggesting?

16         Q    Yes, sir.

17         A    I don't recall ever doing that.

18         Q    Is it appropriate on a professional video

19     call to comment on the looks of a female on the call?

20         A    If it's a positive compliment, I probably

21     wouldn't see a problem with it.

22         Q    Do you agree that complying with the

23     non-harassment policy is part of your job obligation,

24     or was part of your job obligation at BGIS?

25               MR. AIELLO:  I object to the form of the

Page 117

1      question.

2            THE WITNESS:  Can you repeat the question,

3      please.

4  BY MR. PASCOE:

5      Q     Sure.

6            Was part of your job at BGIS to not harass

7  people?

8      A     Yes.

9      Q     And was part of your job at BGIS to not

10  sexually harass people?

11     A     For sure.

12     Q     And was part of your job at BGIS to not

13  create a hostile work environment?

14     A     Yes.

15     Q     Okay.  And you were warned on March 7, 2007,

16  that you were doing all three of those things, right?

17     A     I was warned that what I had said in those

18  three instances was against the values of BGIS.

19     Q     Well, that it constituted harassment, right?

20     A     They asked -- they suggested that I -- it

21  says, "Please see the harassment-free workplace."  I

22  don't remember them telling me I was harassing.

23     Q     So while they might not have exclusively

24  said it, they identified some conduct and then they

25  suggested you look at the harassment policy; is that

Page 118

1    right?

2         A    Except they didn't give me the harassment

3    policy until Friday afternoon, so I didn't know what

4    their policy was.

5         Q    But they identified some conduct?

6         A    Yes.

7         Q    And then they said, "look at the harassment

8    policy," right?

9         A    Yes.

10        Q    Let's go back to Exhibit 1.

11        A    Which is Exhibit 1?

12        Q    It's your employment agreement.

13             If you look at page 2 of Exhibit 1 under

14   "Cause," let's look at Romanette 1 again.  And it

15   says, "Cause can mean your material failure to perform

16   your duties and responsibilities to BGIS."

17             You just acknowledged that part of those

18   duties include not harassing people, not sexually

19   harassing people, and not creating a hostile work

20   environment; is that right?

21        A    Correct.

22        Q    And then it says, (as read) "You have the

23   right to cure such material failure to the reasonable

24   satisfaction of BGIS (if capable of being cured)

25   within 30 days after delivery by BGIS to you of

Page 119

```
 1   written notice requiring curative action."
 2            Do you see that?
 3       A    I do.  I also notice you didn't use the
 4   beginning part of that, which is your material failure
 5   to perform.
 6       Q    Right.  And so you'd agree that on March 7,
 7   2022, you got written notice requiring curative
 8   action; is that right?
 9       A    Yes.
10       Q    And you were not terminated until April 7,
11   2022, 30 days later; is that right?
12       A    Thirty days after that notice, yes.
13       Q    Okay.  So BGIS gave you notice of a material
14   failure to perform your duties and responsibilities,
15   gave you 30 days to cure it, you engaged in the
16   conduct at the trade show and they terminated you; is
17   that right?
18       A    Yes.
19       Q    Okay.  And that falls underneath the
20   definition of cause in Romanette 1, right?
21            MR. AIELLO:  I object to the form of the
22       question.
23            THE WITNESS:  It does not because they
24       didn't give me 30 days, number one, to even cure
25       that.
```

Page 120

```
 1    BY MR. PASCOE:

 2         Q    Okay.  Well, you just testified that they

 3    did.

 4         A    No.  I testified that they did terminate me

 5    30 days after this notice.  I did not testify that

 6    they gave me 30 days to cure.

 7         Q    So do you agree that if somebody had given

 8    you notice of inappropriate harassing, sexually

 9    harassing and hostile workplace conduct, and then

10    within a week of getting that notice you engaged in

11    further harassing conduct, that it would be a good

12    faith and reasonable determination that the conduct

13    was not capable of being cured?

14              MR. AIELLO:  Objection to the form.

15         Combined.  Calls for multiple conclusions.

16              Go ahead.

17              THE WITNESS:  First of all, you keep using

18         the word harassing and I didn't believe I

19         harassed anybody, so that would not have fallen

20         under it.

21              Secondly, 30 days would be from when they

22         gave me some type of tool to understand what

23         their expectations are, and I didn't get that

24         handbook until 4:30 the prior workday from when I

25         left.  And I was told that I was going to get
```

Page 121

1         some kind of online training.  I had to actually

2         remind Ron once or twice to say, "Hey, listen, I

3         want to take this seriously.  Where's the

4         training?"  And he said, "I'll get it to you."

5         And it took almost over two weeks from this

6         letter for me to get the online training.  I

7         completed the training within a few days.

8              And in my opinion, that should have started

9         the 30 days for curing.  If it was so important

10        to BGIS with my behavior, why would it take two

11        weeks to get training?

12   BY MR. PASCOE:

13        Q    Well, that wasn't my question at all.

14        A    That was my answer.

15        Q    My question was whether or not -- whether if

16   BGIS gave you notice of what they believe was

17   harassment, sexual harassment, and creating a hostile

18   work environment, and then seven days after getting

19   that notice you engaged in further sexual harassment

20   and misconduct, if it would have been within BGIS's

21   good faith and reasonable determination, that your

22   action is not capable of being cured?

23             MR. AIELLO:  Objection to form.  Asked and

24        answered.  What you think was your question or

25        not, is not relevant, sir.

Page 122

1          THE WITNESS:  I didn't conduct any

2      inappropriate sexual harassment, so I don't

3      understand why you keep saying that.

4  BY MR. PASCOE:

5      Q    Well, so -- but do you understand that that

6  could be the issue, Mr. Grandis?  I mean, do you

7  understand that the issue really could be that you

8  have no concept that the conduct that you engaged in

9  was inappropriate?

10     A    I would say it's situational.  And knowing

11  Nikki and my relationship with her for five years, it

12  would be highly irregular for her to be offended by

13  it.

14     Q    Well, okay.  So if an individual is informed

15  of misconduct and the individual is not capable of

16  understanding why their actions constitute misconduct,

17  then the individual can't change; isn't that right,

18  Mr. Grandis?

19          MR. AIELLO:  My objection -- I object to

20      your question based upon its tautological form,

21      so go ahead.

22          THE WITNESS:  Yeah, sure.  That might be

23      your opinion.  I don't -- I think everyone is

24      capable of change if they choose to.

25

Page 123

1    BY MR. PASCOE:

2        Q    Is -- when you said knowing Nikki and having

3    worked with her for five years, I mean, is the

4    statement, you know, essentially she never complained

5    about the conduct before?

6        A    I didn't say that.

7        Q    Well, okay.  So then -- then what's the

8    basis of this statement?  You know, you've continued

9    to characterize this as if it's unwelcomed and knowing

10   Nikki.  What do you mean by that when you say knowing

11   Nikki?

12       A    I had a very, very strong relationship with

13   Nikki from her initial hiring, which I did, when I

14   hired her husband as well, her husband-to-be.

15            She came from the construction business in

16   the Bahamas.  Used to be a project manager.  And she

17   told me all kinds of stories about what she'd hear.

18   And she told me, "You know, Devin, nothing can offend

19   me."

20            Because I told her, you know, we're

21   obviously in a construction industry and we had

22   conversations of whether you're thick skinned or thin

23   skinned, and Nikki made it abundantly clear that there

24   was nothing that anyone could really say that would

25   bother her.

Page 124

1          In addition, the words and things that she

2    would say to me would indicate to me, again based on

3    knowing your audience, that she would be perfectly

4    fine for that as I had told her jokes previously, and

5    we had a good relationship.  She even slept over at my

6    house.

7        Q    Did you have a conversation with Ms. Sakoff

8    about the March 7, 2022 letter?

9        A    I did.

10       Q    Tell me about that conversation.

11       A    Being that we were as close as we were, I

12   said, I'm going to have to be very careful how I talk

13   to people because it seems that BGIS is very, very

14   sensitive to saying the wrong thing to the wrong

15   people, something to that effect anyway.

16       Q    What did she say?

17       A    "It's ridiculous."

18       Q    So she agreed with you, is that what you're

19   saying?

20       A    Yes.

21            MR. PASCOE:  All right.  Let's go off the

22        record for a second.

23            THE VIDEOGRAPHER:  Off the video record?

24            MR. PASCOE:  Yep.

25            THE VIDEOGRAPHER:  Going off the record at

Page 125

```
 1        11:56 a.m.
 2              (Recess was taken.)
 3              THE VIDEOGRAPHER:  Back on record at
 4        12:49 p.m.
 5  BY MR. PASCOE:
 6        Q    So, Mr. Grandis, when we went off the record
 7  I said that we were transitioning topics.  I did have
 8  one small additional area to cover.
 9              Before we went on the break you said that
10  you had a conversation with Nikki about the March 7th
11  letter.  She agreed it was ridiculous.  She has thick
12  skin and said you can't offend her.
13              You're aware, right, sir, that she's the one
14  who made the complaint?
15        A    I am now, yes.
16        Q    Okay.  How -- how do you explain that?
17              MR. AIELLO:  I am going to object to the
18        form.
19              THE WITNESS:  I believe that before the
20        purchase she had sent me an e-mail, a very
21        aggressive one, asking for additional money,
22        raises.  She had complained to me when we had let
23        go of our other senior salesperson, she was upset
24        that I didn't give her some of the major accounts
25        so that she could make more money.
```

Page 126

1           And I believe that she threw me under the
2      bus so that she could take over my accounts and
3      get commissions because that's what I helped
4      negotiate for her, so she stood to have a huge
5      amount of financial gain from that.
6  BY MR. PASCOE:
7      Q    And do you contend that BGIS was aware of
8  that?
9      A    Could you specify what "that" is?
10     Q    Well, that plan that you just outlined by
11  Nikki to throw you under the bus and take your
12  accounts?
13     A    I can't tell you what's in somebody else's
14  mind or what they know or what they don't know, but
15  certainly that's my feeling, which is what you asked
16  me.
17     Q    Do you have any evidence to indicate that
18  BGIS was aware of Nikki's plan to take your accounts?
19          MR. AIELLO:  Asked and answered.
20          THE WITNESS:  Just that it would be pretty
21      obvious when she took over the accounts and got
22      commission, and they had held back a couple of
23      accounts from her, that they understood that she
24      was going to have some huge financial gain as a
25      result.

Page 127

1    BY MR. PASCOE:

2         Q     Nothing else that you can think of today?

3         A     Nothing that I could prove to you.

4         Q     Okay.  So let's talk about your signature

5    stamp.  My understanding is you have had, prior to the

6    acquisition of substantially all the assets of APT,

7    you had a signature stamp made of your signature; is

8    that right?

9         A     That's correct.

10        Q     What was the purpose of that signature

11   stamp?

12        A     As a result of me traveling a lot and my

13   long-term relationship with the -- certain people in

14   the accounting department, I gave them permission to

15   use my stamp for making payables and similar items,

16   and then I would review what that stamp was used for

17   post use.

18        Q     So essentially to keep the normal scope of

19   business running while you were traveling for business

20   purposes?

21        A     Correct.

22        Q     And after the acquisition, substantially all

23   the assets of BGIS -- or of APT by BGIS, the stamp

24   continued to be used; is that right?

25        A     Oh, I had no choice.

Page 128

1        Q     But that's a yes, it did continue to be
2     used?
3        A     It was continued to be used, yeah.
4        Q     Okay.  And you had no objection to that; is
5     that right?
6        A     As long as I was there I had no objection to
7     that for the short-term.
8        Q     You acknowledge there was an obligation
9     after the acquisition to continue to transition
10    services, accounts and other things from APT to BGIS;
11    is that right?
12       A     For a period of time, yes.
13       Q     Would you object to the use of your stamp to
14    accomplish that objective after you were terminated
15    from BGIS?
16       A     One more time, please?  Repeat the question.
17       Q     Sure.  Would you object to the use of your
18    stamp to accomplish those objectives that we just
19    identified after your termination from BGIS?
20       A     Yes.
21             MR. AIELLO:  Objection to form.
22    BY MR. PASCOE:
23       Q     Why?
24       A     Because I'm no longer in control of knowing
25    what is getting paid, how it's getting paid, and they

Page 129

1  were using that stamp for companies that they didn't

2  even have control over.  That would be like me signing

3  your name to checks out of your company without you

4  knowing about it.

5        Q    Okay.  What do you mean when you said they

6  were using it for companies that they didn't have

7  control over?

8        A    Well, they didn't own Creative Lighting and

9  they didn't own Sustainable Management Solution, but

10  my understanding was they were using the stamp for

11  those as well.

12        Q    What's the basis of that understanding?

13        A    That I was the only signature on the

14  account.

15        Q    I don't understand what you mean when you

16  say "I was the only."  How does that prove that they

17  were using your signature stamp?

18        A    Well, otherwise, I would have gotten a huge

19  amount of delinquencies from the vendors at Creative

20  Lighting saying that Creative Lighting wasn't making

21  payments.

22             And, again, not knowing what they used the

23  stamp for or not, I can't tell you when they used it

24  or when they didn't use it, only that it was without

25  my expressed permission.

```
                                              Page 130
 1       Q    Okay.  So you, sitting here today, you don't
 2  know what BGIS used the stamp for?
 3       A    I cannot tell you specifically how often or
 4  when they used that stamp, that's correct.
 5       Q    And you have the stamp back now; is that
 6  right?
 7       A    At this point I do have the stamp back, yes.
 8       Q    Can you identify any monetary damages that
 9  you suffered due to BGIS's use of your signature
10  stamp?
11       A    The legal fees that it took me to try and
12  get them to stop using it.  The -- I do not
13  understand, other than some of the bills that were
14  late when my credit would have gone down, other than
15  credit is sometimes measured with your outstanding
16  obligations from a liability standpoint.
17            And so I was -- there was still payables on
18  personal guarantees on assets that are even, as of
19  today, haven't been converted over to BGIS and this is
20  almost two years.
21       Q    Well, I'm not asking about assets that
22  haven't been converted.  I'm asking specifically about
23  monetary damages from the use of the signature stamp.
24       A    Yes.  So, again, the monetary damages would
25  be legal.  It would be an unknown amount that would be
```

Page 131

1   caused by paying late and hurting my name in the

2   industry.  And I -- I didn't get any record of things

3   bounced, so I couldn't really address that.  Those

4   would be the primary -- and the fact that if my credit

5   rating went down, it would cost me more in interest.

6        Q    Okay.  But other than the impact on your

7   credit, hurting your name in the industry, and legal

8   fees, no other damages you can identify today from

9   BGIS's use of your signature stamp?

10       A    Not at this point.

11       Q    And sitting here today, can you identify a

12  specific example of BGIS's use of the signature stamp

13  that was inconsistent with the terms of the transition

14  services agreement?

15       A    Not knowing what they used their stamp for,

16  it would be hard for me to answer that.

17       Q    So that's a no?

18            MR. AIELLO:  Well, I object to the form of

19       the question.

20  BY MR. PASCOE:

21       Q    Is that right, Mr. Grandis?

22       A    It's I'm unaware of what it could

23  potentially be because I didn't know what they used

24  the stamp for.

25       Q    Right, but you don't see any money missing

Page 132

1      out of a personal account or anything like that?

2          A     Out of a personal account?  No, they

3      wouldn't have access to my personal accounts.

4          Q     And you can't identify a payment that was

5      made that shouldn't have been made?

6          A     I have no ability to do so one way or the

7      other because I didn't have access to the books at

8      that point, once I was let go.

9              So I don't know if they paid bills that they

10     shouldn't have paid that would have affected my

11     EBITDA.  And, therefore, when you're asking me are

12     there other financial issues, certainly if they paid

13     things that I wouldn't have wanted to have paid, that

14     would affect my EBITDA so, therefore, to that extent,

15     it could also affect me financially.

16         Q     But you have no evidence to indicate that

17     that happened?

18             MR. AIELLO:  Objection to the form.

19             THE WITNESS:  The only evidence that I would

20         have is that somehow, and I still don't

21         understand it, the payables went up by $700,000

22         or so or more, I don't understand.  Does that

23         mean they didn't pay people?  I have no idea what

24         it means, to be honest with you, but that's not

25         relevant, I guess, at this point.

Page 133

1    BY MR. PASCOE:

2         Q    Well, how would the payables going up

3    $700,000 affect your EBITDA?

4         A    Well, the definition of EBITDA is earnings.

5    Earnings are affected by profit, profit is affected by

6    the delta in part between receivables and payables, as

7    well as inventory.

8         Q    Okay.  But if you had a receivable that

9    offset the payable and the standard profits, so for

10   instance, a receivable -- a payable to a vendor and a

11   receivable from a customer, that can be a good thing?

12             MR. AIELLO:  Objection to the form.

13             THE WITNESS:  Why would it be a good thing?

14   BY MR. PASCOE:

15        Q    Well, you're making profit on a payable of

16   ordering parts from a vendor?

17        A    But if you're paying more than you should,

18   or there's a dispute on a payment that you shouldn't

19   have paid and they made it anyway, that would reduce

20   that profit, wouldn't it.

21        Q    I see.  Do you have any evidence that that

22   actually occurred?

23        A    I'm inquiring as to why the payables went up

24   by -- between 7 and $800,000.  If you showed me that,

25   which I've asked for several times and haven't gotten

Page 134

1  an answer, then I could answer you better.

2      Q    Okay, but other than the payables going up 7

3  to $800,000, you have no indication about any improper

4  use of the stamp; is that right?

5      A    I couldn't --

6           MR. AIELLO:  Object to the -- excuse me.

7       Object to the form of the question.

8           THE WITNESS:  I can't answer that because

9       again I do not know to what extent and where they

10      used that stamp.  If you showed me every place

11      they used the stamp, I then could answer your

12      question more accurately.

13  BY MR. PASCOE:

14      Q    I'm not asking you to give me the entire

15  duration or explanation of the world.  I'm asking

16  about the evidence that you have today which is the

17  only thing that I can legitimately ask you for.

18           And so other than the payables going up by 7

19  to 800,000, do you have any other evidence today of

20  improper -- that the use of the stamp by BGIS was

21  improper?

22           MR. AIELLO:  Object to the form.

23           THE WITNESS:  I don't have evidence that I

24      can point to because I'm unaware of what they

25      used it for.

Page 135

1   BY MR. PASCOE:

2        Q    Okay.

3             MR. PASCOE:  What number are we on?

4             MR. AIELLO:  I think 6.

5             COURT REPORTER:  7.

6             MR. AIELLO:  Oh.  This is all --

7             MR. PASCOE:  All one exhibit, with a cover

8        sheet.

9             (Defendant's Exhibit 7 marked.)

10  BY MR. PASCOE:

11       Q    So, Mr. Grandis, the court reporter has

12  handed you what's been marked as Exhibit 7.  I will

13  represent to you this is a composite exhibit and it

14  consists of essentially a single page PowerPoint

15  graph, several purchase orders, a spreadsheet of

16  transactions.  I have an e-mail stuck in here.

17            Do you have -- okay, yeah.

18            An excel spreadsheet and then a number of

19  supporting documents.  Do you have that, just

20  generally?

21       A    I have a whole bunch of papers here.

22       Q    Okay.  So I want to ask you about a

23  transaction that began back in July of 2021, but

24  extends after the purchase agreement.

25            So on July 30, 2021, APT issued a purchase

Page 136

1   order to Southwest Florida Lighting & Electrical

2   Design who then subsequently issued a purchase order

3   to Linmore on August 4, 2021.  That's what this

4   timeline that you're looking at represents.

5            Who is Linmore?

6       A    They are a manufacturer of lighting

7   fixtures.

8       Q    In this July to August 2020 time frame, did

9   APT attempt to get Linmore to supply some lighting

10  fixtures and Linmore refused due to a lack of

11  creditworthiness of APT?

12      A    No, that's not correct.

13      Q    Okay.  Did APT attempt to get lighting

14  fixtures from Linmore and Linmore refused?

15      A    No, that's not correct.

16      Q    Did APT buy lighting fixtures from Linmore

17  in the July or August 2021 time frame?

18      A    Not directly.

19      Q    Okay.  So do you understand what this

20  transaction is that is shown here?

21      A    Perfectly.

22      Q    Okay.  Why don't you tell me what it is.

23      A    Sure.

24            MR. AIELLO:  I'm going to object to the

25       form.

Page 137

1          THE WITNESS:  The transaction was that we
2      were going to buy product from Linmore but
3      because this was a larger purchase order than we
4      made before, they required APT to pay 100 percent
5      of the product upfront.
6          Nikki had told me that she has a
7      relationship with Linmore and that they would
8      extend her terms.  I asked her if I were to buy
9      the fixtures through her, would she extend those
10     terms to us, and she said sure, no problem.
11         So the understanding was that I would have
12     her pay 50 percent to Linmore when the order was
13     placed, and 50 percent when it was due, which I
14     believe was 30 days after delivery.
15         She didn't have the money to lay that out
16     nor was she going to make any profit on it, so I
17     funded her the ability to do so, and that's how
18     the transaction transpired with the understanding
19     that when we would get paid by the customer, we
20     would get -- she would reimburse -- APT would pay
21     her and she would reimburse me for the money I
22     lent her.
23 BY MR. PASCOE:
24     Q    Okay.  So the second page of Exhibit 7, is
25 this a purchase order that essentially reflects what

Page 138

1    you just said, APT to Southwest Florida Lighting &
2    Electrical?
3         A    Yes, it looks like it is.
4         Q    And then the next page we see a purchase
5    order to Linmore essentially with the same terms you
6    noted, 50 percent deposit, 50 percent due 30 days for
7    delivery; is that right?
8         A    That's right.
9         Q    Okay.
10             MR. AIELLO:  I am going to object to the
11        form.  I'll just point this out.  I see two --
12        never mind.  I apologize.
13             MR. PASCOE:  Okay.
14             MR. AIELLO:  Go ahead.
15    BY MR. PASCOE:
16        Q    Okay.  So July 30th that first purchase
17    order gets issued.  August 4th the purchase order
18    comes from Southwest Florida Lighting Electrical
19    Design to Linmore.
20             And then on August 12, 2021, 1500 Property,
21    LLC pays $79,597.20 to Linmore.
22             Do you see that?
23        A    I do.
24        Q    Why did 1500 Property pay that rather than
25    APT?

Page 139

1      A    If APT would pay it, then we would have paid

2   it directly to Linmore but Linmore wouldn't give us

3   the funds -- wouldn't give us the terms.

4      Q    Okay.  So why did 15 Property pay it?

5      A    It had the cash.

6      Q    Okay.

7      A    It's one of the companies I own.

8      Q    Okay.  So 1500 Property pays Linmore

9   essentially the deposit that's reflected on the

10  purchase order issued by Southwest Florida Lighting &

11  Electrical Design on August 4, 2021; is that right?

12     A    Correct.

13     Q    Okay.  And then we see, if you look at the

14  timeline on the left, in the October 7th to October

15  18, 2021 time frame, the materials received and

16  October 6th -- about October 6th is when it starts to

17  come into the APT warehouse.  Do you see that?

18     A    I see it.

19     Q    And then on October 27, 2021, EEDS makes the

20  other 50 percent payment to Linmore, $79,597.28; is

21  that right?

22     A    Correct.

23     Q    Okay.  And so throughout this entire

24  process, Southwest Florida Lighting & Electrical

25  Design paid nothing to Linmore; is that right?

Page 140

1          MR. AIELLO:  I am going to object to the

2       form of the question.

3          THE WITNESS:  We paid on behalf of Southwest

4       Lighting, which was noted on the checks.

5    BY MR. PASCOE:

6       Q    Okay.  But the funds came from 1500

7    Property, LLC and EEDS; is that right?

8       A    That's where they originated from, yes.

9       Q    And so maybe if I clarify the question, none

10   of Southwest Florida Lighting & Electrical Designs'

11   own money was paid to Linmore?

12      A    That's correct.

13      Q    Okay.  And then after the transaction and --

14   or on January 31, 2022, APT makes a payment of

15   $159,195.95 to Southwest Florida Lighting & Electrical

16   Design.

17          Do you see that?

18      A    Yeah, which is exactly the payment that

19   Southwest had to issue to Linmore, correct.

20      Q    But Southwest never issued any money to

21   Linmore.  It came from --

22      A    They issued --

23      Q    It came from --

24      A    They issued a payment so, therefore,

25   Southwest Lighting was repaying a loan.

Page 141

1        Q    But there was no loan, right?  You

2    acknowledged that 1500 Property paid 79,597.28 and

3    EEDS paid 79,597.28, and you just said that Southwest

4    Florida Lighting & Electrical Design paid none of its

5    own money?

6        A    I also said that we gave the money to

7    Southwest and we paid those amounts to Linmore on

8    behalf of Southwest rather than giving a check to

9    Southwest and then Southwest cutting another check to

10   Linmore.

11            If we had done that, would your argument be,

12   well, therefore, they used their own money?

13       Q    Linmore was already paid in full by not

14   Southwest, right, by 1500 Property and EEDS?

15       A    We paid it on behalf of Southwest --

16       Q    Yes.

17       A    -- rather than giving the money to Southwest

18   for them to cut another check to Linmore --

19       Q    Right.

20       A    -- and Nikki said she had no issue doing it

21   that way.

22       Q    But then you gave another 159,195.95 to

23   Southwest in January of 2022?

24       A    No, it was a payback of the material that

25   Southwest had invoiced APT for.  So the money for the

Page 142

1    transaction went to APT, the profits stayed in APT.

2              APT paid a normal payable to a distributor,

3    happened to be named Southwest.  Southwest, who had

4    taken the money or gotten the money from EEDS and from

5    1500, repaid that amount of money per the agreement

6    that I had with Nikki.

7         Q    But -- but Southwest hadn't paid anything.

8    It came from EEDS and 1500 Property?

9         A    I don't think that matters.

10        Q    Well, it does because APT paid for it twice

11   then.

12        A    No, we didn't.  How could you say it's paid

13   for twice?  Explain that.

14        Q    Linmore was paid $159,195.95 from 1500

15   Property and EEDS in the August to October 2021 time

16   frame.

17        A    So you're suggesting that APT paid twice,

18   why?

19        Q    Well, because then APT then also sent

20   159,195.60 to Southwest Florida which interesting,

21   Southwest Florida didn't keep.  They gave it to EEDS.

22        A    It was a repayment of the loan, otherwise

23   what would have happened is APT would have had no cost

24   of goods sold and would have gotten an unfair

25   enrichment of 159,000.  What you're saying isn't

Page 143

1    making sense.  I'm sorry.

2        Q    But the Asset Purchase Agreement eliminated

3    any intracompany obligations as of January 1, 2022; is

4    that right?

5        A    Number one, it wasn't an intracompany

6    transaction.  And, number two, this was the closing

7    out of a deal that was done way before it was

8    contemplated with absolutely 100 percent of the

9    benefit going to BGIS.

10       Q    Well, if you made a payment of what is

11   really, in essence, a disguised APT transaction, I

12   mean, aren't you paying an intracompany obligation

13   that should have been wiped out in the transaction?

14            MR. AIELLO:  Object to the form of the

15       question.

16            THE WITNESS:  Absolutely not, and I'm not

17       sure, with all due respect, you understand the

18       entire transaction.

19            When you're buying goods, someone has to pay

20       for those goods.  Those goods are part of a cost

21       of goods sold.  Once we get reimbursed for

22       those -- for that purchase order, there's costs

23       that has to be reimbursed to any party that paid

24       for the cost, and the remainder is profit.

25            100 percent of the profit ended up staying

Page 144

1          in APT.  I didn't take an extra dollar than what

2          the cost was.  And the only reason it was done

3          was in order to establish -- was to take

4          advantage of terms that Nikki offered that she'd

5          be happy to do.

6    BY MR. PASCOE:

7          Q    You agree that if the payable was to EEDS,

8    it would have been wiped out in the transaction and it

9    wouldn't have been owed as of January 1, 2022?

10         A    That's a hypothetical because it wasn't done

11   to EEDS.

12         Q    Okay.  But you agree that that's the case,

13   right?

14         A    I don't agree with that.

15         Q    You -- your contention is that the Asset

16   Purchase Agreement maintained intracompany obligations

17   between APT and EEDS?

18         A    I would say that the company paid

19   reimbursement for rent that was due to one of my

20   companies.  I would maintain that the company paid for

21   trucks that was owned by one of my other companies.

22              I would maintain that if EEDS did pay

23   directly, then there'd be a payable from BGIS to EEDS

24   and the obligation would be like all the other

25   payables, that BGIS would have to pay for it;

Page 145

1  otherwise, BGIS would get 159,000 of unfair
2  enrichment.
3      Q    Well, the transaction was fully consummated
4  before the deal, right?
5      A    What transaction was fully consummated?
6      Q    Well, the final payment and the materials
7  were received as of October 27, 2021, right?
8      A    Which was prior to the deal.
9      Q    Right, that's what I said.  And so -- and
10  after the deal is when the payment was made?
11      A    To reimburse for the payables that were laid
12  out, that's correct.
13      Q    Whose monies was used to make that payment?
14      A    APT paid Southwest Lighting for the bill
15  that was created prior.
16      Q    Okay.  So your testimony is that it came
17  from APT and not from BGIS?
18      A    I don't know.  To me APT was BGIS.  But
19  whether or not the payable came from the customer to
20  APT, which was then BGIS, whether BGIS paid for it
21  directly, which I don't think they did, is immaterial
22  to me.
23      Q    Well -- okay.  And so that does get to the
24  previous question, which -- that any intracompany
25  obligations between APT and its affiliated entities

Page 146

1    were wiped out.  They were not acquired by BGIS in the

2    purchase of substantially all of the assets of APT; is

3    that right?

4              MR. AIELLO:  Object to the form and asked

5         and answered.

6              THE WITNESS:  Southwest is not an affiliated

7         company.

8    BY MR. PASCOE:

9         Q    I understand.  Sir, you just -- it will go

10   so much --

11        A    You just want me to answer the question you

12   want.

13        Q    It would go so much faster if you just --

14   it's a simple question.

15             MR. AIELLO:  It's been asked.  Asked and

16        answered.

17             MR. PASCOE:  But he has never said yes to it

18        or no, right?  He's talked about other

19        obligations and various other things, right?

20        It's called an evasive nonresponse.

21   BY MR. PASCOE:

22        Q    And so the question is:  Do you agree or not

23   that all of the intracompany obligations that APT had

24   to its affiliates, including EEDS and 1500 Property

25   that predated the acquisition, were not acquired by

Page 147

1    BGIS as part of the acquisition of substantially all

2    of the assets of APT?

3              MR. AIELLO:  I object to the question.  And

4         I especially object to your comment preceding the

5         question.

6              THE WITNESS:  There were several payables

7         that BGIS took over that could have been

8         considered intracompany, if that is the case.

9         And these were not wiped out and they were

10        divulged in the due diligence upfront.

11   BY MR. PASCOE:

12        Q    Okay.  Transitioning topics, Mr. Grandis,

13   if -- well, let's talk -- let's go back to Exhibit 4.

14        A    Are you finished with this one?

15        Q    For right now, yep.  Let's go back to

16   Exhibit 4, which are your responses to

17   interrogatories.

18             On page 4 of Exhibit 4, let me know when you

19   get there.

20        A    Yes, sir.

21        Q    So Interrogatory Number 11 says, "identify

22   the Person that 'represented' to You that Your

23   termination was 'based upon a joke [you] explained to

24   a colleague' as alleged in Paragraph 35 of the

25   Complaint."

Page 148

1           And you identified me in an e-mail dated

2    February 25, 2022, to Sheree Wilke -- to Cheryl Wilke.

3    Do you see that?

4           A    I do.

5           Q    Were you terminated as of April 5, 2023?

6           A    April 7th.

7           Q    Okay.  So it's not possible that a statement

8    that I made in an e-mail to your counsel could be the

9    basis for your termination in that your termination

10   had not happened yet.

11          A    I don't agree with that.

12          Q    Okay.  Explain to me why.

13          A    Because -- and I don't have the e-mail in

14   front of me -- but between what you had said to Cheryl

15   and the question Cheryl had said, "Devin, they're

16   looking to set you up to terminate you based on this

17   joke that you said."

18          Q    So that was Ms. Wilke's analysis of it.

19               Actually, wait.  Stop.  Yeah, yeah, you know

20   what, let's -- yeah, that was inadvertent.

21               MR. AIELLO:  Maybe you want to show him the

22        e-mail.  I don't know.

23               MR. PASCOE:  Well, I don't.  I don't.

24               MR. AIELLO:  Okay.

25

Page 149

1    BY MR. PASCOE:

2        Q    One of the complaints -- well, tell me if

3    you agree.  One of the complaints regarding the

4    investigation is that you were not given an

5    opportunity to explain your conduct; is that right?

6        A    I was not able to personally explain the

7    conduct or understand what the total investigation

8    was.

9        Q    Okay.  What would you have said if asked to

10   explain your conduct?

11       A    You're asking me to hypothesize what I would

12   have said two years ago?

13       Q    Well, sir, I can't think of a possible

14   justification that would justify your conduct.  And so

15   I'm asking you what you would have said that would

16   justify a week after receiving a final warning making

17   another inappropriate sexual remark to a colleague.

18       A    I would say that based on the relationship

19   that I had with that colleague, and the types of words

20   and phrases and things that she's said to me over five

21   years, based on a situational opportunity, that it was

22   not inappropriate to tell her that joke.

23       Q    Do you still contend today it was not

24   inappropriate to tell her that joke?

25       A    Well, in hindsight I would have a tough time

Page 150

1    arguing that based on that being the reason that they

2    terminated me, I would have been better off not

3    telling the joke.

4        Q    Well, if they had not terminated you, would

5    you believe today that it was appropriate that you

6    told that joke?

7        A    Well, after I took the training, which was a

8    couple of weeks later, I understood how sensitive BGIS

9    was and its culture and its -- what's the word I'm

10   looking for -- acceptance speech.  Although Gord did

11   tell me that I can say what I want with my peers and I

12   just had to be very careful with customers.

13           I never worked for a major, you know,

14   multibillion dollar corporation before and so I wasn't

15   used to any of their rules, regulations and operating

16   situations.  Once I had an opportunity to review their

17   handbook and I took the five courses that they had

18   given me, I understood that that type of behavior

19   would be no longer accepted, and I actually had made

20   that announcement to my entire staff that this isn't

21   the same company anymore and we had to be more careful

22   on how we speak and the joking has to change its

23   direction.

24       Q    How could you have made that announcement to

25   your staff if you were placed on leave prior to

Page 151

1    receiving the link to the training?

2         A    Because I --

3              MR. AIELLO:  Object to the form.  Go ahead.

4              THE WITNESS:  Because I had made that

5         announcement after I received the letter.

6    BY MR. PASCOE:

7         Q    Okay.  You agree, though, that APT's

8    handbook has a sexual harassment policy in it, right?

9         A    It does.

10        Q    And it has an anti-harassment policy in it,

11   right?

12        A    It does.

13        Q    And it has a hostile workplace environment

14   policy in it, right?

15        A    It does.

16        Q    All right.  Is your contention that those

17   policies in the BGIS handbook are materially different

18   than those in the APT handbook?

19        A    You'd have to show me the specific

20   comparison between the two.  I know that in the APT

21   handbook, which we were following, it was very

22   specific to unwelcome comments, and unwelcome

23   harassment, and unwelcome -- creating an environment

24   that was hostile, and I don't think that I fell into

25   any of those.

Page 152

1          MR. PASCOE:  Okay.  Let's take a 15-minute

2      break or maybe less.  I'll let you guys know.  I

3      might be done.

4          MR. AIELLO:  Okay.

5          THE VIDEOGRAPHER:  Going off record at

6      1:21 p.m.

7          (Recess was taken.)

8          THE VIDEOGRAPHER:  Back on record at

9      1:24 p.m.

10          MR. PASCOE:  Mr. Grandis, those are the

11      questions that I have for you at this time.

12      Thank you very much for your time today, sir.

13          MR. AIELLO:  I may have a question or two so

14      hold on, Counsel.

15                  CROSS EXAMINATION

16  BY MR. AIELLO:

17      Q    Mr. Grandis, you were asked some questions

18  today about what your damages are in this case.  Do

19  you recall that?

20      A    Yes.

21      Q    One thing you were not specifically asked

22  about, nor did you specifically say you were waiving

23  it --

24          MR. PASCOE:  Hang on.  I'm just going to

25      object.  This is 100 percent coaching the witness

Page 153

```
 1        to add to his deposition transcript in violation
 2        of the federal rules disguised as a line of
 3        questioning.  Go ahead.
 4             MR. AIELLO:  Okay, so no more speaking
 5        objections after that, right?
 6             MR. PASCOE:  So, Paul, if you want to break
 7        the rules and coach your witness to amend his
 8        damages testimony when I finished examining him,
 9        you feel free to do that.  I don't think the
10        federal court is going to look too kindly at it.
11             MR. AIELLO:  We'll see, but let me ask the
12        questions now.
13   BY MR. AIELLO:
14        Q    Are you waiving -- if there is a right to
15   have statutory damages for misuse of your stamp, are
16   you waiving a right to those damages?
17        A    Not at all.  As I had said I didn't know --
18   I'm not a lawyer so I don't know what other damages
19   I'm entitled to.
20        Q    That's fine.
21             Let me show you something that I saw when we
22   were going over the interrogatory answers.  Pull out
23   Number 4, please.
24             And in number -- excuse me, in Number 4 on
25   page 4, there was an answer given about -- in response
```

Page 154

1    to Number 11.  Do you see that?

2        A    Yes.

3        Q    You talked about that earlier.  The answer

4    was, "Michael Pascoe represented this in an e-mail

5    dated April 5, 2023, to my attorney, Cheryl Wilke."

6             Do you see that?

7        A    Yes.

8        Q    I'm going to show you that letter, which has

9    been marked and produced as Plaintiff's 609.

10            MR. AIELLO:  Do you want to see it before I

11       show it to the witness?  You have it, obviously,

12       but I don't know if it's in your binder right

13       now.  Do you want to see it?

14            MR. PASCOE:  It's fine, Paul.

15   BY MR. AIELLO:

16       Q    Okay.  I'm showing you page 609.  What is

17   the date of that e-mail?  Is it 2023 or 2022?

18       A    April 5, 2022.

19       Q    Okay, thank you.

20            And that was -- you can give it back to me.

21            And that was how many days before you were

22   terminated, that letter was sent by Mr. Pascoe?

23       A    Two -- it was sent two days before my

24   termination.  And when I was terminated Mark Marquis

25   reinforced that that was the reason.

Page 155

1        Q     Okay.  There was some testimony this morning

2    about Nikki Culmer-Sakoff.  And a question I have for

3    you is:  Did Nikki Sakoff ever make any complaint to

4    you, either before or after the trade show, in which

5    she stated she felt harassed in any way by you?

6        A     Never.

7        Q     Okay.  Did anyone else before you received

8    through -- through that -- through your attorney, the

9    e-mail of Mr. Pascoe dated April 5, did anyone else

10   ever say to you that Nikki Sakoff had indicated that

11   she felt harassed by you?

12       A     Never.

13            MR. AIELLO:  Thank you.

14            MR. PASCOE:  I don't have any other

15        questions for you, Mr. Grandis.  I think your

16        counsel is going to want to instruct you on the

17        record about your rights regarding the

18        transcript.

19            MR. AIELLO:  That's correct.  Devin, you

20        have the opportunity to read or waive the right

21        to read your transcript before it's used.

22            And I don't know why I'm telling you because

23        I'm instructing you.  We're going to read.  We're

24        going to read it.

25            MR. PASCOE:  I figured you would.  All

Page 156

1          right.  Off the record.

2                  THE VIDEOGRAPHER:  Going off record at

3          1:29 p.m.

4                  (Deposition concluded at 1:29 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1                        CERTIFICATE OF OATH

2

3

4        STATE OF FLORIDA    )

5        COUNTY OF BROWARD    )

6

7        I, the undersigned authority, certify that

8        DEVIN GRANDIS, remotely appeared before me and

9        was remotely duly sworn.

10        WITNESS my hand and official seal this 12th day

11        of September 2023.

12

13

14

15

16              MARIA E. FERNANDEZ, RPR, FPR-C

                 Notary Public, State of Florida

17              My Commission No. HH 087475

                 Expires: 4/10/2025

18

19

20

21

22

23

24

25

Page 158

1                    CERTIFICATE

2

3        STATE OF FLORIDA  )

4        COUNTY OF BROWARD )

5

6        I, MARIA E. FERNANDEZ, RPR, FPR-C, do hereby

7        certify that I was authorized to and did

8        remotely stenographically report the foregoing

9        deposition of Devin Grandis; that a review of

10       the transcript was requested; and that the

11       transcript is a true record of my stenographic

12       notes.

13       I FURTHER CERTIFY that I am not a relative,

14       employee, attorney, or counsel of any of the

15       parties, nor am I a relative or employee of any

16       of the parties' attorney or counsel connected

17       with the action, nor am I financially

18       interested in the action.

19       Dated this 12th day of September 2023.

20

21

22            MARIA E. FERNANDEZ, RPR, FPR-C
              and Notary Public

23

24

25

# EXHIBIT C-1



**BGIS** ➤  *ENABLING*  210 S. Hudson Street
*INNOVATION*  Suite 318
Seattle, WA 98134

PERSONAL AND CONFIDENTIAL

December 21, 2021

Devin Grandis

Dear Devin,

We are delighted to confirm that BGIS Global Integrated Solutions US LLC (**"BGIS"**) has agreed to acquire the business from Advanced Power Technologies LLC (**"APT"**). We expect the acquisition to occur on December 31, 2021 (**"Acquisition Date"**) with a transition to be completed shortly afterwards.

In connection with the acquisition, we are excited to present to you this offer of employment as follows:

- Your initial role within the company will be as the Senior Vice President and General Manager
- The position is full-time.
- Your People Leader will be Mark Marquis.
- The location of the position is Pompano Beach, FL.
- Your start date with BGIS will be no later February 7, 2022 and is subject to the transition of services from APT to BGIS.

**Compensation Structure**

Base Salary: Your starting base salary will be $300,000 gross per year and the position is considered exempt, under the Fair Labor Standards Act.

Bonus: The BGIS annual bonus program is known as the Optimizer Annual Incentive Award (**"OAIA"**). Upon your commencement of employment with BGIS, you will be invited to participate in BGIS's OAIA Plan, subject to its terms and conditions, including the following:

(i) your target bonus eligibility will be 50% of your base salary (with a multiplier of potentially up to 100% of your base salary based on results exceeding the financial plan); and

(ii) the payment of the target bonus, or any bonus, is condition upon the company achieving financial performance thresholds.

Notwithstanding the foregoing, the OAIA Plan details will be provided to you within the first 90 days of your employment. Management reserves the right to make changes to the OAIA Plan as business needs dictate.

Equity: Subject to Board approval, you will be granted an option to purchase 500 shares of BIFM Jersey TopCo Limited, the ultimate parent entity of BGIS, which will be evidenced by, and subject to the terms and conditions included in, an award agreement in the form attached as Exhibit A.

Δ π EXHIBIT ___1___
Deponent _Grandis_
Date _9/1/23_ Rptr. _MF_
WWW.DEPOBOOKPRODUCTS.COM

Page 1 of 4

| Severance: | Executive severance is being offered to you. You may terminate your employment upon giving BGIS not less than 60 days' written notice. |
|---|---|

If your employment is terminated:

(i)     by BGIS with Cause, then BGIS shall have no further employment obligation or liability to you under this Employment Agreement;

(ii)    during the Initial Period by BGIS without Cause, then you shall be paid by BGIS, on an accelerated basis, as severance, within 30 days of separation and in exchange for a signed release in favor of BGIS all amounts due in base salary for the remaining portion of the Initial Period;

(iii)    after the Initial Period by BGIS without Cause, then you shall be paid by BGIS, on an accelerated basis, as severance, within 30 days of separation and in exchange for a signed release in favor of BGIS, (a) the equivalent of 6 months of your base salary; and (b) the equivalent of your target bonus pro-rated for your time employed with BGIS in the calendar year up to the termination date.

The foregoing definition does not in any manner limit the company's ability to terminate your employment at any time.

For the purpose of this offer,

**"Cause"** means BGIS's good faith and reasonable determination that you have engaged in any of the following:

(i)     your material failure to perform your duties and responsibilities to BGIS, including but not limited to, a failure to cooperate with BGIS in any investigation or formal proceeding; provided, however, you shall have the right to cure such material failure to the reasonable satisfaction of BGIS (if capable of being cured) within thirty (30) days after delivery by BGIS to you of written notice requiring curative action;

(ii)    your commission of any act of fraud, embezzlement, dishonesty or any other intentional misconduct that results in material injury to BGIS; and

(iii)    the unauthorized use or disclosure by you of any proprietary information or trade secrets of BGIS or any other party to whom you owe an obligation of nondisclosure as a result of a commitment you made in good faith; provided, however, you shall have the right to cure such unauthorized use or disclosure to the reasonable satisfaction of BGIS (if capable of being cured) within thirty (30) days after delivery by BGIS to you of written notice requiring curative action.

**"Initial Period"** means the period commencing on January 1, 2022 and ending at the expiry of December 31, 2024.

## Benefits, 401(k), Paid Time Off and Holidays:

Benefits are important piece of your total rewards package. As BGIS goes through this transition, you will remain on the current benefits provided by Advanced Power Technologies LLC to provide continuity. In 2022, BGIS will review the benefit package and make you aware of any changes.

## Position and Career Enhancements

The following are presented in support of your starting role and to encourage you in your career progression at BGIS:

Yours truly,

*Sherry L. Pelletier*

Sherry L. Pelletier, SCP & SPHR
VP, Human Resources
E: sherry.pelletier@bgis.com

Attachments

I hereby agree to the contents of the foregoing letter and accept this offer of employment as presented. It is my understanding that this letter does not constitute an employment contract but is only an offer of employment and does not override the at-will employment status.

_____
Signature

__Devin Grandis__
Printed Name

__12|24|2021__
Date

Page 4 of 4

| | |
|---|---|
| Mileage: | BGIS will reimburse your work-related auto expenditures through a mileage reimbursement plan at the IRS approved rates. |
| Training: | BGIS prides itself on growing and developing our team members. We look forward to providing you with location specific training opportunities that meet your personal & professional goals. |

These team member benefits, options and compensation structures are subject to change from time to time. Eligibility for health, life, disability, and retirement benefits is determined by the terms of the specific plans.

Confidentiality and Intellectual Property

BGIS and its affiliated companies have invested substantial time, money and resources in developing proprietary and confidential information and trade secrets in a wide variety of areas, including technology, marketing and work processes. BGIS will provide you with the proprietary and confidential information and trade secrets that BGIS believes necessary for you to perform well and to develop new skills. **"Confidential information"** includes any non-public information relating to the business, operations, financial affairs, performance, assets, technology, processes, plans, personnel, customers, and suppliers of BGIS or its customers. You will, as part of your normal work, also contribute to the development of BGIS proprietary and confidential information and trade secrets. You,

(a) must not make use of any confidential information for your own purposes or the benefit of any person other than BGIS,

(b) must keep the confidential information in the strictest confidence, and

(c) must not copy, use or disclose to others any confidential or proprietary information or trade secrets of BGIS, its subsidiaries or affiliates, or customers for so long as such information or trade secrets remain confidential or proprietary, except as specifically authorized by BGIS in writing, either during the period you are employed by BGIS or at any time thereafter. By way of example, any client information provided in the performance of the job would be considered BGIS information.

Notwithstanding any other provision, nothing in this offer prohibits or restricts you in any way from providing information to a government authority pursuant to applicable whistleblowing regulations.

For any patentable invention arising out of, or in the course of your employment, such invention shall be the exclusive property of BGIS, and BGIS shall have the exclusive right to file patent applications in BGIS name in connection with those inventions. You must cooperate with BGIS and provide all necessary assistance in the filing and processing of such patent applications. Furthermore, you agree to waive any and all moral rights, and any similar rights, you may have with respect to any copyrights, inventions or other intellectual property arising out of, or in the course of your employment.

This offer of employment is contingent upon you successfully passing a pre-employment drug and alcohol screen, complying with the requirements of the Immigration Reform and Control Act. The offer letter is also contingent upon successful outcomes of criminal background, credit, education, and reference checks. In some cases, this includes successfully passing a client background check and security clearance.

The offer of employment at BGIS is not for a specific duration of time. BGIS is an at-will employer. Should you accept this offer, either you or BGIS may terminate employment at any time and for any reason.

If this offer is acceptable to you, please confirm your acceptance by returning a signed copy of this offer letter to my attention. Please feel free to call me at (206) 294-9115 if you have any questions about this offer.

Page 3 of 4

# EXHIBIT C-2

| Name: | Devin Grandis |
|---|---|
| **Number of Shares of Stock subject to the Stock Option:** | 500 |
| **Exercise Price Per Share (Canadian Dollars):** | $2,085.95 |
| **Date of Grant:** | [Grant Date] |



**STOCK OPTION AGREEMENT
PURSUANT TO
BIFM JERSEY TOPCO LIMITED
2019 EQUITY INCENTIVE PLAN**

This agreement (this "**Agreement**") evidences a stock option granted by BIFM Jersey TopCo Limited, a Jersey private limited company (the "**Company**") to the individual named above (the "**Participant**"), pursuant to and subject to the terms of the BIFM Jersey TopCo Limited 2019 Equity Incentive Plan (as from time to time amended and in effect, the "**Plan**"), which is incorporated herein by reference.  Except as otherwise defined herein, all capitalized terms used herein have the same meaning as in the Plan.

**1.**     **Grant of Stock Option.**  The Company grants to the Participant on the date set forth above (the "**Date of Grant**") an option (the "**Stock Option**") to purchase, pursuant to and subject to the terms set forth in this Agreement and in the Plan, up to the number of shares of Stock set forth above (the "**Shares**"), with an exercise price per Share as set forth above, in each case, subject to adjustment pursuant to Section 7 of the Plan in respect of transactions occurring after the date hereof.

**2.**     **Vesting; Method of Exercise; Cessation of Employment.**

    **(a)**     **Vesting.**  The term "**vest**" as used herein with respect to the Stock Option or any portion thereof means to become exercisable and the term "**vested**" as used herein with respect to the Stock Option or any portion thereof means that the Stock Option (or such portion) is then exercisable, subject, in each case, to the terms of the Plan and this Agreement.  The Stock Option will vest in accordance with the terms of <u>Schedule A</u> attached hereto.

    **(b)**     **Exercise of the Stock Option.**  No portion of the Stock Option may be exercised until such portion vests.  Each election to exercise any vested portion of the Stock Option will be subject to the terms and conditions of the Plan and must be in written or electronic form acceptable to the Administrator, signed (including by electronic signature) by the Participant or, if at the relevant time the Stock Option has passed to a beneficiary or permitted transferee, the beneficiary or permitted transferee (the Participant, the beneficiary or a permitted transferee of the Participant or the beneficiary, as applicable, who holds the Stock Option or any Shares acquired on the exercise thereof, the "**Holder**"), and must be accompanied by full payment made in accordance with Section 6(b)(iii) of the Plan for the portion of the Stock Option being exercised.  In addition, if requested by the Administrator, as a

condition to exercise, the Holder must enter into a nominee agreement in a form acceptable to the Administrator appointing a nominee to hold the Shares acquired on exercise on the Holder's behalf. Each such written or electronic exercise election and, if applicable, nominee agreement must be received by the Company at its principal office or by such other party as the Administrator may prescribe and must be accompanied by payment in full of the exercise price as provided in the Plan. The latest date on which the Stock Option or any portion thereof may be exercised is the 10th anniversary of the Date of Grant (the **"Final Exercise Date"**) and, if not exercised on or prior to such date, the Stock Option or any remaining portion thereof will thereupon immediately terminate.

(c) **Cessation of Employment.** If the Participant's Employment ceases for any reason, the Stock Option, to the extent not then vested will be immediately forfeited for no consideration due to the Participant, and any vested portion of the Stock Option that is then outstanding will be treated as provided in Section 6(a)(4) of the Plan.

3. **Restrictive Covenants.** The Participant acknowledges and agrees that the Participant will execute, no later than the date hereof, and shall be bound by, the Restrictive Covenant Agreement attached hereto as <u>Schedule B</u>. The provisions of <u>Schedule B</u> shall survive any termination, expiration, forfeiture, transfer or other disposition of the Stock Option or any Shares acquired pursuant to the exercise of the Stock Option. In addition to any remedies that may be available to the Company or any of its Affiliates, the Administrator may cause the Stock Option (whether or not vested or exercisable) to be forfeited and the proceeds from the exercise of the Stock Option and/or the disposition, and/or distributions or other amounts received in respect of the Shares to be disgorged to the Company, with interest and related earnings, if at any time the Participant is not in compliance with all of the provisions of <u>Schedule B</u> or any other Restrictive Covenant. By accepting the Stock Option, the Participant expressly acknowledges and agrees that his or her rights, and those of any other Holder of the Stock Option, under the Stock Option, including the right to any Shares acquired under the Stock Option and any amounts received in respect thereof, are subject to Section 6(a)(5) of the Plan.

4. **Stockholders' Agreement.** Not later than upon the execution of this Agreement and effective as of the date hereof, the Participant has executed and become a party to the Stockholders' Agreement as a Management Stockholder thereunder with respect to the Stock Option and any Shares received upon exercise, which shall each be Management Shares under the Stockholders' Agreement. The Participant's rights hereunder (including with respect to Shares received upon exercise) are subject to the restrictions and other provisions contained in the Stockholders' Agreement applicable to Management Stockholders. As a condition to the transfer of the Stock Option or any Shares acquired under the exercise of the Stock Option, any Holder other than the Participant shall execute and become a party to the Stockholders' Agreement as a Management Stockholder thereunder with respect to such transferred Stock Option or Shares.

5. **Transfers of Stock Option.** The Stock Option may not be transferred except as expressly permitted under Section 6(a)(3) of the Plan.

6. **Legends.** Certificates evidencing any Shares purchased upon exercise of the Stock Option granted hereby (if any) may bear such legends as the Administrator may determine to be necessary

or appropriate, in addition to any legends that may be required by applicable securities law, the Plan, the Stockholders' Agreement or any other applicable documents or agreements governing the Shares.

7.     **Withholding.**   The issuance, delivery, vesting and retention of Stock, cash or other property under the Plan and this Agreement are conditioned upon full satisfaction by the Participant of all withholding requirements with respect to the Stock Option.  The Participant expressly acknowledges and agrees that the Participant's rights hereunder, including the right to be issued Shares upon exercise, are subject to the Holder promptly paying to the Company in cash or by check (or by such other means as may be acceptable to the Administrator) all taxes, social contributions and other amounts required to be withheld.  No Shares will be issued pursuant to the exercise of the Stock Option unless and until the person exercising the Stock Option has remitted to the Company an amount in cash sufficient to satisfy all withholding requirements, or has made other arrangements satisfactory to the Company with respect to such amount.   To the extent permitted by applicable law, the Participant authorizes the Company and its Affiliates and subsidiaries to withhold such amount from any amounts otherwise owed to the Participant, but nothing in this sentence may be construed as relieving the Participant from any liability for satisfying his or her obligation under the preceding provisions of this Section.  Any amounts withheld hereunder shall be treated as though made directly to the Participant.

8.     **Effect on Employment.**  Neither the grant of the Stock Option, nor the issuance of Shares upon exercise of the Stock Option, will give the Participant any right to continued Employment, affect the right of the Company or any of its Affiliates or subsidiaries to terminate the Participant's Employment at any time, or affect any right of the Participant to terminate his or her Employment at any time.  The Participant acknowledges and agrees that the grant of the Stock Option is of a one-time, exceptional nature and is limited by the terms set forth herein and, except to the extent required by applicable law, shall not be considered as part of the Participant's employment compensation, wages, entitlements or other compensation or benefits for any purpose.  Eligibility for Awards under the Plan are determined by the Administrator in its sole discretion and eligibility for, or receipt of, an Award in a certain fiscal year does not imply or guarantee entitlement to an Award in any future fiscal years.  The receipt of the Stock Option does not create a right for the Participant to obtain further awards under the Plan or any other plans that may be implemented by the Company or any of its Affiliates.

9.     **Provisions of the Plan.** This Agreement is subject in its entirety to the provisions of the Plan and the Stockholders' Agreement, which are incorporated herein by reference.  Copies of the Plan and the Stockholders' Agreement as in effect on the Date of Grant have been furnished or made available to the Participant.  By accepting the Stock Option, the Participant agrees to be bound by the terms of the Plan, this Agreement and the Stockholders' Agreement.  In the event of any conflict between the terms of this Agreement and the Plan, the terms of the Plan will control and in the event of any conflict between the terms of this Agreement or the Plan and the Stockholders' Agreement, the Stockholders' Agreement will control.

10.    **Data Protection.**  The Company and the Participant's employer hereby provide the following notice regarding their processing of Participant's personal information:

(a) The collection, processing and transfer of the Participant's personal information is necessary for the Company's administration of the Plan and the Participant's participation in the Plan, and the Participant's denial and/or objection to the collection, processing and transfer of personal information may affect the Participant's ability to participate in the Plan.

(b) The Company and the Participant's employer hold certain personal information about the Participant, including the Participant's name, home address and telephone number, date of birth, social security/insurance number or other tax or employee identification number, salary, nationality, job title, any shares of Stock held by the Participant, any directorships and officer positions held by the Participant in the Company or any of its Affiliates or subsidiaries, details of all stock options, other Awards or any other entitlements to shares of Stock awarded, canceled, purchased, vested, exercised, unvested or outstanding in the Participant's favor for the purpose of managing and administering the Plan (collectively, the **"Data"**). The Data may be provided by the Participant or collected, where lawful, from third parties, and the Company and the Participant's employer will process the Data, in relation to this Award, for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

(c) The Company and the Participant's employer may transfer the Data as necessary for the purpose of implementation, administration and management of the Participant's participation in the Plan, and the Company and/or the Participant's employer may each further transfer the Data to any third parties assisting the Company in the implementation, administration and management of the Plan. These recipients may be located in the European Economic Area ("**EEA**"), the United States, Canada or elsewhere throughout the world. If the Company transfers Data subject to the European Union's General Data Protection Law ("**GDPR**") to a third country outside of the EEA, it will rely on suitable safeguards or specific derogations recognized under data protection laws, including the GDPR. The Company will put in place reasonable physical, organizational, and technological safeguards designed to prevent the Data from being accidentally lost, used or accessed in an unauthorized way, altered or disclosed.

(d) The Company will retain the Data for the duration of the Agreement plus some additional limited period of time that is necessary to comply with law or that represents the statute of limitations for legal claims that could arise from the Agreement.

(e) Pursuant to applicable data protection laws, in certain cases, the Participant may have rights with respect to the Data, which may include, with respect to Data about the Participant, the right to: (1) correct or update Data that is inaccurate; (2) restrict or limit the ways in which the Company uses Data; (3) object to the processing of Data; (4) request the deletion of Data; and (5) obtain a copy of the Data in an easily accessible format. The Participant may seek to exercise any applicable rights by contacting the Participant's local human resources manager.

**(f)**     For Data covered by the GDPR or Canadian privacy laws, if the Participant has complaints regarding the Company's processing of the Data, the Participant has the right to make a complaint with his or her national data protection authority (i.e., supervisory authority) or the applicable privacy commissioner.

**11.     Waiver.**  No waiver of any right hereunder by any party will operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages.  No waiver by any party of any breach of this Agreement will be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

**12.     Severability.**  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement will be severable and enforceable to the extent permitted by law.

**13.     Successors.**  The terms of this Agreement will be binding upon and inure to the benefit of the Company, its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

**14.     Acknowledgements.**  The Participant acknowledges and agrees that (i) this Agreement may be executed in two or more counterparts, each of which will be an original and all of which together will constitute one and the same instrument; (ii) this Agreement may be executed and exchanged using facsimile, portable document format (PDF) or electronic signature, which, in each case, will constitute an original signature for all purposes hereunder; and (iii) such signature by the Company will be binding against the Company and will create a legally binding agreement when this Agreement is countersigned by the Participant.

**15.     Power of Attorney.**  The Participant hereby irrevocably constitutes and appoints each of the Company and any of its officers with full power of substitution, acting jointly or severally, as its attorney-in-fact and agent to sign, execute and deliver, in its name and on its behalf, all or any such agreement, deeds, instruments, documents and/or any counterpart thereof or certificates or to take any such action as it deems necessary from time to time or as is required under any applicable law to admit the Participant as a stockholder of the Company or to conduct the affairs of the Company.

*[Signature page follows.]*

The Company, by its duly authorized officer, and the Participant have executed this Agreement as of the Date of Grant.

BIFM JERSEY TOPCO LIMITED

By: _____

Name:  Mark McFadden

Title:  Director

Agreed and Accepted:

By_____
    Devin Grandis

[*Signature Page to Stock Option Agreement*]

**SCHEDULE A**

**VESTING**

This <u>Schedule A</u> describes the terms and conditions upon which the Stock Option will become vested. All capitalized terms used in this <u>Schedule A</u>, unless separately defined, have the meanings set forth in the award agreement to which this <u>Schedule A</u> relates.

1. **Time-Vesting Option.**

   (a)    Fifty percent (50%) of the Shares subject to the Stock Option will be eligible to vest based on the satisfaction of time-based vesting criteria (such portion, the **"Time-Vesting Option"**). Unless earlier terminated, forfeited, or expired, the Time-Vesting Option will vest as to one-fifth (1/5) of the Shares subject to the Time-Vesting Option on each of the first five (5) anniversaries of the Vesting Commencement Date, with the number of Shares that vest on any such date being rounded down to the nearest whole share and the Time-Vesting Option becoming vested as to 100% of the Shares subject thereto on the fifth (5th) anniversary of the Vesting Commencement Date, subject, in each case, to the Participant remaining in continuous Employment from the Date of Grant through such vesting date.

   (b)    In the event of a Change of Control, the Time-Vesting Option, to the extent then outstanding and unvested, will vest in full upon the consummation of the Change of Control, subject to the Participant remaining in continuous Employment from the Date of Grant through the consummation of the Change of Control and, if requested by the Administrator in connection with any Change of Control transaction, subject to the Participant executing and returning to the Company or its Affiliate (and not revoking) a timely and effective release of claims in the form provided by the Company (or its Affiliate) within the time period specified therein.

   (c)    Following an IPO, the Time-Vesting Option, to the extent then outstanding and unvested, will vest in full on the date the closing price of the securities of the Company or its applicable Affiliate that were registered in such IPO equals or exceeds the Liquidity Threshold Price for any ten (10) consecutive trading day period, subject to the Participant remaining in continuous Employment from the date of grant through such date.

2. **Performance-Vesting Option.** Fifty percent (50%) of the Shares subject to the Stock Option will be eligible to vest based on the satisfaction of performance-based vesting criteria (such portion, the **"Performance-Vesting Option"**). Unless earlier terminated, forfeited, or expired, the Performance-Vesting Option will vest (i) in the event of a Change of Control, if the CCMP Shareholders achieve a Return on Capital of at least 2.0x or (ii) in the event of an IPO, if the closing price of the securities of the Company or its applicable Affiliate that were registered in such IPO equals or exceeds the Liquidity Threshold Price for any ten (10) consecutive trading day period, in each case, prior to the Final Measurement Date and subject, in each case, to the Participant remaining in continuous Employment from the Date of Grant through such date. To the extent not then vested, the Performance-Vesting Option shall be forfeited for no consideration due to the Participant immediately upon the earlier to occur of (A) a termination of the Participant's Employment; or (B) the Final Measurement Date.

A-1

**Certain Additional Definitions**

For purposes of this Schedule A, the following terms have the following meanings:

**"CCMP Investors"** has the meaning set forth in the Stockholders' Agreement.  In the event any CCMP Shares are transferred after the Closing Date to any Affiliate of the CCMP Investors, then solely for purposes of this Agreement "CCMP Investors" shall include the Affiliate to which the CCMP Shares are so transferred.

**"CCMP Shares"** means Securities (as defined in the Stockholders' Agreement) in the Company held by the CCMP Investors.

**"Closing Date"** means May 31, 2019.

**"Final Measurement Date"** means the earliest of (A) in the event of a Change of Control, the consummation of the Change of Control or (B) in the event of an IPO, the date on which the CCMP Shareholders cease to hold any CCMP Shares.

**"Investment Amount"** means (without double counting) the sum of (i) the amount of all cash or cash equivalents, plus (ii) the fair market value (as determined by the Administrator) of all other property (net of liabilities assumed or to which the property is subject), in each case, contributed at any time by the CCMP Shareholders in exchange for, or in respect of, CCMP Shares.

**"Liquidity Threshold Price"** means, on any date following an IPO, the lowest per share price, as reported on the principal securities exchange on which the securities of the Company or its applicable Affiliate are registered, which when multiplied by the number of shares then held by the CCMP Shareholders and then added to the Proceeds received by the CCMP Investors following the Closing Date and on or prior to such date, would yield the CCMP Shareholders a 2.0x Return on Capital.

**"Proceeds"** means, as of any date following the Closing Date, the cumulative total (without double counting) of the pre-tax net cash proceeds actually received by the CCMP Shareholders after the Closing Date and on or before such date in respect of CCMP Shares, in each case, other than from any co-investor or Affiliate and determined after giving effect to any payments under the Plan and other compensatory equity-based payments required to be made in connection with a Change of Control, IPO or subsequent receipt of Proceeds.  For the avoidance of doubt, any transaction, management, consulting, monitoring, advisory or similar fees, if any, and any expense reimbursements received by the CCMP Shareholders from the Company or any of its Affiliates shall be excluded from the determination of Proceeds.  For purposes of this Agreement, earn-outs or other contingent consideration will be included in the determination of Proceeds only if and when actually received.  All determinations relating to the CCMP Shareholders' Proceeds under this Agreement will be made by the Administrator in its sole discretion.

**"Return on Capital"** means, as of any date, the Proceeds divided by the Investment Amount.

**"Vesting Commencement Date"** means [Vesting Commencement Date].

## SCHEDULE B

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (this **"Agreement"**) is made and entered into as of [Date of Agreement] by and among BIFM Jersey TopCo Limited, a Jersey private limited company, BGIS Global Integrated Solutions US LLC (collectively, the **"Company"**), on their own behalf and on behalf of their Affiliates, as may exist from time to time, and Devin Grandis (the **"Participant"**). Capitalized terms used in this Agreement but not otherwise defined herein shall have the respective meanings set forth in the Company's 2019 Equity Incentive Plan (as from time to time amended and in effect, the **"Plan"**) and the Participant's award agreement thereunder.

1. **Mutual Agreement.** The Participant acknowledges the importance to the Company and its Affiliates of protecting their Confidential Information and other legitimate business interests, including the valuable trade secrets and good will that they have developed or acquired. In consideration of the Participant's Employment, the Participant's equity award and other good and valuable consideration, the receipt and sufficiency of which the Participant hereby acknowledges, the Participant agrees that the following restrictions on the Participant's activities during and after Employment are reasonable and necessary to protect the legitimate interests of the Company and its Affiliates.

2. **Confidentiality.**

   2.1.   The Participant agrees that all Confidential Information which the Participant creates or to which the Participant has access as a result of the Participant's Employment and other associations with the Company or any of its Affiliates is and will remain the sole and exclusive property of the Company and its Affiliates. The Participant agrees that, except as required for the proper performance of the Participant's regular duties for the Company and its Affiliates, as expressly authorized in writing in advance by a duly authorized officer of the Company, or as required by applicable law, the Participant will never, directly or indirectly, use or disclose any Confidential Information. The Participant understands and agrees that this restriction will continue to apply after the cessation of the Participant's Employment or other associations with the Company for any reason. The Participant will not be held criminally or civilly liable under any federal or state trade secret law for disclosing a trade secret (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (b) in a complaint or other document filed under seal in a lawsuit or other proceeding. Notwithstanding this immunity from liability, the Participant may be held liable if the Participant unlawfully access trade secrets by unauthorized means. For the avoidance of doubt, nothing in this Agreement limits, restricts or in any other way affects the Participant's communicating with any governmental agency or entity, or communicating with any official or staff person of a governmental agency or entity, concerning matters relevant to the governmental agency or entity.

**2.2.** The Participant agrees that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of the Company or any of its Affiliates, and any copies, in whole or in part, thereof (the "**Documents**"), whether or not prepared by the Participant, will be the sole and exclusive property of the Company and its Affiliates. The Participant agrees to safeguard all Documents and to surrender to the Company or its relevant Affiliate, at the time the Participant's Employment terminates or at such earlier time or times as an authorized officer of the Company may specify, all Documents then in the Participant's possession or control. The Participant also agrees to disclose to the Company, at the time the Participant's Employment terminates or at such earlier time or times as an authorized officer of the Company may specify, all passwords necessary or desirable to obtain access to, or that would assist in obtaining access to, any information which the Participant has password-protected on any computer equipment, network or system of the Company or any of its Affiliates.

**3.** **Assignment of Intellectual Property Rights.** The Participant agrees to promptly and fully disclose all Intellectual Property to the Company. The Participant hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) the Participant's full right, title and interest in and to all Intellectual Property. The Participant agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company (or as otherwise directed by the Company) and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. The Participant will not charge the Company for time spent in complying with these obligations. All copyrightable works that the Participant creates during Employment with the Company will be considered "work made for hire" and will, upon creation, be owned exclusively by the Company.

**4.** **Restricted Activities.**

**4.1.** While the Participant is Employed by the Company or an Affiliate and during the twelve (12)-month period immediately following the date of the cessation of the Participant's Employment (the Employment and post-Employment periods, together, the "**Restricted Period**"), the Participant agrees to not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engage in the Business in any geographic area in which to the Participant's knowledge the Company or any of its Affiliates engage in the Business or are actively planning to engage in the Business during the Participant's Employment or, with respect to the portion of the Restricted Period that follows the cessation of the Participant's Employment, at the time of such cessation (the "**Restricted Area**"), or undertake any planning to do any of the foregoing anywhere in the Restricted Area. Specifically, but without limiting the foregoing, during the Restricted Period the Participant agrees not to, in any capacity, work for or provide services to, anywhere in the Restricted Area, whether as an employee, independent contractor or otherwise, whether with or without compensation, any Person that is engaged in the Business.

**4.2.** During the Restricted Period, the Participant agrees to not, directly or indirectly, (a) solicit or encourage any customer, vendor, supplier or other business partner of the Company or any of its Affiliates to terminate or diminish its relationship with any of them; or (b) seek to persuade any such customer, vendor, supplier or other business partner, or any prospective customer, vendor, supplier or other business partner of the Company or any of its Affiliates, to conduct with anyone else any business or activity which such customer, vendor, supplier or other business partner conducts, or such prospective customer, vendor, supplier or other business partner could conduct, with the Company or any of its Affiliates; provided, however, that these restrictions will apply (y) only with respect to those Persons who are or have been a business partner of the Company or any of its Affiliates at any time within the eighteen (18)-month period immediately preceding the activity restricted by this Section 4.2 or whose business has been solicited on behalf of the Company or any of the Affiliates by any of their officers, employees or agents within such eighteen (18)-month period, other than by form letter, blanket mailing or published advertisement, and (z) only if the Participant has performed work for such Person during the Participant's employment or been introduced to, or otherwise had contact with, such Person as a result of the Participant's employment or other associations with the Company or any of its Affiliates or has had access to Confidential Information which would assist in the Participant's solicitation of such Person.

**4.3.** During the Restricted Period, the Participant agrees to not, and to not assist any other Person to, directly or indirectly, (a) hire or engage, or solicit for hiring or engagement, any employee of the Company or any of its Affiliates or seek to persuade any such employee to discontinue employment or (b) solicit or encourage any independent contractor providing services to the Company or any of its Affiliates to terminate or diminish its relationship with any of them. For purposes of this Agreement, an **"employee"** or an **"independent contractor"** of the Company or any of its Affiliates is any Person who was such at any time within the eighteen (18)-month period immediately preceding the activity restricted by this Section 4.3.

**5.** **Nondisparagement.** Subject to the last sentence of Section 2.1 of this Agreement, the Participant agrees that the Participant will never disparage or criticize the Company, its Affiliates, their business, their management or their products or services, and that the Participant will not otherwise do or say anything that could disrupt the good morale of employees of the Company or any of its Affiliates or harm the interests or reputation of the Company or any of its Affiliates.

**6.** **Enforcement of Covenants.** In signing this Agreement, the Participant gives the Company assurance that the Participant has carefully read and considered all of the restraints hereunder, has not relied on any agreements or representations, express or implied, that are not set forth expressly in this Agreement, and has signed this Agreement knowingly and voluntarily. The Participant agrees that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates, and are reasonable in respect to subject matter, length of time and geographic area. The Participant further

agrees that, were the Participant to breach any of the covenants contained herein, the damage to the Company and its Affiliates would be irreparable. The Participant therefore agrees that the Company, in addition to any other remedies available to it, will be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Participant of any such covenants, without having to post bond, together, to the extent the Company prevails in securing any such relief, with an award of its reasonable attorneys' fees incurred in enforcing its rights hereunder. So that the Company may enjoy the full benefit of the covenants contained in Section 4 above, the Participant agrees that the Restricted Period will be tolled, and will not run, during the period of any breach by the Participant of such covenants. In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision will be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The Participant agrees that each of the Company's Affiliates will have the right to enforce the Participant's obligations to that Affiliate under this Agreement. No claimed breach of this Agreement or other violation of law attributed to the Company or any of its Affiliates, or change in the nature or scope of the Participant's Employment or other relationship with the Company or any of its Affiliates, will operate to excuse the Participant from the performance of the Participant's obligations under this Agreement.

7.   **Definitions.**  For purposes of this Agreement, the following definitions apply:

"**Business**" means (i) the integrated facilities management business operated or proposed to be operated by the Company as of the date hereof and as of the Closing Date and (ii) any other business that the Company or any of its Affiliates is engaged in or is actively planning to be engaged in, during Participant's Employment or, with respect to the portion of the Restricted Period that follows termination of Participant's Employment, at the time of such termination.

"**Confidential Information**" means any and all information of the Company and its Affiliates that is not generally available to the public. Confidential Information also includes any information received by the Company or any of its Affiliates from any Person with any understanding, express or implied, that it will not be disclosed. Confidential Information does not include information that enters the public domain, other than through the Participant's breach of the Participant's obligations hereunder.

"**Intellectual Property**" means inventions, discoveries, developments, improvements, methods, processes, procedures, plans, projects, systems, techniques, strategies, information, compositions, know-how, works, concepts and ideas, or modifications or derivatives of any of the foregoing (whether or not patentable or copyrightable or constituting trade secrets) (collectively, "**Inventions**") conceived, made, created, developed or reduced to practice by the Participant (whether alone or with others, whether or not during normal business hours or on or off Company premises) during the Participant's Employment that relate either to the business of the Company or any of its Affiliates or to any prospective activity of the Company or any of its Affiliates or that result from any work performed by the Participant for the Company or any of its Affiliates or that

B-4

make use of Confidential Information or any of the equipment or facilities of the Company or any of its Affiliates.  Notwithstanding the foregoing, Intellectual Property shall not include any Invention that Participant develops entirely on Participant's own time, without using the equipment, supplies, facilities or trade secret information of the Company or any of its Affiliates, unless such Invention (a) relates to the business of the Company or any of its Affiliates for whom Participant is performing services or to the actual or demonstrably anticipated research or development of the Company or any of its Affiliates for whom Participant is performing services or (b) results from any work performed by Participant for the Company or any of its Affiliates.

8.   **Compliance with Other Agreements and Obligations.**  The Participant represents and warrants that the Participant's Employment with the Company or any Affiliate and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which the Participant is a party or is bound, and that the Participant is not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of the Participant's obligations hereunder or the Participant's duties and responsibilities to the Company and its Affiliates.  The Participant will not disclose to or use on behalf of the Company or an Affiliate, or induce the Company or any of its Affiliates to possess or use, any confidential or proprietary information of any previous employer or other third party without that party's consent.

9.   **Entire Agreement; Severability; Modification.**  This Agreement sets forth the entire agreement between the Participant and the Company, and supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter hereof; provided, however, that this Agreement shall not supersede any effective assignment of any invention or other intellectual property to the Company or any of its Affiliates and shall not constitute a waiver by the Company or any of its Affiliates of any right that any of them now has or may now have under any agreement imposing obligations on the Participant with respect to confidentiality, non-competition, non-solicitation of customers and other business partners, no-hire or non-solicitation of employees or independent contractors or like obligations.  The provisions of this Agreement are severable.  This Agreement may not be modified or amended, and no breach will be deemed to be waived, unless agreed to in writing by the Participant and an expressly authorized officer of the Company.  Provisions of this Agreement will survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purpose of other surviving provisions.

10.  **Assignment.**  The Company may assign its rights and obligations under this Agreement without the Participant's consent to any of its Affiliates or to any Person with whom the Company will hereafter effect a reorganization, consolidate or merge, or to whom the Company will hereafter transfer all or substantially all of its properties or assets.  The terms of this Agreement will be binding upon and inure to the benefit of the Company, its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

11. **Effect on Employment.** The Participant acknowledges that this Agreement will not give the Participant any right to continued Employment with the Company or any of its subsidiaries, affect the right of the Company or any of its subsidiaries to terminate the Participant's Employment at any time, or affect any right of the Participant to terminate his or her Employment at any time.

12. **Choice of Law.** This is a Delaware contract and will be governed by and construed in accordance with the laws of Delaware, without regard to any conflict of laws principles that could result in the application of the laws of another jurisdiction. The Participant agrees to submit to the exclusive jurisdiction of the federal and state courts located within the state of Delaware in connection with any dispute arising out of this Agreement.

Intending to be legally bound hereby, the parties have signed this Agreement as of the day and year written above.

BIFM JERSEY TOPCO LIMITED

By: _____
Name: Mark McFadden
Title:   Director

Agreed and Accepted:

By_____
   Devin Grandis

*[Signature Page to Restrictive Covenant Agreement]*

# EXHIBIT C-3





# APT
## ADVANCED POWER TECHNOLOGIES LLC

# Employee Handbook





Δ π EXHIBIT 3
Deponent Grandis
Date 9-1-23 Rptr MF
WWW.DEPOBOOKPRODUCTS.COM

REV. 2021

# ABOUT THIS HANDBOOK/DISCLAIMER

We prepared this handbook to help employees find the answers to many questions that they may have regarding their employment with Advanced Power Technologies. Please take the necessary time to read it.

We do not expect this handbook to answer all the questions. Supervisors and Human Resources also serve as a major source of information.

Neither this handbook nor any other verbal or written communication by a management representative is, nor should it be considered to be, an agreement, contract of employment, express or implied, or a promise of treatment in any particular manner in any given situation, nor does it confer any contractual rights whatsoever. Advanced Power Technologies adheres to the policy of employment at will, which permits APT or the employee to end the employment relationship at any time, for any reason, with or without cause or notice.

No APT representative other than the President and/or the CEO may modify at-will status and/or provide any special arrangement concerning terms or conditions of employment in an individual case or generally and any such modification must be in a signed writing.

Many matters covered by this handbook, such as benefit plan descriptions, are also described in separate APT documents. These APT documents are always controlling over any statement made in this handbook or by any member of management.

This handbook states only general APT guidelines. Advanced Power Technologies may, at any time, in its sole discretion, modify or vary from anything stated in this handbook, with or without notice, except for the rights of the parties to end employment at will, which may only be modified by an express written agreement signed by the employee and the President and/or the CEO.

This handbook supersedes all prior handbooks.

## Table of Contents

Section 1 - Advanced Power Technologies ..... 6

    1-1. Welcome ..... 6

    1-2. Mission, Vision, And Values ..... 6

    1-3. Customer Relations And Service ..... 7

Section 2 - Governing Principles Of Employment ..... 8

    2-1. Introduction ..... 8

    2-2. Employment At-Will ..... 8

    2-3. Equal Employment Opportunity ..... 8

    2-4. Non-Harassment ..... 9

    2-5. Drug-Free And Alcohol-Free Workplace ..... 11

    2-6. Workplace Violence ..... 12

    2-7. Americans With Disabilities Act ..... 13

    2-8. Pregnancy Accommodations ..... 13

Section 3 - Operational Policies ..... 15

    3-1. Employee Classifications ..... 15

    3-2. Employee Service Credit ..... 15

    3-3. Working Hours And Schedule ..... 15

    3-4. Meal Periods ..... 16

    3-5. Timekeeping Procedures ..... 16

    3-6. Overtime ..... 17

    3-7. Direct Deposit ..... 17

    3-8. Your Paycheck ..... 17

    3-9. Remote Work/Telecommuting ..... 18

    3-10. Travel And Expenses For Non-Exempt Employees ..... 20

    3-11. Infectious Disease Control Policy ..... 20

    3-12. Safe Harbor Policy For Exempt Employees ..... 23

    3-13. Your Employment Records ..... 24

    3-14. Performance Review ..... 24

    3-15. Record Retention ..... 24

    3-16. Job Postings ..... 25

Section 4 - Benefits ..... 26

    4-1. Benefits Overview ..... 26

    4-2. Paid Time Off ..... 27

    4-3. Paid Holidays ..... 30

## Table of Contents

4-4. Bereavement Leave ........................................................... 31

4-5. Voting Leave ................................................................... 31

4-6. Jury Duty ....................................................................... 31

4-7. Workers' Compensation .................................................... 32

4-8. Employee Referral Awards ................................................ 32

4-9. Retirement Plan ............................................................. 32

4-10. Lactation Breaks ........................................................... 33

Section 5 - Leaves Of Absence ................................................. 34

5-1. Personal Leave .............................................................. 34

5-2. Military Leave ................................................................ 34

5-3. Family And Medical Leave ................................................. 35

5-4. Domestic Violence Leave .................................................. 41

Section 6 - General Standards Of Conduct ................................. 42

6-1. Workplace Conduct ......................................................... 42

6-2. Punctuality And Attendance .............................................. 43

6-3. Employee Dress And Personal Appearance ........................... 43

6-4. Confidential Company Information ....................................... 44

6-5. Use Of Communications And Computer Systems .................... 44

6-6. Email Etiquette Policy ..................................................... 45

6-7. Use Of Social Media ....................................................... 47

6-8. Use Of Facilities, Equipment And Property, Including Intellectual Property 47

6-9. Use Of Company Vehicle .................................................. 48

6-10. Personal And Company-Provided Portable Communication Devices 49

6-11. Personal Visits And Telephone Calls .................................. 50

6-12. Smoking ..................................................................... 50

6-13. Health And Safety ......................................................... 50

6-14. Solicitation And Distribution ............................................ 51

6-15. Bulletin Boards ............................................................ 51

6-16. Conflict Of Interest And Business Ethics ............................. 51

6-17. Hiring Relatives/Employee Relationships ............................ 52

6-18. Business Expense Reimbursement ..................................... 52

6-19. References .................................................................. 53

6-20. Publicity/Statements To The Media ................................... 53

6-21. If You Must Leave Us ..................................................... 53

P000647

## Table of Contents

**6-22. Exit Interviews**     53

**6-23. A Few Closing Words**     53

**General Handbook Acknowledgment**     55

**Receipt Of Non-Harassment Policy**     56

**Section 1 - Advanced Power Technologies**

For employees who are commencing employment with Advanced Power Technologies ("Advanced Power Technologies" or "APT"), on behalf of the company, let me extend a warm and sincere welcome.

You and Advanced Power Technologies have made an important decision: The Company has decided you can contribute to our success, and you have decided that Advanced Power Technologies is the organization where you can pursue your career productively and enjoyably. We believe we've each made the right decision, one that will result in a mutually profitable relationship.

The minute you start working here, you become an integral part of Advanced Power Technologies and its future. Every job in our company is important, and you will play a key role in the continued growth of our company. As you will quickly discover, our success is based on delivering high-quality products and providing unsurpassed customer service. How do we do it? By working very hard, thinking about our customers' needs, and doing whatever it takes. We do it by treating each other and customers with respect. We do it by acting as a team.

For employees who have been with us, thanks for your past and continued service.

I extend my personal best wishes for success and happiness here at Advanced Power Technologies. We understand that it is our employees who provide the services that our customers rely upon, and who will enable us to create new opportunities in the years to come.

Sincerely,

Devin Grandis, President and CEO

### Mission

We provide our customers with exceptional service, professional guidance, and innovative turnkey solutions for their electrical, lighting, and sustainable needs, at a fair price.

### Vision

APT is an innovative solutions company, driven to exceed our customers' expectations in the lighting, signage, and electrical industries across North America.

### Values

**Fairness** - Be fair to myself. Be fair to the company. Be fair to the client.

6

P000649

**Safety -** Work safe, think safe, be safe.

**Respect** - Openly communicate and treat our internal and external customers with dignity and courtesy.

**Responsibility** - Own and be accountable for all your actions and decisions within your area of responsibility.

Customer service is everyone's responsibility at Advanced Power Technologies. After you, our dedicated employees, customers are our greatest asset. Every employee represents APT to our customers and the public; how we conduct ourselves and the way we do our jobs presents an image of our entire organization.

Customers judge all of us by how they are treated with each APT employee encounter. Therefore, one of our first business priorities is to assist any customer or potential customer. Nothing is more important than being courteous, friendly, helpful, and prompt in your attention to customers.

Our personal contact with the public, our manners on the phone, and the communications we send to customers are a reflection not only of ourselves, but also of the professionalism of APT. Positive customer relations and quality service enhance the public's perception and image of APT, and pays off in greater customer loyalty, increased sales and profit.

## Section 2 - Governing Principles Of Employment

█████████████████████████████████████████████████████

We are glad to have you as a member of the Advanced Power Technologies Team. We hope your employment proves mutually satisfying and you will make important contributions to our future success. Every employee plays an important role at APT and we value the abilities, experience, and background you bring to our company. Our employees provide the services our customers rely upon and enable us to grow and create new opportunities.

Our management team intends to provide you with all the support and resources needed to do your job effectively. If, at any time, you need assistance or guidance, please do not hesitate to ask any member of our leadership team. We are here to help you perform to the best of your abilities.

Sincerely,

The APT Leadership Team

█████████████████████████████████████████████████████

Unless expressly proscribed by statute or contract, your employment is "at-will." All Advanced Power Technologies, LLC employees are at-will, which means they may be terminated at any time and for any reason, with or without advance notice. Employees are also free to quit at any time. Any employment relationship other than at-will must be set out in writing and approved/signed by Advanced Power Technologies' President and CEO.

█████████████████████████████████████████████████████

Advanced Power Technologies is an Equal Opportunity Employer that does not discriminate on the basis of actual or perceived race, color, creed, religion, national origin, ancestry, citizenship status, age, sex or gender (including pregnancy, childbirth and pregnancy-related conditions), gender identity or expression (including transgender status), sexual orientation, marital status, military service and veteran status, physical or mental disability, genetic information, or any other characteristic protected by applicable federal, state or local laws and ordinances. Advanced Power Technologies' management team is dedicated to this policy with respect to recruitment, hiring, placement, promotion, transfer, training, compensation, benefits, employee activities, access to facilities and programs and general treatment during employment.

Advanced Power Technologies will endeavor to make a reasonable accommodation of an otherwise qualified applicant or employee related to an individual's:  physical or mental disability; sincerely held religious beliefs and practices; and/or any other reason required by applicable law, unless doing so would impose an undue hardship upon APT's business operations.

Any applicant or employee who needs accommodation in order to perform the essential functions of the job should contact the Head of Human Resources to request such accommodation. The

P000651

individual should specify what accommodation is needed to perform the job and submit supporting documentation explaining the basis for the requested accommodation, to the extent permitted and in accordance with applicable law. APT then will review and analyze the request, including engaging in an interactive process with the employee or applicant, to identify if such an accommodation can be made. The company will evaluate requested accommodations, and as appropriate, identify other possible accommodations, if any. The individual will be notified of APT's decision regarding the request within a reasonable period. APT treats all medical information submitted as part of the accommodation process in a confidential manner.

Any employees with questions or concerns about equal employment opportunities in the workplace are encouraged to bring these issues to the attention of the Head of Human Resources. APT will not allow any form of retaliation against individuals who raise issues of equal employment opportunity. If employees feel they have been subjected to any such retaliation, they should contact the Head of Human Resources. To ensure our workplace is free of artificial barriers, violation of this policy, including any improper retaliatory conduct, will lead to discipline up to and including discharge. All employees must cooperate with all investigations conducted pursuant to this policy.

It is Advanced Power Technologies's policy to prohibit intentional and unintentional harassment of or against job applicants, contractors, interns, volunteers or employees by another employee, supervisor, vendor, customer or any third party on the basis of actual or perceived race, color, creed, religion, national origin, ancestry, citizenship status, age, sex or gender (including pregnancy, childbirth and pregnancy-related conditions), gender identity or expression (including transgender status), sexual orientation, marital status, military service and veteran status, physical or mental disability, genetic information or any other characteristic protected by applicable federal, state or local laws (referred to as "protected characteristics"). Such conduct will not be tolerated by APT.

The purpose of this policy is not to regulate our employees' personal morality, but to ensure that no one harasses another individual in the workplace, including while on APT premises, while on APT business (whether or not on APT premises) or while representing APT. In addition to being a violation of this policy, harassment or retaliation based on any protected characteristic as defined by applicable federal, state, or local laws is also unlawful. For example, sexual harassment and retaliation against an individual because the individual filed a complaint of sexual harassment or because an individual aided, assisted or testified in an investigation or proceeding involving a complaint of sexual harassment as defined by applicable federal, state, or local laws are unlawful.

**Harassment Defined**

Harassment generally is defined in this policy as unwelcome verbal, visual or physical conduct that denigrates or shows hostility or aversion towards an individual because of any actual or perceived protected characteristic or has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Harassment can be verbal (including slurs, jokes, insults, epithets, gestures or teasing), visual (including offensive posters, symbols, cartoons, drawings, computer displays, text messages, social media posts or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.). Such conduct violates this policy, even if it does not rise to the level of a violation of applicable federal, state or local laws. Because it is difficult to define unlawful

P000652

harassment, employees are expected to behave at all times in a manner consistent with the intended purpose of this policy.

**Sexual Harassment Defined**

Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal, visual or physical conduct of a sexual nature when:

- submission to that conduct or those advances or requests is made either explicitly or implicitly a term or condition of an individual's employment; or
- submission to or rejection of the conduct or advances or requests by an individual is used as the basis for employment decisions affecting the individual; or
- the conduct or advances or requests have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Examples of conduct that violates this policy include:

1. unwelcome flirtations, leering, whistling, touching, pinching, assault, blocking normal movement;
2. requests for sexual favors or demands for sexual favors in exchange for favorable treatment;
3. obscene or vulgar gestures, posters or comments;
4. sexual jokes or comments about a person's body, sexual prowess or sexual deficiencies;
5. propositions or suggestive or insulting comments of a sexual nature;
6. derogatory cartoons, posters and drawings;
7. sexually-explicit e-mails, text messages or voicemails;
8. uninvited touching of a sexual nature;
9. unwelcome sexually-related comments;
10. conversation about one's own or someone else's sex life;
11. conduct or comments consistently targeted at only one gender, even if the content is not sexual; and
12. teasing or other conduct directed toward a person because of the person's gender.

**Reporting Procedures**

If the employee has been subjected to or witnessed conduct which violates this policy, the employee should immediately report the matter to the Head of Human Resources. If the employee is unable for any reason to contact this person, or if the employee has not received an initial response within five (5) business days after reporting any incident of what the employee perceives to be harassment, the employee should contact any member of management. If the person toward whom the complaint is directed is one of the individuals indicated above, the employee should contact any higher-level manager in the reporting hierarchy.

**Investigation Procedures**

Every report of perceived harassment will be fully investigated, and corrective action will be taken where appropriate. All complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed. All employees must cooperate with all investigations conducted pursuant to

this policy.

**Retaliation Prohibited**

In addition, APT will not allow any form of retaliation against individuals who report unwelcome conduct to management or who cooperate in the investigations of such reports in accordance with this policy. If the employee has been subjected to any such retaliation, the employee should report it in the same manner in which the employee would report a claim of perceived harassment under this policy.

Violation of this policy including any improper retaliatory conduct will result in disciplinary action, up to and including termination.

To help ensure a safe, healthy and productive work environment for our employees and others, to protect APT property, and to ensure efficient operations, Advanced Power Technologies has adopted a policy of maintaining a workplace free of drugs and alcohol. This policy applies to all employees and other individuals who perform work for APT.

The unlawful or unauthorized use, abuse, solicitation, theft, possession, transfer, purchase, sale or distribution of controlled substances (including medical marijuana), drug paraphernalia or alcohol by an individual anywhere on APT premises, while on APT business (whether or not on APT premises) or while representing APT, is strictly prohibited. Employees and other individuals who work for APT also are prohibited from reporting to work or working while they are using or under the influence of alcohol or any controlled substances, which may impact the employee's ability to perform their job or otherwise pose safety concerns, except when the use is pursuant to a licensed medical practitioner's instructions and the licensed medical practitioner authorized the employee or individual to report to work. However, this exception does not extend any right to report to work under the influence of medical marijuana or to use medical marijuana as a defense to a positive drug test, to the extent the employee is subject to any drug testing requirement, except as permitted by and in accordance with applicable law.

Violation of this policy will result in disciplinary action, up to and including discharge.

APT maintains a policy of non-discrimination and will endeavor to make reasonable accommodations to assist individuals recovering from substance and alcohol dependencies, and those who have a medical history which reflects treatment for substance abuse conditions. However, employees may not request accommodation to avoid discipline for a policy violation. We encourage employees to seek assistance before their substance abuse or alcohol misuse renders them unable to perform the essential functions of their jobs, or jeopardizes the health and safety of any APT employee, including themselves.

Occasionally, APT management and/or department leaders host social events for employees on APT premises. Alcohol may be served at these events ONLY with prior written approval from the President and CEO. All leftover alcohol must be removed from the premises immediately following the event. As stated above, employees cannot return to work after consuming alcohol.

P000654

Advanced Power Technologies is strongly committed to providing a safe workplace. The purpose of this policy is to minimize the risk of personal injury to employees and damage to APT and personal property.

Advanced Power Technologies does not expect employees to become experts in psychology or to physically subdue a threatening or violent individual. Indeed, Advanced Power Technologies specifically discourages employees from engaging in any physical confrontation with a violent or potentially violent individual. However, Advanced Power Technologies does expect and encourage employees to exercise reasonable judgment in identifying potentially dangerous situations.

Experts in the mental health profession state that prior to engaging in acts of violence, troubled individuals often exhibit one or more of the following behaviors or signs: over-resentment, anger and hostility; extreme agitation; making ominous threats such as bad things will happen to a particular person, or a catastrophic event will occur; sudden and significant decline in work performance; irresponsible, irrational, intimidating, aggressive or otherwise inappropriate behavior; reacting to questions with an antagonistic or overtly negative attitude; discussing weapons and their use, and/or brandishing weapons in the workplace; overreacting or reacting harshly to changes in APT policies and procedures; personality conflicts with co-workers; obsession or preoccupation with a co-worker or supervisor; attempts to sabotage the work or equipment of a co-worker; blaming others for mistakes and circumstances; or demonstrating a propensity to behave and react irrationally.

**Prohibited Conduct**

Threats, threatening language or any other acts of aggression or violence made toward or by any APT employee WILL NOT BE TOLERATED. For purposes of this policy, a threat includes any verbal or physical harassment or abuse, any attempt at intimidating or instilling fear in others, menacing gestures, flashing of weapons, stalking or any other hostile, aggressive, injurious or destructive action undertaken for the purpose of domination or intimidation. To the extent permitted by law, employees and visitors are prohibited from carrying weapons onto APT premises.

**Procedures for Reporting a Threat**

All potentially dangerous situations, including threats by co-workers, should be reported immediately to any member of management with whom the employee feels comfortable. Reports of threats may be maintained confidential to the extent that maintaining confidentiality does not impede Advanced Power Technologies's ability to investigate and respond to complaints. All threats will be promptly investigated. All employees must cooperate with all investigations. No employee will be subjected to retaliation, intimidation or disciplinary action as a result of reporting a threat in good faith under this policy.

If APT determines, after an appropriate good faith investigation, that someone has violated this policy, APT will take swift and appropriate corrective action.

If the employee is the recipient of a threat made by an outside party, that employee should follow the steps detailed in this section. It is important for APT to be aware of any potential danger in its offices. Indeed, APT wants to take effective measures to protect everyone from the threat of a violent act by employees or by anyone else.

P000655

It is Advanced Power Technologies' policy that we will not discriminate against qualified individuals with disabilities regarding any aspect of their employment. APT is committed to complying with the ADA Amendments Act of 2008, the Americans with Disabilities Act of 1990 and its related Section 504 of the Rehabilitation Act of 1973, as applicable. APT recognizes that some individuals with disabilities may require accommodations at work. If you are currently disabled or become disabled during your employment, contact your manager to discuss reasonable accommodations that may enable you to perform the essential functions of your job. We are not required to provide accommodation that could cause the business an undue hardship as defined by law.

The Americans with Disabilities Act defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. "Major life activities" include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

In accordance with the Americans with Disabilities Act, employees with AIDS will be treated like any other ill employee. If the individual is fit to work, he or she will be provided with work in accordance with normal procedures. Usually, no special precautions in the workplace are indicated. However, employees with AIDS may request reasonable accommodation by contacting the human resources department. We are committed to safeguarding the health of all employees and maintaining productivity.

Employees and applicants for employment may request reasonable accommodation for pregnancy, childbirth or related medical or common conditions to enable them to perform the essential functions of their job. In accordance with the Pregnancy Discrimination Act and related legislation, reasonable accommodation will be provided unless the accommodation will impose an undue hardship on APT's business operations.

Reasonable accommodations may include but are not limited to light duty; temporary transfer to a less strenuous or hazardous position; acquisition or modification of equipment; and time off to recover from conditions related to childbirth, or a leave of absence necessitated by pregnancy, childbirth or medical conditions resulting from pregnancy or childbirth.

Employees who take leave as accommodation under this policy will be reinstated to their original job or to an equivalent position with equivalent pay, seniority, benefits and other terms and conditions of employment upon their notification to APT of their intent to return to work or when the employee's need for reasonable accommodation ends. Reinstatement is not required, however, if an undue hardship would result to the company's business operations.

APT may request certain documents from an employee or applicant's health care provider regarding the need for accommodation. It is the employee's or applicant's duty to provide the requested documentation. APT will not deny employment opportunities or take adverse employment actions against employees or otherwise qualified applicants for employment based on the need to

13

make such reasonable accommodations, nor will the company retaliate against applicants or employees who request accommodation or otherwise exercise their rights under these laws. Employees who have questions about this policy or who wish to request reasonable accommodation under this policy should contact their Human Resources representative.

P000657

**Section 3 - Operational Policies**

████████████████████████████████████████████████████

For purposes of this handbook, all Advanced Power Technologies employees fall within one of the classifications below.

**Full-Time Employees** - Employees who regularly work at least 40 hours per week who were not hired on a short-term basis.

**Part-Time Employees** - Employees who regularly work fewer than 40 hours per week who were not hired on a short-term basis.

**Short-Term Employees** - Employees who were hired for a specific short-term project, or on a short-term freelance, per diem or temporary basis. Short-Term employees generally are not eligible for APT benefits, but are eligible to receive statutory benefits.

In addition to the above classifications, employees are categorized as either **"exempt"** or **"non-exempt"** for purposes of federal and state wage and hour laws. Employees classified as exempt do not receive overtime pay; they generally receive the same weekly salary regardless of hours worked. Such salary may be paid less frequently than weekly. The employee will be informed of these classifications upon hire and informed of any subsequent changes to the classifications.

████████████████████████████████████████████████████

"Length of service" refers to the length of time that employees spend as active full-time or part-time employees with APT. Service begins on the day they become full-time or part-time employees.

Length of service may be used in determining certain employee benefits, such as time-off benefits, depending on the reason for termination. Reinstatement of benefits will be at management's discretion. Human Resources will discuss this issue with any rehired employees prior to hiring the individual.

████████████████████████████████████████████████████

Advanced Power Technologies normally is open for business from 8:00AM to 5:00PM, Monday through Friday. However, APT is available to meet the standard and emergent needs of our clients "24/7/365." As such, supervisors and/or managers may establish alternative night, weekend, holiday and "on-call" hours.

APT is a customer service focused, "client-facing" organization. As such, employees will be assigned a work schedule that best serves the needs of our clients, and will be expected to begin and end work according to the schedule. Further, to accommodate the needs of the business, Advanced Power Technologies may occasionally need to change individual work schedules on either a short-term or long-term basis. Whenever possible, management will provide ample notice to employees before changing their work schedule. Employees will be provided meal and rest periods as required by law. A supervisor will provide further details.

Employees will be provided meal and rest periods as required by law. A supervisor will provide further details.

████████████████████████████████████████████████████████

All full-time employees are provided with one mandatory meal period on each workday. Field employees will be given a 30-minute meal period and administrative staff will be given a one-hour meal period. Supervisors will schedule meal periods to accommodate operating requirements. This policy aims to relieve employees of all duties during their meal periods. The company schedules work assignments with the expectation that all employees will take their duty-free meal periods, and encourages employees to do so. Employees will not be compensated for the meal periods taken.

████████████████████████████████████████████████████████

Advanced Power Technologies strives to maintain strict compliance with the Fair Labor Standards Act (FLSA). The FLSA is a federal law that protects employees from unfair pay practices and guarantees payment of minimum wage and overtime to non-exempt employees. These rules help Advanced Power Technologies with the FLSA and ensure all employees are paid fairly and legally. Exempt employees are required to record their daily work attendance and report full days of absence from work for reasons such as leaves of absence, sick leave, or personal business. The below rules apply to non-exempt employees only (If you are unsure of your status as exempt vs. non-exempt, please ask your human resources manager). Failure to follow these rules may subject you to discipline up to discharge.

- You must keep an accurate record of all your work hours in the manner designated by Advanced Power Technologies (e.g., handwritten timecard, time clock, timekeeping computer program, etc.). Non-exempt employees may not start work until their scheduled starting time.
- Review the accuracy of your time records before submitting them to your supervisor for processing. If you need to make a change in your time records to correct an error, make the correction before you submit it for processing. When you sign and submit your time records, you certify that they are complete and that they accurately reflect all the hours that you worked. It is the employee's responsibility to certify the accuracy of all time recorded. Any errors in the time record should be reported immediately to a supervisor, who will attempt to correct legitimate errors.
- Employees are responsible for maintaining their own time records. Do not allow another employee to sign in/out for you, and do not sign in/out for any other employee. Do not tamper with timekeeping equipment. Altering, falsifying, or tampering with time records is prohibited and subjects the employee to discipline, up to and including discharge.
- Enter the exact time you begin and end working on your time records. Record all breaks during which you are completely relieved from work duties if they exceed 20 minutes, including meal breaks. You should not be doing any work during your recorded breaks, as these entries may be deducted from your total work hours as non-compensable time off.

P000659

( )

Like most successful companies, Advanced Power Technologies experiences periods of extremely high activity. During these busy periods, additional work is required from all of us. Supervisors are responsible for monitoring business activity and requesting overtime work if it is necessary. Effort will be made to provide employees with adequate advance notice in such situations.

Any non-exempt employee who works overtime will be compensated at the rate of one and one-half times (1.5) their normal hourly wage for all time worked in excess of 40 hours each week, unless otherwise required by law.

Employees may work overtime only with prior management authorization. All overtime hours must be recorded no later than the day after it is accrued.

For purposes of calculating overtime for non-exempt employees, the workweek begins at 12 a.m. on Monday and ends 168 hours later at 12 a.m. on the following Monday. Overtime pay is based on actual hours worked.

Time taken for lunch or dinner is not included as time worked for purposes of computing overtime. Time off on holidays, sick leave, vacation leave, personal leave or any leave of absence will not be factored in as hours worked when calculating overtime.

Advanced Power Technologies strongly encourages employees to use direct deposit. Authorization forms are available from Payroll and Benefits Specialist or the Head of Human Resources.

Employees will be paid bi-weekly for all the time worked during the past pay period.

Payroll stubs itemize deductions made from gross earnings. By law, Advanced Power Technologies is required to make deductions for Social Security, federal income tax and any other appropriate taxes. These required deductions also may include any court-ordered garnishments. Payroll stubs will also differentiate between regular pay received and overtime pay received.

If there is an error in any employee's pay, the employee should bring the matter to the attention of Payroll and Benefits Specialist immediately, so APT can resolve the matter quickly and amicably.

Paychecks will be given only to the employee, unless the employee requests that they be mailed or authorizes in writing that another person may accept the check.

P000660

Advanced Power Technologies may allow employees to work remotely if their job duties and work performance are determined to be eligible for remote work. Eligibility will be decided on a case-by-case basis by APT. Employees also may be required to work remotely during periods of public health emergencies if government orders and mandates recommend such work.

This policy provides general information regarding remote work/telecommuting. Employees who are approved to work remotely should consult their individual agreement for specific details of their remote work/telecommuting arrangement, such as expected work hours, equipment provided, and other important information.

Any remote work/telecommuting arrangement may be discontinued by APT at any time and at the discretion of APT. Employees also may discontinue the arrangement but may not be guaranteed office space at the APT's location.

**At-Will Employment**

This policy and any individual agreement addressing this work arrangement do not create a contract of employment and are not intended to be considered or construed as a promise of continued employment. Employment is at will and may be discontinued at any time by APT or employee without notice, cause, or liability.

**Hours of Work**

Employees will work full time from home. Scheduled hours of work will be set by the employees' manager or supervisor. Employees should maintain regular contact with their supervisors and managers.

Nonexempt employees must accurately record all hours worked pursuant to the APT's timekeeping system and take rest and meal breaks as if in the APT's workplace and as required by law. Nonexempt employees may not work beyond scheduled working hours (including working more than 40 hours in a workweek) without prior, written authorization from their manager or supervisor.

**Location**

Employees will provide, at their expense, a secure, dedicated work area. Employees are responsible for maintaining the work area in a safe, secure, and nonhazardous condition at all times. Employees will maintain security devices and procedures necessary to prevent use by unauthorized persons, including by preventing the connection of any APT-furnished computer system, network, or database to any computer, network, or database other than a computer, network, or database to which connections are provided or authorized by APT.

**Duties**

Employees are expected to follow all existing APT policies and procedures. The duties, obligations, responsibilities, and conditions of employment with APT remain unchanged. Employees must stay engaged with work throughout the workday and be fully available during normal business hours. If employees do not successfully perform their job duties remotely, this arrangement will be revoked. Employees are expected to follow existing APT policies with respect to scheduled and unscheduled time off, including the obligation to speak with their manager or supervisor before the scheduled start

P000661

time in the event of an unscheduled absence, tardy, or early departure.

## Accidents and Injuries

Employees agree to maintain safe conditions in the remote work space and to practice the same safety habits and rules applied on APT premises. If employees incur an injury arising out of the course and scope of the assigned job duties while working in the remote work space, the workers' compensation provisions in place for the state in which the employees are working will apply. Employees must notify their supervisor or manager immediately and complete all necessary and/or requested documents regarding the reported injury. APT assumes no responsibility for injuries occurring in the remote work space outside normal working hours or for injuries that occur as a result of a reasonably recognizable unsafe remote work space.

## Equipment

Employees agree to use electronic equipment that has been encrypted and meets all of the APT's security requirements. If APT provides equipment for home use, employees agree to provide a secure location for APT-owned equipment and will not use, or allow others to use, such equipment for purposes other than APT business. Employees have no expectation of ownership in such equipment, linkages, property, or other items installed or provided by the company. APT will bear the expense of removal of any such equipment, linkages, and installations provided by APT upon the termination of the remote work/telecommuting arrangement but not modification of or repairs to the work location. Employees hereby release the company from any damage or liability incurred in the installing or removal of the equipment provided by APT.

## Return of APT Property

All equipment, records, and materials provided by APT will remain APT property. Employees agree to return APT equipment, records, and materials upon request. All APT equipment will be returned by employees for inspection, repair, or replacement as needed or requested or immediately upon termination of the remote work/telecommuting arrangement. All equipment must be returned within five (5) business days of written notice to the employees.

## Expenses

Upon presentment of receipts and in accordance with the Business Expense Reimbursement policy, APT will reimburse employees for certain preapproved expenses.

Regular household utility charges, such as electricity, water, phone, Internet service, auto, homeowners' insurance, etc., are not reimbursable unless state law requires reimbursement.

## Confidentiality

Employees agree that they are subject to APT's policies prohibiting the nonbusiness use or dissemination of APT's confidential business information. Employees will take all appropriate steps to safeguard APT's confidential business information, including segregating it from personal papers and documents, not allowing nonemployees to access such information, and keeping such information in locked drawers or file cabinets when not in use. Employees will maintain confidential information, including, but not limited to, information regarding APT's products or services, processing, marketing and sales, client lists, client e-mail addresses and mailing addresses, client data, orders, memoranda, notes, records, technical data, sketches, designs, plans, drawings, trade secrets, research and development data, experimental work, proposals, new product and/or service developments, project reports, sources of supply and material, operating and cost data, and

19

P000662

corporate financial information.

( )   **Contact**

If employees have any questions concerning this policy or would like to apply to work remotely, they should contact Payroll and Benefits Specialist.

████████████████████████████████████████████████████████

The nature of APT's business requires that all requests for travel reimbursement be reviewed on a case-by-case basis (e.g., travel in APT owned/leased vehicle; service routes, project sites, etc.). Generally, non-exempt employees will be reimbursed for reasonable and necessary incurred expenses while traveling on APT business.

When travel for APT business is necessary, travelers must contact the Travel Coordinator to make travel arrangements. You must record all travel and business activities on APT's Expense Report Form and submit it to Accounts Payable. If business travel requires you to be out of the office for an extended period, your report must cover no less than one week and no more than one month of expenses.

APT reserves the right to deduct unauthorized expenses and unauthorized use of company charge cards. An administrative fee may be charged in addition to unauthorized charges at the prevailing administrative fee. In no event will an employee who is chargedback unauthorized expenses earn less than minimum wage for a pay period. To the extent that applicable state law provides greater benefits, state law applies.

████████████████████████████████████████████████████████

Advanced Power Technologies will take proactive steps to protect the workplace in the event of an infectious disease outbreak. It is the goal of APT during any such time period to strive to operate effectively and ensure that all essential services are continuously provided and that employees are safe within the workplace.

Advanced Power Technologies is committed to providing authoritative information about the nature and spread of infectious diseases, including symptoms and signs to watch for, as well as required steps to be taken in the event of an illness or outbreak.

**Preventing the Spread of Infection in the Workplace**

APT will ensure a clean workplace, including the regular cleaning of objects and areas that are frequently used, such as bathrooms, break rooms, conference rooms, door handles and railings. We ask all employees to cooperate in taking steps to reduce the transmission of infectious disease in the workplace. The best strategy remains the most obvious-frequent   hand washing with warm, soapy water; covering your mouth whenever you sneeze or cough; and discarding used tissues in wastebaskets.

Unless otherwise notified, our normal attendance and leave policies will remain in place. Individuals who believe they may face particular challenges reporting to work during an infectious disease outbreak should take steps to develop any necessary contingency plans. For example, employees might want to arrange for alternative sources of child care should schools close and/or speak with

20

supervisors about the potential to work from home temporarily or on an alternative work schedule.

**Limiting Travel**

During an infectious disease outbreak, all nonessential travel should be avoided until further notice. Employees who travel as an essential part of their job should consult with management on appropriate actions.

**Telecommuting**

Telework requests will be handled on a case-by-case basis. While not all positions will be eligible, all requests for temporary telecommuting should be submitted to your manager and the Head of Human Resources for consideration.

**Staying Home When Sick**

Many times, with the best of intentions, employees report to work even though they feel ill. We provide PTO and other benefits to compensate employees who are unable to work due to illness.

During an infectious disease outbreak, it is critical that employees do not report to work while they are ill and/or experiencing the following symptoms: fever, cough, sore throat, runny or stuffy nose, body aches, headache, chills and fatigue. Currently, the Centers for Disease Control and Prevention recommends that people with an infectious illness such as the flu remain at home until at least 24 hours after they are free of fever (100 degrees F or 37.8 degrees C) or signs of a fever without the use of fever-reducing medications. Employees that are experiencing symptoms of COVID-19, or have tested positive for COVID-19, must isolate themselves immediately and notify their direct supervisor and Human Resources. Employees who report working ill will be sent home in accordance with these health guidelines.

This information may be updated by the Centers for Disease Control and Prevention. APT will do their best to keep the information up to date but encourages employees to review the latest guidelines published on the CDC website or other government agency's forums.

**COVID-19 Isolation and Quarantine Guidelines**

If employees test positive for COVID-19, they should contact their supervisor immediately and follow the current interim policy.

If employees are in close contact with someone suspected to be infected with COVID-19, or who has tested positive, they should notify their direct supervisor or the HR Department immediately and follow the interim policy. A <u>Close Contact</u> is someone who was within 6 feet of an infected person (laboratory confirmed or a clinically compatible illness) for a cumulative total of 15 minutes or more over a 24-hour period. An infected person can spread COVID-19 starting from 2 days before they have any symptoms (or asymptomatic patients, 2 days before the positive specimen collection date), until they meet the criteria for discontinuing home isolation.

Example: An employee meets with an individual who has tested positive for COVID-19 three times in a day, 5 minutes each time, for a total of 15 minutes in a period of 24 hours.

APT will handle close contacts with the upmost confidentiality. Any close contact will be informed immediately and asked to isolate following the established guidelines.

Supervisors must notify the Head of Human Resources and the Executive Team immediately after confirming any positive cases of COVID-19 or other infectious disease. The contact tracing must be

completed by the supervisor within a 24-hour period after being notified by the employee that is sick, or that has been in closed contact with someone sick.

**Requests for Medical Information and/or Documentation**

If you are out sick or show symptoms of being ill, it may become necessary to request information from you and/or your health care provider. In general, we would request medical information to confirm your need to be absent, to show whether and how an absence relates to the infection, and to know that it is appropriate for you to return to work. As always, we expect and appreciate your cooperation if and when medical information is sought.

**Confidentiality of Medical Information**

Our policy is to treat any medical information as a confidential medical record. In furtherance of this policy, any disclosure of medical information is in limited circumstances to supervisors, managers, and government officials as required by law.

**Social Distancing Guidelines for Workplace Infectious Disease Outbreaks**

In the event of an infectious disease outbreak, APT may implement these social distancing guidelines to minimize the spread of the disease among the staff.

During the workday, employees are requested to:

1. Avoid meeting people face-to-face. Employees are encouraged to use the telephone, online conferencing, e-mail or instant messaging to conduct business as much as possible, even when participants are in the same building.

2. If a face-to-face meeting is unavoidable, minimize the meeting time, choose a large meeting room and sit at least one yard from each other if possible; avoid person-to-person contact such as shaking hands.

3. Avoid any unnecessary travel and cancel or postpone nonessential meetings, gatherings, workshops and training sessions.

4. Do not congregate in work rooms, pantries, copier rooms or other areas where people socialize.

5. Bring lunch and eat at your desk or away from others (avoid lunchrooms and crowded restaurants).

6. Encourage members and others to request information and orders via phone and e-mail in order to minimize person-to-person contact. Have the orders, materials and information ready for fast pick-up or delivery.

**Outside Activities**

During an infectious disease outbreak, employees might be encouraged to the extent possible to:

1. Avoid public transportation (walk, cycle, drive a car) or go early or late to avoid rush-hour crowding on public transportation.

2. Avoid recreational or other leisure classes, meetings, activities, etc., where employees might come into contact with contagious people.

**COVID-19 Vaccine**

22

P000665

Advanced Power Technologies encourages all employees to receive the COVID-19 vaccine. To learn more about where to get the vaccine, click <u>HERE</u>.

**Acommodations**

Employees that require special accommodation for medical or religious reasons may contact the HR Department for further assistance.

████████████████████████████████████

It is Advanced Power Technologies's  policy and practice to accurately compensate employees and to do so in compliance with all applicable state and federal laws. To ensure proper payment and that no improper deductions are made, employees must review pay stubs promptly to identify and report all errors.

Those classified as exempt salaried employees will receive a salary which is intended to compensate them for all hours they may work for Advanced Power Technologies. This salary will be established at the time of hire or classification as an exempt employee. While it may be subject to review and modification from time to time, such as during salary review times, the salary will be a predetermined amount that will not be subject to deductions for variations in the quantity or quality of the work performed.

Under federal and state law, salary is subject to certain deductions. For example, unless state law requires otherwise, salary can be reduced for the following reasons:

- full-day absences for personal reasons;
- full-day absences for sickness or disability if the deduction is made in accordance with a bona fide plan, policy or practice of providing wage replacement benefits for such absences (deductions also may be made for the exempt employee's full-day absences due to sickness or disability before the employee has qualified for the plan, policy or practice or after the employee has exhausted the leave allowance under the plan);
- full-day disciplinary suspensions for infractions of our written policies and procedures;
- Family and Medical Leave Act absences (either full- or partial-day absences);
- to offset amounts received as payment from the court for jury and witness fees or from the military as military pay;
- the first or last week of employment in the event the employee works less than a full week; and
- any full work week in which the employee does not perform any work.

Salary may also be reduced for certain types of deductions such as a portion of health, dental or life insurance premiums; state, federal or local taxes; social security; or voluntary contributions to a 401(k) or pension plan.

In any work week in which the employee performed any work, salary will <u>not</u> be reduced for any of the following reasons:

- partial day absences for personal reasons, sickness or disability;
- an absence because the APT has decided to close a facility on a scheduled work day;
- absences for jury duty, attendance as a witness, or military leave in any week in which the

employee performed any work (subject to any offsets as set forth above); and
- any other deductions prohibited by state or federal law.

However, unless state law provides otherwise, deductions may be made to accrued leave for full- or partial-day absences for personal reasons, sickness or disability.

If employees believe they have been subject to any improper deductions, they should immediately report the matter to a supervisor. If the supervisor is unavailable or if the employee believes it would be inappropriate to contact that person (or if the employee has not received a prompt and fully acceptable reply), they should immediately contact the Head of Human Resources or any other supervisor in Advanced Power Technologies with whom the employee feels comfortable.

In order to obtain their position, employees have provided personal information, such as address and telephone number. This information is contained in their personnel file.

Employees should keep their personnel file up to date by informing the Payroll and Benefits Specialist of any changes. Employees also should inform the Payroll and Benefits Specialist of any specialized training or skills they acquire, as well as any changes to any required visas. Unreported changes of address, marital status, etc. can affect withholding tax and benefit coverage. Further, an "out of date" emergency contact or an inability to reach employees in a crisis could cause a severe health or safety risk or other significant problem.

Depending on the employee's position and classification, Advanced Power Technologies endeavors to review performance every six months. However, a positive performance evaluation does not guarantee an increase in salary, a promotion or continued employment. Compensation increases and the terms and conditions of employment, including job assignments, transfers, promotions, and demotions, are determined by and at the discretion of management.

In addition to these formal performance evaluations, APT encourages employees and supervisors to discuss job performance on a frequent and ongoing basis.

Advanced Power Technologies acknowledges its responsibility to preserve information relating to litigation, audits and investigations. Failure on the part of employees to follow this policy can result in possible civil and criminal sanctions against APT and its employees and possible disciplinary action against responsible individuals (up to and including discharge of the employee). Each employee has an obligation to contact the Head of Human Resources to inform them of potential or actual litigation, external audit, investigation or similar proceeding involving APT that may have an impact on record retention protocols.

P000667

███████████████████████████████████████

Advanced Power Technologies is dedicated to assisting employees in managing their careers and reaching their professional goals through promotion and transfer opportunities. This policy outlines the on-line job posting program which is in place for all employees. To be eligible to apply for an open position, employees must meet the following requirements:

- be a current, regular, full-time or part-time employee;
- have been in current position for at least six (6) months;
- maintain a performance rating of satisfactory or above;
- not be on conduct/performance-related probation or warning;
- meet the job qualifications listed on the job posting; and
- provide their current manager with notice prior to applying for the position.

If employees find a position of interest on the job posting website and they meet the eligibility requirements, an online job posting application must be completed in order to be considered for the position. Not all positions are guaranteed to be posted. APT reserves the right to seek applicants solely from outside sources or to post positions internally and externally simultaneously.

For more specific information about the program, please contact the Human Resources Department.

P000668

## Section 4 - Benefits

At Advanced Power Technologies we strive to offer a benefit package that gives our employees peace of mind in knowing that the most important things in life are protected - your family, your finances, and your future. We recognize the importance of being able to provide our employees and their families with quality benefits as part of their overall compensation package. In keeping with this goal, each benefit program has been carefully devised. These benefits include time-off benefits, such as vacations and holidays, and insurance and other plan benefits. We are constantly studying and evaluating our benefit programs and policies to better meet present and future requirements. These policies have been developed over the years and continue to be refined to keep up with changing times and needs.

Details of insurance and other plan benefits are provided in the APT Employee Benefits Enrollment Guide provided to all new employees, and available for review upon request from the Payroll and Benefits Specialist. We have prepared this guide to outline and highlight specific coverage or concepts to illustrate your choices and the benefits APT offers for the upcoming year. Additionally, provisions for the plans, including eligibility and benefits provisions, are included in the summary plan descriptions ("SPDs", which may be revised from time to time). In the determination of benefits and all other matters under each plan, the terms of official plan documents shall govern over the language of any descriptions of the plans, including the SPDs and this handbook. We encourage you to take time to educate yourself about your options and choose the best coverage for yourself and your family.

The "Benefits Open Enrollment" is the time of year when new benefits and plan rates are announced, and you have the opportunity to make changes to your benefit selections, including medical, dental, vision and voluntary insurance products. The Head of Human Resources and the Payroll and Benefits Specialist provide Benefits Open Enrollment guidance via email to all employees each year.

Further, APT (including the officers and administrators who are responsible for administering the plans) retains full discretionary authority to interpret the terms of the plans, as well as full discretionary authority with regard to administrative matters arising in connection with the plans and all issues concerning benefit terms, eligibility and entitlement.

While APT intends to maintain these employee benefits, it reserves the absolute right to modify, amend or terminate these benefits at any time and for any reason.

If employees have any questions regarding benefits, they should contact the Payroll and Benefits Specialist.

P000669

Advanced Power Technologies appreciates how hard employees work and recognizes the importance of providing time for rest and relaxation. Advanced Power Technologies fully encourages employees to get this rest by taking paid time off. Time off under this policy includes extended time off, such as for a vacation, and incidental time due to sickness or to handle personal affairs. APT has adopted this PTO Policy to promote work-life balance while accomplishing our mission and meeting the needs of our customers. Our company believes that time away from work is essential to the health and well-being of our employees and encourages the utilization of PTO days throughout the year.

**Paid Time Off (PTO)**

Paid Time Off (PTO) provides eligible employees with regular pay during time away from work that can be used for vacation, personal time, or sick time. This policy replaces vacation, personal, and sick time. When an eligible employee is absent from work for any of the reasons listed, time is deducted from their accrued PTO.

**PTO Eligibility**

Only active, full-time employees (employees in a 30+ hours per week position) are eligible for PTO. The PTO days must be accrued before they can be taken.

**PTO Accrual**

The PTO for eligible employees is accrued over time at a rate determined by the employee's length of service with APT. PTO accrual is based on the employee's start date and anniversary year, not the calendar year. All eligible employees will start accruing PTO after they have been employed with APT for 90 days.

**Accrual Rates**

| Length of Service | PTO Days |
| --- | --- |
| 0 - 1 Year of Service | 5 days (40 hours) |
| 1 - 4  Years of Service | 10 days (80 hours) |
| 5 - 9 Years of Service | 15 days (120 hours) |
| 10+ Years of Service | 20 days (160 hours) |

Example of Anniversary Year:

- Employee Start Date: 06/01/2021
- Employee Anniversary Date: 06/01/2022
- Anniversary Year: 06/01/2022 - 05/31/2023
- PTO Accrued: 80 hours

**Requesting PTO**

Employees must request a PTO when taking time off from work for any reason. PTO may

27

be requested in increments as low as 4 hours. Managers reserve the right to approve, or not approve a request for PTO if it interferes with APT operations, or adversely affects coverage of job and staffing requirements. Employee requests for a pre-scheduled PTO will be accommodated to the extent possible, but when there are scheduling conflicts, seniority and operational requirements will take precedence.

Employees who have an unexpected need to be absent from work should notify their direct supervisor before the scheduled start of their workday, if possible. The direct supervisor must also be contacted on each additional day of unexpected absence. The employee must comply with the reporting procedure as stated in the Punctuality and Attendance Policy. PTO may be used to cover unscheduled absences if the manager approves.

The company reserves the right to require employees to provide a note from the doctor verifying that an absence was caused by a medical situation when such absence was in excess of 3 consecutive work days. The company also reserves the right to require documentation from the doctor authorizing the employee to return to work.

To enable management to schedule appropriate coverage, PTO requests must be submitted in advance as follows:

- PTO request for 80 consecutive hours: submit a request 60 days prior.
- PTO request for 40 consecutive hours: submit a request 30 days prior.
- PTO request for up to 40 consecutive hours: submit a request 14 days prior.

All requests for PTO must be submitted using the "Time Off Request" tool provided by the payroll and human capital management software in place (Paylocity).

- The employee will submit a "Time Off Request" following the established guidelines.
- The system will send the request to the Direct Supervisor or Department Manager for approval. In some cases, the assigned reviewer may approve or reject a PTO request on behalf of the Direct Supervisor or Department Manager.
- Once approved, the system will process the PTO request and transfer it to payroll accordingly.

If a recognized holiday falls during an eligible employee's scheduled PTO, holiday pay will be provided instead of the paid time off benefit that would otherwise have applied.

P000671

**PTO Usage**

PTO may be used as soon as it is accrued. Employees are required to use their accrued PTO during their anniversary year with the following exceptions:

| Length of Service | PTO Days | Exception |
|---|---|---|
| 0 - 1 year of service | 5 days accrued | 100% must be taken within the anniversary year. |
| 1 - 4 years of service | 10 days accrued | • 80% must be taken within the anniversary year.<br>• 20% can be carried over for future use. |
| 5 - 9 years of Service | 15 days accrued | • 75% must be taken within the anniversary year.<br>• 25% can be carried over for future use. |
| 10+ years of service | 23 days accrued | • 50% must be taken within the anniversary year.<br>• 25% may be converted to pay following the employee's anniversary date or carried over for future use.<br>• 25% may be accumulated and used upon retirement or hardship. |

**Notes**:

- PTO Carryover: Regular PTO balances must be used before submitting a request to use PTO Carryover balances.
- Retirement: withdrawal from one's position or occupation or from active working life
- Hardship: a condition that is difficult to endure, something hard to bear.

**Payment of Converted PTO**

Accumulated PTO is paid in installments at the employee's regular rate of pay and is not subject to

overtime.

- Retirement: Accumulated PTO is paid bi-weekly starting with the first scheduled payroll after retirement.
- Hardship: Accumulated PTO is paid bi-weekly on scheduled payroll for the duration of the hardship or until the accumulated PTO is exhausted.
- Lay-Off: If an eligible employee is laid off, the payment for accumulated PTO will be at the discretion of management.
- Voluntary Termination (Resignation): If an eligible employee is laid off, the payment for accumulated PTO will be at the discretion of management. If an eligible employee is terminated due to job abandonment, the payment for accumulated PTO is forfeited.
- Involuntary Termination: If an eligible employee is terminated, the payment for accumulated PTO is forfeited.

Advanced but unaccrued paid time off will be deducted from the employee's final paycheck, to the extent permitted by law.

**This PTO Policy will become effective as of January 1, 2021 based on the Employee's Anniversary Date.**

Example of PTO Policy Start Date:

- Employee Anniversary Date: 05/28/2021
- Employee Starts New PTO Policy: 05/28/2021

Advanced Power Technologies observes the following holidays:

- New Year's Day (January 1)
- Memorial Day (Last Monday in May)
- Independence Day (July 4)
- Labor Day (First Monday in September)
- Thanksgiving and the day after (Fourth Thursday in November)
- Christmas (December 25)
- Mr. G's Family Day (Closed the day before or the day after any Christmas day that falls on a Tuesday or Thursday)

You will be paid for these holidays if you:

- are a full-time employee who has worked at least 90 days at the company;
- worked the full day before and the full day after the holiday unless time off has been;
- scheduled and approved in advance as paid time off.

Holidays that fall on a weekend will be observed as follows:

- Observed Friday if the holiday is on Saturday.
- Observed Monday if the holiday falls on a Sunday.

To avoid confusion, all holidays will be announced in advance.

Due to business needs, some employees may be required to work on company holidays. Your supervisor or manager will notify you if this may apply to you.

When holidays fall or are celebrated on a regular work day, eligible employees will receive one (1) day's pay at their regular straight-time rate. Eligible employees who are called into work on a holiday will receive one (1) day's pay at their regular straight-time rate, and an additional payment of time and a half (overtime rate) for the actual time they work that day.

If a holiday falls within an eligible employee's approved vacation period, the eligible employee will be paid for the holiday (at the regular straight-time rate) in addition to the vacation day, or the eligible employee will receive an additional vacation day at the option of APT.

If a holiday falls within a jury duty or bereavement leave, the eligible employee will be paid for the holiday (at the regular straight-time rate) in addition to the leave day, or the eligible employee will receive an additional day off at the option of APT.

████████████████████████████████████████████████

Advanced Power Technologies understands the death of a family member is a difficult time in which employees wish to be with their families. If the employee is full-time and loses a close relative, the employee will be allowed paid time off of up to 3 days to assist in attending to obligations and commitments.

For the purposes of this policy, a close relative includes a spouse, domestic/civil union partner, child, parent, sibling, or any immediate family required by applicable law. Paid leave days only may be taken on regularly scheduled, consecutive workdays following the day of death. Employees must inform their supervisor prior to commencing bereavement leave. In administering this policy, APT may require verification of death.

████████████████████████████████████████████████

Advanced Power Technologies strongly supports your right to vote. In the event employees do not have sufficient time outside of working hours to vote in a statewide election, if required by state law, the employee may take off enough working time to vote. Such time will be paid if required by state law. This time should be taken at the beginning or end of the regular work schedule. Where possible, supervisors should be notified at least two (2) days prior to the voting day.

████████████████████████████████████████████████

Advanced Power Technologies realizes that it is the obligation of all U.S. citizens to serve on a jury when summoned to do so. All employees will be allowed time off to perform such civic service as required by law. Employees are expected, however, to provide proper notice of a request to perform jury duty and verification of their service.

( )

Employees also are expected to keep management informed of the expected length of jury duty service and to report to work for the major portion of the day if excused by the court. If the required absence presents a serious conflict for management, employees may be asked to try to postpone jury duty.

Employees on jury duty leave will be paid for their jury duty service in accordance with state law; however, exempt employees will be paid their full salary for any week in which time is missed due to jury duty if work is performed for APT during such week.

Advanced Power Technologies covers on-the-job injuries via our Workers' Compensation Insurance Policy, which is provided at no cost. If employees are injured on the job, no matter how slightly, they must report the incident immediately to their supervisor. Failure to follow APT procedures may affect the ability of employees to receive Workers Compensation benefits.

This is solely a monetary benefit and not a leave of absence entitlement. Employees who must miss work due to a workplace injury must also request a formal leave of absence. See the Leave of Absence section of this handbook for more information.

Advanced Power Technologies encourages all employees to refer qualified job applicants for available job openings. Other than managers in the line of authority and all human resources personnel, all employees are eligible to receive employee referral awards. Employees shall obtain permission from the individual before making the referrals, and instruct the applicant to list the employee's name on their employment application as the referral source. Employees should not make any commitments or oral promises of employment.

An employee should submit the referral's resume and/or completed application form to the HR Department for a posted job. If the referral is interviewed, the referring employee will be notified of the initial interview and the final selection decision.

If the referral is hired and completes 3 months of service and the employee is still the employee of APT, the employee is eligible to receive a monetary award. The reward is currently a gross amount of $1,000.00 for regular full-time hires. This will be paid at a rate of 25% per quarter starting 90 days from the referral's hire date.

**Should the referred employee leave or be terminated prior to one full year of service, no further payments will be made to the employee who referred.**

Advanced Power Technologies' retirement plan (401k) is a valuable benefit to help you save for the future. Saving now can help you have the income you'll need at retirement. Participating in our 401k plan is easy. You contribute a portion of your pay to your retirement plan account each payday through a convenient payroll deduction. Advanced Power Technologies, LLC may also make

32

contributions to your account. Contributions are then allocated to the Plan's investment options you select. If you do not make a selection, contributions will be allocated to the Plan's default fund(s) until your investment selections are received.

**Eligibility**

To be able to participate in this retirement plan, employees must have been employed by APT for at least 1 year from the date of hire and must have worked at least 1,000 hours within that year.

We are excited to offer you this worthwhile benefit and we hope you will use it to help make your retirement dreams a reality. To learn more about this benefit, contact the Payroll and Benefits Specialist.

Advanced Power Technologies will provide a reasonable amount of break time to accommodate employees desiring to express breast milk for their infant child, in accordance with and to the extent required by applicable law. The break time, if possible, must run concurrently with rest and meal periods already provided. If the break time cannot run concurrently with rest and meal periods already provided, the break time will be unpaid, subject to applicable law.

APT will make reasonable efforts to provide employees with the use of a room or location other than a toilet stall to express milk in private. This location may be the employee's private office, if applicable. APT may not be able to provide additional break time if doing so would seriously disrupt APT's operations, subject to applicable law. Please consult Payroll and Benefits Specialist with questions regarding this policy.

Employees should advise management if they need break time and an area for this purpose. Employees will not be discriminated against or retaliated against for exercising their rights under this policy.

**Section 5 - Leaves Of Absence**

█████████████████████████████████████████████

If employees are ineligible for any other APT leave of absence, the company, under certain circumstances, may grant a personal leave of absence without pay. A written request for personal leave should be presented to management at least two (2) weeks before the anticipated start of the leave. If the leave is requested for medical reasons and employees are not eligible for leave under the federal Family and Medical Leave Act (FMLA) or any state leave law, medical certification also must be submitted. The request will be considered on the basis of staffing requirements and the reasons for the requested leave, as well as performance and attendance records. Normally, a leave of absence will be granted for a period of up to eight (8) weeks.

However, a personal leave may be extended if, prior to the end of leave, employees submit a written request for an extension to management and the request is granted. During the leave, employees will not earn vacation, personal days or sick days. Advanced Power Technologies will continue health insurance coverage during the leave if employees submit their share of the monthly premium payments to APT in a timely manner, subject to the terms of the plan documents.

When the employees anticipate returning to work, they should notify management of the expected return date. This notification should be made at least one (1) week before the end of the leave.

Upon completion of the personal leave of absence, APT will attempt to return employees to their original job or a similar position, subject to prevailing business considerations. Reinstatement, however, is not guaranteed.

Failure to advise management of availability to return to work, failure to return to work when notified or a continued absence from work beyond the time approved by APT will be considered a voluntary resignation of employment.

Personal leave runs concurrently with any APT-provided Short-Term Disability Leave of Absence.

██████████████████████████████████████████████

Advanced Power Technologies proudly supports our military and its service members. If employees are called to active military service or enlist in uniformed service, they will be eligible to receive an unpaid military leave of absence. To be eligible for military leave, employees must provide management with advance notice of service obligations unless they are prevented from providing such notice by military necessity or it is otherwise impossible or unreasonable to provide such notice.

Provided the absence does not exceed applicable statutory limitations, employees will retain reemployment rights and accrue seniority and benefits in accordance with applicable federal and state laws. Employees should ask management for further information about eligibility for Military Leave.If employees are required to attend yearly Reserves or National Guard duty, they can apply for an unpaid temporary military leave of absence not to exceed the number of days allowed by law (including travel). They should give management as much advance notice of their need for

military leave as possible so APT can maintain proper coverage while employees are away.

( )  ███████████████████████████████████████████████████

**The Leave Policy**

Employees may be entitled to a leave of absence under the Family and Medical Leave Act (FMLA). This policy provides employees information concerning FMLA entitlements and obligations employees may have during such leaves. If employees have any questions concerning FMLA leave, they should contact the Head of Human Resources.

**I. Eligibility**

FMLA leave is available to "eligible employees." To be an "eligible employee," the employee must: 1) have been employed by APT for at least 12 months (which need not be consecutive); 2) have been employed by APT for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave; and 3) be employed at a worksite where 50 or more employees are located within 75 miles of the worksite.

**II. Entitlements**

As described below, the FMLA provides eligible employees with a right to leave, health insurance benefits and, with some limited exceptions, job restoration.

**A. Basic FMLA Leave Entitlement**

The FMLA provides eligible employees up to 12 workweeks of unpaid leave for certain family and medical reasons during a 12-month period. The 12-month period is determined based on a 12-month period measured forward from the start date of the employee's first FMLA leave. Leave may be taken for any one, or for a combination, of the following reasons:

- To care for the employee's child after birth or placement for adoption or foster care;
- To care for the employee's spouse, son, daughter or parent (but not in-law) who has a **serious health condition**;
- For the employee's own serious health condition (including any period of incapacity due to pregnancy, prenatal medical care or childbirth), that makes the employee unable to perform one or more of the essential functions of the employee's job; and/or
- Because of any **qualifying exigency** arising out of the fact that the employee's spouse, son, daughter or parent is a military member on covered active duty or called to covered active duty status (or has been notified of an impending call or order to cover active duty) in the Reserves component of the Armed Forces for deployment to a foreign country in support of contingency operation or Regular Armed Forces for deployment to a foreign country.

A **serious health condition** is an illness, injury, impairment or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents employees from performing the functions of their job, or prevents qualified family member from participating in school or other daily activities. Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to

35

a chronic condition. Other conditions may meet the definition of continuing treatment.

**Qualifying exigencies** may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, caring for the parents of military members on covered active duty and attending post-deployment reintegration briefings.

## B. Additional Military Family Leave Entitlement (Injured Service Member Leave)

In addition to the basic FMLA leave entitlement discussed above, an eligible employee who is the spouse, son, daughter, parent or next of kin of a **covered service member** is entitled to take up to 26 weeks of leave during a single 12-month period to care for the service member with a serious injury or illness. Leave to care for a service member shall only be available during a single-12-month period and, when combined with other FMLA-qualifying leave, may not exceed 26 weeks during the single 12-month period. The single 12-month period begins on the first day when an eligible employee takes leave to care for the injured service member.

A "**covered service member**" is a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status or is on the temporary retired list, for a serious injury or illness. These individuals are referred to in this policy as "current members of the Armed Forces." **Covered service members** also include a veteran who is discharged or released from military services under condition other than dishonorable at any time during the five years preceding the date the eligible employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation or therapy for a serious injury or illness. These individuals are referred to in this policy as "covered veterans."

The FMLA definitions of a "serious injury or illness" for current Armed Forces members and covered veterans are distinct from the FMLA definition of "serious health condition" applicable to FMLA leave to care for a covered family member.

## C. Intermittent Leave and Reduced Leave Schedules

FMLA leave will usually be taken for a period of consecutive days, weeks or months. However, employees also are entitled to take FMLA leave intermittently or on a reduced leave schedule when medically necessary due to a serious health condition of the employee or covered family member or the serious injury or illness of a covered service member. Qualifying exigency leave also may be taken on an intermittent basis.

## D. No Work While on Leave

The taking of another job while on family/medical leave or any other authorized leave of absence is grounds for immediate discharge, to the extent permitted by law.

## E. Protection of Group Health Insurance Benefits

During FMLA leave, eligible employees are entitled to receive group health plan coverage on the same terms and conditions as if they had continued to work.

## F. Restoration of Employment and Benefits

At the end of FMLA leave, subject to some exceptions including situations where job restoration of "key employees" will cause APT substantial and grievous economic injury, employees generally

have a right to return to the same or equivalent positions with equivalent pay, benefits and other employment terms. APT will notify employees if they qualify as "key employees," if it intends to deny reinstatement, and of their rights in such instances. Use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of an eligible employee's FMLA leave.

## G. Notice of Eligibility for, and Designation of, FMLA Leave

Employees requesting FMLA leave are entitled to receive written notice from APT telling them whether they are eligible for FMLA leave and, if not eligible, the reasons why they are not eligible. When eligible for FMLA leave, employees are entitled to receive written notice of: 1) their rights and responsibilities in connection with such leave; 2) APT' designation of leave as FMLA-qualifying or non-qualifying, and if not FMLA-qualifying, the reasons why; and 3) the amount of leave, if known, that will be counted against the employee's leave entitlement.

APT may retroactively designate leave as FMLA leave with appropriate written notice to employees provided the APT' failure to designate leave as FMLA-qualifying at an earlier date did not cause harm or injury to the employee. In all cases where leaves qualify for FMLA protection, APT and employee can mutually agree that leave be retroactively designated as FMLA leave.

## III. Employee FMLA Leave Obligations

## A. Provide Notice of the Need for Leave

Employees who take FMLA leave must timely notify APT of their need for FMLA leave. The following describes the content and timing of such employee notices.

## 1. Content of Employee Notice

To trigger FMLA leave protections, employees must inform the Head of Human Resources and/or their Manager and/or their Supervisor of the need for FMLA-qualifying leave and the anticipated timing and duration of the leave, if known. Employees may do this by either requesting FMLA leave specifically, or explaining the reasons for leave so as to allow APT to determine that the leave is FMLA-qualifying. For example, employees might explain that:

- a medical condition renders them unable to perform the functions of their job;
- they are pregnant or have been hospitalized overnight;
- they or a covered family member are under the continuing care of a health care provider;
- the leave is due to a qualifying exigency caused by a military member being on covered active duty or called to covered active duty status to a foreign country; or
- if the leave is for a family member, that the condition renders the family member unable to perform daily activities or that the family member is a covered servicemember with a serious injury or illness.

Calling in "sick," without providing the reasons for the needed leave, will not be considered sufficient notice for FMLA leave under this policy. Employees must respond to APT's questions to determine if absences are potentially FMLA-qualifying.

If employees fail to explain the reasons for FMLA leave, the leave may be denied. When employees seek leave due to FMLA-qualifying reasons for which APT has previously provided FMLA-protected leave, they must specifically reference the qualifying reason for the leave or the need for FMLA leave.

**2. Timing of Employee Notice**

Employees must provide 30 days' advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days' notice is not possible, or the approximate timing of the need for leave is not foreseeable, employees must provide APT notice of the need for leave as soon as practicable under the facts and circumstances of the particular case. Employees who fail to give 30 days' notice for foreseeable leave without a reasonable excuse for the delay, or otherwise fail to satisfy FMLA notice obligations, may have FMLA leave delayed or denied.

**B. Cooperate in the Scheduling of Planned Medical Treatment (Including Accepting Transfers to Alternative Positions) and Intermittent Leave or Reduced Leave Schedules**

When planning medical treatment, employees must consult with APT and make a reasonable effort to schedule treatment so as not to unduly disrupt APT's operations, subject to the approval of the employee's health care provider. Employees must consult with APT prior to the scheduling of treatment to work out a treatment schedule that best suits the needs of both APT and the employees, subject to the approval of the employee's health care provider . If employees providing notice of the need to take FMLA leave on an intermittent basis for planned medical treatment neglect to fulfill this obligation, APT may require employees to attempt to make such arrangements, subject to the approval of the employee's health care provider.

When employees take intermittent or reduced work schedule leave for foreseeable planned medical treatment for the employee or a family member, including during a period of recovery from a serious health condition or to care for a covered servicemember, APT may temporarily transfer employees, during the period that the intermittent or reduced leave schedules are required, to alternative positions with equivalent pay and benefits for which the employees are qualified and which better accommodate recurring periods of leave.

When employees seek intermittent leave or a reduced leave schedule for reasons unrelated to the planning of medical treatment, upon request, employees must advise APT of the reason why such leave is medically necessary. In such instances, APT and employee shall attempt to work out a leave schedule that meets the employee's needs without unduly disrupting APT's operations, subject to the approval of the employee's health care provider.

**C. Submit Medical Certifications Supporting Need for FMLA Leave (Unrelated to Requests for Military Family Leave)**

Depending on the nature of FMLA leave sought, employees may be required to submit medical certifications supporting their need for FMLA-qualifying leave. As described below, there generally are three types of FMLA medical certification: an **initial certification, recertification** and a **return to work/fitness for duty certification**.

It is the employee's responsibility to provide APT with timely, complete and sufficient medical certifications. Whenever APT requests employees to provide FMLA medical certifications, employees must provide the requested certifications within 15 calendar days after APT's request, unless it is not practicable to do so despite the employee's diligent, good faith efforts. APT will inform employees if submitted medical certifications are incomplete or insufficient and provide employees at least seven calendar days to cure deficiencies. APT will deny FMLA leave to employees who fail to timely cure deficiencies or otherwise fail to timely submit requested medical certifications.

With the employee's permission, APT (through individuals other than the employee's direct supervisor) may contact the employee's health care provider to authenticate or clarify completed and

38

sufficient medical certifications. If employees choose not to provide APT with authorization allowing it to clarify or authenticate certifications with health care providers, APT may deny FMLA leave if certifications are unclear.

Whenever APT deems it appropriate to do so, it may waive its right to receive timely, complete and/or sufficient FMLA medical certifications.

### 1. Initial Medical Certifications

Employees requesting leave because of their own, or a covered relation's, serious health condition, or to care for a covered servicemember, must supply medical certification supporting the need for such leave from their health care provider or, if applicable, the health care provider of their covered family or service member. If employees provide at least 30 days' notice of medical leave, they should submit the medical certification before leave begins. A new initial medical certification will be required on an annual basis for serious medical conditions lasting beyond a single year leave.

If APT has reason to doubt initial medical certifications, it may require employees to obtain a second opinion at APT's expense. If the opinions of the initial and second health care providers differ, APT may, at its expense, require employees to obtain a third, final and binding certification from a health care provider designated or approved jointly by APT and the employee.

### 2. Medical Recertifications

Depending on the circumstances and duration of FMLA leave, AdvancedPower Technologies may require employees to provide recertification of medical conditions giving rise to the need for leave. APT will notify employees if recertification is required and will give employees at least 15 calendar days to provide medical recertification.

### 3. Return to Work/Fitness for Duty Medical Certifications

Unless notified that providing such certifications is not necessary, employees returning to work from FMLA leaves that were taken because of their own serious health conditions that made them unable to perform their jobs must provide APT with medical certification confirming they are able to return to work and the employees' ability to perform the essential functions of the employees' position, with or without reasonable accommodation. APT may delay and/or deny job restoration until employees provide return to work/fitness for duty certifications.

### D. Submit Certifications Supporting Need for Military Family Leave

Upon request, the first time employees seek leave due to qualifying exigencies arising out of the covered active duty or call to covered active duty status of a military member, APT may require employees to provide: 1) a copy of the military member's active duty orders or other documentation issued by the military indicating the military member is on covered active duty or call to covered active duty status and the dates of the military member's covered active duty service; and 2) a certification from the employee setting forth information concerning the nature of the qualifying exigency for which leave is requested. Employees shall provide a copy of new active duty orders or other documentation issued by the military for leaves arising out of qualifying exigencies arising out of a different covered active duty or call to covered active duty status of the same or a different military member.

When leave is taken to care of a covered service member with a serious injury or illness, APT may require employees to obtain certifications completed by an authorized health care provider of the covered service member. In addition, and in accordance with the FMLA regulations, APT may

39

request that the certification submitted by employees set forth additional information provided by the employee and/or the covered service member confirming entitlement to such leave.

### E. Substitute Paid Leave for Unpaid FMLA Leave

Employees must use any accrued paid time while taking unpaid FMLA leave.

The substitution of paid time for unpaid FMLA leave time does not extend the length of FMLA leave and the paid time will run concurrently with the employee's FMLA entitlement.

Leaves of absence taken in connection with a disability leave plan or workers' compensation injury/illness shall run concurrently with any FMLA leave entitlement. Upon written request, the APT will allow employees to use accrued paid time to supplement any paid disability benefits.

### F. Pay Employee's Share of Health Insurance Premiums

During FMLA leave, employees are entitled to continued group health plan coverage under the same conditions as if they had continued to work. Unless APT notifies employees of other arrangements, whenever employees are receiving pay from APT during FMLA leave, APT will deduct the employee portion of the group health plan premium from the employee's paycheck in the same manner as if the employee was actively working.

If FMLA leave is unpaid, employees must pay their portion of the group health premium through a method determined by the APT upon leave.

### IV. Exemption for Highly Compensated Employees

The APT may choose not to return highly compensated employees (highest paid 10% of employees at a worksite or within 75 miles of that worksite) to their former or equivalent positions following a leave if restoration of employment will cause substantial economic injury to the APT. (This fact-specific determination will be made by the APT on a case-by-case basis.) The APT will notify employees if they qualify as a "highly compensated", if the APT intends to deny reinstatement, and of the employee's rights in such instances.

### V. Questions and/or Complaints about FMLA Leave

If you have questions regarding this FMLA policy, please contact the Head of Human Resources. Advanced Power Technologies is committed to complying with the FMLA and, whenever necessary, shall interpret and apply this policy in a manner consistent with the FMLA.

The FMLA makes it unlawful for employers to: 1) interfere with, restrain or deny the exercise of any right provided under FMLA; or 2) discharge or discriminate against any person for opposing any practice made unlawful by FMLA or involvement in any proceeding under or relating to FMLA. If employees believe their FMLA rights have been violated, they should contact the Head of Human Resources immediately. APT will investigate any FMLA complaints and take prompt and appropriate remedial action to address and/or remedy any FMLA violation. Employees also may file FMLA complaints with the United States Department of Labor or may bring private lawsuits alleging FMLA violations.

### VI. Coordination of FMLA Leave with Other Leave Policies

The FMLA does not affect any federal, state or local law prohibiting discrimination, or supersede any State or local law that provides greater family or medical leave rights. For additional information

40

P000683

concerning leave entitlements and obligations that might arise when FMLA leave is either not available or exhausted, please consult APT's other leave policies in this handbook or contact the Head of Human Resources.

Employees who have worked for APT for at least three (3) months may be granted up to three (3) days of unpaid leave in any 12-month period if the employee or a family or household member of the employee is the victim of domestic violence.

Leave may be used to:

- seek an injunction for protection against domestic violence or an injunction for protection in cases of repeat violence, dating violence or sexual violence;
- obtain medical care or mental health counseling, or both, for the employee or a family or household member to address physical or psychological injuries resulting from an act of domestic violence;
- obtain services from a victim-services organization, including, but not limited to, a domestic violence shelter or program or a rape crisis center as a result of the act of domestic violence;
- make their home secure from the perpetrator of the domestic violence or to seek new housing to escape the perpetrator; or
- seek legal assistance in addressing issues arising from the act of domestic violence.

"Family or household member" means spouses, former spouses, persons related by blood or marriage, persons who are presently residing together as if a family or who have resided together in the past, as if a family, and persons who are parents of a child in common regardless of whether they have been married. With the exception of persons who have a child in common, the family or household members must be currently residing or have in the past resided together in the same single dwelling unit.

Except in cases of imminent danger to the health or safety of the employees or their family or household member, one (1) day advance notice of the need for leave is required. Sufficient documentation of the act of domestic violence, such as a restraining order, police report or order to appear in court, is also required. Requests for leave and documents in connection with this leave will be kept confidential to the extent permitted by law.

P000684

## Section 6 - General Standards Of Conduct

Advanced Power Technologies endeavors to maintain a positive work environment. Each employee plays a role in fostering this environment. Accordingly, we all must abide by certain rules of conduct, based on honesty, common sense and fair play.

Because everyone may not have the same idea about proper workplace conduct, it is helpful to adopt and enforce rules all can follow. Unacceptable conduct may subject the offender to disciplinary action, up to and including discharge, in the APT's sole discretion. The following are examples of some, but not all, conduct which can be considered unacceptable:

1. Obtaining employment on the basis of false or misleading information.
2. Stealing, removing or defacing Advanced Power Technologies property or a co-worker's property, and/or disclosure of confidential information.
3. Completing another employee's time records.
4. Violation of safety rules and policies.
5. Violation of Advanced Power Technologies's Drug and Alcohol-Free Workplace Policy.
6. Fighting, threatening or disrupting the work of others or other violations of Advanced Power Technologies's Workplace Violence Policy.
7. Failure to follow lawful instructions of a supervisor.
8. Failure to perform assigned job duties.
9. Violation of the Punctuality and Attendance Policy, including but not limited to irregular attendance, habitual lateness or unexcused absences.
10. Gambling on APT property.
11. Willful or careless destruction or damage to APT assets or to the equipment or possessions of another employee.
12. Wasting work materials.
13. Performing work of a personal nature during working time.
14. Violation of the Solicitation and Distribution Policy.
15. Violation of Advanced Power Technologies's Harassment or Equal Employment Opportunity Policies.
16. Violation of the Communication and Computer Systems Policy.
17. Unsatisfactory job performance.
18. Any other violation of Advanced Power Technologies policy.

Obviously, not every type of misconduct can be listed. Note that all employees are employed at-will, and Advanced Power Technologies reserves the right to impose whatever discipline it chooses, or none at all, in a particular instance. The APT will deal with each situation individually and nothing in this handbook should be construed as a promise of specific treatment in a given situation.

The observance of these rules will help to ensure that our workplace remains a safe and desirable place to work.

P000685

Employees are hired to perform important functions at Advanced Power Technologies. As with any group effort, operating effectively takes cooperation and commitment from everyone. Therefore, attendance and punctuality are very important. Unnecessary absences and lateness are expensive, disruptive and place an unfair burden on fellow employees and Supervisors. We expect excellent attendance from all employees. Excessive absenteeism or tardiness will result in disciplinary action up to and including discharge.

APT does recognize, however, there are times when absences and tardiness cannot be avoided. In such cases, employees are expected to notify Supervisors as early as possible, but no later than the start of the work day. For every late arrival or absence, employees must call their direct supervisor, state the nature of the situation causing the late arrival or absence, and its expected duration. Asking another employee, friend or relative to give this notice is improper and constitutes grounds for disciplinary action.

Unreported absences of three (3) consecutive work days generally will be considered a voluntary resignation of employment with APT.

Employees are expected to report to work well groomed, clean, and dressed according to the requirements of their position. Some employees may be required to wear uniforms or safety equipment/clothing. During business hours or when representing the company, you are expected to present a clean, neat, and tasteful appearance. You should dress and groom yourself according to the requirements of your position. Employees should contact their supervisor for specific information regarding acceptable attire for their position.

If employees report to work dressed or groomed inappropriately, they may be prevented from working until they return to work well-groomed and wearing the proper attire. Under such circumstances, you will not be compensated for the time away from work. Consult your supervisor or your Human Resources representative if you have any questions as to what constitutes an appropriate appearance. Where necessary, reasonable accommodation may be made for a person with a disability.

Without unduly restricting individual tastes, the following personal appearance guidelines should be followed:

- T-shirts must be a solid color or APT issued logo T-shirt; must not be faded or ripped.
- No ripped jeans
- No see-through clothing
- Shirts/blouses must cover your stomach
- Skirts must not be shorter than 5" above the knee
- Low cut tops that show excessive cleavage are unacceptable.
- Tank tops, tube or halter tops, or shorts may not be worn under any circumstances.
- Shoes must provide safe, secure footing and protection against hazards.
- Office personnel may wear professional open-toed or open-heel (i.e., sling-backs) shoes; no
- flip-flop style shoes

P000686

- Hairstyles are expected to be in good taste
- Offensive body odor and poor personal hygiene is not professionally acceptable.
- Jewelry should not be functionally restrictive, dangerous to job performance, or excessive.
- Visible excessive tattoos and similar body art must be covered during business hours.

Each Department Manager is responsible for the enforcement of the dress code. If you have a question as to what is or is not acceptable attire, you may contact the Head of Human Resources.

During the course of work, employees may become aware of confidential information about APT's business, including but not limited to information regarding APT finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers and customers and potential customers. Employees also may become aware of similar confidential information belonging to APT's clients. It is extremely important that all such information remains confidential, and particularly not be disclosed to Advanced Power Technologies' competitors. Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of APT may be subject to disciplinary action up to and including termination. Employees may be required to sign an agreement reiterating these obligations.

Advanced Power Technologies' communication and computer systems are intended primarily for business purposes; however, limited personal usage is permitted if it does not hinder performance of job duties or violate any other APT policy. This includes voice mail, e-mail and Internet systems. Users have no legitimate expectation of privacy in regard to their use of APT systems.

Advanced Power Technologies may access the voice mail and e-mail systems and obtain the communications within the systems, including past voice mail and e-mail messages, without notice to users of the system, in the ordinary course of business when APT deems it appropriate to do so. The reasons for which APT may obtain such access include, but are not limited to: maintaining the system; preventing or investigating allegations of system abuse or misuse; assuring compliance with software copyright laws; complying with legal and regulatory requests for information; and ensuring that APT operations continue appropriately during the employee's absence.

Further, Advanced Power Technologies may review Internet usage to ensure that such use with APT property, or communications sent via the Internet with APT property, are appropriate. The reasons for which APT may review employees' use of the Internet with APT property include, but are not limited to: maintaining the system; preventing or investigating allegations of system abuse or misuse; assuring compliance with software copyright laws; complying with legal and regulatory requests for information; and ensuring that APT operations continue appropriately during the employee's absence.

APT may store electronic communications for a period of time after the communication is created. From time to time, copies of communications may be deleted.

APT's policies prohibiting harassment, in their entirety, apply to the use of APT' communication and computer systems. No one may use any communication or computer system in a manner that may

44

P000687

be construed by others as harassing or offensive based on race, national origin, sex, sexual orientation, age, disability, religious beliefs or any other characteristic protected by federal, state or local law.

Further, since APT's communication and computer systems are intended for business use, all employees, upon request, must inform management of any private access codes or passwords. Unauthorized duplication of copyrighted computer software violates the law and is strictly prohibited. No employee may access, or attempt to obtain access to, another employee's computer systems without appropriate authorization.

### Procedures for Computer Physical Security

Each employee provided with a computer by Advanced Power Technologies is responsible for the physical security of the computer. All computers acquired for or on behalf of APT are deemed to be company property.

All employees must take the following actions to ensure the physical security of APT's computers:

- When not in use, the computer must be locked with a password and caution taken when entering any company passwords on the computer.
- Store the computer in a locked cabinet or desk when not in use.
- Do not leave your computer in your vehicle. If it is necessary to leave the computer in your vehicle for a very short period of time, the computer must be locked in the trunk of the vehicle.
- When using the computer in public areas, do not leave the computer unattended for any length of time.

During travel:

- Do not pack your computer in checked luggage.
- Attach a name tag or business card to your computer to easily identify it during security checks or if lost.
- Store the computer in a hotel room safe or locked suitcase when you are not in the room.

### Policy Violations

Violation of this policy may be grounds for disciplinary action up to and including termination of employment. If an employee's laptop is stolen due to negligence, the employee will be responsible for the cost of replacing the computer.

███████████████████████████████████

Advanced Power Technologies requires employees to follow email etiquette guidelines to reduce unnecessary email traffic and promote effective communication between employees and customers. Email etiquette refers to how a person should behave when writing, answering and sending emails, but it can vary depending on the nature of the email being sent. This is important for the following reasons:

- Enables you to convey professionalism in a business setting
- Ensure your emails are straightforward and easily understood

- Can prevent potential lawsuits associated with inappropriate emails sent in a work setting

Employees must adhere to the following email etiquette guidelines:

- Be sure that your email address is of a professional nature.
- Ensure your tone is professional.
- Use a clear and concise subject line.
- Avoid grammar or spelling mistakes.
- Double-check the spelling of your recipient's name.
- Follow APT's email signature guidelines.
- Only include attachments that are necessary.
- Reply to professional emails as promptly as possible.
- Check to make sure you are sending your email to the correct recipient.
- Never use vulgar or offensive language.
- Do not use "all caps".
- Do not use multiple exclamation marks.
- Be succinct - to the point and in as few words as possible for clarity.

Before sending an email, employees must follow the following requirements:

- In the "To" line, only include the primary recipients responsible for completing an action item or receiving the information.
- Use the "Cc" line judiciously, only include the recipients who will absolutely need the information.
- If you often send emails to a specific group of people, submit a request to the IT Department to create an email group or distribution list.
- Only use the "Bcc" line to hide select addresses.
- The "Subject" line must be concise and contain one of the following headers:

  - "Action Required" - Use this header whenever you need someone to complete a task. If the required action is urgent, use the "High Importance" flag and include the word "Urgent" in the subject line.
  - "Information Only" - Use this header to let recipients know that the message conveyed is for informational purposes and does not require immediate action. Do not use a "High Importance" flag when sending this type of email.
- Employees must respond to an "Action Required" within 24 hours. For urgent matters, recipients must respond within 1 hour.
- If an action requires more than 2 people, set up a meeting or group call to efficiently convey the message to all parties involved.
- If an action item requires more than 3 emails to convey a message, stop the email exchange and coordinate a meeting or phone call.

P000689

Advanced Power Technologies respects the right of any employee to maintain a blog or web page or to participate in a social networking site, Twitter or similar site, including but not limited to Facebook and LinkedIn. However, to protect APT interests and ensure employees focus on their job duties, employees must adhere to the following rules:

Employees may not post on a blog or web page or participate on a social networking platform, such as Twitter or similar site, during work time or at any time with APT equipment or property.

All rules regarding confidential and proprietary business information apply in full to blogs, web pages and social networking platforms, such as Twitter, Facebook, LinkedIn or similar sites. Any information that cannot be disclosed through a conversation, a note or an e-mail also cannot be disclosed in a blog, web page or social networking site.

Whether the employees are posting something on their own blog, web page, social networking, Twitter or similar site or on someone else's, if the employee mentions APT and also expresses either a political opinion or an opinion regarding APT's actions that could pose an actual or potential conflict of interest with APT, the poster must include a disclaimer. The poster should specifically state that the opinion expressed is his/her personal opinion and not the APT's position. This is necessary to preserve APT's good will in the marketplace.

Any conduct that is impermissible under the law if expressed in any other form or forum is impermissible if expressed through a blog, web page, social networking, Twitter or similar site. For example, posted material that is discriminatory, obscene, defamatory, libelous or violent is forbidden. APT policies apply equally to employee social media usage.

Advanced Power Technologies encourages all employees to keep in mind the speed and manner in which information posted on a blog, web page, and/or social networking site is received and often misunderstood by readers. Employees must use their best judgment. Employees with any questions should review the guidelines above and/or consult with their manager. Failure to follow these guidelines may result in discipline, up to and including discharge.

Equipment essential in accomplishing job duties is often expensive and may be difficult to replace. When using property, employees are expected to exercise care, perform required maintenance, and follow all operating instructions, safety standards and guidelines.

Employees must notify their supervisor if any equipment, machines, or tools appear to be damaged, defective or in need of repair. Prompt reporting of loss, damage, defects and need for repairs could prevent deterioration of equipment and possible injury to employees or others. Supervisors can answer any questions about the employees' responsibility for maintenance and care of equipment used on the job. Improper, careless, negligent, destructive, or unsafe use or operation of equipment can result in disciplinary action, up to and including discharge.

Negligent damage to APT equipment may be charged back to employees as determined by management. In no event will an employee who is charged back for damages earn less than minimum wage for any pay period. Employees also are prohibited from any unauthorized use of

47

APT's intellectual property, such as audio and video tapes, print materials and software.

Further, APT is not responsible for any damage to employees' personal belongings unless the employee's supervisor provided advance approval for the employee to bring personal property to work.

Use of APT owned/leased vehicles is limited to authorized employees. Equipment and vehicles must only be used in work related activities and may not be used for personal business or activities without the express prior approval of management. Employees authorized to operate APT vehicles to conduct company business must have a valid driver's license in their possession while operating a vehicle off or on APT property and maintain an acceptable driving record. It is the responsibility of every employee to drive safely and obey traffic, vehicle safety, and parking laws or regulations. Drivers must demonstrate safe driving habits at all times. Any change in license status or driving record must be reported to the employee's direct supervisor or the Department Manager immediately. APT is required to ensure that employees driving APT vehicles maintain a valid driver's license. Therefore, the company will periodically request Department of Motor Vehicles driving records reports. If the license status or driving record of any employee, whose job responsibilities include driving a company vehicle, becomes unacceptable to Management and/or APT's insurance carrier, the employee may be restricted from driving, reassigned, suspended, or discharged at Management's discretion.

APT-owned or leased vehicles may be used only as authorized by management. Vehicles and associated equipment essential to accomplishing job duties are expensive and may be difficult to replace. When using property, employees are expected to exercise care and follow all operating instructions, safety standards, and guidelines. Poorly kept vehicles and associated equipment will be cleaned and/or repaired at the driver's expense. Drivers must notify their direct supervisor if any vehicles or equipment appear to be damaged, defective, or in need of repair. Prompt reporting of damage, defects, and the need for repairs could prevent deterioration and possible injury to employees and others. The supervisor can answer any questions about an employee's responsibility for maintenance and care of vehicles or equipment used on the job.

Improper, careless, negligent, destructive, or unsafe use or operation of vehicles or equipment, and excessive or avoidable traffic and parking violations, can result in disciplinary action, up to and including discharge. If a vehicle breaks down while the employee is on the road, the employee is responsible for staying with the vehicle and will be paid their regular pay for up to 4 hours. If it is determined that the vehicle broke down due to employee negligence, the employee will not be paid while the vehicle is out of service and could lead to disciplinary action up to and including discharge. Negligent damage to APT vehicles from accidents, using improper fuel, and other damage may be charged back to employees as determined by management. In no event will an employee who is charged back for damages earn less than minimum wage for any pay period.

**Portable Communication Device Use while Driving**

Employees who drive for APT business must abide by all state or local laws prohibiting or limiting portable communication device (PCD) use, including cell phones or personal digital assistants, while driving. Further, even if use is permitted, employees may choose to refrain from using any PCD while driving. "Use" includes, but is not limited to, talking or listening to another

48

P000691

person or sending an electronic or text message via the PCD. Regardless of the circumstances, including slow or stopped traffic, if any use is permitted while driving, employees should proceed to a safe location off the road and safely stop the vehicle before placing or accepting a call. If acceptance of a call is absolutely necessary while the employees are driving, and permitted by law, they must use a hands-free option and advise the caller that they are unable to speak at that time and will return the call shortly.

Under no circumstances should employees feel that they need to place themselves at risk to fulfill business needs. Since this policy does not require any employee to use a PCD while driving, employees who are charged with traffic violations resulting from the use of their PCDs while driving will be solely responsible for all liabilities that result from such actions. Texting and e-mailing while driving is prohibited in all circumstances. APT reserves the right, at any time, without prior notice, to inspect and search its property for the purpose of determining whether this policy or any other has been violated. These inspections may be conducted during or after hours in the presence or absence of the employee.

Advanced Power Technologies-provided portable communication devices (PCDs), including cell phones and personal digital assistants, should be used primarily for business purposes. Employees have no reasonable expectation of privacy in regard to the use of such devices, and all use is subject to monitoring, to the maximum extent permitted by applicable law. This includes, as permitted, the right to monitor personal communications as necessary.

Some employees may be authorized to use their own PCD for business purposes. These employees should work with the IT department to configure their PCD for business use. Communications sent via a personal PCD also may be subject to monitoring if sent through APT's networks and the PCD must be provided for inspection and review upon request.

All conversations, text messages and e-mails must be professional. When sending a text message or using a PCD for business purposes, whether it is a APT-provided or personal device, employees must comply with applicable APT guidelines, including policies on sexual harassment, discrimination, conduct, confidentiality, equipment use and operation of vehicles. Using a APT-issued PCD to send or receive personal text messages is prohibited at all times and personal use during working hours should be limited to emergency situations.

If employees who use a personal PCD for business resign or are discharged, they will be required to submit the device to the IT department for resetting on or before their last day of work. At that time, the IT department will reset and remove all information from the device, including but not limited to, APT information and personal data (such as contacts, e-mails and photographs). The IT department will make efforts to provide employees with the personal data in another form (e.g., on a disk) to the extent practicable; however, the employee may lose some or all personal data saved on the device.

Employees may not use their personal PCD for business unless they agree to submit the device to the IT department on or before their last day of work for resetting and removal of APT information. This is the only way currently possible to ensure that all APT information is removed from the device at the time of termination. The removal of APT information is crucial to ensure compliance with APT's confidential and proprietary information policies and objectives.

Please note that whether employees use their personal PCD or a APT-issued device, APT's

49

electronic communications policies, including but not limited to, proper use of communications and computer systems, remain in effect.

**Portable Communication Device Use While Driving**

Employees who drive on APT business must abide by all state or local laws prohibiting or limiting PCD (cell phone or personal digital assistant) use while driving. Further, even if usage is permitted, employees may choose to refrain from using any PCD while driving. "Use" includes, but is not limited to, talking or listening to another person or sending an electronic or text message via PCD.

Regardless of the circumstances, including slow or stopped traffic, if any use is permitted while driving, employees should proceed to a safe location off the road and safely stop the vehicle before placing or accepting a call. If acceptance of a call is absolutely necessary while driving, and permitted by law, employees must use a hands-free option and advise the caller that they are unable to speak at that time and will return the call shortly.

Under no circumstances should employees feel that they need to place themselves at risk to fulfill business needs.

Since this policy does not require any employee to use a cell phone while driving, employees who are charged with traffic violations resulting from the use of their PCDs while driving will be solely responsible for all liabilities that result from such actions.

Texting and e-mailing while driving are prohibited in all circumstances.

███████████████████████████████████████████████████████████████

Disruptions during work time can lead to errors and delays. Therefore, personal telephone calls must be kept to a minimum, and only be made or received after working time, or during lunch or break time.

For safety and security reasons, employees are prohibited from having personal guests visit or accompany them anywhere in APT facilities other than the reception areas without prior management approval.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Smoking, including the use of e-cigarettes, is prohibited in all APT vehicles and on APT premises. (except in outdoor designated areas). Smokers are subject to paying for cleaning and sanitizing APT vehicles.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

The health and safety of employees and others on APT property are of critical concern to Advanced Power Technologies. APT intends to comply with all health and safety laws applicable to our business. To this end, we must rely upon employees to ensure that work areas are kept safe and free of hazardous conditions. Employees are required to be conscientious about workplace safety, including proper operating methods, and recognize dangerous conditions or hazards. Any unsafe conditions or potential hazards should be reported to management immediately, even if the problem

50

appears to be corrected. Any suspicion of a concealed danger present on the APT's premises, or in a product, facility, piece of equipment, process or business practice for which APT is responsible should be brought to the attention of management immediately.

Periodically, APT may issue rules and guidelines governing workplace safety and health. APT may also issue rules and guidelines regarding the handling and disposal of hazardous substances and waste. All employees should familiarize themselves with these rules and guidelines, as strict compliance will be expected.

Any workplace injury, accident, or illness must be reported to the employee's supervisor as soon as possible, regardless of the severity of the injury or accident.

To avoid distractions, solicitation by the employee of another employee is prohibited while either employee is on work time. "Work time" is defined as the time the employee is engaged, or should be engaged, in performing his/her work tasks for Advanced Power Technologies. Solicitation of any kind by non-employees on APT premises is prohibited at all times.

Distribution of advertising materials, handbills, printed or written literature of any kind in working areas of APT is prohibited at all times. Distribution of literature by non-employees on APT premises is prohibited at all times.

Important notices and items of general interest are continually posted on Advanced Power Technologies bulletin boards. Employees should make it a practice to review bulletin boards frequently. This will assist employees in keeping up with what is current at Advanced Power Technologies. To avoid confusion, employees should not post or remove any material from the bulletin board.

It is Advanced Power Technologies's policy that all employees avoid any conflict between their personal interests and those of APT. The purpose of this policy is to ensure that APT's honesty and integrity, and therefore its reputation, are not compromised. The fundamental principle guiding this policy is that no employee should have, or appear to have, personal interests or relationships that actually or potentially conflict with the best interests of APT.

It is not possible to give an exhaustive list of situations that might involve violations of this policy. However, the situations that would constitute a conflict in most cases include but are not limited to:

1. holding an interest in or accepting free or discounted goods from any organization that does, or is seeking to do, business with APT, by any employee who is in a position to directly or indirectly influence either APT's decision to do business, or the terms upon which business would be done with such organization;
2. holding any interest in an organization that competes with APT;
3. being employed by (including as a consultant) or serving on the board of any organization

51

P000694

which does, or is seeking to do, business with APT or which competes with APT; and/or

4. profiting personally, e.g., through commissions, loans, expense reimbursements or other payments, from any organization seeking to do business with APT.

A conflict of interest would also exist when a member of the employee's immediate family is involved in situations such as those above.

This policy is not intended to prohibit the acceptance of modest courtesies, openly given and accepted as part of the usual business amenities, for example, occasional business-related meals or promotional items of nominal or minor value.

It is the employee's responsibility to report any actual or potential conflict that may exist between the employee (and the employee's immediate family) and APT.

███████████████████████████████████████████████

A familial relationship among employees can create an actual or at least a potential conflict of interest in the employment setting, especially where one relative supervises another relative. To avoid this problem, Advanced Power Technologies may refuse to hire or place a relative in a position where the potential for favoritism or conflict exists.

In other cases, such as personal relationships where a conflict or the potential for conflict arises, even if there is no supervisory relationship involved, the parties may be separated by reassignment or discharged from employment, at the discretion of APT. Accordingly, all parties to any type of intimate personal relationship must inform management.

If two employees marry, become related, or enter into an intimate relationship, they may not remain in a reporting relationship or in positions where one individual may affect the compensation or other terms or conditions of employment of the other individual. APT generally will attempt to identify other available positions, but if no alternate position is available, APT retains the right to decide which employee will remain with APT.

For the purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage.

███████████████████████████████████████████████

Employees will be reimbursed for reasonable approved expenses incurred in the course of conducting APT business and travel. Employees must coordinate travel through our APT Travel Coordinator.

The Travel Coordinator and/or the Employees' Supervisor will provide established per diem and hotel rates for travel locations. Expenses must be approved by the employee's Supervisor, and may include air travel, hotels, motels, meals, cab fare, rental vehicles, or gas and car mileage for personal vehicles. All expenses incurred shall be submitted on an APT Expense Report via the employee's Supervisor to the Accounts Payable/Accounting Department with receipts as soon as practicable.

Employees are expected to exercise restraint and good judgment when incurring expenses,

and should contact their Supervisor in advance if they have any questions about whether an expense will be reimbursed.

███████████████████████████████████████████████████████████████

Advanced Power Technologies will respond to reference requests through the Human Resources Department. APT will provide general information concerning the employee such as date of hire, date of discharge, and positions held. Requests for reference information must be in writing, and responses will be in writing. Please refer all requests for references to the Human Resources Department.

**Only the Human Resources Department may provide references.**

███████████████████████████████████████████████████████████████

All media inquiries regarding the position of Advanced Power Technologies as to any issues must be referred to the President. Only the President is authorized to make or approve public statements on behalf of APT. No employees, unless specifically designated by the President, are authorized to make those statements on behalf of APT. Any employee wishing to write and/or publish an article, paper, or other publication on behalf of APT must first obtain approval from the President.

███████████████████████████████████████████████████████████████

Should any employees decide to leave APT, we ask that they provide a Supervisor with at least 2 weeks advance notice of departure. Thoughtfulness will be appreciated. All APT, property including, but not limited to, keys, security cards, parking passes, laptop computers, fax machines, uniforms, etc., must be returned at separation. Employees also must return all of the APT's Confidential Information upon separation. To the extent permitted by law, employees will be required to repay the APT (through payroll deduction, if lawful) for any lost or damaged APT property. As noted previously, all employees are employed at-will and nothing in this handbook changes that status.

███████████████████████████████████████████████████████████████

Employees who resign are requested to participate in an exit interview with Head of Human Resources, if possible.

███████████████████████████████████████████████████████████████

This handbook is intended to give employees a broad summary of things they should know about Advanced Power Technologies. The information in this handbook is general in nature and, should questions arise, any member of management should be consulted for complete details. While we intend to continue the policies, rules and benefits described in this handbook, Advanced Power Technologies, in its sole discretion, may always amend, add to, delete from or modify the provisions of this handbook and/or change its interpretation of any provision set forth in this handbook. Employees should not hesitate to speak to management if they have any questions about APT or its

P000696

**General Handbook Acknowledgment**

This Employee Handbook is an important document intended to help employees become acquainted with Advanced Power Technologies. This document is intended to provide guidelines and general descriptions only; it is not the final word in all cases. Individual circumstances may call for individual attention.

Because APT's operations may change, the contents of this Handbook may be changed at any time, with or without notice, in an individual case or generally, at the sole discretion of management.

Please read the following statements and sign below to indicate your receipt and acknowledgment of this Handbook.

**I have received and read a copy of APT's Employees Handbook. I understand that the policies, rules and benefits described in it are subject to change at the sole discretion of APT at any time.**

**I further understand that my employment is terminable at will, either by myself or APT, with or without cause or notice, regardless of the length of my employment or the granting of benefits of any kind.**

**I understand that no representative of Advanced Power Technologies other than the President and/or the CEO may alter "at will" status and any such modification must be in a signed writing.**

**I understand that my signature below indicates that I have read and understand the above statements and that I have received a copy of APT's Employee Handbook.**

Employee's Printed Name: _____

Employee's Signature: _____

Position: _____

Date: _____

The signed original copy of this acknowledgment should be given to management – it will be filed in your personnel file.

### Receipt Of Non-Harassment Policy

( )

It is Advanced Power Technologies's policy to prohibit intentional and unintentional harassment of or against job applicants, contractors, interns, volunteers or employees by another employee, supervisor, vendor, customer or any third party on the basis of actual or perceived race, color, creed, religion, national origin, ancestry, citizenship status, age, sex or gender (including pregnancy, childbirth and pregnancy-related conditions), gender identity or expression (including transgender status), sexual orientation, marital status, military service and veteran status, physical or mental disability, genetic information or any other characteristic protected by applicable federal, state or local laws (referred to as "protected characteristics"). Such conduct will not be tolerated by APT.

The purpose of this policy is not to regulate our employees' personal morality, but to ensure that no one harasses another individual in the workplace, including while on APT premises, while on APT business (whether or not on APT premises) or while representing APT. In addition to being a violation of this policy, harassment or retaliation based on any protected characteristic as defined by applicable federal, state, or local laws is also unlawful. For example, sexual harassment and retaliation against an individual because the individual filed a complaint of sexual harassment or because an individual aided, assisted or testified in an investigation or proceeding involving a complaint of sexual harassment as defined by applicable federal, state, or local laws are unlawful.

### Harassment Defined

Harassment generally is defined in this policy as unwelcome verbal, visual or physical conduct that denigrates or shows hostility or aversion towards an individual because of any actual or perceived protected characteristic or has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Harassment can be verbal (including slurs, jokes, insults, epithets, gestures or teasing), visual (including offensive posters, symbols, cartoons, drawings, computer displays, text messages, social media posts or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.). Such conduct violates this policy, even if it does not rise to the level of a violation of applicable federal, state or local laws. Because it is difficult to define unlawful harassment, employees are expected to behave at all times in a manner consistent with the intended purpose of this policy.

### Sexual Harassment Defined

Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal, visual or physical conduct of a sexual nature when:

- submission to that conduct or those advances or requests is made either explicitly or implicitly a term or condition of an individual's employment; or
- submission to or rejection of the conduct or advances or requests by an individual is used as the basis for employment decisions affecting the individual; or
- the conduct or advances or requests have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

56

P000699

Examples of conduct that violates this policy include:

1. unwelcome flirtations, leering, whistling, touching, pinching, assault, blocking normal movement;
2. requests for sexual favors or demands for sexual favors in exchange for favorable treatment;
3. obscene or vulgar gestures, posters or comments;
4. sexual jokes or comments about a person's body, sexual prowess or sexual deficiencies;
5. propositions or suggestive or insulting comments of a sexual nature;
6. derogatory cartoons, posters and drawings;
7. sexually-explicit e-mails, text messages or voicemails;
8. uninvited touching of a sexual nature;
9. unwelcome sexually-related comments;
10. conversation about one's own or someone else's sex life;
11. conduct or comments consistently targeted at only one gender, even if the content is not sexual; and
12. teasing or other conduct directed toward a person because of the person's gender.

## Reporting Procedures

If the employee has been subjected to or witnessed conduct which violates this policy, the employee should immediately report the matter to the Head of Human Resources. If the employee is unable for any reason to contact this person, or if the employee has not received an initial response within five (5) business days after reporting any incident of what the employee perceives to be harassment, the employee should contact any member of management. If the person toward whom the complaint is directed is one of the individuals indicated above, the employee should contact any higher-level manager in the reporting hierarchy.

## Investigation Procedures

Every report of perceived harassment will be fully investigated, and corrective action will be taken where appropriate. All complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed. All employees must cooperate with all investigations conducted pursuant to this policy.

## Retaliation Prohibited

In addition, APT will not allow any form of retaliation against individuals who report unwelcome conduct to management or who cooperate in the investigations of such reports in accordance with this policy. If the employee has been subjected to any such retaliation, the employee should report it in the same manner in which the employee would report a claim of perceived harassment under this policy.

Violation of this policy including any improper retaliatory conduct will result in disciplinary action, up to and including termination.

I have read and I understand Advanced Power Technologies's Non-Harassment Policy.

Employee's Printed Name: _____

Employee's Signature: _____

Position: _____

Date: _____

The signed original copy of this receipt should be given to management - it will be filed in your personnel file.

# EXHIBIT C-4

( )



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 22-61477-CIV-SINGHAL/VALLE

DEVIN GRANDIS, an individual, and
ADVANCED POWER TECHNOLOGIES,
LLC, a Florida limited liability company

        Plaintiffs,

v.

BGIS GLOBAL INTEGRATED SOLUTIONS
US LLC, a Washington limited liability
company, and BIFM JERSEY TOPCO
LIMITED, a Jersey limited liability company,

        Defendants.

_____/

## PLAINTIFF's ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, DEVIN GRANDIS, hereby serves his answers to Defendant's First Set Of

Interrogatories and states as follows:

**ROG NO. 1.**  Identify each Person who has assisted You—Including providing Documents or information to You—in responding to these Interrogatories.

**ANSWER:**  My current attorneys.

**ROG NO. 2.**  Identify each Person from whom You, Your attorney, or anyone acting on Your behalf has obtained any written statements Regarding any of the events or matters referenced in the pleadings in the Lawsuit.

**ANSWER:** No one.

**ROG NO. 3.**  Identify All statements for each Person Identified in response to ROG NO. 2.

Case No.: 22-Civ-61477-Singhal/Valle

**ANSWER:** Not applicable.

**ROG NO. 4.**  Identify All contracts and agreements between BGIS Global Integrated Solutions US LLC ("BGIS") and Plaintiff relating to Plaintiff's employment with BGIS.

**ANSWER:**  The letter offering employment to Grandis on December 21, 2021, which he signed on December 24, 2021.

**ROG NO. 5.**  Identify All Your social media account information for All social-media accounts You have maintained since December 21, 2021, Including Facebook, Instagram, Twitter and LinkedIn. This information should include Your login name, Your login email address, and the URL where Your account can be accessed.

**ANSWER:**

While this information is publicly available and can be found by searching the public domain, I identify the following social media accounts that I can recall:

https://www.facebook.com/search/top?q=devin%20grandis
https://www.instagram.com/devingrandis/
https://www.linkedin.com/in/devin-grandis-04314213/
https://twitter.com/DevinG59

**ROG NO. 6.**  Identify All phones You owned and/or used during Your employment with BGIS, Including the make, model, telephone number, and telephone service provider for each such phone.

**ANSWER:**   One cell phone number, 954-732-1232; Two phones, Samsung S23 Ultra and Samsung Android; One service provider, Verizon.

**ROG NO. 7.**  Identify All instances where BGIS directed You to take sensitivity or harassment training, Including the date BGIS directed You to take such training, the date You took or attended such training, and the nature of the conduct that led to BGIS's direction for You to take such training.

**ANSWER:** According to a letter to me dated March 7, 2022 (the "March 7th Letter") by Mark Marquis, President, BGIS, in Ontario, Canada, Ron Shory, Global Chief People Officer, BGIS, Ontario, Canada, would assign on-line learning courses for me to take in the areas of workplace civility behavior and gender bias. On Friday, March 11, 2022, during a phone call, Ron Shory told me that he would send me on-line training information the following week. On March 23, 2022,

2

( )

investigation." Mr. Marquis sent me a final letter dated April 7, 2022 (the "April 7th Letter"), in which he advised me that my "employment with BGIS was terminated [allegedly] with cause, effective immediately." In fact, the "termination for cause," was a pretext to avoid the payment of the severance owed to me by BGIS.

**ROG NO. 9.**  Identify the "off-color joke" You made to "another BGIS female employee," as alleged in Paragraph 35 of the Complaint, Including the date of the joke, the place of the joke, and the substance of the joke.

**ANSWER:** On or about March 14, 2022, in Nashville, Tennessee, Christopher a/k/a Chris Palmieri and I escorted our female colleague back to her hotel. During the walk back, I shared the following joke with the female colleague: "If you went camping and woke up with a condom sticking out of your rear end, would you tell anyone?" In response, the female colleague said, "No, I think I would know who I went camping with." Not expecting this response, I tried to explain the joke, and I told her that ordinarily the person I tell the joke to responds, "No," to the question. I then said if she had given me the response I was expecting, the punchline would have been another question, "Do you want to go camping?" The female colleague said "huh?" or something like that. I then decided to just let the joke drop.

( )

**ROG NO. 10.** Identify the "colleague" to whom You "explained the joke" as alleged in Paragraph 35 of the Complaint.

**ANSWER:** Nikki Culmer-Sakoff, an individual who had worked with me approximately five years at Advanced Power Technologies, LLC ("APT") before we both became employees at BGIS.

**ROG NO. 11.** Identify the Person that "represented" to You that Your termination was "based upon a joke [You] explained to a colleague" as alleged in Paragraph 35 of the Complaint.

**ANSWER:** Michael B. Pascoe, Esq., represented this in an email dated April 5, 2023 to my attorney, Cheryl Wilke, Esq.

**ROG NO. 12.** Identify All instances where any Person asserted, either verbally or in writing, that You engaged in inappropriate behavior, Including harassment, creating an unsafe work environment, and verbal abuse, while You were working at BGIS. For the purposes of this Interrogatory, "Identify" include[s] the identity of the person, the date of the assertion, a description of the inappropriate behavior.

**ANSWER:** Besides the assertions that my comments as identified in the answers to Interrogatory Nos. 7 and 9 above were "inappropriate," I am not aware of any other assertions against me, either

( )

4

Case No.: 22-Civ-61477-Singhal/Valle

Ibrahim Bhayat provided me with a link to online courses, at percipio.com, which I completed in five to six days.

According to the March 7th Letter, I was asked to take the online courses as a result of (a) three comments I made in front of male representatives of BGIS Shell Mobility US and Greenlots Technology n/k/a Shell Recharge Solutions (collectively, "Shell") during a two-day workshop in Los Angeles, California on February 16-17, 2022, and (b) two other comments I made in private conversations with two male employees of BGIS. The five comments were deemed "inappropriate" or "inconsistent with BGIS core values," a phrase that did not appear in any written materials that I received from BGIS, including the US Team Member Handbook (the "Handbook"), which I did not receive until March 11, 2022.

The three comments at the Los Angeles workshop for Shell that were deemed inappropriate were as follows: (i) I encouraged the Shell representatives to take a business trip to Florida during the winter months, offering to take them out on my boat; when one of the representatives asked if I go fishing, I joked that all my boat catches are "mermaids." (ii) In another conversation, when the Shell representatives complained about engineers who were taking six months or more to produce drawings for charging stations, I said something to the effect that "we should grow some balls" in our dealings with the engineers and force them to reduce the turnaround time on the drawings or give the work to other engineering firms especially if Shell wanted 250 charging stations before the end of 2022. (iii) While riding in the third seat of an Uber van, during a phone call with a BGIS colleague, I was told that two Shell Mobility US representatives overheard me using profanity in response to a proposal that BGIS needs to reduce pricing for another customer whose AR to BGIS was overdue to the tune of one million dollars. The two comments made to the two BGIS employees were as follows: (i) I used the word "chicks," and (ii) I made the off-color joke or comment that I admitted in Defendant's Request for Admission, No. 6.

No one at BGIS ever once suggested that the handful of off-color jokes or comments that I made constituted intentional misconduct designed to harass or discriminate against any employee of BGIS or anyone else for any reason let alone an illegal reason.

**ROG NO. 8.**  Identify All instances where BGIS disciplined You, Including the discipline You received, the nature of the conduct that led to the discipline, and when the disciplinary action occurred. For the purposes of this Interrogatory, "discipline" means a written or verbal warning regarding Your conduct, direction to participate in harassment or sensitivity training, direction to obtain counseling, or any other actions imposed on You by BGIS Regarding Your failure to follow BGIS rules, standard, or policies.

**ANSWER:** My telephone call, during the week of February 21, 2022, with Gordon a/k/a Gord Hicks, CEO, at BGIS, Ontario, Canada, was not in the nature of a verbal warning, and, therefore, this phone call was not "discipline." The March 7th Letter described in my answer to Interrogatory No. 7 states, in its first paragraph, that it was a "final warning letter." Further, the March 7th Letter directed me to take the on-line courses as described in my answer to Interrogatory No. 7, which courses I completed. On March 30, 2022, Mr. Marquis sent me another letter (the "March 30th Letter"), in which he told me that I was "being placed on a paid suspension pending an internal

3

Case No.: 22-Civ-61477-Singhal/Valle

verbally or in writing. No one, including the persons identified in the answers to Interrogatory Nos. 7 and 9, ever accused me of creating "an unsafe work environment" or "humiliating or harassing" another employee at BGIS or any other person for that matter. Also, no one ever accused me of any inappropriate behavior in the form of physical conduct, unwelcome or otherwise. Basically, I was accused of using crude or profane language only in the specific instances identified in the answers to Interrogatory Nos. 7 and 9 above, but no other type of misconduct.

**ROG NO. 13.** Identify each lawsuit involving a commercial dispute, other than this Lawsuit, in which You were a party, or You were an officer, owner, or employee of a company that was a party. For the purposes of this Interrogatory, "Identify" includes the identity of the court, the case number, and the parties.

**ANSWER**: While this information is publicly available and can be found by searching the public domain, I identify the following lawsuits other than this one that I am able to recall with the help of my attorneys:

1. *APT, et al., v. Daszkal Bolton, et al.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE-0409357;

2. *Herbert Stettin v. Devin Grandis*, County Court, Broward County, Florida, COWE-10015124;

3. *Suntrust Bankcard, N.A. v. Devin Grandis*, County Court, Broward County, Florida, COSO-96005505;

4. *Ana Portillo, et al. vs. Felix Guerro, APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE11031611;

5. *APT v. Fla. Acquisition Fund Espe*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE01003431;

6. *APT vs. Philip B. Carter*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE 03002294;

7. *JGB Indus. Inc. v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE 03002294;

8. *Jeanne Pilcher v. Hess Corp., APT, et al.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE 07026801;

9. *APT v. Hess Corp.*, United States District Court, S.D. Fla., Case No. 08-cv-60251-WJZ

10. *PNC Bank vs. Woolbright Coral Springs II LLC, APT, et al.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE09054865;

5

Case No.: 22-Civ-61477-Singhal/Valle

11. *APT vs. Perkins Restaurant, Inc.*, County Court, Broward County, Florida , COCE02014250;

12. *Skilled Labor Solutions, Inc. v. APT*, County Court, Broward County, Florida , COCE3002833;

13. *Michael Glorioso v. APT*, County Court, Broward County, Florida, , CONO06001755;

14. *Suite Partners Inc. v. APT*, County Court, Broward County, Florida, , COSO08003701;

15. *Citgo Petroleum Corp. v. APT*, County Court, Broward County, Florida, , COWE03018187;

16. *Clifford Cronkleton v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE10018113;

17. *APT v. Service Force USA LLC*, County Court, Broward County, Florida, , COCE10012841;

18. *APT v. Fluoresco Lighting-Sign Maintenance Corp.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE10044241;

19. *APT v. Fluoresco Lighting-Sign Maintenance Corp.*, United States District Court, S.D. Fla., Case No. 10-cv-62376-PAS;

20. *Katrina Hunter v. Paul E. Cross, APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE11004874;

21. *Raymond D. Pāga v. APT*, United States District Court, S.D. Fla., Case No. 10-cv-62415-WPD

22. *APT v. Energy Planning Assocs. Corp.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE13012637;

23. *Gaylor Inc. v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE13014721;

24. *Lee Terrells v. Cranston Obryon Martin, APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE14002776

25. *Gregory Campbell v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE14021689;

26. *Young Signs Inc. v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE014021899;

6

Case No.: 22-Civ-61477-Singhal/Valle

27. *APT v. Revolt Energy LLC, et al.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE16015417;

28. *APT v. William Troupe*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE17001751;

29. *Tammy Crawford v. Jose Mercado, APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE17021318;

30. *Kwick Lights, LLC v. APT*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE19000594;

31. *APT v. David Yargus*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE20001391;

32. *Corporate Lodging Consultants Inc. v. APT*, County Court, Broward County, Florida, , COCE20003790;

33. *Devin Grandis, et al v. BGIS Global Integrated Solutions US, LLC, et al.*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE22010408;

34. *Devin Grandis, et al. v. BGIS*, United States District Court, S.D. Fla., Case No. 22-Civ-61477-Singhal/Valle
he
35. *Electrical Supplies, Inc. v. APT*, County Court, Miami-Dade County, Florida, , Case No. 2006-002636-CA-01;

36. *Fromberg Fromberg Lewis & Brecker v. APT*, County Court, Miami-Dade County, Florida, Case No. 1997-002781-SP-23;

37. *Michael Miller v. Kyle Hughes*, APT, Fifteenth Judicial Circuit Court, Palm Beach County, Florida, Case No. 50-2012-CA-019394-XXXX-MB;

38. *NationsBank of Florida, N.A. v. Devin Grandis*, County Court, Palm Beach County, Florida, Case No. 50-1994-CC-018243-CVRE-MB;

39. *Devin R. Grandis v. Susan M. Strang*, Fifteenth Judicial Circuit Court, Palm Beach County, Florida, Case No. 50-1995-CA-007760-ANAD-MB;

40. *Joseph J. Pierce v. Devin Grandis, et al.*, Fifteenth Judicial Circuit Court, Palm Beach County, Florida, Case No. 50-1995-CA-009194-OCAB-MB;

41. *Joseph J. Pierce v. Devin Grandis, et al.*, United States District Court, S.D. Fla., Case No. 1:94-civ-00800-Ungaro

7

Case No.: 22-Civ-61477-Singhal/Valle

42. *A&H Manufacturing Co v. Devin R. Grandis*, County Court, Palm Beach County, Florida, Case No. 50-1995-SC-000124-SMRF-MB;

43. *Marla Grandis v. Andrea Brenner, Devin Grandis, et al.*, Fifteenth Judicial Circuit Court, Palm Beach County, Florida, Case No. 50-2015-CP-005686-XXXX-SB;

44. *JD Int'l Lighting v. Creative Lighting, LLC*, County Court, Broward County, Florida, COCE09003364;

45. *JD Int'l Lighting I v. Creative Lighting, LLC*, County Court, Broward County, Florida, COCE09008433; and

46. *JGB Industries Inc. vs. Advanced Power Technologies*, Seventeenth Judicial Circuit Court, Broward County, Florida, CACE04000549.

**ROG NO. 14.** Identify All facts supporting Your contention that BGIS acted in "bad faith" in terminating Your employment with BGIS as alleged in Paragraph 34 of the Complaint.

**ANSWER:** BGIS's determination that my employment should be terminated for cause was not a reasonable determination made in good faith, as required by the employment contract, for at least the following reasons: (A) BGIS did not give me the benefit of a written notice followed by a 30-day curative period as required by the definition of "Cause" in paragraph (i) on page 2 of the Employment Contract;[1] (B) BGIS did not provide any employment manual until four days after I received a "Final Warning" on March 7, 2022; (C) Likewise, even though I had received a "Final Warning" that stated I had supposedly violated "core values" of BGIS, no one ever provided me with any literation of the "core values"; (D) also, BGIS delayed providing any training aids until March 23, 2022, which was more than two weeks after I received the "Final Warning"; (E) BGIS terminated me without ever letting me speak to the decisionmaker or even identifying who decided that "Cause" supposedly existed to terminate my employment; (F) BGIS terminated me without ever specifically stating the factual basis for the conclusion that I was being terminated for "Cause"; (G) presumably, BGIS terminated me for the off-color joke that I shared with Nikki Culmer-Sakoff; however, this act hardly amounted to intentional misconduct sufficient to constitute "Cause," as that term is used, in paragraph (ii) on page 2 of the Employment Contract; (H) furthermore, other executives of BGIS regularly engaged in conduct that was no less crude than my own; (F) also, BGIS sustained no material injury as required by the definition of "Cause" in paragraph (ii) on page 2 of the Employment Contract; and (I) in reality, the termination of my employment supposedly for "Cause" was nothing more than a pretext for the real reason behind my discharge, which was the desire of BGIS to avoid payment of the severance that was owed to me.

---

[1] The Employment Contract was a written offer of employment signed by Sherry Pelletier on behalf of BGIS on December 21, 2021 and accepted by my signature on December 24, 2021.

Case No.: 22-Civ-61477-Singhal/Valle

**ROG NO. 15.** Identify All facts supporting Your contention that BGIS "continues to use Grandis'[s] facsimile stamp to endorse documents such as cheques and other payment instruments in Grandis'[s] name" as alleged in Paragraph 39 of the Complaint.

**ANSWER:** After BGIS terminated Grandis and before this lawsuit was filed on July 15, 2022, BGIS continued to use, without the consent of Devin Grandis, a stamp for the signature of Devin Grandis to sign checks on three different bank accounts of APT, Sustainable Management Solutions, LLC, and Creative Lighting, LLC. Despite multiple letters by Grandis to request that BGIS cease and desist from the continued use of Grandis' signature, BGIS refused to do so until Grandis was able to retrieve the stamps after this lawsuit was filed.

**ROG NO. 16.** Identify All facts supporting Your contention that "Grandis has been damaged" by BGIS's use of the facsimile stamp as alleged Paragraph 71 of the Complaint.

**ANSWER:** In one breath, BGIS made an announcement that I have left the business, yet each day it continues to stamp checks for payments to vendors as well as work and purchase orders with my name. This confusion reflects poorly upon BGIS, a company from which I will receive an earnout premium only if it is profitable. Also, the use of a stamp with my name also puts me in a bad light as BGIS does not keep its vendors and suppliers current. While discovery is ongoing, to date, I incurred attorneys' fees to make demands upon BGIS with respect to the facsimile stamp and to prepare Count 5 in the Complaint. Additionally, I believe the use of my stamp has affected my professional reputation, creditworthiness, and/or otherwise affected me negatively.

**ROG NO. 17.** Identify All damages—Including monetary, compensatory, pain and suffering, or otherwise—You have incurred caused by BGIS's use of the facsimile stamp after Your termination from BGIS as alleged in Paragraph 71 of the Complaint.

**ANSWER:** While discovery is ongoing, to date, I incurred attorneys' fees to make demands upon BGIS with respect to the facsimile stamp and to prepare Count 5 in the Complaint. Additionally, I believe the use of my stamp has affected my professional reputation, creditworthiness, and/or otherwise affected me negatively.

**ROG NO. 18.** If Your response to RFA No. 18 is anything other than an unqualified admission, Identify All monetary damages You have incurred, Including the amount, caused by BGIS's use of the facsimile stamp after Your termination from BGIS.

**ANSWER:** While discovery is ongoing, to date, I incurred attorneys' fees to make demands upon BGIS with respect to the facsimile stamp and to prepare Count 5 in the Complaint. Additionally, I believe the use of my stamp has affected my professional reputation, creditworthiness, and/or otherwise affected me negatively.

9

Case No.: 22-Civ-61477-Singhal/Valle

**ROG NO. 19.** Identify All "property," in which BGIS "acquire[d] or maintain[ed] title, rights, interest, and equity" due to BGIS's use of "Grandis'[s] facsimile stamp" as alleged in Paragraph 70(4) of the Complaint.

**ANSWER**: BGIS acquired or maintained interests in vehicles of Sustainable Management Solutions, LLC ("SMS") and inventory of APT and Creative Lighting, LLC ("Creative Lighting") through use of the facsimile or signature stamp of Devin Grandis.

**ROG NO. 20.** Identify each member of the "enterprise" alleged in Paragraph 70(4) of the Complaint.

**ANSWER**: Each of APT, Creative Lighting, and SMS was a legitimate enterprise, the finances of which were controlled with the facsimile or signature stamp of Grandis by the defendant, BGIS.

<u>VERIFICATION</u>

I have read the interrogatories and the answers to interrogatories that have been set forth above and I state on this 16th day of August, 2023, under the penalty for perjury, that to the best of my knowledge the answers stated after the interrogatories are true and correct.

Devin Grandis

10

Case No.: 22-Civ-61477-Singhal/Valle

Respectfully submitted,

*Counsel for the Plaintiff Devin Grandis*
BENNETT & AIELLO
3471 Main Highway, Suite 206
Coconut Grove, Florida 33133-5929
Phone: (305) 358-9011
Facsimile: (305) 358-9012

By: /s Paul Aiello
Michael P. Bennett, FBN 775304
mbennett@bennettaiello.com
Paul Aiello, FBN 0909033
paiello@bennettaiello.com

11

Case No.: 22-Civ-61477-Singhal/Valle

### CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, 2023 a true and correct copy of the original of this document was submitted through electronic mail for filing and service upon the attorneys of record who are listed below.

*Counsel for Plaintiff Devin Grandis*
BENNETT AIELLO
Michael P. Bennett, Esq.
mbennett@bennettaiello.com
Paul Aiello, Esq.
paiello@bennettaiello.com
Coconut Grove, Florida 33133-5929

Michael B. Pascoe, Esq.
mpascoe@hahnlaw.com
Robert Port, Esq.
rport@hahnlaw.com
Hahn, Loeser & Parks, LLP
Cleveland, Ohio

Allison Bentley Christensen, Esq.
achristensen@hahnlaw.com
Hahn, Loeser & Parks, LLP
Naples, Florida

Phoebe Sarah Wise, Esq.
pwiseaustinlaurato.com
Austin and Laurato, P.A.
Tampa, Florida

12

# EXHIBIT C-5

March 7, 2022

**HAND DELIVERED**



Devin Grandis
devin@advancedpowertech.com

Dear Devin,

This letter is intended to summarize our concerns with respect to your ongoing pattern of inappropriate behavior which is unacceptable and will not be tolerated.  Further, we wish to memorialize job performance expectations consistent with the established guidelines in the BGIS Global Integrated Solutions US LLC ("BGIS") Team Member Handbook and shall serve as a final warning letter. I am aware that during the week of February 21, 2022 Gord Hicks, Global Chief Executive Officer verbally addressed these serious concerns with you.

On February 16 and 17, 2022 you attended a two-day workshop in Los Angeles, CA at the Greenlots Head Office for our Shell Mobility US ("Shell") and Green Lots accounts. There were senior leaders present from both of our client organizations. It was brought to the attention of BGIS from our client, and witnessed by Alain Chaput, Vice President Client Service Delivery (BGIS), that some of your actions and statements were inappropriate and clearly not aligned with either the values of BGIS and/or our client organizations. Furthermore, during an Uber cab ride to the Greenlots Head Office, you were overheard making inappropriate comments that were derogatory in nature about your dissatisfaction with other clients while in the presence of Shell leaders. As a direct result of this series of events, the client at Shell specifically requested that they do not wish to interact with you in the future.  As you are aware, we have developed a long-term, strategic relationship with Shell that could have been damaged irreparably by your actions.

You have also made inappropriate comments on other occasions and, specifically in the presence of Brian Fellows, Senior Vice President, Client Services when he asked you what a female team member did for the Company. You made a flippant and highly unacceptable remark about what she does. You have also referred to women as "chicks" in front of Brian which is inconsistent with BGIS core values.

Please see the Harassment Free Workplace sections in the BGIS Team Member Handbook to review our expectations of team members while working and representing the Company. In addition, Ron Shory will assign you some on-line learning courses that you will be required to complete surrounding the topics of workplace civility behaviors and gender bias.

I would like you to be successful and I am here to assist you so that you can be successful. Please let me know if there is anything I or the Human Resources team can do to help you through this process. Needless to say, immediate and sustained improvement is expected. Our workplace investigation continues although any violations of BGIS guidelines or any other

serious deficiency in your performance may result in further disciplinary actions up to and including termination of your employment.

Sincerely,

**BGIS GLOBAL INTEGRATED SOLUTIONS US LLC**

Mark Marquis
President – BGIS US

ACKNOWLEDGED RECEIPT OF LETTER:

_____          3/7/22
Devin Grandis                                                    Date

cc:     Team Member File
        Human Resources

-2-

# EXHIBIT C-6

**BGIS** ENABLING INNOVATION

211 South Hudson St
Suite 318
Seattle, WA 98134

# Workplace Investigation

**Attorney-Client Privilege**
*-Investigation completed under the direction of Michael Pascoe, Partner, Hahn Loeser & Parks LLP*

| | |
|---|---|
| Team Member: | Michael Gainsley |
| System Job Title: | VP, Business Development |
| Date of Interview: | March 31, 2022 |
| Type of Interview: | Witness |
| Time: | 1:30PM – 2:00 PDST |
| Telephone: | 954.540.3719 |
| Conducted By: | Sherry Pelletier |
| Job Title: | VP, Human Resources – US |
| Investigation: | Sakoff - Grandis |

Δ π EXHIBIT 6
Deponent Grandis
Date 9-1-23 Rptr MF
WWW.DEPOBOOKPRODUCTS.COM

Logistical information Ms. Pelletier shared with Mr. Gainsley at the beginning of telephone call:

- Human Resources (HR) is conducting this investigation at the direction of counsel.
- The investigation itself is privileged, but the privilege is held by the company and not by the individual.
- You are not required to participate in the investigation and you are entitled to have counsel present if you wish.
- This interview is confidential and should not be discussed with others, such as, people leaders or co-workers. If someone asks you about the investigation please refer them to Sherry Pelletier with HR.
- BGIS has a non-retaliation policy and if believe that you are being retaliated against in any manner based on your participation in this investigation, please contact Sherry Pelletier immediately for resolution.
- If after our conversation you think of something you believe I should know, please contact me via phone or email.
- Finally, it is important to share with me specific words that you remember hearing. While I understand you will want to me as professional as possible, I want you to use the exact words that you remember hearing.
- Explain the investigation process.
- Any general questions before we get started.

**Interview Summary:**

Mr. Gainsley attended the Restaurant Facility Management Association (RFMA) tradeshow in Nashville, TN as part of his work responsibilities for BGIS. He flew in alone from Georgia on

Sunday, March 13, 2022 and left on Tuesday, March 15, 2022. He primary duty was to work the BGIS tradeshow booth with co-workers: Devin Grandis, Nikki Sakoff and Chris Palmieri and attend client and/or customer events such as dinners, cocktail hours, events, etc.

When asked if Mr. Gainsley remembers any unprofessional statements or behaviors being made by his co-workers, he shared there was an incident at the tradeshow booth. He further stated he knew it was extremely unprofessional at the time, but he did not say anything at the time. Mr. Gainsley claims that on Monday, March 14, 2022, in the afternoon the four of them were working in the booth with Mr. Grandis behind the table, Ms. Sakoff on the other side of the table by the aisle way leaning on the table with her elbows and Mr. Palmieri and Mr. Gainsley were on each side of table. Mr. Gainsley stated that he heard something inappropriate said by Mr. Grandis towards Ms. Sakoff, "If you keep bending over the table like that with your ass out, you're bound to get attacked or raped." Mr. Gainsley said that no one replied to that and there was just awkward silence. It took several minutes before something was said. Mr. Gainsley said that Ms. Sakoff was just resting on the table with her elbows and he did not think her pose was suggestive. He does not remember what they were talking about prior to these comments, but that comments like this is just Devin.

Mr. Gainsley does not remember any conversations or statements about camping. When he was further asked if "condoms" and "camping" were discussed he replied that he does not remember conversations about that.

Mr. Gainsley stated that Ms. Sakoff and he were having a work conversation last week when she brought up the incident that occurred in the trade show booth and asked what he thought. Mr. Gainsley told her it was definitely wrong and Mr. Grandis needs to learn that he is not "King Devin" anymore. Prior to BGIS purchasing Advanced Power Technologies (APT) Devin has said and done whatever he wants with Annie Lasaga, Finance Director, supporting him. Employees know that it is Devin and Annie calling the shots. Mr. Grandis has not learned that he now works for a big company that follows the rules. Mr. Gainsley does not remember Ms. Sakoff saying anything to him after the incident at the tradeshow as he left on Tuesday.

Mr. Gainsley said that Mr. Grandis has made other remarks about females before. While he did not remember the details, he knows that he will frequently comment about the beauty of a female be it a leader for a client or a vendor. Mr. Gainsley states that it is typically met with awkward silence.

**Ms. Pelletier's Impression:**

Mr. Gainsley was cooperative and answered all questions. He was very concerned for Ms. Sakoff and what the outcome will be. He works with Ms. Sakoff frequently in his daily responsibilities.

#####

# EXHIBIT C-7







7/30/21
APT Operating Account
PO: $159.195.60
Southwest Florida Lighting & Electrical Design ("SWFLED") (Broker?)
Δ π EXHIBIT 7
Deponent Grandis
Date 9/1/23 Rptr. MF
WWW.DEPOBOOKPRODUCTS.COM
8/4/21
Linmore (Supplier)
PO: $79.97.28
[50% down; 50% due]
$159.194.56
PO/Invoice [A/P]
8/10/21
APT Operating Account
8/12/21
Linmore (Supplier)
$79,597.28
50% deposit
1500 Property LLC
$79,597.28
Transfer/Return same day
10/7/21
Receive Material [A/P booked to SWFLED]
$150,000 Loan
Grandis's Father's Trust
10/18/21
Energy & Environmental Design Services ("EEDS")
$30,000 Loan
Oct. '21 [>10/6/21]
APT Warehouse
10/27/21
$79,597.28
50% Balance
Oct-Dec 2021
$180,233.40
(net x-fer over 3 mos.)
APT Operating Account
12/23/21
Asset Purchase Agreement Date
1/31/22
SWFLED
$159,195.95
Clear A/P from APT's books
"Requesting refund to EEDS"
2/2/22
$159,195.95
"overpayment refund"
EEDS

7/30/21
APT Operating Account
PO: $159.195.60
Southwest Florida Lighting & Electrical Design ("SWFLED") (Broker?)
8/4/21
Linmore (Supplier)
PO: $79.97.28
[50% down; 50% due]
$159.194.56
PO/Invoice [A/P]
8/10/21
APT Operating Account
8/12/21
Linmore (Supplier)
$79,597.28
50% deposit
1500 Property LLC
$79,597.28
Transfer/Return same day
10/7/21
Receive Material [A/P booked to SWFLED]
$150,000 Loan
Grandis's Father's Trust
10/18/21
Energy & Environmental Design Services ("EEDS")
$30,000 Loan
Oct. '21 [>10/6/21]
APT Warehouse
10/27/21
$79,597.28
50% Balance
Oct-Dec 2021
$180,233.40
(net x-fer over 3 mos.)
APT Operating Account
12/23/21
Asset Purchase Agreement Date
1/31/22
SWFLED
$159,195.95
Clear A/P from APT's books
"Requesting refund to EEDS"
2/2/22
$159,195.95
"overpayment refund"
EEDS

7/30/21
APT Operating Account
PO: $159.195.60
Southwest Florida Lighting & Electrical Design ("SWFLED") (Broker?)
8/4/21
Linmore (Supplier)
PO: $79.97.28
[50% down; 50% due]
$159.194.56
PO/Invoice [A/P]
8/10/21
APT Operating Account
8/12/21
Linmore (Supplier)
$79,597.28
50% deposit
1500 Property LLC
$79,597.28
Transfer/Return same day
10/7/21
Receive Material [A/P booked to SWFLED]
$150,000 Loan
Grandis's Father's Trust
10/18/21
Energy & Environmental Design Services ("EEDS")
$30,000 Loan
Oct. '21 [>10/6/21]
APT Warehouse
10/27/21
$79,597.28
50% Balance
Oct-Dec 2021
$180,233.40
(net x-fer over 3 mos.)
APT Operating Account
12/23/21
Asset Purchase Agreement Date
1/31/22
SWFLED
$159,195.95
Clear A/P from APT's books
"Requesting refund to EEDS"
2/2/22
$159,195.95
"overpayment refund"
EEDS

**From:** Mark Marquis <Mark.Marquis@bgis.com>
**Sent:** Sunday, November 21, 2021 10:24:35 AM
**To:** Devin Grandis <devin@AdvancedPowerTech.com>
**Subject:** RE: A few personal questions to clarify

See comments below. Look forward to catching up at 5. Have a great day and safe travels.

**From:** Devin Grandis <devin@AdvancedPowerTech.com>
**Sent:** Saturday, November 20, 2021 6:58 AM
**To:** Mark Marquis <Mark.Marquis@bgis.com>
**Subject:** A few personal questions to clarify

CAUTION: This is an external email. Please do not click on links or open attachments you do not trust.

My title for APT/BGIS?
Sr Vice President & General Manager
That's the most sr title under President.

Bonus paid on total  Salary and Commission earnings or  just the base? Bonus is against base salary. I reflected on your "rocketship" comment and discussed with Gord yesterday and want to discuss a different approach to comp than sales commission. We can cover at 5. We need you aligned for the bigger picture – which is why we are doing this deal – not just for what APT is, or plans to be in FY22 – but what we can do together.

Should my time be required to do more running the rocketship rather than personal sales, what are your thoughts as my earnings are important, but making sure the overall company is running as it should be is a higher priority, unless you have some thoughts I am unaware of re that. This and other dynamics suggest a re-visit on approach to comp. Let's discuss today.

If I bring other companies under our umbrella, how does that work and what is typical of compensation credit for those type of sales? Is it the same 3% for bringing in their revenue? Let's discuss today. We don't compensate uniquely for acquisitions.

Health insurance- same as all or is there a difference for SR. Execs, as in fully paid family coverage? No differences for Sr. Execs. One plan.

P000579

| Date | From | To | Amount | Source |
|---|---|---|---|---|
| 8/4/21 | APT | 1500 Property | $25,000.00 | 8/31/21 1500 Statement |
| 8/4/21 | 1500 Property | APT | -$25,000.00 | 8/31/21 1500 Statement |
| 8/5/21 | APT | 1500 Property | $24,382.40 | 8/31/21 1500 Statement |
| 8/12/21 | 1500 Property | APT | -$79,597.28 | 8/31/21 1500 Statement |
| 8/12/21 | APT | 1500 Property | $79,597.28 | 8/31/21 1500 Statement |
| 8/12/21 | 1500 Property | Linmore | -$79,597.28 | 8/31/21 1500 Statement |
| 10/5/21 | EEDS | APT | -$7,000.00 | 10/31/21 EEDS Statement |
| 10/6/21 | APT | EEDS | $7,000.00 | 10/31/21 EEDS Statement |
| 10/7/21 | Grandis Trust | EEDS | $150,000.00 | 10/31/21 EEDS Statement |
| 10/12/21 | EEDS | APT | -$45,833.40 | 10/31/21 EEDS Statement |
| 10/13/21 | APT | EEDS | $88,000.00 | 10/31/21 EEDS Statement |
| 10/13/21 | EEDS | APT | -$88,000.00 | 10/31/21 EEDS Statement |
| 10/15/21 | EEDS | APT | -$100,000.00 | 10/31/21 EEDS Statement |
| 10/18/21 | Grandis Trust | EEDS | $30,000.00 | 10/31/21 EEDS Statement |
| 10/18/21 | EEDS | APT | -$20,000.00 | 10/31/21 EEDS Statement |
| 10/20/21 | EEDS | APT | -$10,000.00 | 10/31/21 EEDS Statement |
| 10/27/21 | APT | EEDS | $80,000.00 | 10/31/21 EEDS Statement |
| 10/27/21 | EEDS | Linmore | -$79,597.28 | 10/31/21 EEDS Statement |
| 11/4/21 | APT | 1500 Property | -$19,382.40 | 11/30/21 APT Statement |
| 12/6/21 | APT | 1500 Property | -$3,500.00 | 12/31/21 APT Statement |
| 12/6/21 | EEDS | 1500 Property | -$8,485.76 | 12/31/21 EEDS Statement |
| 12/7/21 | EEDS | APT | -$15,000.00 | 12/31/21 EEDS Statement |
| 12/8/21 | APT | EEDS | $15,000.00 | 12/31/21 EEDS Statement |
| 12/15/21 | Grandis Trust | EEDS | $50,000.00 | 12/31/21 EEDS Statement |
| 12/15/21 | EEDS | APT | -$15,000.00 | 12/31/21 EEDS Statement |
| 12/16/21 | EEDS | APT | -$10,000.00 | 12/31/21 EEDS Statement |
| 12/16/21 | EEDS | APT | -$40,000.00 | 12/31/21 EEDS Statement |
| 12/17/21 | Grandis Trust | EEDS | $70,000.00 | 12/31/21 EEDS Statement |
| 12/17/21 | EEDS | Global Cash Card Clearing Acco (APT) | -$7,400.00 | 12/31/21 EEDS Statement |
| 12/17/21 | EEDS | APT | -$15,000.00 | 12/31/21 EEDS Statement |
| 12/20/21 | EEDS | APT | -$25,000.00 | 12/31/21 EEDS Statement |
| 12/21/21 | EEDS | APT | -$15,000.00 | 12/31/21 EEDS Statement |
| 12/22/21 | APT | EEDS | $50,000.00 | 12/31/21 EEDS Statement |
| 12/22/21 | EEDS | APT | -$15,000.00 | 12/31/21 EEDS Statement |
| 12/28/21 | APT | 1500 Property | -$1,000.00 | 12/31/21 APT Statement |
| 12/28/21 | EEDS | Global Cash Card Clearing Acco (APT) | -$2,500.00 | 12/31/21 EEDS Statement |
| 12/29/21 | APT | EEDS | $2,500.00 | 12/31/21 EEDS Statement |
| 1/7/22 | APT | 1500 Property | -$24,382.40 | 1/31/22 APT Statement |
| 1/10/22 | APT | 1500 Property | -$46,567.84 | 1/31/22 APT Statement |
| 1/12/22 | APT | SWFLED | -$56,323.70 | 1/31/22 APT Statement |
| 1/25/22 | APT | SWFLED | -$6,725.40 | 1/31/22 APT Statement |
| 1/31/22 | APT | SWFLED | -$159,195.95 | 1/31/22 APT Statement |
| 1/31/22 | APT | 1500 Property | -$93,029.60 | 1/31/22 APT Statement |
| 2/2/22 | SWFLED | EEDS | $159,195.95 | 2/21/22 EEDS Statement |

| Entity | Account |
|---|---|
| APT | 4085 |
| EEDS | 7404 |
| 1500 | 4255 |
| Linmore Transaction | |
| Grandis Trust | |

| Linmore Transaction | |
|---|---|
| Entity | Net |
| APT | -$159,195.95 |
| Linmore | $159,194.56 |
| 1500 | -$79,597.28 |
| EEDS | $79,598.67 |
| SWFLED | $0.00 |

# 1500 Property LLC

# 8/31/21 Bank Statement

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 8/31/21                Page 1 of 4



TO PO 142782-22-22-4 - 10034

010034

1500 PROPERTY LLC
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069


010034

  

**PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

**1-800-968-0801**

**24-hr Online Banking**
**iberiabank.com**

| FREE BUSINESS CHECKING | | ACCOUNT NUMBER ******4255 | |
|---|---|---|---|
| Previous Balance | 79,789.59 | Statement Dates | 8/02/21 thru 8/31/21 |
| 3 Deposits/Credits | 128,979.68 | Days this Statement Period | 30 |
| 9 Checks/Debits | 204,895.90 | Average Ledger Balance | 30,539.74 |
| Service Charge | .00 | Average Collected Balance | 30,539.74 |
| Interest Paid | .00 | | |
| Current Balance | 3,873.37 | | |

### DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 8/04 | From DDA *4085,To DDA *4255 | 25,000.00 |
| 8/05 | From DDA *4085,To DDA *4255 | 24,382.40 |
| 8/12 | From DDA *4085,To DDA *4255 | 79,597.28 |

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 8/04 | Wire Transfer Debit Wire Clearing 061000104 9175001122 UNITED STATES SUNTRUST ATL 20210804MMQFMP9H001920 20210804F1QCZ68C005229 08041451FT03 | 13,729.91- |
| 8/04 | From DDA *4255,To DDA *4085 | 25,000.00- |
| 8/04 | Wire Transfer Fee | 10.00- |
| 8/12 | Wire Transfer Debit Linmore LED Labs 121002042 5797654638 UNITED STATES CAL BK & TRUST SOUTHWEST FL LIGHTING 20210812MMQFMP9H000153 20210812L4B74B1C000169 08120930FT03 | 79,597.28- |

Please examine this statement upon receipt and report at once if you find any difference.

# IBERIABANK

---

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

**CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT**

| No. | $ |  |
|-----|---|--|
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
|     |   |  |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

**BANK BALANCE SHOWN ON THIS STATEMENT** $ _____

## ADD

**DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)** $ _____

## TOTAL $ _____

## SUBTRACT—

**CHECKS OUTSTANDING** $ _____

## BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---

**Member**
**FDIC**


EQUAL HOUSING LENDER

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In the letter, please give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 8/31/21          Page 3 of 4

---

**FREE BUSINESS CHECKING** (continued)                    **Account Number *******4255**

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 8/12 | From DDA *4255 To DDA *4085 | 79,597.28- |
| 8/12 | Wire Transfer Fee | 10.00- |
| 8/27 | Wire Transfer Debit Wire Clearing 061000104 9175001122 UNITED STATES SUNTRUST ATL 20210827MMQFMP9H000293 20210827F1QCZ68C002922 08271010FT03 | 1,541.43- |
| 8/27 | Wire Transfer Fee | 10.00- |



010034

## CHECKS IN NUMERICAL ORDER

| Date | Check No | Amount |
|------|----------|--------|
| 8/04 | 1011 | 5,400.00 |

(*) Check Numbers Missing

## DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 8/02 | 79,789.59 | 8/05 | 85,032.08 | 8/27 | 3,873.37 |
| 8/04 | 60,649.68 | 8/12 | 5,424.80 | | |

---

# EEDS

# 10/31/21 Bank Statement

# IBERIABANK



**STATEMENT OF ACCOUNT**

Date 10/29/21          Page 1 of 4

TO PO 144138-22-20-1 - 10459

010459   ENERGY AND ENVIRONMENTAL DESIGN SERVICES
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069


010459



**PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL**

**1-800-968-0801**

**24-hr Online Banking**
**iberiabank.com**

---

**FREE BUSINESS CHECKING**                         **ACCOUNT NUMBER *******7404**

| | | | |
|---|---|---|---|
| Previous Balance | 8,346.77 | Statement Dates | 10/01/21 thru 10/31/21 |
| 6 Deposits/Credits | 377,000.00 | Days this Statement Period | 31 |
| 12 Checks/Debits | 352,785.44 | Average Ledger Balance | 53,336.26 |
| Service Charge | .00 | Average Collected Balance | 52,626.59 |
| Interest Paid | .00 | | |
| Current Balance | 32,561.33 | | |

---

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 10/06 | From DDA *4085,To DDA *7404 | 7,000.00 |
| 10/07 | Wire Transfer Credit | 150,000.00 |
| | STANLEY GRANDIS TUA FBO | |
| | DEVIN GRANDIS UAD 10212010 | |
| | 801 NE 167TH ST STE 306 | |
| | NORTH MIAMI BEACH FL 33162-372 | |
| | 20211007F1QCZ68C005605 | |
| | 20211007MMQFMP9H001421 | |
| | 10071712FT03 | |
| 10/13 | From DDA *4085,To DDA *7404 | 88,000.00 |
| 10/18 | Wire Transfer Credit | 30,000.00 |
| | STANLEY GRANDIS TUA FBO | |
| | DEVIN GRANDIS UAD 10212010 | |
| | 801 NE 167TH ST STE 306 | |
| | NORTH MIAMI BEACH FL 33162-372 | |
| | 20211018F1QCZ68C006470 | |
| | 20211018MMQFMP9H001518 | |
| | 10181735FT03 | |
| 10/20 | Deposit | 22,000.00 |
| 10/27 | From DDA *4085,To DDA *7404 | 80,000.00 |

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 10/05 | From DDA *7404,To DDA *4085 | 7,000.00- |

---

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ |
|-----|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **TOTAL** |  |

BANK BALANCE SHOWN
ON THIS STATEMENT                           $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                    $ _____

## TOTAL                                    $ _____

## SUBTRACT—

CHECKS OUTSTANDING                          $ _____

## BALANCE                                  $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

**Member**
**FDIC**

In Case of Errors or Questions About Your Electronic Transfers
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299


EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.   If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have
use of the money during the time it takes us to complete our investigation.  This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account
used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions).
To get the "Average Daily Balance" we take the beginning balance of your account each day, and any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up
all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily
periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the
billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account
and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate
the amount of your minimum payment due as per your original contract.   We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have writ-
ten to us to dispute that we are currently investigating).  "New Balance" means the total outstanding  balance of your line on any cycle closing date which includes principal.  If the New Balance is less than
or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to
make equal or level payments on your Account, your minimum payment will be calculated accordingly.  The amount of your minimum payment is disclosed to you on this statement and will be automatically
deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed
to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch
office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible.  We
must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
•   Your name and account number.
•   The dollar amount of the suspected error.
•   Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount
    in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as
    delinquent or take any action to collect the amount you question.



**STATEMENT OF ACCOUNT**

Date 10/29/21          Page 3 of 4

---

**FREE BUSINESS CHECKING** (continued)                    **Account Number ******7404**

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 10/06 | NTCLBIIVRC THE HARTFORD<br>CCD   ENERGY AND ENVIRONMENT | 1,157.38- |
| 10/07 | Wire Transfer Fee | 15.00- |
| 10/12 | From DDA *7404,To DDA *4085 | 45,833.40- |
| 10/13 | From DDA *7404,To DDA *4085 | 88,000.00- |
| 10/15 | From DDA *7404,To DDA *4085 | 100,000.00- |
| 10/18 | Wire Transfer Fee | 15.00- |
| 10/19 | From DDA *7404,To DDA *4085 | 20,000.00- |
| 10/20 | From DDA *7404,To DDA *4085 | 10,000.00- |
| 10/26 | NTCLBIIVRC THE HARTFORD<br>CCD   ENERGY AND ENVIRONMENT | 1,157.38- |
| 10/27 | Wire Transfer Debit<br>Linmore LED Labs<br>121002042<br>5797654638<br>UNITED STATES<br>CAL BK & TRUST<br>PO365<br>20211027MMQFMP9H001343<br>20211027L4B74B1C000400<br>10271358FT03 | 79,597.28- |
| 10/27 | Wire Transfer Fee | 10.00- |

## DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 10/01 | 8,346.77 | 10/12 | 111,340.99 | 10/19 | 21,325.99 |
| 10/05 | 1,346.77 | 10/13 | 111,340.99 | 10/20 | 33,325.99 |
| 10/06 | 7,189.39 | 10/15 | 11,340.99 | 10/26 | 32,168.61 |
| 10/07 | 157,174.39 | 10/18 | 41,325.99 | 10/27 | 32,561.33 |



010459

# APT

# 11/30/21 Bank Statement

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21          Page 1 of 21

ADVANCED POWER TECHNOLOGIES LLC
DIP 20-13304
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069




PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL
**1-800-968-0801**
24-hr Online Banking
**iberiabank.com**

---

**COMMERCIAL CHECKING ANALYSIS**

| | | ACCOUNT NUMBER ******4085 | |
|---|---|---|---|
| Previous Balance | 358,525.87 | Statement Dates | 11/01/21 thru 11/30/21 |
| 10 Deposits/Credits | 1,574,023.60 | Days this Statement Period | 30 |
| 236 Checks/Debits | 1,662,792.20 | Average Ledger Balance | 236,382.66 |
| Service Charge | .00 | Average Collected Balance | 235,873.54 |
| Interest Paid | .00 | | |
| Current Balance | 269,757.27 | | |

---

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 11/02 | Deposit | 10.00 |
| 11/02 | Deposit | 32.40 |
| 11/02 | Deposit | 1,777.59 |
| 11/02 | Deposit | 5,107.61 |
| 11/02 | Deposit | 8,346.00 |
| 11/03 | Wire Transfer Credit | 505,000.00 |
| | TBK BANK, SSB | |
| | 12700 PARK CENTRAL DRIVE SUITE | |
| | DALLAS TX 75251 | |
| | 20211103GMQFMP01013308 | |
| | 20211103MMQFMP9H000809 | |
| | 11031306FT03 | |
| 11/10 | Wire Transfer Credit | 221,000.00 |
| | TBK BANK, SSB | |
| | 12700 PARK CENTRAL DRIVE SUITE | |
| | DALLAS TX 75251 | |
| | 20211110GMQFMP01026371 | |
| | 20211110MMQFMP9H001286 | |
| | 11101524FT03 | |
| 11/12 | Wire Transfer Credit | 750.00 |
| | MOMENTUM FLEET MGMT GROUP | |
| | 4258 SAINT FRANCIS CT | |
| | AVON      OH 44011372 | |
| | CVI | |
| | 20211112A1B7A41C004648 | |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000305

# IBERIABANK

**THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT**

CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT

| No. | $ |
|-----|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **TOTAL** |  |

BANK BALANCE SHOWN
ON THIS STATEMENT                    $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                       $ _____

## TOTAL                                   $ _____

## SUBTRACT—

CHECKS OUTSTANDING                 $ _____

## BALANCE                            $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

**Member**
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**



As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21        Page 3 of 21

---

**COMMERCIAL CHECKING ANALYSIS (continued)**                    Account Number ******4085

---

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
|      | 20211112MMQFMP9H002171 | |
|      | 11121557FT03 | |
| 11/17 | Wire Transfer Credit | 492,000.00 |
|      | TBK BANK, SSB | |
|      | 12700 PARK CENTRAL DRIVE SUITE | |
|      | DALLAS TX 75251 | |
|      | 20211117GMQFMP01021396 | |
|      | 20211117MMQFMP9H001095 | |
|      | 11171500FT03 | |
| 11/24 | Wire Transfer Credit | 340,000.00 |
|      | TBK BANK, SSB | |
|      | 12700 PARK CENTRAL DRIVE SUITE | |
|      | DALLAS TX 75251 | |
|      | 20211124GMQFMP01015191 | |
|      | 20211124MMQFMP9H000885 | |
|      | 11241228FT03 | |

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 11/01 | QR PAYMENT CBKCCOMM CARD WEB | 4,000.00- |
| 11/01 | Transfer to DDA Acct No.   20002254093-D | 4,422.75- |
| 11/01 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 11/01 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 11/01 | From DDA *4085,To DDA *4063 | 10,000.00- |
| 11/01 | From DDA *4085,To DDA *4077 | 12,000.00- |
| 11/01 | INS PYMT   HUMANA, INC. PPD | 54,848.18- |
| 11/02 | CREDITCARD BARCLAYCARD US WEB | 500.00- |
| 11/02 | QR PAYMENT CBKCCOMM CARD WEB | 5,000.00- |
| 11/03 | ACH PMT   AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 11/03 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 11/03 | From DDA *4085,To DDA *4063 | 10,020.95- |
| 11/03 | QR PAYMENT CBKCCOMM CARD WEB | 15,000.00- |
| 11/03 | Transfer to DDA Acct No.   20002254093-D | 344,408.42- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21          Page 4 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number *******4085

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 11/04 | Wire Transfer Debit Global Cash Card Clearing Acco 273970116 1700016652 7 Corporate Park, Suite 130 Irvine, CA 92606 890 Advanced Power Tech LLC T METABANK NA 890_Advanced Power Technologie Travel Program 20211104MMQFMP9H001519 20211104GMQFMP01024424 11041501FT03 | 5,000.00- |
| 11/04 | EPAY      CHASE CREDIT CRD WEB | 5,000.00- |
| 11/04 | QR PAYMENT CBKCCOMM CARD WEB | 7,000.00- |
| 11/04 | ACH PMT    AMEX EPAYMENT CCD   Advanced Power Tech | 12,000.00- |
| 11/04 | From DDA *4085,To DDA *4255 | 19,382.40- |
| 11/05 | Wire Transfer Debit Global Cash Card Clearing Acco 273970116 1700016652 7 Corporate Park, Suite 130 Irvine, CA 92606 890 Advanced Power Tech LLC T METABANK NA 890_Advanced Power Technologie Travel Program 20211105MMQFMP9H001339 20211105GMQFMP01021986 11051312FT03 | 5,000.00- |
| 11/05 | ELEC PYMT FPL DIRECT DEBIT WEB | 1,966.49- |
| 11/05 | QR PAYMENT CBKCCOMM CARD WEB | 4,900.00- |
| 11/05 | ACH PMT    AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 11/05 | EPAY      CHASE CREDIT CRD WEB | 5,000.00- |
| 11/05 | Transfer to DDA Acct No.    20002254093-D | 10,378.08- |
| 11/05 | Payment    AFCO Credit Corp CCD   Advanced Power Technol | 79,562.97- |
| 11/08 | PAYMENTREQ SUN LIFE CANADA CCD   ADVANCED POWER TECH. | 312.21- |
| 11/08 | PAYMENTREQ SUN LIFE CANADA CCD   ADVANCED POWER TECH | 1,047.28- |
| 11/08 | EPAY      CHASE CREDIT CRD WEB | 1,500.00- |
| 11/08 | PAYMENTREQ SUN LIFE CANADA CCD   ADVANCED POWER TECH. | 3,030.04- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21          Page 5 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 11/08 | Transfer to DDA<br>Acct No.    20002254093-D | 3,036.92- |
| 11/08 | SALE     GPS FLEET SOLUTI<br>CCD   ADVANCED POWER TECHNOL | 3,209.33- |
| 11/08 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/08 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 11/08 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 287.84- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 333.37- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 343.98- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 356.13- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 358.39- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 385.31- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 413.31- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 414.81- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 417.09- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 429.45- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 441.25- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 488.90- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 498.07- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 573.66- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 576.13- |
| 11/09 | BILL PYMNT ACHMA VISB<br>WEB | 661.60- |
| 11/09 | EPAY     CHASE CREDIT CRD<br>WEB | 2,000.00- |
| 11/09 | Transfer to DDA<br>Acct No.    20002254093-D | 4,551.38- |
| 11/09 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/09 | QR PAYMENT CBKCCOMM CARD<br>WEB | 6,700.00- |

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000309

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21          Page 6 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 11/09 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 8,000.00- |
| 11/09 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 8,000.00- |
| 11/10 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211110MMQFMP9H000314<br>20211110GMQFMP01010440<br>11101007FT03 | 5,000.00- |
| 11/10 | DEBIT     FEDERAL EXPRESS<br>CCD | 44.69- |
| 11/10 | UTILITYBIL TECO/PEOPLE GAS<br>WEB | 56.88- |
| 11/10 | DEBIT     FEDERAL EXPRESS<br>CCD | 779.35- |
| 11/10 | Transfer to DDA<br>Acct No.    20002254093-D | 1,890.96- |
| 11/10 | From DDA *4085,To DDA *4063 | 4,340.29- |
| 11/10 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/10 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/10 | CONS COLL  H19 SUTTON LEASI<br>PPD | 9,475.51- |
| 11/10 | QR PAYMENT CBKCCOMM CARD<br>WEB | 10,000.00- |
| 11/12 | Transfer to DDA<br>Acct No.    20002254093-D | 4,416.23- |
| 11/12 | QR PAYMENT CBKCCOMM CARD<br>WEB | 4,900.00- |
| 11/12 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/12 | EPAY     CHASE CREDIT CRD<br>WEB | 6,000.00- |
| 11/12 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 8,000.00- |

---

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21        Page 7 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                        Account Number \*\*\*\*\*\*\*4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 11/15 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211115MMQFMP9H002689<br>20211115GMQFMP01038549<br>11151642FT03 | 5,000.00- |
| 11/15 | PPDFUNDING AMERIFLEX<br>PPD | 40.00- |
| 11/15 | QR PAYMENT CBKCCOMM CARD<br>WEB | 4,000.00- |
| 11/15 | EPAY      CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/15 | QR PAYMENT CBKCCOMM CARD<br>WEB | 6,000.00- |
| 11/15 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 7,000.00- |
| 11/15 | EPAY      CHASE CREDIT CRD<br>WEB | 7,000.00- |
| 11/15 | Transfer to DDA<br>Acct No.    20002254093-D | 10,819.46- |
| 11/16 | PAYMENT   ADT<br>PPD | 6.16- |
| 11/16 | PAYMENT   ADT<br>PPD | 21.40- |
| 11/16 | PAYMENT   ADT<br>PPD | 45.69- |
| 11/16 | PAYMENT   ADT<br>PPD | 45.69- |
| 11/16 | PAYMENT   ADT<br>PPD | 45.69- |
| 11/16 | PAYMENT   ADT<br>PPD | 139.79- |
| 11/16 | PAYMENT   ADT<br>PPD | 236.91- |
| 11/16 | PAYMENT   ADT<br>PPD | 236.91- |
| 11/16 | PAYMENT   ADT<br>PPD | 266.46- |
| 11/16 | PAYMENT   ADT<br>PPD | 1,301.14- |
| 11/16 | Transfer to DDA<br>Acct No.    20002254093-D | 3,519.33- |
| 11/16 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000311

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21          Page 8 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number ******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 11/16 | PURCHASE  RHTECHNOLOGYSOLU<br>CCD  ADVANCED POWER TECHNOL | 8,466.78- |
| 11/17 | From DDA *4085,To DDA *4063 | 2,009.97- |
| 11/17 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 11/17 | QR PAYMENT CBKCCOMM CARD<br>WEB | 11,000.00- |
| 11/17 | Transfer to DDA<br>Acct No.   20002254093-D | 363,453.48- |
| 11/18 | Wire Transfer Debit<br>ROCKET ELECTRIC<br>026009593<br>334069075349<br>2440 Sandy Plains Rd. Bldg 28<br>Suite 200, Marietta GA 30066<br>UNITED STATES<br>BK AMER NYC<br>20211118MMQFMP9H001324<br>20211118B6B7HU3R011049<br>11181348FT03 | 20,804.40- |
| 11/18 | ALLY PAYMT ALLY<br>CCD  Advanced Power Tec | 645.55- |
| 11/18 | INTERNET   WASTE MANAGEMENT<br>WEB | 1,160.48- |
| 11/18 | ALLY PAYMT ALLY<br>CCD  Advanced Power Tec | 1,526.74- |
| 11/18 | QR PAYMENT CBKCCOMM CARD<br>WEB | 3,900.00- |
| 11/18 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 11/19 | Wire Transfer Debit<br>LOWELL LISTER LOUISIANA REPAIR<br>311175093<br>1381758704<br>BARKSDAL AFBFCU LA<br>20211119MMQFMP9H001134<br>20211119QMGFNP67001095<br>11191152FT03 | 2,726.11- |
| 11/19 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologe<br>Travel Program<br>20211119MMQFMP9H000316<br>20211119GMQFMP01007488<br>11190905FT03 | 10,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21        Page 9 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|-------:|
| 11/19 | Wire Transfer Debit<br>World Insurance Associates LLC<br>031101266<br>4375185042<br>14821 South Dixie Highway<br>Miami Florida  33176 UNITED ST<br>TD BANK NA<br>20211119MMQFMP9H002703<br>20211119MMQFMPYQ007578<br>11191513FT03 | 44,124.67- |
| 11/19 | QR PAYMENT CBKCCOMM CARD<br>WEB | 2,900.00- |
| 11/19 | ACH PMT    AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 11/19 | Transfer to DDA<br>Acct No.    20002254093-D | 8,799.00- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 427.15- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 432.12- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 458.05- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 461.66- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 469.92- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 510.64- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 520.56- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 528.89- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 533.94- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 552.90- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 554.08- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 588.59- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 619.14- |
| 11/22 | BILL PYMNT ACHMA VISB<br>WEB | 655.45- |
| 11/22 | EPAY     CHASE CREDIT CRD<br>WEB | 2,000.00- |
| 11/22 | Transfer to DDA<br>Acct No.    20002254093-D | 3,394.44- |
| 11/22 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/22 | QR PAYMENT CBKCCOMM CARD<br>WEB | 7,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21    Page 10 of 21

---

COMMERCIAL CHECKING ANALYSIS (continued)    Account Number ******4085

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 11/22 | Account Analysis Charge | 1,163.59- |
| 11/23 | Wire Transfer Debit<br>Lewis Brisbois Bisgaard & Smit<br>121000248<br>8073429907<br>633 West 5th Street, Suite 400<br>Los Angeles, California 90071<br>UNITED STATES<br>WELLS FARGO NA<br>Michael G. Platner<br>20211123MMQFMP9H000203<br>20211123I1B7032R006550<br>11230939FT03 | 5,000.00- |
| 11/23 | Transfer to DDA<br>Acct No.    20002254093-D | 2,365.17- |
| 11/23 | QR PAYMENT CBKCCOMM CARD<br>WEB | 3,700.00- |
| 11/23 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/24 | BT1123    GEXPRO<br>CCD  Advanced Power Technol | 2,718.61- |
| 11/24 | Transfer to DDA<br>Acct No.    20002254093-D | 6,919.90- |
| 11/24 | QR PAYMENT CBKCCOMM CARD<br>WEB | 10,000.00- |
| 11/26 | CREDITCARD BARCLAYCARD US<br>WEB | 500.00- |
| 11/26 | CCPYMT    WELLS FARGO CARD<br>WEB | 2,500.00- |
| 11/26 | QR PAYMENT CBKCCOMM CARD<br>WEB | 2,500.00- |
| 11/26 | EPAY    CHASE CREDIT CRD<br>WEB | 3,000.00- |
| 11/26 | BT1124    GEXPRO<br>CCD  Advanced Power Technol | 4,248.50- |
| 11/26 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/26 | ACH PMT  AMEX EPAYMENT<br>CCD  Advanced Power Tech | 8,000.00- |
| 11/29 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211129MMQFMP9H000458<br>20211129GMQFMP01014055<br>11291052FT03 | 5,000.00- |

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 11/30/21     Page 11 of 21

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 11/29 | Wire Transfer Debit<br>JD SAC CONSULTING<br>026009593<br>334069075349<br>2440 Sandy Plains Rd Suite 28-<br>Marietta GA 30066 UNITED STATE<br>BK AMER NYC<br>20211129MMQFMP9H000445<br>20211129B6B7HU4R006592<br>11291049FT03 | 10,104.40- |
| 11/29 | QR PAYMENT CBKCCOMM CARD<br>WEB | 3,200.00- |
| 11/29 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 11/29 | PURCHASE  RHTECHNOLOGYSOLU<br>CCD   ADVANCED POWER TECHNOL | 8,829.37- |
| 11/30 | QR PAYMENT CBKCCOMM CARD<br>WEB | 3,000.00- |
| 11/30 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/30 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 11/30 | BT1129   GEXPRO<br>CCD   Advanced Power Technol | 19,648.61- |

## CHECKS IN NUMERICAL ORDER

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|---|---|---|---|---|---|---|---|---|
| 11/23 | 4386 | 5.73 | 11/08 | 4809 | 926.00 | 11/02 | 4832 | 1,000.00 |
| 11/19 | 4522* | 3.34 | 11/05 | 4810 | 1,195.99 | 11/02 | 4833 | 750.00 |
| 11/01 | 4687* | 18.00 | 11/03 | 4811 | 2,743.13 | 11/04 | 4834 | 400.00 |
| 11/17 | 4691* | 69.41 | 11/05 | 4812 | 556.56 | 11/01 | 4835 | 1,000.00 |
| 11/12 | 4694* | 244.15 | 11/08 | 4813 | 1,162.50 | 11/05 | 4836 | 860.00 |
| 11/17 | 4695 | 775.85 | 11/05 | 4814 | 864.29 | 11/04 | 4837 | 1,000.00 |
| 11/29 | 4696 | 2,342.80 | 11/04 | 4816* | 1,187.30 | 11/22 | 4838 | 1,200.00 |
| 11/29 | 4697 | 3,118.98 | 11/03 | 4817 | 1,043.72 | 11/29 | 4839 | 250.00 |
| 11/02 | 4703* | 695.50 | 11/05 | 4818 | 838.76 | 11/08 | 4840 | 500.00 |
| 11/03 | 4707* | 305.28 | 11/08 | 4819 | 1,130.38 | 11/03 | 4841 | 750.01 |
| 11/22 | 4712* | 1,400.00 | 11/03 | 4820 | 1,805.80 | 11/02 | 4842 | 1,200.00 |
| 11/15 | 4714* | 445.00 | 11/09 | 4821 | 27,675.14 | 11/02 | 4843 | 100.00 |
| 11/02 | 4722* | 40.00 | 11/02 | 4823* | 10,550.00 | 11/12 | 4844 | 60.00 |
| 11/01 | 4733* | 1,200.00 | 11/03 | 4824 | 2,700.00 | 11/01 | 4845 | 580.00 |
| 11/03 | 4746* | 2,948.50 | 11/01 | 4825 | 1,030.00 | 11/01 | 4846 | 375.00 |
| 11/02 | 4787* | 1,333.22 | 11/08 | 4826 | 350.00 | 11/04 | 4847 | 135.00 |
| 11/18 | 4798* | 690.66 | 11/02 | 4827 | 40.00 | 11/08 | 4848 | 8,707.47 |
| 11/02 | 4803* | 306.00 | 11/04 | 4828 | 750.00 | 11/02 | 4850* | 57.12 |
| 11/02 | 4806* | 726.02 | 11/03 | 4829 | 1,000.00 | 11/10 | 4851 | 6,722.98 |
| 11/05 | 4807 | 1,100.00 | 11/02 | 4830 | 950.00 | 11/09 | 4852 | 1,634.50 |
| 11/03 | 4808 | 500.00 | 11/02 | 4831 | 600.00 | 11/09 | 4853 | 1,915.95 |

(*) Check Numbers Missing

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000315

# IBERIABANK

STATEMENT OF ACCOUNT

Date 11/30/21    Page 12 of 21

COMMERCIAL CHECKING ANALYSIS (continued)    Account Number ******4085

**CHECKS IN NUMERICAL ORDER**

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 11/10 | 4855* | 464.60 | 11/17 | 4874* | 500.00 | 11/23 | 4887* | 32.82 |
| 11/15 | 4859* | 445.00 | 11/17 | 4875 | 5,000.00 | 11/26 | 4888 | 560.58 |
| 11/19 | 4860 | 251.00 | 11/24 | 4880* | 9,598.00 | 11/23 | 4889 | 1,755.00 |
| 11/23 | 4861 | 25.00 | 11/24 | 4881 | 3,976.48 | 11/30 | 4892* | 18,000.00 |
| 11/17 | 4862 | 2,427.84 | 11/24 | 4882 | 6,173.58 | 11/29 | 4895* | 5,000.00 |
| 11/16 | 4863 | 2,124.83 | 11/22 | 4883 | 5,000.00 | 11/29 | 4897* | 5,008.00 |
| 11/16 | 4864 | 1,081.04 | 11/23 | 4884 | 695.50 | | | |
| 11/19 | 4866* | 2,000.00 | 11/22 | 4885 | 3,098.80 | | | |

(*) Check Numbers Missing

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/01 | 259,051.94 | 11/10 | 253,030.38 | 11/22 | 112,534.30 |
| 11/02 | 250,477.68 | 11/12 | 225,160.00 | 11/23 | 93,955.08 |
| 11/03 | 353,544.40 | 11/15 | 179,410.54 | 11/24 | 394,568.51 |
| 11/04 | 301,689.70 | 11/16 | 156,872.72 | 11/26 | 368,259.43 |
| 11/05 | 184,466.56 | 11/17 | 258,636.17 | 11/29 | 320,405.88 |
| 11/08 | 153,261.90 | 11/18 | 224,908.34 | 11/30 | 269,757.27 |
| 11/09 | 80,805.64 | 11/19 | 149,104.22 | | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000316

# APT

# 12/31/21 Bank Statement

# IBERIABANK

STATEMENT OF ACCOUNT

Date 12/31/21                     Page 1 of 17

ADVANCED POWER TECHNOLOGIES LLC
DIP 20-13304
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069




**PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL**
**1-800-968-0801**
**24-hr Online Banking**
**iberiabank.com**

## COMMERCIAL CHECKING ANALYSIS

**ACCOUNT NUMBER ******4085**

| | | | |
|---|---|---|---|
| Previous Balance | 269,757.27 | Statement Dates | 12/01/21 thru 12/31/21 |
| 16 Deposits/Credits | 1,714,907.22 | Days this Statement Period | 31 |
| 170 Checks/Debits | 1,812,109.67 | Average Ledger Balance | 83,392.02 |
| Service Charge | .00 | Average Collected Balance | 81,656.07 |
| Interest Paid | .00 | | |
| Current Balance | 172,554.82 | | |

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 12/01 | Wire Transfer Credit | 196,000.00 |
| | TBK BANK, SSB | |
| | 12700 PARK CENTRAL DRIVE SUITE | |
| | DALLAS TX 75251 | |
| | 20211201GMQFMP01015967 | |
| | 20211201MMQFMP9H001103 | |
| | 12011258FT03 | |
| 12/03 | Deposit | 5,107.61 |
| 12/03 | Deposit | 8,346.00 |
| 12/07 | From DDA *7404,To DDA *4085 | 15,000.00 |
| 12/08 | Wire Transfer Credit | 331,000.00 |
| | TBK BANK, SSB | |
| | 12700 PARK CENTRAL DRIVE SUITE | |
| | DALLAS TX 75251 | |
| | 20211208GMQFMP01014160 | |
| | 20211208MMQFMP9H000814 | |
| | 12081302FT01 | |
| 12/15 | From DDA *7404,To DDA *4085 | 15,000.00 |
| 12/15 | Wire Transfer Credit | 365,000.00 |
| | TBK BANK, SSB | |
| | 12700 PARK CENTRAL DRIVE SUITE | |
| | DALLAS TX 75251 | |
| | 20211215GMQFMP01016278 | |
| | 20211215MMQFMP9H001046 | |
| | 12151300FT01 | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# iBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

**CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT**

| No. | $ |
|-----|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **TOTAL** |  |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

**BANK BALANCE SHOWN ON THIS STATEMENT** $ _____

### ADD

**DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)** $ _____

### TOTAL $ _____

### SUBTRACT—

**CHECKS OUTSTANDING** $ _____

### BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

---

**Member FDIC**



**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.  If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.  This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**

Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original account.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating).  "New Balance" means the total outstanding  balance of your line on any cycle closing date which includes principal.  If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly.  The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**

If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# iBERIABANK

STATEMENT OF ACCOUNT

Date 12/31/21          Page 3 of 17

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number ******4085

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|------|-------------|--------|
| 12/16 | From DDA *7404,To DDA *4085 | 10,000.00 |
| 12/16 | From DDA *7404,To DDA *4085 | 40,000.00 |
| 12/17 | From DDA *7404,To DDA *4085 | 15,000.00 |
| 12/20 | From DDA *7404,To DDA *4085 | 25,000.00 |
| 12/21 | From DDA *7404,To DDA *4085 | 15,000.00 |
| 12/22 | From DDA *7404,To DDA *4085 | 15,000.00 |
| 12/22 | Wire Transfer Credit | 240,000.00 |
|  | TBK BANK, SSB |  |
|  | 12700 PARK CENTRAL DRIVE SUITE |  |
|  | DALLAS TX 75251 |  |
|  | 20211222GMQFMP01013714 |  |
|  | 20211222MMQFMP9H000833 |  |
|  | 12221221FT01 |  |
| 12/29 | Wire Transfer Credit | 406,000.00 |
|  | TBK BANK, SSB |  |
|  | 12700 PARK CENTRAL DRIVE SUITE |  |
|  | DALLAS TX 75251 |  |
|  | 20211229GMQFMP01013940 |  |
|  | 20211229MMQFMP9H000847 |  |
|  | 12291224FT01 |  |
| 12/31 | Deposit | 13,453.61 |

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 12/01 | From DDA *4085,To DDA *4063 | 220.27- |
| 12/01 | QR PAYMENT CBKCCOMM CARD | 2,500.00- |
|  | WEB |  |
| 12/01 | ACH PMT   AMEX EPAYMENT | 5,000.00- |
|  | CCD   Advanced Power Tech |  |
| 12/01 | EPAY     CHASE CREDIT CRD | 5,000.00- |
|  | WEB |  |
| 12/01 | From DDA *4085,To DDA *4077 | 10,000.00- |
| 12/01 | Transfer to DDA | 300,327.61- |
|  | Acct No.    20002254093-D |  |
| 12/02 | QR PAYMENT CBKCCOMM CARD | 4,500.00- |
|  | WEB |  |
| 12/02 | EPAY     CHASE CREDIT CRD | 5,000.00- |
|  | WEB |  |
| 12/02 | Transfer to DDA | 8,138.67- |
|  | Acct No.    20002254093-D |  |
| 12/03 | Wire Transfer Debit | 2,500.00- |
|  | LOWELL LISTER LOUISIANA REPAIR |  |
|  | 311175093 |  |
|  | 1381758704 |  |
|  | BARKSDAL AFBFCU LA |  |
|  | 20211203MMQFMP9H001436 |  |
|  | 20211203QMGFNP69001463 |  |
|  | 12031315FT03 |  |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000619

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21        Page 4 of 17

---

**COMMERCIAL CHECKING ANALYSIS** (continued)        Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 12/03 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211203MMQFMP9H001158<br>20211203GMQFMP01019369<br>12031229FT03 | 7,000.00- |
| 12/03 | Transfer to DDA<br>Acct No.    20002254093-D | 1,981.84- |
| 12/03 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 12/03 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,900.00- |
| 12/03 | INS PYMT  HUMANA, INC.<br>PPD | 58,667.91- |
| 12/06 | Wire Transfer Debit<br>JD SAC CONSULTING<br>026009593<br>334069075349<br>2440 Sandy Plains Rd Suite 28-<br>Marietta GA 30066 UNITED STATE<br>BK AMER NYC<br>20211206MMQFMP9H000179<br>20211206B6B7HU4R004495<br>12060940FT01 | 10,165.00- |
| 12/06 | Transfer to DDA<br>Acct No.    20002254093-D | 1,725.72- |
| 12/06 | From DDA *4085,To DDA *4255 | 3,500.00- |
| 12/06 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/06 | QR PAYMENT CBKCCOMM CARD<br>WEB | 7,000.00- |
| 12/07 | Transfer to DDA<br>Acct No.    20002254093-D | 759.77- |
| 12/07 | EPAY     CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 12/07 | QR PAYMENT CBKCCOMM CARD<br>WEB | 6,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000620

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21          Page 5 of 17

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number** *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 12/08 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211208MMQFMP9H001236<br>20211208GMQFMP01019409<br>12081323FT01 | 5,000.00- |
| 12/08 | Wire Transfer Debit<br>JD SAC CONSULTING<br>026009593<br>334069075349<br>2440 Sandy Plains Rd Suite 28-<br>Marietta GA 30066 UNITED STATE<br>BK AMER NYC<br>20211208MMQFMP9H002091<br>20211208B6B7HU2R014457<br>12081609FT01 | 24,781.00- |
| 12/08 | Wire Transfer Debit<br>THE BANCORP BANK Lease Payment<br>031101114<br>405231100<br>UNITED STATES<br>THE BANCORP BANK<br>21,290.06<br>20211208MMQFMP9H001415<br>20211208L1LFBL8C000708<br>12081404FT01 | 26,425.85- |
| 12/08 | PAYMENTREQ SUN LIFE CANADA<br>CCD  ADVANCED POWER TECH. | 253.41- |
| 12/08 | PAYMENTREQ SUN LIFE CANADA<br>CCD  ADVANCED POWER TECH | 965.90- |
| 12/08 | PAYMENTREQ SUN LIFE CANADA<br>CCD  ADVANCED POWER TECH. | 2,776.55- |
| 12/08 | Transfer to DDA<br>Acct No.   20002254093-D | 4,347.98- |
| 12/08 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 12/08 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 12/08 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/08 | From DDA *4085,To DDA *4077 | 5,000.00- |
| 12/08 | QR PAYMENT CBKCCOMM CARD<br>WEB | 10,000.00- |
| 12/08 | From DDA *4085,To DDA *7404 | 15,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000621

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21          Page 6 of 17

---

COMMERCIAL CHECKING ANALYSIS (continued)                    Account Number ******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 12/09 | Wire Transfer Debit<br>Mitsubishi HC Capital America<br>071000288<br>1126288<br>UNITED STATES<br>BMO HARRIS BANK NA<br>20211209MMQFMP9H000271<br>20211209G1QG750C003687<br>12090957FT01 | 2,222.65- |
| 12/09 | Transfer to DDA<br>Acct No.    20002254093-D | 879.18- |
| 12/09 | QR PAYMENT CBKCCOMM CARD<br>WEB | 2,000.00- |
| 12/09 | EPAY     CHASE CREDIT CRD<br>WEB | 3,000.00- |
| 12/09 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/09 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 8,000.00- |
| 12/10 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890_Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20211210MMQFMP9H002663<br>20211210GMQFMP01034742<br>12101558FT01 | 2,500.00- |
| 12/10 | Transfer to DDA<br>Acct No.    20002254093-D | 1,355.21- |
| 12/10 | EPAY     CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 12/10 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/10 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 12/10 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 12/10 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 12/10 | CONS COLL  H19 SUTTON LEASI<br>PPD | 9,476.02- |
| 12/10 | Payment   AFCO Credit Corp<br>CCD   Advanced Power Technol | 83,540.71- |
| 12/13 | Transfer to DDA<br>Acct No.    20002254093-D | 1,448.60- |
| 12/13 | EPAY     CHASE CREDIT CRD<br>WEB | 3,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21          Page 7 of 17

---

**COMMERCIAL CHECKING ANALYSIS (continued)**                              Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 12/13 | QR PAYMENT CBKCCOMM CARD WEB | 5,000.00- |
| 12/13 | ACH PMT   AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 12/13 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 12/14 | Wire Transfer Debit Global Cash Card Clearing Acco 273970116 1700016652 7 Corporate Park, Suite 130 Irvine, CA 92606 890 Advanced Power Tech LLC  T METABANK NA 890_Advanced Power Technologie Travel Program 20211214MMQFMP9H000976 20211214GMQFMP01017577 12141243FT01 | 5,000.00- |
| 12/14 | TAX COLL.  BROWARD COUNTY WEB | 3,450.82- |
| 12/14 | ACH PMT   AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 12/14 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 12/14 | QR PAYMENT CBKCCOMM CARD WEB | 6,000.00- |
| 12/15 | PPDFUNDING AMERIFLEX PPD | 40.00- |
| 12/15 | EPAY     WWEX Franchise H CCD   APT POMPANO FL | 2,838.81- |
| 12/15 | ACH PMT   AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 12/15 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |
| 12/15 | BT1214    GEXPRO CCD   Advanced Power Technol | 5,509.06- |
| 12/15 | PURCHASE  RHTECHNOLOGYSOLU CCD   ADVANCED POWER TECHNOL | 8,158.87- |
| 12/15 | QR PAYMENT CBKCCOMM CARD WEB | 9,000.00- |
| 12/15 | Transfer to DDA Acct No.   20002254093-D | 349,214.67- |
| 12/16 | LEVITONLAW THE LEVITON LAW CCD   Advance Power Technolo | 1,500.00- |
| 12/16 | QR PAYMENT CBKCCOMM CARD WEB | 4,000.00- |
| 12/16 | ACH PMT   AMEX EPAYMENT CCD   Advanced Power Tech | 5,000.00- |
| 12/16 | EPAY     CHASE CREDIT CRD WEB | 5,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000623

# iBERIABANK

STATEMENT OF ACCOUNT

Date 12/31/21          Page 8 of 17

---

**COMMERCIAL CHECKING ANALYSIS (continued)**          **Account Number ******4085**

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 12/16 | Transfer to DDA<br>Acct No.    20002254093-D | 23,878.30- |
| 12/17 | ELEC PYMT  FPL DIRECT DEBIT<br>WEB | 11,737.50- |
| 12/17 | EPAY     CHASE CREDIT CRD<br>WEB | 3,000.00- |
| 12/17 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 12/17 | Transfer to DDA<br>Acct No.    20002254093-D | 5,251.00- |
| 12/20 | Wire Transfer Debit<br>LOWELL LISTER LOUISIANA REPAIR<br>311175093<br>1381758704<br>BARKSDAL AFBFCU LA<br>20211220MMQFMP9H001068<br>20211220QMGFNP75001364<br>12201220FT01 | 1,600.00- |
| 12/20 | Wire Transfer Debit<br>PAUL NIZER<br>026009593<br>446016122976<br>UNITED STATES<br>BK AMER NYC<br>20211220MMQFMP9H001062<br>20211220B6B7HU2R009358<br>12201219FT01 | 8,730.00- |
| 12/20 | Transfer to DDA<br>Acct No.    20002254093-D | 1,577.72- |
| 12/20 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/20 | Account Analysis Charge | 1,100.29- |
| 12/21 | From DDA *4085,To DDA *4063 | 135.44- |
| 12/21 | From DDA *4085,To DDA *4063 | 227.16- |
| 12/21 | Transfer to DDA<br>Acct No.    20002254093-D | 5,231.13- |
| 12/21 | QR PAYMENT CBKCCOMM CARD<br>WEB | 8,000.00- |
| 12/22 | Wire Transfer Debit<br>JD SAC CONSULTING<br>026009593<br>334069075349<br>2440 Sandy Plains Rd Suite 28-<br>Marietta GA 30066 UNITED STATE<br>BK AMER NYC<br>20211222MMQFMP9H001604<br>20211222B6B7HU2R012727<br>12221325FT01 | 26,294.40- |
| 12/22 | Transfer to DDA<br>Acct No.    20002254093-D | 1,521.46- |
| 12/22 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number ******4085**

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|-------:|
| 12/22 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 12/22 | From DDA *4085,To DDA *7404 | 50,000.00- |
| 12/23 | Wire Transfer Debit<br>ECOTALITY INC<br>121000248.<br>8771981993<br>605 LINCOLN ROAD<br>SUITE 500<br>MIAMI BEACH, FL. 33139 UNITED<br>WELLS FARGO NA<br>20211223MMQFMP9H000981<br>20211223I1B7032R012864<br>12231149FT01 | 3,509.74- |
| 12/23 | EPAY    CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 12/23 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 12/23 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 12/23 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 12/24 | From DDA *4085,To DDA *4077 | 200.00- |
| 12/27 | Transfer to DDA<br>Acct No.   20002254093-D | 761.41- |
| 12/27 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 12/27 | QR PAYMENT CBKCCOMM CARD<br>WEB | 9,000.00- |
| 12/28 | From DDA *4085,To DDA *4255 | 1,000.00- |
| 12/28 | QR PAYMENT CBKCCOMM CARD<br>WEB | 4,000.00- |
| 12/28 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 12/29 | Wire Transfer Debit<br>ECOTALITY INC<br>121000248<br>8771981993<br>605 LINCOLN ROAD<br>SUITE 500<br>MIAMI BEACH, FL. 33139 UNITED<br>WELLS FARGO NA<br>20211229MMQFMP9H000745<br>20211229I1B7031R012794<br>12291136FT01 | 216.00- |
| 12/29 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 2,500.00- |
| 12/29 | EPAY    CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 12/29 | From DDA *4085,To DDA *7404 | 2,500.00- |
| 12/29 | QR PAYMENT CBKCCOMM CARD<br>WEB | 2,900.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21          Page 10 of 17

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number ******4085

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 12/29 | Transfer to DDA | 332,052.40- |
|  | Acct No.    20002254093-D |  |
| 12/30 | Wire Transfer Debit. | 2,543.00- |
|  | LOWELL LISTER LOUISIANA REPAIR |  |
|  | 311175093 |  |
|  | 1361758704 |  |
|  | BARKSDAL AFBCU LA |  |
|  | 20211230MMQFMP9H001549 |  |
|  | 20211230QMGFNP69001443 |  |
|  | 12301253FT01 |  |
| 12/31 | Checkr, In Checkr, Inc Chec | 986.70- |
|  | CCD   ADVANCED POWER TECHNOL |  |
| 12/31 | Transfer to DDA | 15,232.30- |
|  | Acct No.    20002254093-D |  |

## CHECKS IN NUMERICAL ORDER

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 12/07 | 4566 | 9.60 | 12/07 | 4910 | 200.00 | 12/14 | 4933 | 1,561.73 |
| 12/07 | 4700* | 3,150.00 | 12/06 | 4911 | 650.00 | 12/16 | 4961* | 2,750.00 |
| 12/02 | 4704* | 255.15 | 12/09 | 4912 | 1,000.00 | 12/16 | 4968* | 5,230.00 |
| 12/08 | 4710* | 1,000.00 | 12/23 | 4913 | 1,200.00 | 12/16 | 4979* | 6,951.00 |
| 12/13 | 4715* | 4,710.48 | 12/09 | 4915* | 500.00 | 12/31 | 4981* | 4,000.00 |
| 12/01 | 4716 | 1,188.10 | 12/24 | 4916 | 848.66 | 12/17 | 4990* | 58.00 |
| 12/01 | 4858* | 330.00 | 12/01 | 4918* | 112.76 | 12/23 | 4992* | 112.00 |
| 12/01 | 4865* | 9,712.50 | 12/06 | 4919 | 750.01 | 12/20 | 4993 | 75.00 |
| 12/02 | 4886* | 1,596.00 | 12/01 | 4920 | 100.00 | 12/13 | 4995* | 1,430.00 |
| 12/01 | 4894* | 3,000.00 | 12/13 | 4922* | 1,200.00 | 12/22 | 4996 | 50.57 |
| 12/01 | 4898* | 2,915.75 | 12/10 | 4923 | 60.00 | 12/28 | 4997 | 137.50 |
| 12/13 | 4902* | 2,606.22 | 12/01 | 4924 | 580.00 | 12/15 | 4999* | 125.00 |
| 12/03 | 4903 | 1,030.00 | 12/02 | 4925 | 375.00 | 12/21 | 5001* | 1,829.65 |
| 12/06 | 4904 | 350.00 | 12/13 | 4926 | 9,353.34 | 12/21 | 5002 | 158.40 |
| 12/31 | 4905 | 40.00 | 12/07 | 4928* | 1,584.50 | 12/21 | 5003 | 2,222.56 |
| 12/02 | 4906 | 750.00 | 12/31 | 4929 | 112.00 | 12/21 | 5004 | 262.00 |
| 12/16 | 4907 | 950.00 | 12/21 | 4930 | 1,343.97 | 12/21 | 5005 | 500.00 |
| 12/06 | 4908 | 850.00 | 12/21 | 4931 | 887.76 | 12/21 | 5006 | 1,942.00 |
| 12/01 | 4909 | 1,213.78 | 12/10 | 4932 | 7,760.00 | 12/29 | 5011* | 180.65 |

(*) Check Numbers Missing

## DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/01 | 123,556.50 | 12/10 | 75,776.48 | 12/21 | .00 |
| 12/02 | 102,941.68 | 12/13 | 37,027.84 | 12/22 | 167,133.57 |
| 12/03 | 34,315.54 | 12/14 | 11,015.29 | 12/23 | 144,811.83 |
| 12/06 | 4,324.81 | 12/15 | 6,128.88 | 12/24 | 143,763.17 |
| 12/07 | 5,120.94 | 12/16 | 869.58 | 12/27 | 129,001.76 |
| 12/08 | 225,570.25 | 12/17 | 823.08 | 12/28 | 118,864.26 |
| 12/09 | 202,968.42 | 12/20 | 7,740.07 | 12/29 | 182,015.21 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000626



STATEMENT OF ACCOUNT

Date 12/31/21       Page 11 of 17

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number ******4085**

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| 12/30 | 179,472.21 | 12/31 | 172,554.82 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000627

# EEDS

# 12/31/21 Bank Statement

# IBERIABANK

STATEMENT OF ACCOUNT

Date 12/31/21        Page 1 of 3

TO PO 145635-22-23-1 - 13483

ENERGY AND ENVIRONMENTAL DESIGN SERVICES
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069

013483





PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL
1-800-968-0801



24-hr Online Banking
iberiabank.com

---

**FREE BUSINESS CHECKING**                           **ACCOUNT NUMBER ******7404**

| | | | |
|---|---|---|---|
| Previous Balance | 31,158.68 | Statement Dates | 12/01/21 thru 12/31/21 |
| 5 Deposits/Credits | 187,500.00 | Days this Statement Period | 31 |
| 16 Checks/Debits | 169,593.14 | Average Ledger Balance | 35,866.46 |
| Service Charge | .00 | Average Collected Balance | 35,866.46 |
| Interest Paid | .00 | | |
| Current Balance | 49,065.54 | | |

---

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 12/08 | From DDA *4085,To DDA *7404 | 15,000.00 |
| 12/15 | Wire Transfer Credit | 50,000.00 |
| | STANLEY GRANDIS TUA FBO | |
| | DEVIN GRANDIS UAD 10212010 | |
| | 801 NE 167TH ST STE 306 | |
| | NORTH MIAMI BEACH FL 33162-372 | |
| | 20211215F1QCZ68C006119 | |
| | 20211215MMQFMP9H001592 | |
| | 12151549FT01 | |
| 12/17 | Wire Transfer Credit | 70,000.00 |
| | STANLEY GRANDIS TUA FBO | |
| | DEVIN GRANDIS UAD 10212010 | |
| | 801 NE 167TH ST STE 306 | |
| | NORTH MIAMI BEACH FL 33162-372 | |
| | 20211217F1QCZ68C007145 | |
| | 20211217MMQFMP9H001924 | |
| | 12171650FT01 | |
| 12/22 | From DDA *4085,To DDA *7404 | 50,000.00 |
| 12/29 | From DDA *4085,To DDA *7404 | 2,500.00 |

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 12/06 | From DDA *7404,To DDA *4255 | 8,485.76- |
| 12/07 | From DDA *7404,To DDA *4085 | 15,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000213

# IBERIABANK

Page 2 of 3

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

**CHECKS OUTSTANDING-NOT CHARGED TO ACCOUNT**

| No. | $ | |
|-----|---|---|
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
|     |   |   |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

**BANK BALANCE SHOWN ON THIS STATEMENT** $ _____

### ADD

**DEPOSITS NOT SHOWN ON THIS STATEMENT (IF ANY)** $ _____

### TOTAL $ _____

### SUBTRACT—

**CHECKS OUTSTANDING** $ _____

### BALANCE $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your check register all automatic transactions, such as charges and interest earned, shown on the front of this statement.

**Member FDIC**


EQUAL HOUSING LENDER

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 12/31/21          Page 3 of 3

---

**FREE BUSINESS CHECKING (continued)**                    Account Number * * * * * *7404

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 12/15 | From DDA *7404,To DDA *4085 | 15,000.00- |
| 12/15 | Wire Transfer Fee | 15.00- |
| 12/16 | From DDA *7404,To DDA *4085 | 10,000.00- |
| 12/16 | From DDA *7404,To DDA *4085 | 40,000.00- |
| 12/17 | Wire Transfer Debit | 7,400.00- |
|  | Global Cash Card Clearing Acco | |
|  | 273970110 | |
|  | 1700016652 | |
|  | 7 Corporate Park, Suite 130 | |
|  | Irvine, CA 92606 | |
|  | 890 Advanced Power Tech LLC  T | |
|  | METABANK NA | |
|  | 890_Advanced Power Technologie | |
|  | Travel Program | |
|  | 20211217MMQFMP9H003086 | |
|  | 20211217GMQFMP01036812 | |
|  | 12171603FT01 | |
| 12/17 | From DDA *7404,To DDA *4085 | 15,000.00- |
| 12/17 | Wire Transfer Fee | 10.00- |
| 12/17 | Wire Transfer Fee | 15.00- |
| 12/20 | From DDA *7404,To DDA *4085 | 25,000.00- |
| 12/21 | From DDA *7404,To DDA *4085 | 15,000.00- |
| 12/22 | From DDA *7404,To DDA *4085 | 15,000.00- |
| 12/24 | NTCLBIIVRC THE HARTFORD CCD   ENERGY AND ENVIRONMENT | 1,157.38- |
| 12/28 | Wire Transfer Debit | 2,500.00- |
|  | Global Cash Card Clearing Acco | |
|  | 273970110 | |
|  | 1700016652 | |
|  | 7 Corporate Park, Suite 130 | |
|  | Irvine, CA 92606 | |
|  | 890 Advanced Power Tech LLC  T | |
|  | METABANK NA | |
|  | 890_Advanced Power Technologie | |
|  | Travel Program | |
|  | 20211228MMQFMP9H001447 | |
|  | 20211228GMQFMP01024541 | |
|  | 12281505FT01 | |
| 12/28 | Wire Transfer Fee | 10.00- |

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/01 | 31,158.68 | 12/16 | 7,657.92 | 12/24 | 49,075.54 |
| 12/06 | 22,672.92 | 12/17 | 55,232.92 | 12/28 | 46,565.54 |
| 12/07 | 7,672.92 | 12/20 | 30,232.92 | 12/29 | 49,065.54 |
| 12/08 | 22,672.92 | 12/21 | 15,232.92 | | |
| 12/15 | 57,657.92 | 12/22 | 50,232.92 | | |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct   All items are credited subject to final payment.

00000215

# APT

# 1/31/22 Bank Statement

# iBERIABANK

STATEMENT OF ACCOUNT

Date 1/31/22          Page 1 of 28



**PLEASE CONTACT YOUR RELATIONSHIP MANAGER WITH ANY QUESTIONS OR CALL**

1-800-968-0801



24-hr Online Banking

iberiabank.com

ADVANCED POWER TECHNOLOGIES LLC
DIP 20-13304
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069

## COMMERCIAL CHECKING ANALYSIS

ACCOUNT NUMBER ******4085

| | | | |
|---|---|---|---|
| Previous Balance | 172,554.82 | Statement Dates | 1/01/22 thru 1/31/22 |
| 16 Deposits/Credits | 2,830,121.48 | Days this Statement Period | 31 |
| 258 Checks/Debits | 2,431,504.06 | Average Ledger Balance | 323,828.39 |
| Service Charge | .00 | Average Collected Balance | 322,863.61 |
| Interest Paid | .00 | | |
| Current Balance | 571,172.24 | | |

## DEPOSITS AND CREDITS

| Date | Description | Amount |
|---|---|---|
| 1/06 | Wire Transfer Credit | 240,000.00 |
| | ADVANCED POWER TECHNOLOGIES LL | |
| | 1500 N POWERLINE RD | |
| | POMPANO BEACH FL 33069-1621 | |
| | 20220106GMQFMP01020493 | |
| | 20220106MMQFMP9H001068 | |
| | 01061522FT01 | |
| 1/07 | Wire Transfer Credit | 200,000.00 |
| | BGIS GLOBAL INTEGRATED SOLUTIO | |
| | 4175 FOURTEENTH AVENUE, MARKHA | |
| | ARIO, CANADA, L3R 0J2 | |
| | APT AS FLOAT - FUNDING REQUIRE | |
| | 2022-007W-CITI | |
| | 20220107MMQFMPYZ004410 | |
| | 20220107MMQFMP9H000046 | |
| | 01070213FT01 | |
| 1/11 | Wire Transfer Credit | 569,000.00 |
| | ADVANCED POWER TECHNOLOGIES LL | |
| | 1500 N POWERLINE RD | |
| | POMPANO BEACH FL 33069-1621 | |
| | 20220111GMQFMP01006988 | |
| | 20220111MMQFMP9H000520 | |
| | 01111133FT01 | |
| 1/12 | Deposit | 23.88 |
| 1/12 | Deposit | 446.25 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the statement will be considered correct.  All items are credited subject to final payment.

00000263

# iBERIABANK

Page 2 of 28

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | | |
|-----|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| TOTAL |  |  |  |

Please examine immediately and report if incorrect. If no reply is
received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                           $ _____

### ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                             $ _____

### TOTAL                                          $ _____

### SUBTRACT—

CHECKS OUTSTANDING                      $ _____

### BALANCE                                      $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

### NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

---

**Member**
**FDIC**

**In Case of Errors or Questions About Your Electronic Transfers**
TELEPHONE US AT: 1-800-682-3231 OR
WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299


EQUAL HOUSING
LENDER

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.
We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits. This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge." Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account. On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract. The minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating). "New Balance" means the total outstanding balance of your line on any cycle closing date which includes principal. If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly. The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account. If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting. Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
• Your name and account number.
• The dollar amount of the suspected error.
• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22          Page 3 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|------|-------------|-------:|
| 1/12 | Deposit | 497.35 |
| 1/18 | Wire Transfer Credit | 225,515.00 |
|      | ADVANCED POWER TECHNOLOGIES LL | |
|      | 1500 N POWERLINE RD | |
|      | POMPANO BEACH FL 33069-1621 | |
|      | 20220118GMQFMP01006571 | |
|      | 20220118MMQFMP9H000802 | |
|      | 01181035FT01 | |
| 1/20 | Wire Transfer Credit | 130,984.00 |
|      | ADVANCED POWER TECHNOLOGIES LL | |
|      | 1500 N POWERLINE RD | |
|      | POMPANO BEACH FL 33069-1621 | |
|      | 20220120GMQFMP01011568 | |
|      | 20220120MMQFMP9H000742 | |
|      | 01201219FT01 | |
| 1/24 | Wire Transfer Credit | 106,671.00 |
|      | ADVANCED POWER TECHNOLOGIES LL | |
|      | 1500 N POWERLINE RD | |
|      | POMPANO BEACH FL 33069-1621 | |
|      | 20220124GMQFMP01004904 | |
|      | 20220124MMQFMP9H000422 | |
|      | 01241030FT01 | |
| 1/25 | Deposit | 88.89 |
| 1/25 | Deposit | 489.93 |
| 1/25 | Deposit | 1,454.78 |
| 1/26 | Wire Transfer Credit | 142,177.00 |
|      | ADVANCED POWER TECHNOLOGIES LL | |
|      | 1500 N POWERLINE RD | |
|      | POMPANO BEACH FL 33069-1621 | |
|      | 20220126GMQFMP01007518 | |
|      | 20220126MMQFMP9H000562 | |
|      | 01261127FT01 | |
| 1/26 | Wire Transfer Credit | 300,000.00 |
|      | BGIS GLOBAL INTEGRATED SOLUTIO | |
|      | 4175 FOURTEENTH AVENUE, MARKHA | |
|      | ARIO, CANADA, L3R 0J2 | |
|      | FUNDING APT AS FLOAT | |
|      | 2022-044W-CITI | |
|      | 20220126MMQFMPYZ010424 | |
|      | 20220126MMQFMP9H000379 | |
|      | 01261014FT01 | |
| 1/28 | Wire Transfer Credit | 900,000.00 |
|      | BGIS GLOBAL INTEGRATED SOLUTIO | |
|      | 4175 FOURTEENTH AVENUE, MARKHA | |
|      | ARIO, CANADA, L3R 0J2 | |
|      | FUNDING APT AS FLOAT | |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000765

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22     Page 4 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number * * * * * * * 4085

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|------|------------|--------|
|      | 2022-053W-CITI | |
|      | 20220128MMQFMPYZ022855 | |
|      | 20220128MMQFMP9H001484 | |
|      | 01281518FT01 | |
| 1/31 | From DDA *4063,To DDA *4085 | 12,773.40 |

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|------------|--------|
| 1/03 | Wire Transfer Debit | 2,500.00- |
|      | Global Cash Card Clearing Acco | |
|      | 273970116 | |
|      | 1700016652 | |
|      | 7 Corporate Park, Suite 130 | |
|      | Irvine, CA 92606 | |
|      | 890 Advanced Power Tech LLC T | |
|      | METABANK NA | |
|      | 890_Advanced Power Technologie | |
|      | Travel Program | |
|      | 20220103MMQFMP9H001793 | |
|      | 20220103GMQFMP01028220 | |
|      | 01031609FT01 | |
| 1/03 | Transfer to DDA | 2,387.03- |
|      | Acct No.    20002254093-D | |
| 1/03 | From DDA *4085,To DDA *4039 | 11,538.46- |
| 1/04 | UTILITYBIL TECO/PEOPLE GAS | 180.08- |
|      | WEB | |
| 1/04 | Transfer to DDA | 711.60- |
|      | Acct No.    20002254093-D | |
| 1/04 | INTERNET   WASTE MANAGEMENT | 1,292.95- |
|      | WEB | |
| 1/04 | EPAY     CHASE CREDIT CRD | 5,000.00- |
|      | WEB | |
| 1/04 | ACH PMT   AMEX EPAYMENT | 17,000.00- |
|      | CCD   Advanced Power Tech | |
| 1/05 | CREDITCARD BARCLAYCARD US | 250.00- |
|      | WEB | |
| 1/05 | CCPYMT   WELLS FARGO CARD | 250.00- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 401.93- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 413.58- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 476.24- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 499.36- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 500.59- |
|      | WEB | |
| 1/05 | BILL PYMNT ACHMA VISB | 506.12- |
|      | WEB | |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000265

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22          · Page 5 of 28

---

**COMMERCIAL CHECKING ANALYSIS (continued)**                    Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 547.97- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 551.63- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 554.39- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 569.73- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 618.54- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 745.65- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 760.04- |
| 1/05 | BT0104   GEXPRO<br>CCD  Advanced Power Technol | 1,112.64- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 1,270.96- |
| 1/05 | BILL PYMNT ACHMA VISB<br>WEB | 2,314.09- |
| 1/05 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/05 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/06 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220106MMQFMP9H001897<br>20220106GMQFMP01027674<br>01061619FT01 | 10,000.00- |
| 1/06 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 2,000.00- |
| 1/06 | Transfer to DDA<br>Acct No.   20002254093-D | 4,936.86- |
| 1/07 | Wire Transfer Debit<br>THE BRIGHTER CHOICE SE LLC<br>061100606<br>1012030357<br>UNITED STATES<br>SYNOVUS BANK<br>20220107MMQFMP9H000295<br>20220107F1QCZ70C000491<br>01070933FT01 | 21,405.00- |
| 1/07 | Transfer to DDA<br>Acct No.   20002254093-D | 1,330.73- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

C00000767

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22          Page 6 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number ******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/07 | ACH PMT AMEX EPAYMENT<br>CCD Advanced Power Tech | 5,000.00- |
| 1/07 | ACH PMT AMEX EPAYMENT<br>CCD Advanced Power Tech | 10,000.00- |
| 1/07 | EPAY CHASE CREDIT CRD<br>WEB | 10,000.00- |
| 1/07 | QR PAYMENT CBKCCOMM CARD<br>WEB | 10,000.00- |
| 1/07 | From DDA *4085,To DDA *4255 | 24,382.40- |
| 1/07 | From DDA *4085,To DDA *4063 | 65,619.86- |
| 1/10 | Wire Transfer Debit<br>ller Group, Inc.<br>026009593<br>003679561595<br>UNITED STATES<br>BK AMER NYC<br>20220110MMQFMP9H000685<br>20220110B6B7HU4R006988<br>01101149FT01 | 6,372.62- |
| 1/10 | EPAY CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/10 | QR PAYMENT CBKCCOMM CARD<br>WEB | 8,000.00- |
| 1/10 | From DDA *4085,To DDA *4077 | 34,807.99- |
| 1/10 | From DDA *4085,To DDA *4255 | 46,567.84- |
| 1/10 | INS PYMT HUMANA, INC.<br>PPD | 48,170.14- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 3.49- |
| 1/11 | UTILITYBIL TECO/PEOPLE GAS<br>WEB | 58.73- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 137.72- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 137.72- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 232.72- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 386.97- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 522.27- |
| 1/11 | EPAY CHASE CREDIT CRD<br>WEB | 1,000.00- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 1,104.37- |
| 1/11 | INTERNET WASTE MANAGEMENT<br>WEB | 1,111.53- |
| 1/11 | From DDA *4085,To DDA *4077 | 2,600.00- |
| 1/11 | ACH PMT AMEX EPAYMENT<br>CCD Advanced Power Tech | 5,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000768

# IBERIABANK

STATEMENT OF ACCOUNT

Date 1/31/22          Page 7 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)          Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/11 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/11 | Transfer to DDA<br>Acct No.     20002254093-D | 7,388.67- |
| 1/11 | QR PAYMENT CBKCCOMM CARD<br>WEB | 10,000.00- |
| 1/12 | Wire Transfer Debit<br>MATHEW ERICKSON<br>121000248<br>3548594807<br>23173 DAHLIA ST NW<br>ST FRANCIS MN 55070 UNITED STA<br>WELLS FARGO NA<br>20220112MMQFMP9H001218<br>20220112I1B7032R015388<br>01121347FT01 | 955.00- |
| 1/12 | Wire Transfer Debit<br>VALERA LIGHTING SERVICES, LLC<br>072000326<br>716867178<br>UNITED STATES<br>JPMCHASE MICHIGAN<br>20220112MMQFMP9H001224<br>20220112B1QGC01R053886<br>01121348FT01 | 8,638.26- |
| 1/12 | Wire Transfer Debit<br>MACIAS LIGHTING INC<br>121000248<br>1010096477775<br>UNITED STATES<br>WELLS FARGO NA<br>20220112MMQFMP9H001221<br>20220112I1B7032R015399<br>01121348FT01 | 34,744.00- |
| 1/12 | Wire Transfer Debit<br>FOX VALLEY ELECTRIC & LIGHTING<br>071000013<br>193827111<br>PO BOX 1660<br>MCHENRY, IL 60051 UNITED STATE<br>JPMCHASE ILLINOIS<br>20220112MMQFMP9H001215<br>20220112B1QGC01R053765<br>01121347FT01 | 35,354.77- |
| 1/12 | Wire Transfer Debit<br>SOUTHWEST FLORIDA LIGHTING & E<br>121000248<br>8113549359<br>4340 LORRAINE AVE<br>NAPLES, FL 34104 UNITED STATES<br>WELLS FARGO NA<br>20220112MMQFMP9H000101<br>20220112I1B7033R006131<br>01120926FT01 | 56,323.70- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22        Page 8 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/12 | COPB UTILI CITY OF POMPANO<br>CCD   ADVANCED POWER TECHNOL | 266.56- |
| 1/12 | ELEC PYMT  FPL DIRECT DEBIT<br>WEB | 1,546.59- |
| 1/12 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/12 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/12 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/12 | PURCHASE   RHTECHNOLOGYSOLU<br>CCD   ADVANCED POWER TECHNOL | 8,724.73- |
| 1/12 | EPAY     WWEX Franchise H<br>CCD   APT POMPANO FL | 11,538.15- |
| 1/12 | Transfer to DDA<br>Acct No.   20002254093-D | 290,849.74- |
| 1/13 | EPAY     CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 1/13 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/13 | QR PAYMENT CBKCCOMM CARD<br>WEB | 8,000.00- |
| 1/14 | Wire Transfer Debit<br>LOWELL LISTER LOUISIANA REPAIR<br>311175093<br>1381758704<br>BARKSDAL AFBFCU LA<br>20220114MMQFMP9H000414<br>20220114QMGFNP72000828<br>01141016FT01 | 1,060.00- |
| 1/14 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220114MMQFMP9H002158<br>20220114GMQFMP01029432<br>01141449FT01 | 4,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22          Page 9 of 28

---

**COMMERCIAL CHECKING ANALYSIS (continued)**                 Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/14 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220114MMQFMP9H001633<br>20220114GMQFMP01024535<br>01141334FT01 | 5,000.00- |
| 1/14 | EPAY    CHASE CREDIT CRD<br>WEB | 1,000.00- |
| 1/14 | Transfer to DDA<br>Acct No.    20002254093-D | 1,881.38- |
| 1/14 | QR PAYMENT CBKCCOMM CARD<br>WEB | 6,000.00- |
| 1/18 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220118MMQFMP9H001704<br>20220118GMQFMP01027634<br>01181302FT01 | 5,000.00- |
| 1/18 | PAYMENTREQ SUN LIFE CANADA<br>CCD   ADVANCED POWER TECH | 963.79- |
| 1/18 | PAYMENTREQ SUN LIFE CANADA<br>CCD   ADVANCED POWER TECH. | 1,830.83- |
| 1/18 | From DDA *4085,To DDA *4077 | 2,500.00- |
| 1/18 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/18 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/18 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/18 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 1/18 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/18 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/18 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/18 | From DDA *4085,To DDA *4063 | 6,410.71- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

STATEMENT OF ACCOUNT

Date 1/31/22        Page 10 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)        Account Number *******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/18 | Transfer to DDA<br>Acct No.    20002254093-D | 18,262.86- |
| 1/19 | PPDFUNDING AMERIFLEX<br>PPD | 40.00- |
| 1/19 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/19 | ACH PMT    AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/19 | Transfer to DDA<br>Acct No.    20002254093-D | 6,837.01- |
| 1/19 | QR PAYMENT CBKCCOMM CARD<br>WEB | 8,000.00- |
| 1/20 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890  Advanced Power Technologie<br>Travel Program<br>20220120MMQFMP9H001120<br>20220120GMQFMP01019685<br>01201314FT01 | 2,500.00- |
| 1/20 | PAYMENTREQ SUN LIFE CANADA<br>CCD   ADVANCED POWER TECH. | 250.28- |
| 1/20 | Transfer to DDA<br>Acct No.    20002254093-D | 1,087.77- |
| 1/20 | EPAY     CHASE CREDIT CRD<br>WEB | 3,500.00- |
| 1/20 | ACH PMT    AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/20 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 1/20 | Account Analysis Charge | 1,386.55- |
| 1/21 | Wire Transfer Debit<br>EPIPHANY LIGHTING LLC DBA BLUE<br>021000021<br>755609952<br>UNITED STATES<br>JPMCHASE<br>20220121MMQFMP9H001656<br>20220121B1QGC01R063851<br>01211435FT01 | 6,000.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000772

# iBERIABANK

STATEMENT OF ACCOUNT

Date 1/31/22          Page 11 of 28

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number *******4085

## WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|------|-------------|--------|
| 1/21 | Wire Transfer Debit<br>Instel Power Services, Inc.<br>053208011<br>0045880<br>303 Greer Drive<br>Simpsonville, SC 29681<br>UNITED STATES<br>SOUTHERN FIRST BK<br>20220121MMQFMP9H001655<br>20220121MMQFMPHA000125<br>01211434FT01 | 20,000.00- |
| 1/21 | Wire Transfer Debit<br>H&E EQUIPMENT SERVICES INC<br>026009593<br>3752208209<br>7500 PECUE LANE<br>BATON ROUGE LA 70809-5107<br>UNITED STATES<br>BK AMER NYC<br>20220121MMQFMP9H001652<br>20220121B6B7HU3R011499<br>01211434FT01 | 25,000.00- |
| 1/21 | Wire Transfer Debit<br>AHERN RENTALS, INC.<br>026009593<br>3752209787<br>1401 Mineral Ave<br>Las Vegas, NV 89106 UNITED STA<br>BK AMER.NYC<br>20220121MMQFMP9H001644<br>20220121B6B7HU4R011493<br>01211433FT01 | 27,327.10- |
| 1/21 | Wire Transfer Debit<br>THE MAINTENANCE TEAM, INC.<br>084000026<br>220000910707<br>4015 Shopton Road, Suite 400,<br>Charlotte, NC 28217 UNITED STA<br>FIRST HORIZON BANK<br>20220121MMQFMP9H001687<br>20220121MMQFMPWQ001386<br>01211441FT01 | 40,000.89- |
| 1/21 | Wire Transfer Debit<br>The Leviton Law Firm LTD  IOLT<br>071901604<br>8100729733<br>UNITED STATES<br>FIRST MIDWEST BANK<br>20220121MMQFMP9H001649<br>20220121G1B7231C000327<br>01211433FT01 | 70,000.00- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000773

# iBERIABANK

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                         Account Number ∗∗∗∗∗∗∗4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 1/21 | Wire Transfer Debit<br>SUNBELT RENTALS INC<br>026009593<br>3751929738<br>2341 DEERFIELD DR<br>FORT MILL SC 29715 UNITED STAT<br>BK AMER NYC<br>20220121MMQFMP9H001683<br>20220121B6B7HU3R011653<br>01211441FT01 | 80,000.00- |
| 1/21 | EPAY      CHASE CREDIT CRD<br>WEB | 2,500.00- |
| 1/21 | QR PAYMENT CBKCCOMM CARD<br>WEB | 8,000.00- |
| 1/24 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220124MMQFMP9H000105<br>20220124GMQFMP01007232<br>01240913FT01 | 2,500.00- |
| 1/24 | ALLY PAYMT ALLY<br>CCD  Advanced Power Tec | 27.54- |
| 1/24 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 1/24 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 1/24 | EPAY      CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/24 | ACH PMT   AMEX EPAYMENT<br>CCD  Advanced Power Tech | 8,000.00- |
| 1/25 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220125MMQFMP9H000586<br>20220125GMQFMP01010809<br>01251058FT01 | 3,000.00- |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22          Page 13 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    **Account Number * * * * * * *4085**

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|------|-------------|--------|
| 1/25 | Wire Transfer Debit<br>SOUTHWEST FLORIDA LIGHTING & E<br>121000248<br>8113549359<br>4340 LORRAINE AVE<br>NAPLES, FL 34104 UNITED STATES<br>WELLS FARGO NA<br>20220125MMQFMP9H001734<br>20220125I1B7032R017443<br>01251507FT01 | 6,725.40- |
| 1/25 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/25 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/25 | QR PAYMENT CBKCCOMM CARD<br>WEB | 7,000.00- |
| 1/26 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220126MMQFMP9H000512<br>20220126GMQFMP01012045<br>01261107FT01 | 5,000.00- |
| 1/26 | QR PAYMENT CBKCCOMM CARD<br>WEB | 2,500.00- |
| 1/26 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/26 | Transfer to DDA<br>Acct No.    20002254093-D | 374,848.27- |
| 1/27 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/27 | ACH PMT   AMEX EPAYMENT<br>CCD   Advanced Power Tech | 5,000.00- |
| 1/27 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 1/28 | Wire Transfer Debit<br>LOWELL LISTER LOUISIANA REPAIR<br>311175093<br>1381758701<br>UNITED STATES LA<br>BARKSDAL AFBFCU LA<br>20220128MMQFMP9H001192<br>20220128QMGFNP62001238<br>01281201FT01 | 1,200.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

# iBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22    Page 14 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)    Account Number ******4085

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 1/28 | Wire Transfer Debit<br>JD SAC CONSULTING<br>026009593<br>334069075349<br>2440 Sandy Plains Rd Suite 28-<br>Marietta GA 30066 UNITED STATE<br>BK AMER NYC<br>20220128MMQFMP9H001782<br>20220128B6B7HU4R012173<br>01281342FT01 | 6,500.00- |
| 1/28 | PARKING TK NYC FINANCE<br>CCD  ADVANCED POWER TECHNOL | 76.09- |
| 1/28 | ACH PMT  AMEX EPAYMENT<br>CCD  Advanced Power Tech | 5,000.00- |
| 1/28 | QR PAYMENT CBKCCOMM CARD<br>WEB | 5,000.00- |
| 1/28 | EPAY    CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/28 | Transfer to DDA<br>Acct No.  20002254093-D | 12,987.98- |
| 1/31 | Wire Transfer Debit<br>Global Cash Card Clearing Acco<br>273970116<br>1700016652<br>7 Corporate Park, Suite 130<br>Irvine, CA 92606<br>890 Advanced Power Tech LLC  T<br>METABANK NA<br>890_Advanced Power Technologie<br>Travel Program<br>20220131MMQFMP9H001815<br>20220131GMFMP01027662<br>01311402FT01 | 5,000.00- |
| 1/31 | Wire Transfer Debit<br>Halco Lighting Technologies LL<br>121000248<br>4774405963<br>2940 Pacific Dr.,<br>Norcross, GA 30071 UNITED STAT<br>WELLS FARGO NA<br>20220131MMQFMP9H002253<br>20220131I1B7032R032338<br>01311509FT01 | 12,773.40- |
| 1/31 | Wire Transfer Debit<br>SOUTHWEST FLORIDA LIGHTING & E<br>121000248<br>8113549359<br>4340 LORRAINE AVE<br>NAPLES, FL 34104 UNITED STATES<br>WELLS FARGO NA<br>20220131MMQFMP9H002770<br>20220131I1B7032R037194<br>01311625FT01 | 159,195.95- |
| 1/31 | COPB UTILI CITY OF POMPANO<br>CCD  ADVANCED POWER TECHNOL | 246.58- |

---

Please examine this statement upon receipt and report at once if you find any difference.<br>If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000776

# IBERIABANK

**STATEMENT OF ACCOUNT**

Date 1/31/22        Page 15 of 28

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                    Account Number ＊＊＊＊＊＊＊4085

### WITHDRAWALS AND DEBITS

| Date | Description | Amount |
|---|---|---|
| 1/31 | Checkr, In Checkr, Inc Chec<br>CCD   ADVANCED POWER TECHNOL | 502.50- |
| 1/31 | Transfer to DDA<br>Acct No.    20002254093-D | 1,431.77- |
| 1/31 | EPAY     CHASE CREDIT CRD<br>WEB | 5,000.00- |
| 1/31 | From DDA *4085,To DDA *4255 | 93,029.60- |
| 1/31 | From DDA *4085,To DDA *4063 | 192,437.35- |

### CHECKS IN NUMERICAL ORDER

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|---|---|---|---|---|---|---|---|---|
| 1/20 | 4474 | 6.29 | 1/20 | 4974 | 426.25 | 1/14 | 5036 | 207.00 |
| 1/07 | 4815* | 1,555.50 | 1/19 | 4976* | 225.00 | 1/19 | 5037 | 107.00 |
| 1/04 | 4917* | 500.00 | 1/10 | 4977 | 3,524.75 | 1/18 | 5038 | 101.54 |
| 1/12 | 4936* | 435.00 | 1/11 | 4980* | 1,500.00 | 1/18 | 5039 | 2,314.41 |
| 1/10 | 4938* | 2,485.20 | 1/10 | 4982* | 7,623.26 | 1/18 | 5040 | 45.69 |
| 1/07 | 4939 | 2,144.41 | 1/12 | 4983 | 2,087.52 | 1/19 | 5041 | 2,109.41 |
| 1/07 | 4940 | 138.87 | 1/19 | 4984 | 1,555.12 | 1/24 | 5042 | 422.49 |
| 1/14 | 4941 | 1,472.09 | 1/18 | 4985 | 4,373.48 | 1/21 | 5043 | 4,685.60 |
| 1/10 | 4942 | 237.83 | 1/07 | 4987* | 690.05 | 1/21 | 5044 | 725.00 |
| 1/12 | 4943 | 185.80 | 1/03 | 4998* | 135.00 | 1/19 | 5046* | 627.20 |
| 1/12 | 4944 | 491.51 | 1/05 | 5008* | 1,487.50 | 1/18 | 5047 | 995.42 |
| 1/10 | 4945 | 217.68 | 1/05 | 5010* | 1,445.00 | 1/18 | 5048 | 3,230.06 |
| 1/11 | 4946 | 500.00 | 1/03 | 5012* | 1,359.15 | 1/19 | 5050* | 1,386.00 |
| 1/19 | 4947 | 1,275.00 | 1/05 | 5013 | 1,030.00 | 1/26 | 5051 | 1,100.00 |
| 1/18 | 4948 | 1,156.43 | 1/31 | 5014 | 350.00 | 1/12 | 5052 | 8,576.26 |
| 1/11 | 4949 | 332.81 | 1/24 | 5015 | 40.00 | 1/18 | 5053 | 3,750.17 |
| 1/10 | 4950 | 292.50 | 1/06 | 5016 | 750.00 | 1/18 | 5055* | 4,400.00 |
| 1/31 | 4951 | 15.00 | 1/14 | 5017 | 950.00 | 1/25 | 5056 | 15,601.25 |
| 1/18 | 4952 | 170.00 | 1/06 | 5018 | 850.00 | 1/31 | 5058* | 7,798.97 |
| 1/11 | 4953 | 828.64 | 1/06 | 5019 | 1,000.00 | 1/18 | 5061* | 215.00 |
| 1/12 | 4954 | 160.00 | 1/11 | 5020 | 1,000.00 | 1/18 | 5062 | 50.00 |
| 1/14 | 4956* | 557.50 | 1/20 | 5021 | 1,200.00 | 1/18 | 5065* | 455.00 |
| 1/19 | 4957 | 457.69 | 1/11 | 5022 | 500.00 | 1/18 | 5066 | 14,562.34 |
| 1/10 | 4958 | 22.78 | 1/06 | 5024* | 1,259.00 | 1/12 | 5067 | 12,368.94 |
| 1/10 | 4959 | 94.15 | 1/04 | 5025 | 100.00 | 1/18 | 5068 | 1,982.20 |
| 1/07 | 4960 | 46.74 | 1/04 | 5026 | 60.00 | 1/19 | 5069 | 180.00 |
| 1/07 | 4964* | 560.00 | 1/04 | 5027 | 580.00 | 1/19 | 5071* | 500.00 |
| 1/21 | 4965 | 90.96 | 1/04 | 5028 | 375.00 | 1/12 | 5072 | 147.94 |
| 1/18 | 4966 | 1,574.50 | 1/06 | 5029 | 250.00 | 1/19 | 5073 | 281.31 |
| 1/11 | 4967 | 715.32 | 1/18 | 5030 | 4,573.10 | 1/19 | 5075* | 300.00 |
| 1/11 | 4969* | 351.19 | 1/21 | 5031 | 62.02 | 1/13 | 5076 | 1,430.00 |
| 1/31 | 4970 | 720.81 | 1/18 | 5032 | 498.00 | 1/18 | 5078* | 471.65 |
| 1/26 | 4971 | 209.24 | 1/19 | 5033 | 1,725.00 | 1/27 | 5079 | 150.00 |
| 1/10 | 4972 | 1,391.62 | 1/14 | 5034 | 336.60 | 1/26 | 5080 | 175.00 |
| 1/18 | 4973 | 607.42 | 1/14 | 5035 | 3,937.73 | 1/27 | 5084* | 5,000.00 |

(*) Check Numbers Missing

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct.  All items are credited subject to final payment.

00000777

# IBERIABANK

---

**COMMERCIAL CHECKING ANALYSIS** (continued)                                    Account Number ******4085

---

### CHECKS IN NUMERICAL ORDER

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 1/28 | 5088* | 1,784.23 | 1/31 | 5091* | 1,200.00 | 1/31 | 5097* | 213.66 |

(*) Check Numbers Missing

### DAILY BALANCE INFORMATION

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 1/01 | 172,554.82 | 1/11 | 732,389.66 | 1/21 | 102,280.32 |
| 1/03 | 154,635.18 | 1/12 | 244,962.67 | 1/24 | 182,961.29 |
| 1/04 | 128,835.55 | 1/13 | 228,032.67 | 1/25 | 142,668.24 |
| 1/05 | 102,529.59 | 1/14 | 201,630.37 | 1/26 | 196,012.73 |
| 1/06 | 321,483.73 | 1/18 | 311,369.46 | 1/27 | 175,862.73 |
| 1/07 | 368,610.17 | 1/19 | 276,045.03 | 1/28 | 1,038,314.43 |
| 1/10 | 203,801.81 | 1/20 | 386,671.89 | 1/31 | 571,172.24 |

Please examine this statement upon receipt and report at once if you find any difference.
If no error is reported in 30 days, the account will be considered correct. All items are credited subject to final payment.

00000178

# EEDS

# 2/21/22 Bank Statement



**STATEMENT OF ACCOUNT**

Date 2/18/22                          Page 1 of 3

TO PO 146806-22-14-1 - 16117



016117

ENERGY AND ENVIRONMENTAL DESIGN SERVICES
OPERATING ACCOUNT
1500 NORTH POWERLINE ROAD
POMPANO BEACH FL 33069



016117



**PLEASE CONTACT YOUR
RELATIONSHIP MANAGER
WITH ANY QUESTIONS
OR CALL**

**1-800-968-0801**



24-hr Online Banking
iberiabank.com

---

**FREE BUSINESS CHECKING**                          **ACCOUNT NUMBER *******7404**

| | | | |
|---|---|---|---|
| Previous Balance | 49,065.54 | Statement Dates | 2/01/22 thru 2/21/22 |
| 1 Deposits/Credits | 159,195.95 | Days this Statement Period | 21 |
| 3 Checks/Debits | 136,239.14 | Average Ledger Balance | 148,771.53 |
| Service Charge | .00 | Average Collected Balance | 148,771.53 |
| Interest Paid | .00 | | |
| Current Balance | 72,022.35 | | |

---

**DEPOSITS AND CREDITS**

| Date | Description | Amount |
|---|---|---|
| 2/02 | Wire Transfer Credit | 159,195.95 |
| | SOUTHWEST FLORIDA LIGHTING | |
| | 4340 LORRAINE AVE | |
| | NAPLES, FL 34104-4739 | |
| | LYNMORE | |
| | 20220202I1B7031R010601 | |
| | 20220202MMQFMP9H000793 | |
| | 02021302FT01 | |

---

**WITHDRAWALS AND DEBITS**

| Date | Description | Amount |
|---|---|---|
| 2/02 | Wire Transfer Fee | 15.00 |
| 2/14 | Wire Transfer Debit | 136,214.14- |
| | Coolsys Energy Solutions, LLC | |
| | 021000021 | |
| | 601239517 | |
| | PO Box 1466 | |
| | Savannah GA 31402 UNITED STATE | |
| | JPMCHASE | |
| | Sustainable Management Solutio | |
| | 20220214MMQFMP9H000160 | |
| | 20220214B1QGG01R025521 | |
| | 02140939FT01 | |
| 2/14 | Wire Transfer Fee | 10.00- |

---

Please examine this statement upon receipt and report at once if you find any difference.

# IBERIABANK

## THIS FORM IS PROVIDED TO HELP YOU BALANCE YOUR BANK STATEMENT

CHECKS OUTSTANDING-NOT
CHARGED TO ACCOUNT

| No. | $ | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Please examine immediately and report if incorrect. If no reply is received within 30 days the account will be considered correct.

BANK BALANCE SHOWN
ON THIS STATEMENT                          $ _____

## ADD

DEPOSITS NOT SHOWN
ON THIS STATEMENT
(IF ANY)                                   $ _____

## TOTAL                                   $ _____

## SUBTRACT—

CHECKS OUTSTANDING                         $ _____

## BALANCE                                 $ _____

SHOULD AGREE WITH YOUR CHECK BOOK BALANCE
AFTER DEDUCTING SERVICE CHARGE
(IF ANY) SHOWN ON THIS STATEMENT.

## NOTE

Please make sure you have entered in your
check register all automatic transactions,
such as charges and interest earned, shown
on the front of this statement.

**Member FDIC**


EQUAL HOUSING LENDER

**In Case of Errors or Questions About Your Electronic Transfers**
**TELEPHONE US AT: 1-800-682-3231 OR**
**WRITE US AT: P. O. BOX 7299, Little Rock, AR 72217-7299**

As soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem appeared.

1) Tell us your name and account number.
2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3) Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.  If we take more than ten business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.  This Regulation E error resolution notice is only applicable to consumer accounts. A consumer account is defined as an account used primarily for personal, family and household purposes.

**LINE OF CREDIT ACCOUNT INFORMATION**
Refer to the Line of Credit section of this statement. We figure the finance charge on your account by applying the periodic rate to the "Average Daily Balance" of your account (including current transactions). To get the "Average Daily Balance" we take the beginning balance of your account each day, add any new advances, and subtract any payments or credits.  This gives us the daily balance. We then add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance." We then multiply this Average Daily Balance by the daily periodic rate that has been established for your Account (shown on your statement along with the corresponding annual percentage rate) and then we multiply the product by the number of days in the billing cycle. The result is the dollar figure shown on your statement as "Finance Charge."  Finance Charges for advances on your line will begin to accrue on the date such advances are posted to your account and will continue until the date your account is paid in full. There is no grace period that would allow you to avoid a finance charge on your account.  On the closing date of your billing cycle, we will calculate the amount of your minimum payment due as per your original contract.  We figure this minimum payment by calculating a percentage of the New Balance of your account (less any amount you have written to us to dispute that we are currently investigating).  "New Balance" means the total outstanding  balance of your line on any cycle closing date which includes principal.  If the New Balance is less than or equal to the minimum payment required on your account, your minimum payment will be the entire New Balance (less any disputed amount), plus finance charges and other fees. If you have elected to make equal or level payments on your Account, your minimum payment will be calculated accordingly.  The amount of your minimum payment is disclosed to you on this statement and will be automatically deducted from your checking account.  If you wish to make payments in addition to those which are automatically deducted from your checking account, you may do so at any time. Payments may be mailed to the address shown on the statement, Attn.: Loan Accounting.  Additional payments which are mailed to that address will be credited to your account as of the date of receipt. Payment made at any branch office will be credited promptly to your account, but in no event later than 5 days after receipt.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR LINE OF CREDIT ACCOUNT STATEMENT**
If you think your bill is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address shown on the face of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.
In the letter, please give us the following information:
•  Your name and account number.
•  The dollar amount of the suspected error.
•  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item that you are not sure about.  You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we are investigating your question, we cannot report you as delinquent or take any action to collect the amount you question.

# IBERIABANK

---

**FREE BUSINESS CHECKING** (continued)          **Account Number \*\*\*\*\*\*\*7404**

**DAILY BALANCE INFORMATION**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 2/01 | 49,065.54 | 2/02 | 208,246.49 | 2/14 | 72,022.35 |



016117



# PURCHASE ORDER

4340 Lorraine Ave.
Naples FL 34104
23-503-1186

nikki@swfle.com

| | |
|---|---|
| **INVOICE NO.** | 365 |
| **DATE** | August 4, 2021 |
| **CUSTOMER ID** | |

**TO**

Chuck Preacher
Linmore LED
2360 S. Orange Ave.
Fresno, CA 93725
559-485-6010

**Ship To:**

Advanced Power Technologies
1500 N. Powerline Road
Pompano Beach FL 33069

| SALESPERSON | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| Chuck Peacher | BRIC | 50% Deposit / Balance before Shipping | 8/4/21 |

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| | Services Rendered: | | |
| 199 | LLSL1XL400WD50KT4UNVG2WHSF | $551.04 | 109,656.96 |
| 50 | LLSL1XL400WD50KT5UNVG2WHSF | $551.04 | 27,552.00 |
| 87 | LLSL1A8WH | $133.00 | 11,571.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| **SUBTOTAL** | $ | 148,779.96 |
| **Tax** | | 10,414.60 |
| **Deposit** | | 79,597.28 |
| **Total Due** | $ | 79,597.28 |



b 119603



**INVOICE**

| | |
|---|---|
| 4340 Lorraine Ave. | |
| Naples FL 34104 | |
| 239-503-1186 | |

nikki@swfle.com

| INVOICE NO. | 366 |
|---|---|
| DATE | August 10, 2021 |
| CUSTOMER ID | 100423APT |

TO    Devin Grandis, President/CEO
Advanced Power Technologies, LLC
1500 N. Powerline Rd.
Pompano Beach, FL 33069
954-861-6900

| SALESPERSON | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| | BRIC Material | N/A | 8/10/21 |

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| | Services Rendered: | | |
| 1 | Linmore Material for Bric | 159,194.56 | 159,194.56 |
| | | | $0.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| SUBTOTAL | $ | 159,194.56 |
| Deposit | | 79,597.28 |
| Balance | | 79,597.28 |
| Total Due | $ | 79,597.28 |





# Purchase Order

Advanced Power Technologies, LLC
1500 North Powerline Road
Pompano Beach FL 33069
(888) 278-8518

Purchase Order: PO00311734
Page: 1
Date: 7/30/2021
Buyer:



**Vendor**
2677
SOUTHWEST FLORIDA LIGHTING AND
ELECTRICAL
4340 LORRAINE AVE
NAPLES FL 34104

**Ship To**
BRIC
Advanced Power Technologies (BRIC)
1500 N. Powerline Rd.
Pompano Beach FL 33069
United States

| Our Purchase Order number must appear on all invoices, packages, and shipping documents. | Please verify that our Purchase Order has the correct pricing. If pricing is incorrect DO NOT PROCESS until you receive a revised PO from us. |
|---|---|

| Line/Rel | Qty Ordered | Item | Description | Promise Date | U/M | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|
| 1 | 199.00 | LLSL1XL400WD50KT4UNVG2WHSF | Linmore LED | 8/9/2021 | EA | 551.04 | 109,656.96 |
| 2 | 50.00 | LLSL1XL400WD50KT5UNVG2WHSF | Linmore LED | | EA | 551.04 | 27,552.00 |
| 3 | 87.00 | LLSL1A8WH | Linmore LED | | EA | 133.00 | 11,571.00 |
| 4 | 1.00 | 502 | Direct - Sales Tax Expense | | EA | 10,415.99 | 10,415.99 |

Additional Notes:

| Total | 159,195.950 |
|---|---|

Buyer/Purchasing Agent          Date                    Manager                    Date