IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| **DEVIN GRANDIS,** | ) | |
| | ) | |
| **Plaintiff**, | ) | CASE NO. 22-CV-61477-JB |
| v. | ) | |
| | ) | JUDGE JACQUELINE BECERRA |
| **BGIS GLOBAL INTEGRATED** | ) | |
| **SOLUTIONS US LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT BGIS'S MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

Defendant BGIS Global Integrated Solutions US LLC ("BGIS"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby moves this Court for entry of partial summary judgment against Plaintiff Devin Grandis ("Grandis") as to Counts I & II and summary judgment on Count V, including punitive damages (the "Motion").

## I.   __INTRODUCTION__

Only three claims remain in this case: Count I for breach of contract, Count II for Breach of the Implied Covenant of Good Faith and Fair Dealing, each regarding Grandis's employment agreement (collectively, the "Contract Claims"), and Count V for Conversion of the Facsimile Stamp. As part of BGIS's acquisition of substantially all the assets of Advanced Power Technologies ("APT")—Grandis's former company—BGIS hired Grandis as Senior Vice President and General Manager subject to the terms of an employment agreement. Grandis worked for BGIS for approximately three months before BGIS was forced to terminate his employment—for cause—due to his inability to conduct himself in a professional manner in front of both customers and employees and his failure to cooperate with BGIS's investigation of his radically unprofessional conduct. In the short time that Grandis worked at BGIS, Grandis (1) failed to perform his job duties and caused harm to the company by alienating a highly valued customer who demanded no further interaction with Grandis; (2) used inappropriate language regarding female employees; and as the final straw, (3) made inappropriate and harassing comments to a female employee, in front of another employee, while representing BGIS at a trade show. When BGIS investigated the female employee's allegations of Grandis's harassing conduct, Grandis lied in response to an investigative inquiry, thereby failing to cooperate with investigation.

Under the employment agreement, Grandis had three potential sources of income: base salary, bonus plan, and a conditional option to purchase stock in BGIS's ultimate parent company

(the "Stock Option"). Grandis was an at-will employee and could be terminated for any reason or no reason at all. If, however, BGIS terminated Grandis without "cause"—as defined in his employment agreement—he would be entitled to a severance payment based solely on his base salary—nothing else. In the Contract Claims, Grandis is now seeking damages based on BGIS's alleged failure to pay severance and failure to award the Stock Option. For the purposes of this Motion only, BGIS will assume *arguendo* that Grandis's entitlement to severance is a disputed issue. But under the express terms of his employment agreement, once his employment ended, for any reason, Grandis was not entitled to the Stock Option. And even if he was, the undisputed evidence shows that he has no damages. The Court should, therefore, grant BGIS partial summary judgment on the Contract Claims regarding the Stock Option.

In Count V, Grandis alleges that BGIS converted one of two identical rubber stamp bearing his signature (the "Stamp"). For several years prior to the asset acquisition, Grandis and others in his office used the Stamp to issue checks in the regular conduct of APT's day-to-day business. Because the operating bank account for APT was solely in Grandis's name, BGIS continued to use the Stamp to issue checks during a "transition period" after the acquisition, until BGIS could transition the operating account to a new bank account in BGIS's name. BGIS terminated Grandis's employment before it had transitioned the bank account. BGIS, therefore, retained the Stamp in order to continue to conduct its new business as it had before Grandis's termination until BGIS completed the transition to a new account. As defined in the Asset Purchase Agreement, the Stamp was a "Purchased Asset," acquired by BGIS as part of the asset acquisition, and therefore, had a right to retain possession of the Stamp. And even if it was not purchased, BGIS had the right to retain the Stamp during the transition period under a separate Transition Services Agreement governing the parties' rights and obligations during the "transition period." BGIS, therefore, had

a right to retain the Stamp after Grandis's termination, and there was no conversion. BGIS is entitled to summary judgment on Count V.

Finally, because no conversion occurred, there is no basis for Grandis's claim for punitive damages. Regardless, Grandis has no factual basis to assert that BGIS acted with the requisite conduct to satisfy his burden of proof by clear and convincing evidence. BGIS is, therefore, entitled to summary judgment on Grandis's baseless claim for punitive damages.

## II.    UNDISPUTED MATERIAL FACTS

### A.    BGIS acquired substantially all of assets of Advanced Power Technologies through an asset purchase agreement and related documents.

BGIS provides integrated facilities management, including energy and sustainability, asset management, and real estate services. SOF[1] ¶ 1. Advanced Power Technologies ("APT") was an established company—founded by Grandis—in the business of electrical, lighting, electrical vehicle charging stations, and energy management services. *Id*. at ¶ 2. BGIS was looking to expand its capabilities—and APT, on the surface, appeared to be a good fit. *Id*. at ¶ 1. To that end, BGIS entered into Asset Purchase Agreement ("APA") to acquire "substantially all of [APT]'s assets as used in the Business," which acquisition closed on December 31, 2021. *Id*. at ¶ 3.

The APA defined "Purchased Assets" with a listing of items, which included "all other assets of [APT] used predominantly in the conduct of the Business in the twelve (12) months prior to Closing." *Id.* at ¶ 34. Conversely, "Excluded Assets" includes "all other assets of [APT] not related to or required for the conduct of the Business." *Id.* at ¶ 35.

To avoid any disruption in the business after the Acquisition, and as required in the APA, APT and BGIS entered into a transition services agreement "to provide for the continuation of

---

[1] "SOF" refers to BGIS's Statement of Material Facts submitted pursuant to S.D.L.R. 56.1, filed contemporaneously herewith.

certain transitional services" (the "TSA"). *Id.* at ¶ 36. In the TSA, BGIS and Grandis agreed to "cooperate" in the migration of services during the transition period. *Id.* at ¶ 37. The TSA further required APT to "pay such third parties … until transitioned, so as to ensure the ongoing operations of the Business." *Id.* at ¶ 38. And regarding ensuring payment to third parties, there was no deadline or defined duration of the transition period. *Id.* at ¶ 39.

**B.  BGIS hired Grandis as part of an asset acquisition transaction.**

As part of the asset acquisition transaction (the "Acquisition"), BGIS hired Grandis as an executive pursuant to an employment agreement executed on December 24, 2021 (the "Employment Agreement"). *Id.* at ¶ 4. The final "form" of the Employment Agreement was attached as Schedule 4 to the APA. *Id.* at ¶ 5. Under the express terms of the APA, the Employment Agreement was an integrated agreement and

> supersede[d] all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no representations, warranties, conditions, covenants or other agreements, express or implied, collateral, statutory or otherwise, between the Parties … except as specifically set forth herein and therein.

*Id.* at ¶ 6.

The Employment Agreement defined an "Initial Period" of "January 1, 2022 and ending at the expiry of December 31, 2024." *Id.* at ¶ 12. Grandis was an "at-will" employee, such that "either [Grandis] or BGIS may terminate employment at any time and for any reason," and Grandis understood this. *Id.* at ¶ 13. If BGIS terminated Grandis "during the Initial Period" and "without Cause," then Grandis may be entitled to severance consisting ***only*** of "all amounts due in base salary for the remaining portion of the Initial Period." *Id.* at ¶ 14. It is undisputed that BGIS terminated Grandis on or about April 7, 2022. *Id.* at ¶ 15.

**C.  The Employment Agreement included the conditional grant of a stock option subject to the terms and conditions of a separate award agreement.**

Grandis's compensation consisted of a base salary of $300,000 per year and participation

in BGIS's bonus program. *Id.* at ¶ 7. Grandis also had the potential opportunity to obtain an option to purchase stock in BIFM Jersey TopCo Limited ("BIFM"), BGIS's ultimate parent company. That opportunity, however, was conditioned on approval by the BIFM Board:

> **Subject to Board approval**, you [Grandis] will be granted an **option to purchase** 500 shares of BIFM … , which will be evidenced by, and subject to the terms and conditions included in, an award agreement[2] in the form attached as Exhibit A."

(the "Stock Option"). *Id.* at ¶ 8 (emphasis added). The Board did not approve the award of the Stock Option to Grandis before BGIS terminated his employment. *Id.* at ¶ 9.

Under the plain and unambiguous language of the Employment Agreement, the Stock Option constituted an opportunity to "*purchase* … shares of BIFM" stock. And Grandis understood this was a potential opportunity to purchase shares, not to receive them as a gift. *Id.* at ¶ 10. When Grandis received the final Employment Agreement for his signature on December 21, 2021, he explicitly responded the next day that the Employment Agreement "states that *I can purchase the shares* as opposed to granting me the shares as agreed." *Id.* This shows Grandis understood the plain language of the Employment Agreement and signed it, thereby "accept[ing] this offer of employment as presented" and "agree[ing] to the contents." *Id.* at ¶ 11.

### D.  Grandis's ability to obtain the Stock Option or exercise the option to purchase shares ended with the termination of his employment.

The award of Stock Options is primarily governed by the three documents: BIFM Jersey Topco Limited 2019 Equity Incentive Plan (the "Plan"), BIFM Jersey Topco Limited Stockholders' Agreement, and the individual participants' Award Agreements, sometimes colloquially referred to as a stock option agreement or option agreement. *Id.* at ¶ 16. As prescribed in the Plan, the award of a Stock Option is further governed by an "Award Agreement setting forth

---

[2] "Award Agreement," as used herein, refers to the award agreement referenced in Grandis's Employment Agreement.

HAHN LOESER & PARKS LLP
5811 Pelican Bay Blvd., Suite 650   Naples, FL 34108   phone 239.254.2900

the terms and conditions applicable to the Participant's award." *Id.* at ¶ 17. Furthermore, "[b]y accepting and Award, the Participant agrees to the terms and conditions of .. the Stockholders' Agreement." *Id.* Although Grandis was never awarded the Stock Option, Paul Nizer—another former APT employee that became employed by BGIS—did receive an award. *Id.* at ¶ 18. As stated in the Employment Agreement, Grandis's Stock Option was "subject to the terms and conditions included in an award agreement in the form attached as Exhibit A." *Id.* Unfortunately, there was no award agreement form attached to the Employment Agreement. Nizer's Award Agreement, however, shows the form of the Award Agreement applicable to ***all BGIS employees***, which explicitly incorporates by reference the terms of the Plan. *Id.*

A participant in the Plan may not exercise any portion of the Stock Option—i.e., purchase shares of stock—until the "Stock Option or any portion thereof" becomes "vested." *Id.* at ¶ 19. As specified in the Award Agreement, portions of the Stock Option vest over a period of time, known as time-vesting. *Id.* at ¶ 20. Specifically, "the Stock Option will vest as to one-fourth (1/4) of the Shares subject to the Stock Option on each of the first four (4) anniversaries of the Vesting Commencement Date," as that date is specified in the Award Agreement. *Id.* In other words, if a participant is awarded an option to purchase 100 shares of stock, the participant would have to wait one year before he could exercise the option to purchase one-fourth of the available shares—or twenty-five (25) shares. The following year, another one-fourth would vest, and the participant could—if desired—purchase another twenty-five shares—or fifty (50) shares if the participant did not exercise his option for the first vested twenty-five (25) shares. And so on until the end of four years, at which time the participant could purchase all 100 shares if he so chooses.

If the participant's employment "ceases for any reason," any unvested portion of the Stock Option "will be immediately forfeited for no consideration due to the Participant." *Id.* at ¶ 21.

Furthermore, the "loss of existing or potential profit in an Award will not constitute damages in the event of the cessation of a Participant's Employment, for any reason." *Id.* at ¶ 22. Finally, if an employee is terminated "for any reason," BIFM had the right to "repurchase" the shares "for the Fair Market Value of such Shares on the date of repurchase." *Id.* at ¶ 23.

The Award Agreement specifies the "Exercise Price," sometime called the strike price, which is the price at which the participant may purchase shares once any portion of the Stock Option vests. *Id.* at ¶ 24. The Exercise Price is the "Fair Market Value of the Stock … as of the date of the grant." *Id.* At the time Grandis was hired, the Exercise Price was $2,085.95 Canadian dollars, and remained at the same Exercise Price through, at least, September 19, 2022—the date Mr. Nizer received his first Stock Option award. *Id.* at ¶ 25.

### E.   For nearly a decade, APT used the Stamp in the regular conduct of its business.

Starting in 1994, APT was a very small company, and because Grandis was the only authorized signer on APT's operating account, he was required to personally sign "all of [APT]'s checks." *Id.* at ¶ 26. As APT's business grew, Grandis was often out of the office, and in 2012, he "decided to use a Stamp to make necessary payments to suppliers and vendors when he was unavailable to sign checks." *Id.* at ¶ 27. Grandis had "two stamps ***created for APT***." *Id.* at ¶ 28.

Ana Lasaga worked at APT starting in 2002 as Comptroller and, in 2012, was promoted to Vice President of Finance where she managed APT's finances and cash flow. *Id.* at ¶ 29. Grandis acquired the Stamp specifically so Lasaga "could make payment in [his] absence." *Id.* at ¶ 30. At all times after Grandis acquired the Stamp, "it was the regular practice to use the Stamp to sign checks", "so that APT could conduct its business in the regular course." *Id.* at ¶ 31. By the end of 2021, when the Acquisition occurred, "when a check from APT required a signature to conduct its business, that was done using the Stamp." *Id.* at ¶ 32. And it was primarily Lasaga that was using

the Stamp to issue checks. *Id.* Because Grandis was often "away" and "not available," without the Stamp, there was a danger that the business would "stop running" if APT could not "make necessary payments to suppliers and vendors." *Id.* at ¶ 33.

**F.    During the transition period after the Acquisition, BGIS had the right to retain the Stamp to ensure the ongoing operations of the acquired business.**

Before the Acquisition, APT had an operating bank account at First Horizon Bank it used to make all payments to third parties. *Id.* at ¶ 40. After the acquisition, BGIS continued to use the First Horizon account "as its operating account during the transition period." *Id.* at ¶ 41. And Grandis "remained the only authorized signer on that First Horizon account." *Id.* at ¶ 42. As of April 7, 2022, the date of Grandis's termination, and thereafter, BGIS was still operating under the TSA, and BGIS was still using the First Horizon account as its operating account. *Id.* at ¶ 43. After the Acquisition, BGIS continued to use the Stamp for "the same things that it was used" before the closing—"paying bills" and "making sure the business is running smoothly." *Id.* at ¶ 44. Use of the Stamp was "part of the transition agreement [TSA]." *Id.* at ¶ 45. When Grandis left BGIS on April 7, 2022, he kept possession of one of his signature stamps. *Id.* at ¶ 58. After Grandis's termination, BGIS had "no way to pay bills from … First Horizon other than using [Grandis's] Stamp." *Id.* at ¶ 46. BGIS understood that, at a minimum, it was permitted to retain the Stamp under the TSA until BGIS completed the transition of the operating account away from APT's bank account. *Id.* at ¶ 45. BGIS returned the second Stamp to Grandis after BGIS transitioned away from the First Horizon account. *Id.* at ¶ 47.

## III.    PROCEDURAL HISTORY

On July 15, 2022, Grandis filed the original Complaint against BGIS and BIFM, asserting six causes of action: (1) Breach of Employment Agreement; (2) Breach of Implied Covenant of Good Faith and Fair Dealing Regarding the Employment Agreement; (3) Breach of Asset Purchase

Agreement ("APA"); (4) Breach of Implied Covenant of Good Faith and Fair Dealing Regarding the APA; (5) Civil Remedy for Criminal Activities Under FLA. Stat. § 772.104 [Forgery] (the "Civil RICO Claim"); and (6) Securities Fraud. *Id.* at ¶ 48. By December 16, 2002, after granting two motions to dismiss, only Claims I, II, and V remained in the case. *Id.* at ¶ 49.

On August 23, 2023, BGIS moved for judgement on the pleadings regarding Count V— the Civil RICO Claim—which was based on the theory that BGIS's ***use of the Stamp*** after Grandis's termination constituted forgery. *Id.* at ¶ 50. On December 20, 2023, the Court granted BGIS's motion, and dismissed Count V with leave to amend by January 3, 2024. *Id.* at ¶ 51. In the First Amended Complaint, filed on January 3, 2024, Grandis abandoned the Civil RICO Claim and replaced it with a new claim for conversion of the Stamp, including seeking punitive damages for the first time. *Id.* at ¶ 52.

On January 16, 2024, BGIS moved to dismiss the new Count V for failure to state a claim, primarily because most of the allegations—and all the purported damages—in the new conversion claim related to BGIS's alleged ***misuse*** of the Stamp after Grandis's termination, not the alleged conversion, i.e., unauthorized interference with his possessory rights. *Id.* at ¶ 53. On April 26, 2024, the Court granted in part and denied in part the motion to dismiss. *Id.* at ¶ 54.

In granting the motion in part, the Court recognized the distinction between BGIS's alleged misuse of the Stamp, i.e., forgery, and BGIS's alleged conversion of the Stamp. The original Count V (Civil RICO Claim) was premised solely on BGIS's purported misuse of the Stamp as acts of forgery and the alleged actual and consequential damages flowing therefrom. *Id.* at ¶ 55. The elements of Conversion, the new Count V, however, relate solely to BGIS's alleged unauthorized interference with Grandis's possessory rights in the Stamp, but not BGIS's use of the Stamp. *Id.* at ¶ 56]; *see also infra* at p. 15. Grandis, however, sought the same actual and consequential

damages in the new Conversion claim even though use of the Stamp is not an element of Conversion. SOF at ¶ 56.

Based on this legal distinction—conversion vs. use—the Court granted BGIS's motion to dismiss Count V "with prejudice to the extent it seeks actual and consequential damages," finding there was no "causal nexus" between the alleged damages and alleged conversion. *Id.* at ¶ 57. The Court denied the motion, however, "with respect to Plaintiff's conversion claim seeking nominal damages and any associated punitive damages." *Id.*

## IV.   LAW AND ARGUMENT

### A.   Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), citing Fed. R. Civ. P. 56. The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)). A factual dispute is "'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248; *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

Thus, the Court should grant summary judgment if the party who bears the burden of proof at trial fails to establish an essential element of his case. *Celotex,* 477 U.S. at 323. Such is the case here.

**B.**    **BGIS is entitled to partial summary judgment on Contract Claims because Grandis is not entitled to the Stock Option as a matter of law and, even if he were, he suffered no damages.**

Grandis contends that BGIS materially breached the Employment Agreement by "never giving Grandis an opportunity to acquire BIFM shares or paying him the difference between the current value of such shares and the … exercise price." [Amended Complaint (ECF No. 172) at ¶ 30.] Grandis's claim regarding the Stock Option fails as a matter of law because (1) the clear and unambiguous language in the Employment Agreement shows that the award of the Stock Option was conditional upon "Board approval," which never happened; and (2) because Grandis was an at-will employee, he sustained no damages for failure to obtain the Stock Option.

1.    Grandis is not entitled to the Stock Option because the BIFM Board never approved the award.

Grandis's entitlement to the Stock Option was expressly "subject to Board approval." SOF at ¶ 8. It is, however, undisputed that the BIFM's Board never approved the award of the Stock Option to Grandis. *Id*. at ¶ 9. Therefore, under the clear and unambiguous terms of the Employment Agreement, Grandis was never entitled to the Stock Option in the first place.

Where the terms of a contract are clear and unambiguous, the court may rule on them as a matter of law without resort to extrinsic evidence or rules of construction. *See Key v. Allstate Ins. Co.,* 90 F.3d 1546, 1548–49 (11th Cir.1996). As a general rule, contracts are to be read, understood, and interpreted according to the plain and ordinary meaning because "the plain meaning of the language used by the parties controls as the best indication of the parties' agreement." *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) (citation omitted). "The plain and unambiguous meanings are interpreted as they would be understood by the man-on-the-street."

*State Farm Mut. Auto. Ins. Co. v. Baldassini*, 909 F. Supp. 2d 1363, 1366–67 (S.D. Fla. 2012), *aff'd,* 545 Fed. Appx. 842 (11th Cir. 2013) (citations omitted).

*UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-CV-01704-EJD, 2017 WL 6405620 (N.D. Cal. Dec. 15, 2017) is highly instructive. In *UCAR*, the defendants—former employees—each had an employment agreement stating: "Subject to the approval of the Company's Board of Directors, you will be granted option to purchase ... shares ... of the Company's ... stock." *Id*. at *7. The former employees filed a counterclaim for breach of their employment agreements, alleging that UCAR "failed to grant [them] the stock options ... to which they are entitled." *Id*. at *4. UCAR moved to dismiss the claims, arguing that it "did not have a contractual obligation" to grant the stock options because "any stock options would be subject to approval of the Company's Board," which never happened. *Id*. at *7. Finding that the "grant of any stock ... is conditioned upon board approval," the court dismissed the breach-of-contract claims. *Id*. This is precisely the same situation presented here. Except not only did Grandis fail to allege that the BIFM Board approved the Stock Option, but it is undisputed that BIFM Board never approved the Stock Option.

BGIS anticipates that Grandis will argue that he was entitled to 500 shares of BIFM stock at no charge—as opposed to an option to purchase the shares at a specific price. But any such argument is disingenuous and directly conflicts with the plain language of the Employment Agreement. SOF at ¶¶ 8, 10 (emphasis added). And Grandis understood this plain language. Before signing the Employment Agreement, Grandis emailed Mark Marquis—BGIS's then-current President—and wrote that the Employment Agreement "states that I can ***purchase the shares*** as opposed to granting me the shares." *Id*. at ¶ 10. Regardless of Grandis's initial misunderstanding, he signed the Employment Agreement—as drafted—whereby he "agree[d] to the contents … and accept[ed] this offer of employment ***as presented***." *Id*. at ¶ 11. There is simply no credible

argument that Grandis thought he was entitled to 500 shares of BIFM stock for free. Regardless, the Employment Agreement is clear, unambiguous, and controlling.

The Stock Option was conditional upon Board approval, which never happened. And for the same reason that the *UCAR* court dismissed the contract claim, the Court should grant partial summary judgment in favor of BGIS on the Contract Claims regarding the Stock Option.

2.    <u>BGIS is entitled to partial summary judgment because Grandis has suffered no damages from a failure to obtain the Stock Option.</u>

Even if Grandis was entitled to the Stock Option—and he was not—the Contract Claims still fail in part because he suffered no damages. The award of Stock Options is primarily governed by the Plan, BIFM Jersey Topco Limited Stockholders' Agreement, as well as by terms and conditions of an Award Agreement. *Id.* at ¶¶ 16-18. Under the terms of these controlling documents, Grandis incurred no damages because (1) he could not have exercised any portion of the Stock Option to purchase shares of BIFM stock before his termination; and (2) even if he did exercise the Stock Option, BIFM could repurchase the shares at the same price Grandis purchased them—resulting in no financial gain to Grandis.

*First, Grandis could not exercise any portion of the Stock Option before his termination.* Even if BIFM approved the Stock Option award, he could not "exercise" any portion of the Stock Option—i.e., purchase shares of BIFM stock—until the Stock Option vested. *Id.* at ¶ 19. And no portion of the Stock Option vested until one year from the date that BIFM awarded the Stock Option. *Id.* at ¶ 20. Finally, pursuant to the Plan and the Award Agreement, all unvested portions of the Stock Option "will cease to be exercisable and will terminate," and "will be immediately forfeited for no consideration due to" Grandis upon termination of his employment "for any reason." *Id.* at ¶ 21. Therefore, even if BIFM approved the Stock Option on January 1, 2022—Grandis's first day as a BGIS employee—no portion of the Stock Option would vest until January

1, 2023—the "first … anniversar[y] of the Vesting Commencement Date." *Id.* at ¶ 20. But BGIS terminated Grandis's employment on April 7, 2021—at a time when no portion of the Stock Option would have vested. Therefore, the entirety of the Stock Option "immediately" terminated along with Grandis's employment, resulting in no damages to Grandis. *Id.* at ¶¶ 21-22.

*Second, even if Grandis could have exercised any portion of the Stock Option, BIFM could repurchase the shares upon his termination for no profit.* When Grandis became employed by BGIS, the Exercise Price, i.e., Fair Market Value, was $2,085.95 Canadian dollars, and remained at the same price through, at least, September 19, 2022. *Id.* at ¶ 25. As previously stated, upon the termination of Grandis's employment "***for any reason***," BIFM had the right to repurchase the shares from Grandis at the then-current Fair Market Value. *Id.* at ¶ 23. But the Fair Market Value of BIFM stock remained the same between the date BGIS hired Grandis and the date of his termination on April 7, 2022. Therefore, even if BIFM awarded the Stock Option (which it did not), and Grandis exercised any portion of the Stock Option before his termination (which he could not), he would have been required to sell back the shares to BIFM at the same price he purchased them, resulting in no financial gain. Thus, it is undisputed that Grandis has incurred no damages for any purported failure of BIFM to approve the Stock Option.

In *Kovar v. CSX Transp., Inc.*, 327 Fed. Appx. 197, 198 (11th Cir. 2009), the court reviewed a stock-option contract with a similar vesting term. The court observed that, "pursuant to the contract, options will not vest after an employee is terminated." *Id.* Therefore, "the unvested options that [the employee] had at the time of his termination would never vest, and he would never be entitled to exercise those options." *Id.* The *Kovar* court found that the employer did not breach any contractual duty to the employee by cancelling the unvested options and affirmed the district court's grant of summary judgment in favor of the employer. *Id.*

Because the Board never approved the award, Grandis never had a right to the Stock Option in the first instance. And even if he did, he could never exercise any portion of the Stock Option because no portion of the Stock Option had vested by the time his employment terminated. Finally, even if he could have exercised the Stock Option, upon his termination, BIFM would have repurchased the shares at the same price as Grandis purchased them. Each of these facts provides an independent basis for the Court to grant partial summary judgment on the Contract Claims.

### C.    Plaintiff's Conversion Claim fails as a matter of law.

Under Florida law, "conversion is an ***unauthorized*** act that deprives another of his or her property, permanently or for an indefinite period of time." *Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, No. 21-21573-CIV, 2022 WL 2348642 (S.D. Fla. May 26, 2022) (emphasis added). But BGIS's retention of the Stamp after Grandis's termination was not "unauthorized." It was entirely proper for two reasons: (1) BGIS acquired ownership of the Stamp as part of the asset Acquisition; and, regardless, (2) under the TSA, BGIS was entitled to retain the Stamp during the transition period to ensure the ongoing operations of the business.

### 1.    BGIS acquired the Stamp as part of the asset Acquisition and, therefore, did not convert it.

The APA plainly defines the "Purchased Assets" to include "all other assets of [APT] used predominantly in the conduct of the Business in the twelve (12) months prior to Closing." SOF at ¶ 34. Grandis was the only authorized signer on APT's operating account. *Id.* at ¶ 26. It is undisputed that Grandis had two Stamps "***created for APT***" so that Lasaga "could make payments in [his] absence." *Id.* at ¶¶ 28, 30. Otherwise, the business could "stop running" if Grandis was away and APT could not "make necessary payments to suppliers and vendors." *Id*. at ¶ 33.

It is similarly beyond dispute that between 2012 and December 2021, when the Acquisition closed, it was APT's "regular practice to use the Stamp" "so that APT could conduct its business

in the regular course." *Id.* at ¶ 31. When a "check from APT required a signature to conduct its business, that was done using the Stamp." *Id.* at ¶ 32.

Based on this evidence, it is beyond dispute that APT used the Stamp predominantly in the conduct of its business for several years right up to the closing date. The Stamp, therefore, falls squarely within the definition of a Purchased Asset. The elements of conversion require that the defendant deprive the plaintiff of "his or her property." *Ryder Truck Rental, Inc.*, 2022 WL 2348642 at *27. BGIS could not have deprived Grandis of "his property," because the stamp belonged to BGIS through the Acquisition. On this basis alone, BGIS is entitled to judgment as a matter of law on the Conversion claim.

> 2.   Under the TSA, BGIS was entitled to retain the Stamp at least until BGIS transitioned the operating account to a its own account.

Assuming *arguendo* that BGIS did not acquire the Stamp as part of the Acquisition, BGIS was contractually entitled to retain the Stamp during the transition period until BGIS transitioned the First Horizon operating account to a BGIS-owned account.

The entire purpose of the TSA was to "provide for the continuation of certain transitional services," ensuring the smooth and uninterrupted conduct of BGIS's new business after the acquisition. SOF at ¶ 36. To that end, under the TSA, Grandis was required to "pay such third parties … until transitioned, so as to ensure the ongoing operations of the Business." *Id.* at ¶ 38. Relevant to this Motion, Grandis was required to ensure payment to third parties, like suppliers and vendors, until the transition of the First Horizon account was complete.

While Grandis was working at BGIS, he satisfied this obligation through BGIS's use of the Stamp for "paying bills" and "making sure the business is running smoothly." *Id.* at ¶ 44. The Stamp was "part of the transition agreement." *Id.* at ¶ 45. At the time of Grandis's termination, BGIS was still operating under the TSA and still using the First Horizon account as the operating

account. *Id.* at ¶ 43. Although the TSA did allow for deadlines to complete certain transition services, there was no deadline in the TSA regarding the transition away from the First Horizon account. *Id.* ¶ 39.

After Grandis's termination on April 7, 2022, he would not be available to personally sign checks for BGIS, and BGIS had "no way to pay bills from … First Horizon other than using [Grandis's] Stamp." *Id.* at ¶ 46. At bottom, the ***only way*** Grandis could satisfy this contractual obligation under the TSA, would be through use of the Stamp. Therefore, in accord with Grandis's requirements under the TSA, BGIS properly retained the Stamp after Grandis's termination until BGIS completed its transition away from the First Horizon account, after which BGIS returned the Stamp to Grandis in early August 2022. *Id.* at 47.

Because BGIS had the legal right to retain the Stamp through the transition period, Grandis's conversion claim fails as a matter of law. *CC Air Servs., Inc. v. Schlesinger*, No. 05 80543 CIV RYSKAMP, 2006 WL 3694639, at *3 (S.D. Fla. Dec. 13, 2006) ("If Defendant were authorized to use [Plaintiff's property] the conversion claim fails.").

      **D.**     <u>**Plaintiff is not entitled to punitive damages as a matter of law.**</u>

Even if there is sufficient evidence that BGIS converted the Stamp, Grandis is not entitled to punitive damages unless he can prove by "clear and convincing evidence" that BGIS converted the Stamp with "intentional conduct or gross negligence." Fl. Stat. § 768.72(2). Grandis has no such evidence.

Because a plaintiff "must meet the heightened standard of clear and convincing evidence in proving a heightened level of culpability," "[d]efeating a motion for summary judgment on a claim for punitive damages is an extraordinarily high bar." *Nunez v. Coloplast Corp.*, 461 F.Supp.3d 1260, 1269 (S.D.Fla., 2020). "[P]roof of an intentional tort by itself cannot support an

award for punitive damages." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1536 (11th Cir. 1985); *see also CCP Harbour Island, LLC v. Manor at Harbour Island, LLC*, 373 So.3d 18, 29 (Fla.App. 2 Dist., 2023). And "[t]he general rule is that exemplary or punitive damages are given solely as punishment where torts are committed with fraud, actual malice, deliberate violence, or oppression or with such gross negligence as to indicate a wanton disregard of the rights of others." *Gen. Fin. Corp. of Jacksonville v. Sexton*, 155 So. 2d 159, 162 (Fla. Dist. Ct. App. 1963); *see also Tambourine Comércio Internacional S.A. v. Solowsky*, 2007 WL 9701095, at *11 (S.D.Fla., 2007), quoting *Ciamar Marcy, Inc. v. Monteiro Da Costa*, 508 So. 2d 1282, 1284 (Fla. 3rd DCA 1987) (same). As such, "[Punitive] damages "are recoverable only against defendants whose wrongful conduct is particularly reprehensible." *G.M. Brod & Co*., 759 F.2d at 1536; *see also CCP Harbour Island, LLC*, So.3d at 29, *quoting Weinstein Design Grp., Inc. v. Fielder*, 884 So. 2d 990, 1001 (Fla. 4th DCA 2004).

1.    <u>There is no evidence that BGIS acted with "intentional conduct."</u>

Under Florida law, "intentional conduct" to mean that a "defendant had actual knowledge of [1] the wrongfulness of the conduct and [2] the high probability that injury or damage to the claimant would result and, despite that knowledge, [3] intentionally pursued that course of conduct, [4] resulting in injury or damage." Fl. Stat. § 768.72(2)(a). Grandis's claim for punitive damages fails because he has no evidence—let alone clear and convincing evidence—to support elements one, two, and four.

<u>First</u>, as shown above, BGIS acquired the Stamp as part of the asset Acquisition, or, at least, had the right to possess the Stamp during the transition period. Even assuming *arguendo* that BGIS did not have the right to retain the Stamp, there is ***no evidence*** that BGIS had actual knowledge of the wrongfulness of retaining the Stamp to use it in the regular course of business,

just as it did before Grandis's termination. <u>Second</u>, there is no evidence that BGIS had knowledge of ***any*** potential damage to Grandis, let alone that a "high probability" of damage "would result" from BGIS's retention of the Stamp. Grandis had two identical Stamps, one of which Grandis kept upon his termination. SOF ¶¶ 28, 58. Therefore, even if BGIS retained one Stamp, Grandis still "had a stamp he could use" if needed. *Id.* at ¶ 58. It is, therefore, undisputed that there is zero evidence of a "high probability" that Grandis would suffer any injury because BGIS retained one of the Stamps. <u>Finally</u>, as the Court has already found that Grandis, in fact, suffered no damages due to BGIS's purported conversion of the Stamp and dismissed the conversion claim **"WITH PREJUDICE** to the extent it seeks actual and consequential damages." SOF ¶ 57 (emphasis in original). As Grandis as suffered no damages, he is not—as a matter of law—entitled to punitive damages for "intentional conduct."

2.  <u>There is no evidence that BGIS acted with "gross negligence."</u>

"Gross negligence" means conduct that "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." 768.72(2)(b). As described above, BGIS' retention of the stamp cannot be gross negligence as BGIS had no actual knowledge of the wrongfulness of its actions. BGIS always reasonably believed it was entitled to possess the stamp, either as an asset acquired as part of the asset Acquisition or with authorization under the TSA. *See supra* at 15-17.

\*   \*   \*

Grandis can proffer no evidence, let alone clear and convincing evidence, that the alleged conversion the stamp was done with intentional conduct or gross negligence as defined by the statute.

## V.    CONCLUSION

There is only one matter for trial—whether Grandis was terminated "for cause" as that term is defined in the Employment Agreement. There is no question, factually, what happened, and the interpretation of the Employment Agreement is for this Court to decide. When read according to its plain meaning, the language of the Employment Agreement confirms that Grandis's claims for anything more than unpaid base salary fail as a matter of law. The Court should, likewise, dismiss Grandis's conversion claim as it is both legally and factually baseless. But even if the Court disagrees, because BGIS had a good faith justification to retain Grandis's Stamp there are no grounds for an award of punitive damages.

## VI.    REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), BGIS respectfully request that the Court hear oral argument on the instant Motion and set a hearing. BGIS desires a hearing because the issues and factual background are complex, and resolution of the instant motion may significantly focus the trial in this case. BGIS estimates a total time of forty (40) minutes for oral argument, with each side allotted fifteen (15) minutes for their initial presentation and ten (10) minutes for rebuttal.

Respectfully Submitted,

HAHN LOESER & PARKS LLP
5811 Pelican Bay Boulevard, Suite 650
Naples, Florida 34108
Phone: (239) 254-2900
Fax: (239) 254-2947

200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Fax: (216) 241-2824

By:    */s/ Allison B. Christensen*
Allison B. Christensen, ESQ.

Florida Bar No. 103515

By:    */s/ Michael B. Pascoe*
MICHAEL B. PASCOE, ESQ.
Ohio Bar No. *80899 (pro hac vice admission)*
ROBERT B. PORT, ESQ.
Ohio Bar No. 78329 (*pro hac vice admission*)
*achristensen@hahnlaw.com*
*mpascoe@hahnlaw.com*
*rport@hahnlaw.com*

*Attorneys for Defendant BGIS Global Integrated Solutions US, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 26, 2024, a true and correct copy of the foregoing was filed via the CM/ECF system, which will serve a true and correct copy of the same to all attorneys of record.

By: */s/ Michael Pascoe*
    Michael Pascoe, ESQ.

HAHN LOESER & PARKS LLP
5811 Pelican Bay Blvd., Suite 650   Naples, FL 34108   phone 239.254.2900

21

18008327.2